**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MAYAGÜEZ S.A.,

                    Plaintiff,

          -against-

CITIGROUP, INC.,
CITIBANK, N.A.,

                Defendants.

Case No. 16 Civ. 06788 (PGG)

---

## <u>FIRST AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

PARTIES .............................................................................................................4

JURISDICTION AND VENUE .............................................................................4

GOVERNING LAW ..............................................................................................4

FACTUAL BACKGROUND .................................................................................5

I.     Mayagüez's Business ..................................................................................5

     A.    Mayagüez Earns Revenues in Its Local Colombian Currency and  U.S. Dollars ..................................................................................................5

     B.    The Foreign Exchange Rate Between U.S. Dollars and Colombian Pesos Affects Mayagüez's Revenues and Profits ................................6

II.    Mayagüez's Hedging ..................................................................................8

     A.    Currency Forwards Protect Companies from Exchange Rate Fluctuations............8

     B.    For Almost a Decade, Mayagüez Successfully Hedged with "Plain Vanilla" Currency Forwards ......................................................9

     C.    Mayagüez Has Hedged with Citibank Since 2009 ...............................10

     D.    In 2012 and 2013, Citigroup Lied to Mayagüez and Fraudulently Induced Mayagüez to Enter into the Complex and Lopsided Currency Trades That Resulted in Tens of Millions of Dollars in Losses for Mayagüez ......................12

          1.    The Citibank Colombia Employees Who Sold the Currency Trades to Mayagüez Were Also Citigroup Employees ..................12

          2.    Citigroup Marketed an Unnecessarily Complex and Exotic Currency Forward to Mayagüez ......................................14

          3.    Citigroup Made False and Misleading Statements to Mayagüez and Omitted Material Information from Mayagüez in Order to Induce Mayagüez to Enter into the Currency Trades ...........................17

          4.    Citigroup Had Complete Information About Mayagüez's Finances and Hedging Requirements..........................................24

     E.    Currency Trades ..................................................................................24

          1.    November 2013:  The First Currency Trade....................................24

          2.    July 2014:  The Second Currency Trade....................................28

          3.    January 2015:  The Third Currency Trade....................................31

               (a)    Terms of the January 2015 Currency Trade .....................32

               (b)    Citigroup's False Promises ..............................................34

i

(c)     Mayagüez's Demands that Citigroup Keep its Promises ............... 36

(d)     Outcome of the January 2015 Currency Trade ............................ 37

III.   Mayagüez's Harm Resulting from Defendants' Misrepresentations and Material Omissions ........................................................................................................ 37

FIRST CAUSE OF ACTION ................................................................................... 40

SECOND (ALTERNATIVE) CAUSE OF ACTION ................................................ 42

THIRD (ALTERNATIVE) CAUSE OF ACTION .................................................... 43

FOURTH (ALTERNATIVE) CAUSE OF ACTION ................................................ 45

FIFTH CAUSE OF ACTION ................................................................................... 46

SIXTH (ALTERNATIVE) CAUSE OF ACTION .................................................... 48

SEVENTH (ALTERNATIVE) CAUSE OF ACTION .............................................. 51

EIGHTH CAUSE OF ACTION ............................................................................... 54

NINTH (ALTERNATIVE) CAUSE OF ACTION .................................................... 55

TENTH (ALTERNATIVE) CAUSE OF ACTION ................................................... 56

ELEVENTH CAUSE OF ACTION .......................................................................... 58

PRAYER FOR RELIEF ........................................................................................... 60

Plaintiff Mayagüez S.A. ("Mayagüez" or "Plaintiff"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, brings this First Amended Complaint against Citigroup, Inc. ("Citigroup") and Citibank, N.A. ("Citibank," and together with Citigroup, the "Defendants"), and respectfully alleges as follows:

## INTRODUCTION

1.      Mayagüez, a Colombian sugar producer, brings this action against Citibank and Citigroup for fraud under Colombian law (and in the alternative, fraudulent inducement and fraudulent concealment under New York law), negligence under Colombian law (and in the alternative, negligent misrepresentation under New York law), acting in bad faith under Colombian law, promissory estoppel and unjust enrichment under New York law (in the alternative to the Colombian fraud, negligence and bad faith claims) and unconscionability under New York law.

2.      This case involves complicated currency transactions.  It is yet another case of a big global financial institution (Citibank and its parent, Citigroup) selling highly complex financial instruments to an unsophisticated client, where those instruments created enormous risk for the client at virtually no risk to the financial institution.  In doing so, Defendants disregarded the client's needs and knowingly misrepresented the terms and risks of the instruments, thereby placing the client at risk of unlimited losses with significant potential gain to Defendants.  By contrast, the potential gain to the client, and the potential loss to Defendants, were strictly limited to approximately USD 450,000-USD 1,500,000 for the various trades.

3.      While Defendants represented that the transactions would hedge currency risk, they in fact did the exact opposite:  they dramatically increased the currency risk to Mayagüez.

4.      The tremendous risk to Mayagüez very quickly ripened into tremendous economic loss.  Mayagüez, a company with annual export revenues of $28 million for 2013 and

$19 million in 2014, incurred more than $64 million in losses. Mayagüez never would have entered into these transactions—which were supposed to maintain the value of its United States dollar ("USD") export revenues—had it known they could result in losses more than twice the size of its annual export revenues.

5. Defendants are, and in fact portrayed themselves as, experts in structured currency products, including products designed to protect exporters of agricultural products from currency fluctuations. Mayagüez entered into a series of complex, proprietary currency transactions (as amended from time to time, the "Currency Trades") because Defendants assured it that these instruments would safely protect Mayagüez against significant losses that could result from the depreciation of the value of USD revenues relative to the Colombian peso ("COP"). In fact, these instruments did not protect Mayagüez, instead exposing Mayagüez to tremendous risk and ultimately tremendous harm while protecting only Defendants themselves.

6. Mayagüez trusted and relied on Defendants to assist it in managing currency fluctuation risks. Defendants misused that trust and reliance and induced Mayagüez to enter into the Currency Trades by: (i) falsely stating that the Currency Trades safely satisfied—and were the best solution for—Mayagüez's currency hedging needs and that Defendants would restructure or amend the Currency Trades when it was best for Mayagüez; (ii) fraudulently omitting that the Currency Trades created unlimited exposure for Mayagüez, while allowing Defendants to profit substantially; and (iii) falsely promising to amend the Currency Trades to protect Mayagüez from the tremendous harm it incurred.

7. The terms of the Currency Trades were weighted unreasonably and egregiously in Defendants' favor. In addition to creating unlimited risk to Mayagüez with very limited potential gain, one of the trades had a strike price below the then-current exchange rate, which

meant that unless the exchange rate fell immediately and dramatically, Mayagüez would be exposed to enormous losses. It would make no sense for any reasonable business to enter into the Currency Trades based on their terms. Mayagüez did so only because it relied upon the false statements, omissions and promises of Defendants.

8.      The Currency Trades ultimately were entered into and governed by the terms of the International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement (the "ISDA Master Agreement"), dated as of July 28, 2009, between Citibank and Mayagüez, including the Schedule thereto.[1]  The Currency Trades were documented through confirmations that were part of the ISDA Master Agreement (the "Confirmations").

9.      As a result of changes in currency exchange rates, the substantial risks Defendants foisted on their client have exploded into significant liabilities. Defendants knew that the product they were selling was inappropriate to meet the client's needs and might well cause the client serious financial harm; yet they proceeded anyway, disregarding these risks and reaping large profits. Instead of selling protection, Defendants sold a time bomb.

10.     Defendants have acted in bad faith to defraud Mayagüez, have failed to comply with their special relationship obligations relating to the Currency Trades and have been unjustly enriched by their misconduct. Defendants must be held accountable.

11.     This Court should order Defendants to refund all sums paid by Mayagüez in connection with the Currency Trades.

---

[1]      ISDA publishes standard forms or templates of financial contracts governing swaps and derivatives. The ISDA Master Agreement is based on the standard form published by ISDA.

## PARTIES

12.    Mayagüez is a corporation organized under the laws of Colombia and operating primarily in Colombia.  Mayagüez produces and refines cane sugar, and a primary source of its export revenue is the sale of sugar in U.S. dollars, including in the United States.

13.    Defendant Citigroup is a multinational banking and financial services corporation incorporated in Delaware.  Citigroup maintains a principal place of business at 399 Park Avenue, New York, New York.  Citigroup conducts business across the United States.

14.    Defendant Citibank is a national banking association chartered under the laws of the United States, with its principal place of business at 399 Park Avenue, New York, New York.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the Defendants because under Section 13(b)(i)(2) of the ISDA Master Agreement and Part 4(h) of the Schedule thereto, each of the parties submitted to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City "with respect to any suit, action or proceeding relating to any dispute arising out of or in connection with" the ISDA Master Agreement.

16.    Venue is proper in this Court because pursuant to CPLR § 501 and Section 13(b)(ii) of the ISDA Master Agreement, Citibank has contractually agreed to venue in New York County.

## GOVERNING LAW

17.    Under Section 13(a) of the ISDA Master Agreement and Part 4(h) of the Schedule thereto, the ISDA Master Agreement will be governed and construed in accordance with New York law.  Accordingly, only contractual claims related to the ISDA Master Agreement are

governed by New York law.  Non-contractual claims related to or in connection with the ISDA Master Agreement may be subject to other laws, including foreign law.

18.     Because (i) Mayagüez is a Colombian company; (ii) Defendants made fraudulent representations, concealed material information and made false promises to Mayagüez, including through in-person meetings and telephone conferences in Colombia; (iii) Defendants acted, at least in part, through employees located in Colombia, as further described below; and (iv) Mayagüez suffered injury in Colombia, Defendants committed several non-contractual violations of Colombian law.  Specifically, Defendants engaged in fraud and negligence under Colombian law and acted in bad faith under Colombian law, causing tens of millions of dollars in damages to Mayagüez and as such, are liable to Mayagüez under Colombian law.

## FACTUAL BACKGROUND

**I.      Mayagüez's Business**

**A.      Mayagüez Earns Revenues in Its Local Colombian Currency and U.S. Dollars**

19.     Mayagüez is a small Colombian sugar manufacturing company.  The company grows the sugar cane and then either (i) refines it into sugar for consumption; or (ii) uses the sugar to produce ethanol.  Mayagüez sells sugar in Colombia and abroad, including in the United States, but sells ethanol only in Colombia.

20.     Mayagüez's operations are in Colombia.  Therefore, most of Mayagüez's expenses are incurred in COP, the local currency.  For instance, Mayagüez pays its employees and suppliers in COP.

21.     Mayagüez sells its products both in Colombia and outside Colombia, including in the United States.  It therefore earns money in both COP and USD.  Specifically, when

Mayagüez sells sugar outside of Colombia, it always receives payment in USD and, conversely, when Mayagüez sells sugar and ethanol in Colombia, it generally receives payment in COP.

22.     In 2013, Mayagüez's gross revenue for domestic sales was approximately COP 345 billion (approximately USD 180 million (at the average USD/COP exchange rate in 2013)) and for exports was approximately USD 28 million.

23.     In 2014, Mayagüez's gross revenue for domestic sales was approximately COP 389 billion (approximately USD 162 million (at the average USD/COP exchange rate in 2014)) and for exports was approximately USD 19 million.

**B.     The Foreign Exchange Rate Between U.S. Dollars and Colombian Pesos Affects Mayagüez's Revenues and Profits**

24.     Given that Mayagüez exports approximately 20% of its refined sugar production, a significant proportion of its revenues is booked in U.S. dollars.  However, for purposes of its financial statements, Mayagüez reports its revenues, expenses and profits in Colombian pesos. Accordingly, any fluctuations in the exchange rate between U.S. dollars and Colombian pesos will impact Mayagüez's reported revenues and profits.

25.     For example, assume that on Day 1, (i) Mayagüez sells 1,000 pounds of sugar each to a buyer in Colombia and a buyer in the United States at a price of COP 200 per pound; (ii) the exchange rate on Day 1 is COP 200 to USD 1; and (iii) Mayagüez's expenses amount to COP 5,000.  On Day 1, the buyer in Colombia therefore pays COP 200,000 (1,000 pounds of sugar at 200 COP per pound), whereas the buyer in the United States pays USD 1,000 (i.e., COP 200,000 divided by COP 200).  In turn, for Day 1, Mayagüez will book (i) COP 200,000 and USD 1,000 in revenues; and (ii) COP 5,000 in expenses.

26.     If the entirety of the USD revenues are converted to Colombian pesos—the currency in which its financial statements are booked and reported—then Mayagüez will have

earned a total of COP 400,000 on Day 1: (i) COP 200,000 earned from the sale in Colombia; and (ii) COP 200,000 (i.e., USD 1,000 x COP 200) from the sale in the United States. After deducting COP 5,000 in expenses, Mayagüez's profits on Day 1 will be COP 395,000.

27. However, assume that on Day 2, the value of the U.S. dollar weakens against the Colombian peso,[2] such that the exchange rate changes from COP 200 to USD 1 to COP 100 to USD 1. In other words, on Day 2, it is more expensive to buy Colombian pesos using U.S. dollars (i.e., the U.S. dollar becomes weaker relative to the peso). Whereas on Day 1, one U.S. dollar would purchase 200 COP, on Day 2, one U.S. dollar would buy only 100 COP.

28. If the entirety of Day 1's USD revenues are converted to Colombian pesos on Day 2, then Mayagüez's revenues will total COP 300,000: (i) COP 200,000 from the sale in Colombia; and (ii) COP 100,000 from the sale in the United States (i.e., USD 1,000 x COP 100). After deducting COP 5,000 in expenses, the total profit will, in turn, be COP 295,000.

29. In summary, the change in the COP to USD exchange rate on Day 2 results in net reductions for both revenues and, in turn, profits for Mayagüez. Specifically, under these examples, Mayagüez's revenues would decrease from COP 400,000 to COP 300,000 and its profits would decrease from COP 395,000 to COP 295,000.

30. Similarly, fluctuations in the exchange rate can adversely impact Mayagüez's overall volume of sales in the United States. Specifically, a decrease in the value of the Colombian peso against the U.S. dollar would likely lead to an increase in exports from Colombia to the United States because it would be cheaper for U.S. consumers to buy Colombian products. Therefore, for instance, if the exchange rate changed from COP 100 to

---

[2]     If the U.S. dollar weakens against the Colombian peso, the result is that the U.S. dollar can buy fewer Colombian pesos.

USD 1 to COP 500 to USD 1, then a U.S. consumer could buy significantly more goods priced in Colombian pesos using the same amount of U.S. dollars.

31.     Indeed, certain governments intentionally devalue their local currency against the U.S. dollar as a means to increase exports from their home country.  Devaluing a currency typically helps local industries that rely heavily on exports, such as those in the agricultural industry—including Mayagüez.

32.     In light of the significant impact that changes in the exchange rate between the Colombian peso and U.S. dollar can have on revenues and, in turn, profits, it is imperative for Mayagüez to protect itself from wide fluctuations in the USD/COP exchange rate.  Mayagüez has therefore historically used tools to hedge, or manage, that risk.  These hedging tools included, primarily, "plain vanilla" currency forwards.

II.     **Mayagüez's Hedging**

A.     **Currency Forwards Protect Companies from Exchange Rate Fluctuations**

33.     Currency forwards are contracts between a seller and buyer of a currency whereby the buyer agrees to purchase a certain amount of a specified currency at some point in the future at a particular exchange rate, with the purchase price payable in a second specified currency, regardless of the actual exchange rate on that future date.  As such, currency forwards hedge the risk of fluctuations in the foreign exchange market.

34.     Specifically, the most typical and simplest currency forward operates as follows. The seller and buyer of a currency forward agree that at some point in the future (e.g., in six months) they will exchange two currencies at a specific exchange rate (the "strike price").  The amount of currency that the seller agrees to sell at the strike price is called the "notional value." For example, on January 1, a U.S. bank may agree to purchase USD 1 million (the "notional value") from a Colombian company in exchange for Colombian pesos at an exchange rate of

COP 2,000 to USD 1 (i.e., the strike price) on June 30 (i.e., the date that the currency forward matures and the two amounts are exchanged).

35.     The currency forward described above is known as a "plain vanilla" currency forward, and it is sold by all major foreign exchange dealers.  As further described below, some major dealers, including Citibank, also offer their clients other types of complex currency forwards and options.

### B.     For Almost a Decade, Mayagüez Successfully Hedged with "Plain Vanilla" Currency Forwards

36.     Mayagüez has hedged against fluctuations in the exchange rate between the Colombian peso and U.S. dollar since at least 2006.

37.     From in or around 2002 until 2006, the USD/COP exchange rate decreased from approximately COP 3,000 to USD 1 to approximately COP 2,000 to USD 1.  For a Colombian business exporting agricultural products to the United States, that change in the exchange rate resulted in reduced COP revenues.

38.     From approximately 2006 to 2013, Mayagüez primarily hedged through currency forwards with the Colombian government.  Specifically, in approximately 2006, due to the USD/COP exchange rate decrease described above, the Colombian government, through a government-owned bank, launched a program to incentivize companies in the agricultural sector to hedge against currency risks by offering "plain vanilla" currency forwards with more favorable exchange rates than the currency forwards offered by private financial institutions.  In 2010, however, the Colombian government lowered the exchange rates it offered in its currency forwards (e.g., from COP 1,800 per USD 1 to COP 1,600 per USD 1).

39.     From approximately 2006 to 2013, Mayagüez also hedged through currency forwards with private Colombian financial institutions, including Citibank, S.A., Citibank's Colombian subsidiary ("Citibank Colombia").

40.     Mayagüez's currency forwards, with the Colombian government and with private financial institutions, were "plain vanilla" currency forwards.  These forward contracts typically involved notional values of approximately USD 2 million with terms of 6 to 12 months.

41.     Before 2014, Mayagüez hedged with these "plain vanilla" currency forwards, which are the most simple and straightforward in the market.  From approximately 2006 to 2013, Mayagüez relied on the expertise of the Colombian government and sophisticated Colombian financial institutions to enter into these "plain vanilla" currency forwards that protected Mayagüez from the significant risks that currency fluctuations present for Colombian exporters.

42.     Before 2014, Mayagüez successfully hedged its foreign currency risks and was protected when the USD weakened against the COP;  without the forwards, Mayagüez's USD revenues otherwise would have purchased fewer COP.

43.     Mayagüez is not a financial institution and is unfamiliar with complex financial operations and instruments.   It is a small Colombian sugar company, which relies on sophisticated banks to manage financial risks, such as fluctuations in the USD/COP exchange rate.

**C.     Mayagüez Has Hedged with Citibank Since 2009**

44.     In anticipation of entering into currency forwards with Citibank Colombia and Citibank, Mayagüez executed contracts that set forth the terms governing any future currency forwards.

45.     <u>First</u>, on July 28, 2009, in anticipation of possibly entering into currency forwards with Citibank, Mayagüez executed the ISDA Master Agreement.

46.     The ISDA Master Agreement sets forth the general terms that govern specific currency forwards between Citibank and Mayagüez, the terms of which are typically set out in documents confirming the terms of the currency forward, including the notional value, exchange rate and term ("Confirmations").

47.     The ISDA Master Agreement: (i) is governed by New York law; and (ii) states that any controversies arising out of or in connection with it are subject to the exclusive jurisdiction of New York courts.  Importantly, under Part 4(m) of the Schedule to the ISDA Master Agreement, Mayagüez agreed that it would not rely on Citibank for investment advice but that "information and explanations related to the terms and conditions [of a Currency Trade] shall not be considered investment advice."  As further described below, from in or around 2012 to 2015, Citigroup and Citibank provided to Mayagüez information and explanations about the terms and conditions of the Currency Trades that were false and/or misleading, inducing Mayagüez to enter into highly detrimental Currency Trades.  Defendants' false and misleading information and explanations are not "investment advice" and Mayagüez could, and did, rely on such information and explanations when entering into the Currency Trades.

48.     Second, on January 3, 2011, Mayagüez entered into a master agreement (equivalent to the ISDA Master Agreement) with Citibank Colombia (the "2011 Citibank Colombia Agreement").  This agreement set forth the terms that would govern specific currency forwards between Citibank Colombia and Mayagüez.  The 2011 Citibank Colombia Agreement: (i) is governed by Colombian law; and (ii) states that any controversies related to it, including in regard to any specific currency forwards between the parties, are subject to arbitration in Colombia.

**D.      In 2012 and 2013, Citigroup Lied to Mayagüez and Fraudulently Induced Mayagüez to Enter into the Complex and Lopsided Currency Trades That Resulted in Tens of Millions of Dollars in Losses for Mayagüez**

49.      In 2012, Citigroup, Citibank and Citibank Colombia employees offered Mayagüez a complex currency forward transaction called *collar de compensacion limitada* (or "limited compensation collar").  Based on the misrepresentations and material omissions of these employees about the terms and risks, Mayagüez entered into the Currency Trades.

50.      By 2012, Mayagüez had been Citibank's client for approximately three years.  As a result of this long-term relationship, Mayagüez came to trust and rely on Citibank and on its financial expertise, especially in regard to currency hedging transactions.

51.      As further described below, all the Citibank Colombia employees who sold the Currency Trades to Mayagüez were also employees of a division of Citigroup called the Institutional Clients Group.

1.      *The Citibank Colombia Employees Who Sold the Currency Trades to Mayagüez Were Also Citigroup Employees*

52.      The Institutional Clients Group (the "ICG"), a division of Citigroup that is based in New York, New York, is responsible for servicing high net worth public and private sector clients, including by "globally" providing them with "tailored" financial products.[3]

53.      The ICG has operations in over 100 countries and conducts business both directly and through Citigroup's subsidiaries, including Citibank and Citibank Colombia.  The ICG is one of two main business divisions at Citigroup, the other being Global Consumer Banking, which focuses on retail banking.   One of ICG's principal services is to provide financial

---

[3]      http://icg.citi.com/icg/about_us/

"solutions" to "top-tier multi-national clients around the globe," including derivatives and structured products.[4]

54.    The ICG is currently divided into the following five groups:  (i) Capital Markets Origination ("CMO"); (ii) Corporate and Investment Banking ("CIB"); (iii) Markets and Securities Services ("MSS" or "MKTS"); (iv) Treasury and Trade Solutions ("TTS"); and (v) Citi Private Bank ("CPB").   ICG employees with responsibility for foreign exchange derivatives and structured products work both in the CIB and MKTS groups.

55.    Michael Corbat, Citigroup's chief executive officer ("CEO"), who is ultimately responsible for ICG's global operations, is based in New York, New York.  Mr. Corbat's direct subordinate, James A. Forese, is the global head of the ICG and is also based in New York.

56.    The ICG's website advertises its CIB division as having expertise on "complex financial issues" including "derivatives and structured products" focused on "the world's preeminent corporations and financial institutions," providing "innovative cross-border and local financial solutions tailored to the specific needs of our [Citigroup's] clients."[5]

57.    The ICG's website advertises its MKTS division as having "product knowledge" and "on-the-ground local markets expertise," providing "world-class products and financing solutions for corporations, governments, and institutional and retail investors" including by addressing "their [Citigroup's clients'] needs with products in all major currencies, sectors and geographies."[6]

58.    The ICG promotes itself as highly technical and sophisticated, with expertise on all ranges of complex financial issues, focused mainly on servicing large corporations, financial

---

[4]      http://icg.citi.com/icg/corporateandinvestmentbanking/corp_comm_bank.html

[5]      http://icg.citi.com/icg/corporateandinvestmentbanking/corp_comm_bank.html

[6]      http://icg.citi.com/icg/global_markets/index.jsp

institutions, and governments.  Because ICG offers complex financial "solutions," it does not purport to focus on small, unsophisticated, and inexperienced foreign clients.  However, as further described below, Citigroup's ICG targeted Mayagüez, an unsophisticated and inexperienced foreign client, and lured it into entering devastatingly harmful complex currency hedging instruments.

59.     Citigroup's Latin America CEO is Jane Fraser ("Ms. Fraser"). [7]  Ms. Fraser reports to Mr. Corbat.  Bernardo Chacin ("Mr. Chacin") is the Citi Country Officer ("CCO") of Citibank Colombia and reports directly to Ms. Fraser.[8]

60.     All the Citibank Colombia employees who sold the Currency Trades to Mayagüez (i) used "@citi.com" email addresses; (ii) had electronic signatures with stamps bearing the terms "[ICG-CIB]" and "[ICG-MKTS]," which identified them as ICG employees; and (iii) used Citigroup's servers to correspond with Mayagüez, including to convince Mayagüez to purchase the Currency Trades.

61.     All the Citibank Colombia employees who sold the Currency Trades to Mayagüez reported to and were subordinates of Mr. Chacin, who reports to Citigroup's highest executives, including Ms. Fraser, Citigroup's Latin America CEO.[9]

>           2.      *Citigroup Marketed an Unnecessarily Complex and Exotic Currency*
>                   *Forward to Mayagüez*

62.     In 2012, Citigroup began marketing the Currency Trades—specifically, limited compensation collars—to Mayagüez.  In Citigroup's own words, these Currency Trades are an

---

[7]        http://www.citigroup.com/citi/about/leaders/jane-fraser-bio.html

[8]        http://www.citi.com/latinamerica/en/about-us/leaders/bernardo-chacin-bio.html

[9]        http://www.citi.com/latinamerica/en/about-us/leaders/bernardo-chacin-bio.html

"exotic product."[10]  Prior to Citigroup employees initiating their marketing efforts in regard to the Currency Trades, Mayagüez was not familiar with this type of complex currency transaction.

63.    During the summer of 2012, ICG representatives and Mayagüez had a series of discussions concerning Mayagüez's currency hedging requirements.  Rather than providing Mayagüez with a perfectly suitable "plain vanilla" hedge—which the company had been using successfully since approximately 2006—Citigroup elected to promote a product purportedly tailored to Mayagüez's specific needs:  the Currency Trades.

64.    With the Currency Trades, Citigroup offered to purchase a capped amount of Mayagüez's U.S. dollars at a better (i.e., higher) strike price (expressed in COP) than other banks.  In return for this limited benefit, Citigroup demanded: (i) that the trade have a term significantly longer than six to twelve months; and (ii) more importantly, that if the USD strengthened so that the actual USD/COP exchange rate exceeded the strike price, Mayagüez would have to make monthly payments to Citigroup.

65.    These payments had no limit and depended on the difference between the actual exchange rate and the strike price.  The Currency Trades therefore provided very limited protection to Mayagüez (due to the cap on the amount of USD Citigroup agreed to buy), but significant potential payments by Mayagüez to Citigroup.

66.    Citigroup offered to purchase a capped amount of U.S. dollars from Mayagüez at the strike price of approximately COP 2,000 to USD 1 after a period of 20 to 36 months.  At that time, other banks were offering "plain vanilla" currency forwards with a strike price of approximately COP 1,800 to USD 1 and terms of 6 to 12 months.  In return for obtaining the marginally higher strike price, Mayagüez unknowingly agreed to make monthly payments that,

---

[10]    https://www.citibank.com.co/resources/pdf/Citibank_ColombiaSA_12.pdf

as a practical matter, constituted a harsh penalty in the event the actual USD/COP exchange rate exceeded the strike price.

67.     Specifically, Mayagüez unknowingly agreed that if USD 1 would buy more than COP 2,000, Mayagüez would pay to Citigroup on each of the monthly payout dates, the difference between COP 2,000 and the actual exchange rate, multiplied by the USD 2 million notional amount of the Currency Trade.

68.     Thus, for example, with a contractual strike price of COP 2,000 to USD 1, if the exchange rate was COP 2,500 to USD 1 on a monthly payout date, rather than potentially benefitting from this currency shift (by being able to buy COP 2,500 with each of its USD), Mayagüez instead suffered serious harm, as it was required to pay to Citigroup the difference between (x) the amount of COP Mayagüez could purchase with USD 2 million at an exchange rate of COP 2,000 to USD 1 (2 million * 2,000 = 4 billion COP), and (y) the amount of COP Mayagüez could purchase with USD 2 million at an exchange rate of COP 2,500 to USD 1 (2 million * 2,500 = 5 billion COP).   The difference, 1 billion COP, converted to USD at the exchange rate of COP 2,500 to USD 1, is USD 400,000, representing the *monthly* payment Mayagüez would be required to pay to Citigroup at that exchange rate.  A currency shift that otherwise could have worked very much to the benefit of Mayagüez as an exporter to the United States—i.e., a shift that permitted each USD of export revenues to purchase substantially more COP—actually worked against Mayagüez and caused Mayagüez to incur substantial liabilities.

69.     Under the Citigroup offer, if either Citigroup or Mayagüez wanted to cancel the Currency Trades before their term elapsed, they had to value them according to the exchange rates Citigroup projected through the remainder of the term and pay the entire value to the other party (the "mark to market value" or "MTM value").

16

70.     In addition to the asymmetrical economic terms described above, the Currency Trades were inappropriate for Mayagüez due to their duration of approximately two to three years.  A company such as Mayagüez that is engaged in producing and exporting sugar cannot accurately predict its long-term currency hedging requirements.  At best, the company can project, with relative accuracy, its currency hedging requirements for approximately six months, and certainly no more than twelve months, into the future, based on factors such as current commodity prices and volume of customer orders.  Due to volatility in the commodities markets and uncertainties related to customer orders, however, hedging requirements beyond this six to twelve month window are impossible to accurately predict.  Accordingly, a long-term Currency Trade was inappropriate for a company such as Mayagüez.  Indeed, between 2006 and 2013, the terms of Mayagüez's "plain vanilla" currency forwards never exceeded 12 months.

   3.    *Citigroup Made False and Misleading Statements to Mayagüez and Omitted Material Information from Mayagüez in Order to Induce Mayagüez to Enter into the Currency Trades*

71.     Mayagüez agreed to the Currency Trades based on Citigroup's false and misleading representations and material omissions regarding (i) the suitability of the Currency Trades to address Mayagüez's hedging needs; (ii) alleged cost savings that the Currency Trades would provide; and (iii) the terms and risks of the Currency Trades.  It is clear that a "plain vanilla" currency hedge would have been ideal to address Mayagüez's hedging needs.[11] However, Citigroup had something else in mind.

---

[11]     For example, Mayagüez could have purchased a plain vanilla call option to use USD to purchase COP at a specified price at a specified future date.  If the cost of COP had increased dramatically, Mayagüez would be protected against loss.  If the cost of COP had decreased, Mayagüez could simply let the call option expire and benefit from the fact that its USD revenues could then purchase more COP.  Alternatively, Mayagüez could have entered a forward contract pursuant to which it agreed to purchase an amount of COP at a set price in USD, at a set date in the future.  Both of these alternatives provide protection against USD currency depreciation against the COP, with limited attendant risks.

17

72.     Citigroup employees made false and misleading representations to Mayagüez and omitted material information that Citigroup had a duty to disclose to Mayagüez in, among other things, emails and during in-person meetings with Mayagüez executives.

73.     <u>First</u>, for example, in an email dated August 8, 2012 and timestamped at 11:11 AM (the "August 2012 Email"), Maria Isabel Botero ("Ms. Botero") from Citigroup wrote the following to Mayagüez:  "Nowadays, the sugar factories have decided to diversify, and *they use not only forwards but also other types of structured products composed of options* like the ones illustrated in the attached document."  August 2012 Email (emphasis added).

74.     Ms. Botero further stated in the August 2012 Email:  "The idea is that, given the large number of structured products available, we look at them one by one in order to figure out which one of those would attract your attention more than others, and is in line with your needs for hedging and what you are looking for depending on budget, and confirm a variable portfolio that gives a better rate than the one that could be obtained in a regular forward."

75.     <u>Second</u>, attached to the August 2012 Email was a presentation dated August 2012 and entitled *COP\USD: Ideas de Cobertura* (or "COP\USD: Coverage Ideas") (the "August 2012 Presentation").  The August 2012 Presentation contained further statements that were false and misleading about the terms and risks of the proposed trades and designed to persuade Mayagüez to purchase a financial product ill-suited to its needs.

76.     For example, page 8 of the August 2012 Presentation contains the following statement:  "In the event of an unexpected currency depreciation, *this structured product allows the sugar factory to be covered by the highest coverage rate that any other type of financial product could offer, therefore reducing the claims for compensation against the company*" (emphasis added).

18

77.     Similarly, page 13 of the August 2012 Presentation contains further false and misleading statements about the terms of the Currency Trades.   This page has the heading "Conclusions" and states as follows:

- "The hedging costs will be better than the ones in a regular forward."

- "The proposed structured products reduce the risk of exposure to which the sugar factory is exposed due to the fluctuation of market factors such as the exchange rates."

- "The financial instrument proposed in this presentation allows the sugar factory to enjoy certain hedging benefits for its portion that is not yet covered and still exposed."

78.     The fact is that all of this information and explanations about the terms of the Currency Trades were false and/or misleading.   Citigroup knew that the "hedging costs" for Mayagüez would not "be better than the ones in a regular forward" because the Currency Trades were designed by Defendants solely for the purpose of generating higher profits to Citigroup than would "plain vanilla" forwards and options, while exposing Mayagüez to unlimited risk. Thus, Citigroup knew that the "hedging costs" for Mayagüez were unlimited.   Likewise, the Currency Trades neither "reduce[d] the risk of exposure" nor provided any "hedging benefits" for Mayagüez.   To the contrary, the Currency Trades were the worst possible hedging alternative for Mayagüez because the Currency Trades exposed Mayagüez to bankruptcy.

79.     Citigroup never mentioned in this presentation the unlimited risks to Mayagüez if the COP weakened against the USD.

80.     In the August 2012 Email, which accompanied the August 2012 Presentation, Ms. Botero, who reported to executives within Citigroup, (i) used an "@citi.com" email address; (ii) had an electronic signature bearing a stamp that read "[ICG-MKTS]," identifying her as an employee of the ICG; and (iii) used Citigroup's servers to correspond with Mayagüez.

81.     In the August 2012 Email and the August 2012 Presentation, Citigroup falsely represented that the Currency Trades were: (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.  Equally important, in the August 2012 Email and the August 2012 Presentation, Defendants fraudulently omitted that the Currency Trades: (i) created unlimited exposure for Mayagüez; and (ii) were very profitable for Citibank.

82.     Third, in an email dated December 7, 2012 and timestamped 12:16 PM (the "December 2012 Email"), Juan Santiago Montejo ("Mr. Montejo") from Citibank's Derivatives and Structuring Division sent to Mayagüez an Excel spreadsheet (the "December 2012 Spreadsheet") with calculations reflecting how different currency transactions would work, including the Currency Trades.  Mr. Montejo's email signature contained a stamp showing that Citigroup was considered by Global Finance to be the "Best Derivatives Provider in LATAM."

83.     Neither in the December 2012 Email nor in the December 2012 Spreadsheet did Citigroup explain the unlimited exposure Mayagüez would suffer by entering into the Currency Trades.  In contrast, Mr. Montejo deceptively named the December 2012 Spreadsheet, "Risk Management."  Accordingly, the December 2012 Email and the December 2012 Spreadsheet, fraudulently omitted that the Currency Trades: (i) created unlimited exposure for Mayagüez; and (ii) had the potential to generate much more substantial earnings for Citigroup than would "plain vanilla" forwards and options.

84.     Fourth, in an email dated October 21, 2013 and timestamped at 1:25 PM (the "October 2013 Email"), David Polania ("Mr. Polania") from Citibank's Derivatives and Structuring Division sent a presentation to Mayagüez (the "October 2013 Presentation").  The October 2013 Presentation also contained statements that were false and misleading about the

terms and risks of the Currency Trades.  For example, in the opening slide, the October 2013 Presentation provided an overview of the risks and omitted stating that Mayagüez would have to make unlimited payments to Citigroup if the COP lost value against the USD.

85.    Further,  the October 2013 Presentation inaccurately stated that payments  in the Currency Trades operated "exactly" as payments in "plain vanilla" forwards.  In fact, the Currency Trades served the opposite purpose of "plain vanilla" forwards.  The Currency Trades did not satisfy any Mayagüez hedging need, created unlimited exposure to Mayagüez, and generated large profits for Defendants.

86.    Accordingly, in the October 2013 Email and the October 2013 Presentation, Citigroup falsely represented that the Currency Trades were: (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.  Equally important, Citigroup fraudulently omitted that the Currency Trades: (i) created unlimited exposure for Mayagüez; and (ii) had the potential to generate much more substantial earnings for Citigroup than would "plain vanilla" forwards and options.

87.    Fifth, in 2012 and 2013, a group from Citigroup met and corresponded with Mayagüez to offer Mayagüez the Currency Trades ("2012 and 2013 Offers").  The Citigroup representatives included (i) Citibank Colombia relationship manager Lina Bermudez ("Ms. Bermudez"); (ii) Mr. Montejo, Ms. Bermudez's supervisor at Citibank Colombia; and (iii) Mr. Polania, who, as described above, worked in Citibank's Derivatives and Structuring Division. This team told Mayagüez that other companies in the sugar industry, including the largest sugar company in Colombia, were utilizing transactions such as the Currency Trades and represented to Mayagüez that the Currency Trades were ideal for Mayagüez and that the Currency Trades were the best available hedging alternative.  At no time did this team disclose to Mayagüez that

by entering into the Currency Trades Mayagüez would face unlimited exposure while Citigroup stood to profit significantly.

88.     In the 2012 and 2013 Offers, Citigroup falsely represented that the Currency Trades were: (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.  Equally important, Citigroup fraudulently omitted that the Currency Trades: (i) created unlimited exposure for Mayagüez; and (ii) had the potential to generate very significant earnings for Defendants.

89.     In connection with the 2012 and 2013 Offers, Ms. Bermudez, who reported to Citigroup executives: (i) used an "@citi.com" email address; (ii) had an electronic signature with a stamp bearing "[ICG-CIB]," which identified her as an employee of the ICG; and (iii) used Citigroup's servers to correspond with Mayagüez.

90.     In connection with the 2012 and 2013 Offers, Messrs. Polania and Montejo, who reported to Citigroup executives: (i) used "@citi.com" email addresses; (ii) had electronic signatures with stamps bearing "[ICG-MKTS]," identifying them as employees of the ICG; and (iii) used Citigroup's servers to correspond with Mayagüez.

91.     The statements in the (i) August 2012 Email; (ii) August 2012 Presentation; (iii) December 2012 Email; (iv) December 2012 Spreadsheet; (v) October 2013 Email; (vi) October 2013 Presentation; and (vii) 2012 and 2013 Offers, among other statements, were false and misleading.  Citigroup had designed the Currency Trades and aggressively marketed them, including to Mayagüez.  Citigroup knew its representations to Mayagüez were false and misleading.

92.     Additionally, had Mayagüez understood the Currency Trades, it would not have entered into them.  Citigroup, in contrast to Mayagüez, knew that the Currency Trades were

detrimental to Mayagüez at the time it made its representations to Mayagüez, and thus, it was apparent to Citigroup that Mayagüez was mistaken regarding its understanding of the trades and risks of the Currency Trades.  Citigroup had superior knowledge regarding the Currency Trades because it structured the Currency Trades, and thus, Citigroup had a duty to disclose to Mayagüez that the Currency Trades: (i) created unlimited exposure for Mayagüez; and (ii) had the potential to generate much more substantial earnings for Citigroup than would "plain vanilla" forwards and options.

93.    The fact is that the Currency Trades (and their terms and risks) were impossible to understand for an unsophisticated client such as Mayagüez.  As an example of the financial complexity underlying these exotic products, this is the formula that Defendants designed to calculate the payments resulting from the Currency Trades.

$$\frac{Target\,Amount - \sum_{t-1}^{N-1} Max\big[0, StrikePrice_t - SpotFix_t\big]}{Max\big[0, StrikePrice_N - SpotFix_N\big]}$$

94.    Defendants took advantage of the financial and mathematical complexity of the product they structured, to fraudulently induce Mayagüez into entering the Currency Trades.

95.    On information and belief, the Currency Trades produced much bigger profits to Citigroup than would have more suitable "plain vanilla" currency forwards or options.  Citigroup never disclosed to Mayagüez this inherent conflict of interest in marketing the Currency Trades to Mayagüez.

96.    In reliance on the false and misleading representations and material omissions, including about the terms and risks of the Currency Trades in the (i) August 2012 Email; (ii) August 2012 Presentation; (iii) December 2012 Email; (iv) December 2012 Spreadsheet;

(v) October 2013 Email; (vi) October 2013 Presentation; and (vii) 2012 and 2013 Offers, among others, Mayagüez agreed to enter into the Currency Trades.  Given Citigroup's proclaimed expertise concerning structured currency products, Mayagüez's reliance was reasonable. Unfortunately, Citigroup opted to exploit this reliance and trust.  Mayagüez has suffered significant financial harm as a result.

           4.    *Citigroup Had Complete Information About Mayagüez's Finances and Hedging Requirements*

97.    From at least 2012 to 2016, Citigroup requested and received from Mayagüez detailed financial information including its audited financial statements, data regarding sales and exports and financial projections.

98.    With this information, Citigroup knew full well that the Currency Trades could threaten the existence of Mayagüez because the potential liability vastly exceeded the potential benefit.

**E.    Currency Trades**

99.    Based on the misrepresentations and material omissions of Citigroup, Mayagüez entered into its first Currency Trade with Citigroup, through Citibank Colombia, in November 2013, followed by the second and third Currency Trades in July 2014 and January 2015, respectively.

           1.    *November 2013:  The First Currency Trade*

100.    In November 2013, Citibank Colombia and Mayagüez entered into the first Currency Trade (the "November 2013 Currency Trade"), the terms of which were set forth in a Confirmation dated November 6, 2013 (the "November 2013 Confirmation").  As set forth in Table A, Citibank Colombia agreed to a trade with Mayagüez with a notional value of USD 2 million, a strike price of COP 2,020 per USD 1 and a term of twenty-two months.

24

| Table A:  November 2013 Currency Trade | | |
|---|---|---|
| Term:  January 2014 – October 2015 | | |
| Notional Value for Mayagüez and Citibank Colombia | Strike Price | Maximum Amount Payable to Mayagüez |
| USD 2 million | COP 2,020 | COP 900 million (c. USD 450,000) |

101.    The November 2013 Currency Trade had a list of monthly dates (collectively, the "Payout Dates") on which Citibank Colombia had to purchase U.S. dollars from Mayagüez at the strike price of COP 2,020 per USD 1, regardless of whether the actual exchange rate was lower in COP terms.

102.    However, this trade imposed a cap on the amount of Colombian pesos that Mayagüez could receive from Citibank:  a maximum of COP 900 million (or approximately USD 450,000 at the strike price).  If and when Citibank had paid to Mayagüez this maximum amount, the Currency Trade would be terminated and Mayagüez would have no more hedging protection.  Thus, the potential gain to Mayagüez, and the potential risk to Citibank, was strictly limited to approximately USD 450,000.

103.    At the time, other financial institutions offered Mayagüez "plain vanilla" currency forwards with strike prices of approximately COP 1,800 to USD 1 and a term of 6 to 12 months. In return for the marginally higher strike price offered by Citibank Colombia (i.e., COP 2,020 per USD 1 instead of COP 1,800 per USD 1), Mayagüez unknowingly agreed—based on Citigroup' misrepresentations—to pay what essentially amounted to a substantial penalty if the actual USD/COP exchange rate ever exceeded the strike price (i.e., if the number of Colombian pesos required to purchase one U.S. dollar exceeded COP 2,020).  Specifically, Mayagüez agreed that if the USD/COP exchange rate was greater than COP 2,020 to USD 1 on any monthly Payout Date, Mayagüez would pay to Citibank Colombia on each such Payout Date the

difference between the COP 2,020 strike price and the actual USD/COP exchange rate, multiplied by the notional amount of USD 2 million.

104.   The notional value of this Currency Trade was USD 2 million.  On any Payout Date where the exchange rate was COP 2,520 to USD 1, Mayagüez was obligated to pay Citibank Colombia approximately USD 400,000 (2 million * COP 500 = COP 1 billion; COP 1 billion / 2,520 = USD 400,000).

105.   Furthermore, the November 2013 Currency Trade imposed no limit on how much Mayagüez had to pay to Citibank Colombia.  Thus, while Mayagüez's protection against a decline in the USD/COP exchange rate was limited to COP 900 million (approximately USD 450,000), if the USD/COP exchange rate went the other way, Mayagüez's payment obligations to Citibank Colombia were unlimited through the end of the term of the Currency Trade (i.e., October 30, 2015).

106.   In addition, the November 2013 Currency Trade contained a provision stating that, if either Citibank Colombia or Mayagüez wanted to cancel the trade before its term elapsed, they had to value it according to the exchange rates Citibank Colombia projected through the remainder of the term (i.e., through October 2015) and pay the MTM value to the other party.

107.   During the first quarter of 2014, the USD/COP exchange rate was on the rise (i.e., the number of Colombian pesos required to purchase one U.S. dollar was increasing) which would cause Mayagüez to pay to Citibank Colombia the difference between the COP 2,020 strike price and the actual USD/COP exchange rate, multiplied by the notional amount of USD 2 million.

108.   To continue providing hedging protection to Mayagüez and to prevent that Mayagüez start making payments to Citibank Colombia, Citigroup offered to amend the

November 2013 Currency Trade thrice.  Specifically, Ms. Bermudez, Mr. Montejo and Mr. Polania stated that they would amend the November 2013 Currency Trade as necessary—mainly, by increasing the strike price—to prevent Mayagüez from incurring any losses by having to make payments to Citibank Colombia.

109.    The first amendment, on February 13, 2014, (i) increased the strike price to a floor of COP 2,060 and a ceiling of COP 2,090 (for one half of the trade) and to COP 2,075 (for the other half of the trade); and (ii) extended the end of the term of the trade to December 2016. The second amendment, on February 26, 2014, increased the strike price to COP 2,073 (for one half of the trade) and maintained the strike price at COP 2,075 (for the other half of the trade). The third amendment, on April 16 2014, (i) increased the maximum amount payable to Mayagüez from COP 900 million to approximately COP 1,656 million (approximately USD 850,000); and (ii) maintained the strike price at COP 2,075 from February to June 2014 but decreased it to COP 2,060 from July 2014 to December 2016 (for one half of the trade) and maintained the strike price at COP 2,073 from February to June 2014 and decreased it to COP 2,060 from July 2014 to December 2016 (for the other half of the trade).

110.    Table B reflects the amendments to the November 2013 Currency Trade.

| Table B:  Amendments to November 2013 Currency Trade | | |
|---|---|---|
| **Original Trade** | | |
| **Term:  January 2014 – October 2015** | | |
| **Notional Value for Mayagüez and Citibank Colombia** | **Strike Price** | **Maximum Amount Payable to Mayagüez** |
| USD 2 million | COP 2,020 | COP 900 million |
| **February 13, 2014 Amendment** | | |
| **Term:  January 2014 – December 2016** | | |
| **Notional Value for Mayagüez and Citibank Colombia** | **Strike Price** | **Maximum Amount Payable to Mayagüez** |
| USD 1 million | COP 2,060 (floor) – COP 2,090 | COP 450 million |

| Table B:  Amendments to November 2013 Currency Trade | | |
|---|---|---|
| | (ceiling) | |
| USD 1 million | COP 2,075 | COP 450 million |
| **February 26, 2014 Amendment** | | |
| **Term:  January 2014 – December 2016** | | |
| **Notional Value for Mayagüez and Citibank Colombia** | **Strike Price** | **Maximum Amount Payable to Mayagüez** |
| USD 1 million | COP 2,073 | COP 450 million |
| USD 1 million | COP 2,075 | COP 450 million |
| **April 16, 2014 Amendment** | | |
| **Term:  January 2014 – December 2016** | | |
| **Notional Value for Mayagüez and Citibank Colombia** | **Strike Price** | **Maximum Amount Payable to Mayagüez** |
| USD 1 million | COP 2,073 (Feb. 2014-June 2014) and COP 2,060 (July 2014-Dec. 2016) | COP 829.78 million |
| USD 1 million | COP 2,075 (Feb. 2014-June 2014) and COP 2,060 (July 2014-Dec. 2016) | COP 825.78 million |

111.    The November 2013 Currency Trade elapsed prior to the end of its term, in December 2016, because Citibank Colombia had paid to Mayagüez the maximum amount of COP 1,656 million.

2.    *July 2014:  The Second Currency Trade*

112.    In July 2014, Citibank Colombia and Mayagüez entered into the second Currency Trade (the "July 2014 Currency Trade"), the terms of which were set forth in a Confirmation dated July 31, 2014 (the "July 2014 Confirmation").   Table C indicates the salient terms of the second Currency Trade.

| Table C:  July 2014 Currency Trade |
|---|

| Table C:  July 2014 Currency Trade | | | |
|---|---|---|---|
| Term:  September 2014 – July 2017 | | | |
| Notional Value for Mayagüez | Notional Value for Citibank Colombia | Strike Price | Maximum Payable Amount to Mayagüez |
| USD 3 million | USD 6 million | COP 2,090 | COP 3,000 million |

113.    The terms of the July 2014 Currency Trade were materially different from those of the November 2013 Currency Trade in that the July 2014 Currency Trade was substantially longer and also forced Mayagüez to be twice as exposed to Citibank Colombia.

114.    The July 2014 Currency Trade, like the November 2013 Currency Trade, had Payout Dates every month, but under the July 2014 Currency Trade, the Payout Dates ran through July 2017, for a longer term of two years and eleven months.  On each Payout Date, Citibank Colombia had to purchase U.S. dollars from Mayagüez at a strike price of COP 2,090, based on a Mayagüez notional amount of USD 3 million.

115.    Over the term of the July 2014 Currency Trade, Mayagüez was permitted to receive a maximum of COP 3,000 million (approximately USD 1.5 million) from Citibank Colombia.  As with the November 2013 Currency Trade, if and when during the term Mayagüez reached the maximum it could purchase, the Currency Trade would terminate.  As a result, the potential gain to Mayagüez, and the potential risk to Citibank, was strictly limited to approximately USD 1.5 million.

116.    At the time, other financial institutions were offering Mayagüez "plain vanilla" currency forwards with strike prices of approximately COP 1,800 and terms of 6 to 12 months.

117.    Under the July 2014 Currency Trade, if the exchange rate on a Payout Date exceeded COP 2,090 per USD 1, Mayagüez had to pay Citibank Colombia the difference between the actual exchange rate and the strike price of COP 2,090, multiplied by USD 6 million

(the Citibank Colombia notional amount).  The unfairness of this trade to Mayagüez is highlighted by the fact that the notional amount applicable to currency fluctuations that were favorable to Citibank Colombia (USD 6 million) was *double* the notional amount for fluctuations favorable to Mayagüez (USD 3 million).  Citibank Colombia did not explain the reason for this new, asymmetrical term, how it functioned as part of the trade or the serious financial harm it could cause Mayagüez.

118.    Further, the July 2014 Currency Trade imposed no limit on how much Mayagüez had to pay to Citibank Colombia.  Thus, while Mayagüez's protection against a decline in the value of the USD against the COP was limited to approximately USD 1.5 million, Mayagüez's payment obligations if the USD strengthened against the COP were unlimited, were calculated based on a higher notional amount of USD 6 million and could increase until the end of the term of the trade.

119.    In addition, the July 2014 Currency Trade contained a provision stating that if either Citigroup Colombia or Mayagüez wanted to cancel the trade before its term elapsed, they had to value future obligations arising from the trade according to the exchange rates Citibank Colombia projected through the term (i.e., through July 2017) and pay the MTM value to the other party.

120.    During the second half of 2014, the USD strengthened against the COP (i.e., the number of Colombian pesos that could be purchased by one U.S. dollar increased).  In or around October 2014, Mayagüez expressed its concerns to Citibank Colombia that it now understood that it would have to start making payments to Citibank Colombia on the Payout Dates if the exchange rate exceeded COP 2,090.

121.    From November to December 2014, the exchange rate between Colombian pesos and U.S. dollars did, in fact, exceed COP 2,090 to USD 1, hitting a high of COP 2,446.35 during that period.  As a result, in November and December 2014, Mayagüez made total payments to Citibank Colombia of approximately USD 670,000.  More importantly, under the July 2014 Currency Trade, by January 2015, on a mark-to-market basis, Mayagüez owed approximately USD 34.9 million to Citibank Colombia.  These losses, caused by a financial product that was supposed to protect the value of Mayagüez's USD export revenues, dwarfed the company's export revenues for 2014.

122.    Therefore, by January 2015, Mayagüez had already paid approximately USD 670,000 to Citibank Colombia resulting from the July 2014 Currency Trade and the July 2014 Currency Trade had a MTM value of approximately USD 34.9 million in favor of Citibank Colombia.

123.    In or around October 2014, Mayagüez informed Citigroup that it wanted to cancel the July 2014 Currency Trade by paying the USD 34.9 million MTM value.  As further described below, in January 2015, Citigroup fraudulently convinced Mayagüez not to exit the July 2014 Currency Trade by offering a new currency trade or in Citigroup's own words, by "kicking the can" or "deactivating the bomb."

3.    *January 2015:  The Third Currency Trade*

124.    In January 2015, Citibank and Mayagüez entered into a Currency Trade (the "January 2015 Currency Trade"), the terms of which are governed by a Confirmation dated January 13, 2015 (the "January 2015 Confirmation").  One day after executing the January 2015

Currency Trade, Citibank Colombia assigned its claim against Mayagüez resulting from the July 2014 Currency Trade to Citibank.[12]

125.    In or around October 2014, Mayagüez expressly informed Citigroup that it wanted to cancel the July 2014 Currency Trade by paying the USD 34.9 million MTM value. Instead, Citigroup fraudulently convinced Mayagüez not to exit the July 2014 Currency Trade and to enter into the January 2015 Currency Trade.  Citigroup structured the January 2015 Currency Trade with two tranches, each tranche having a different notional value, strike price and term.  As a practical matter, the January 2015 Currency Trade was two distinct trades: (i) one that would take effect immediately and cover 2015; and (ii) one that would commence in December 2015.  As further described below, because Mayagüez was concerned about incurring additional losses by entering into the January 2015 Currency Trade, the sole reason why Mayagüez agreed to the January 2015 Currency Trade was Citigroup's false promise that Citigroup would again "kick the can" or "deactivate the bomb" by (i) deferring Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) increasing the strike price of the January 2015 Currency Trade above the USD/COP exchange rate if the exchange rate exceeded COP 2,600 during the first tranche of the January 2015 Trade, or in any event, before the second tranche went into effect, ensuring that Mayagüez would not have to make any more payments to Citibank.

(a)      Terms of the January 2015 Currency Trade

126.    Table D details the key components of the two-tranche January 2015 Currency Trade.

---

[12]      The ISDA Master Agreement governs currency forwards between Citibank and Mayagüez.  Therefore, the ISDA Master Agreement governs (i) the July 2014 Currency Trade, because Citibank became a party to this trade as a result of Citibank Colombia's assignment; and (ii) the January 2015 Currency Trade.

| Table D:  January 2015 Currency Trade | | |
| --- | --- | --- |
| Term (first tranche):  January 2015 – November 2015 | | |
| Notional Value for Mayagüez and Citibank | Strike Price | Maximum Amount Payable to Mayagüez |
| USD 6 million | COP 2,600 | COP 2,100 million |

| Table D:  January 2015 Currency Trade | | | |
| --- | --- | --- | --- |
| Term (second tranche):  December 2015 – January 2018 | | | |
| Notional Value for Mayagüez and Citibank | Strike Price (December 2015 – July 2017) | Strike Price (August 2017 – January 2018) | Maximum Amount Payable to Mayagüez |
| USD 7.5 million | COP 2,090 | COP 2,385 | COP 1,500 million |

127.    Taken together, the two tranches of the January 2015 Currency Trade had monthly Payout Dates through January 2018, for a still longer combined term of three years. Neither the first nor second tranches of the January 2015 Currency Trade imposed any limit on how much Mayagüez had to pay to Citibank.  Thus, Mayagüez's payment obligations were *unlimited* if the USD strengthened against the COP.

128.    In contrast, Mayagüez's protection against the weakening of the USD against the COP was strictly limited (under the first tranche, to approximately USD 800,000, and under the second tranche, to approximately USD 650,000,  Once again, this provided a hard cap on any potential gain to Mayagüez and any potential loss to Citibank.

129.    In the first tranche (through November 2015), Citibank had to sell COP to Mayagüez at a strike price of COP 2,600, regardless of whether the actual exchange rate was lower.[13]  The maximum benefit Mayagüez could receive from Citibank was COP 2,100 million (approximately USD 800,000).  If and when Mayagüez reached this maximum amount during the first tranche term, that tranche would terminate.

---

[13]    At the time, other financial institutions were offering Mayagüez currency forwards with strike prices of approximately COP 2,000 and terms of 6 to 12 months.

130.    Notably, the second tranche would begin in December 2015, with a strike price of COP 2,090—even though the exchange rate as of January 2015, when Citigroup structured the trade, was approximately COP 2,400 to USD 1.   Therefore, Citigroup structured the second tranche so that Mayagüez would immediately incur substantial and unlimited losses in payments to Citibank starting in December 2015.  Mayagüez would incur these losses with certainty unless there was an immediate and dramatic drop in the exchange rate, and these losses would be incurred in addition to the losses on the prior trades.

(b)      Citigroup's False Promises

131.    Citigroup convinced Mayagüez to enter into the January 2015 Currency Trade through approximately 10 in-person meetings and telephone conferences between Ms. Bermudez and Messrs. Polania and Montejo and Mayagüez from October 2014 to January 2015.  In those meetings and telephone conversations, Citigroup:   (i) stated that the January 2015 Currency Trade would provide some immediate relief to Mayagüez because the USD/COP exchange rate was under COP 2,600, the first tranche's strike price; and (ii) falsely promised that (a) it would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (b) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Citigroup would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

132.    Mayagüez relied on these promises because (i) Citigroup had been its bank for many years and thus, Mayagüez trusted Citigroup; (ii) Citigroup had similarly amended the November 2013 Currency Trade thrice by increasing the strike price over the USD/COP exchange rate, preventing Mayagüez from incurring any losses; and (iii) Citigroup had likewise "kicked the can" in late 2014 by amending the July 2014 Currency Trade, (a) folding

34

Mayagüez's existing debt into the January 2015 Currency Trade; and (b) setting the strike price of the first tranche of the January 2015 Currency Trade at COP 2,600, above the USD/COP exchange rate.

133.    Mayagüez relied on these false promises to enter into the January 2015 Currency Trade.  Mayagüez would not have entered into a trade that would automatically cause it losses within a year, had it not been for Citigroup's promises to amend.  Citigroup, however, knew it could not keep its promise to continue "kicking the can."  Indeed, had Citigroup intended to keep its promises to amend when it made them, Citigroup would have actually amended the January 2015 Currency Trade, as Citigroup had done with respect to the November 2013 Currency Trade—thrice—and with respect to the July 2014 Currency Trade.

134.    In 2015, the USD/COP exchange rate continued to increase.  Mayagüez, in turn, expressed concerns to Citigroup that it now understood it would need to start making payments to Citibank on the first tranche Payout Dates if the exchange rate exceeded the strike price of COP 2,600.  In the first quarter of 2015, Mayagüez informed Citigroup that it wanted to cancel the January 2015 Currency Trade and pay its MTM value, as provided under the January 2015 Confirmation.  At that point, the MTM value for the first and second tranches was approximately USD 44.5 million in Citibank's favor.  Citigroup assured Mayagüez that cancelling the January 2015 Currency Trade was unnecessary because Citigroup would amend it, if and when the USD/COP exchange rate exceeded COP 2,600 and in any case, before the second tranche took effect.

135.    During the first quarter of 2015, Citigroup also delivered a presentation to Mayagüez setting forth its USD/COP exchange rate projections (the "2015 Presentation").

Citigroup indicated in the 2015 Presentation that the USD/COP exchange rate would significantly increase (i.e., the USD would continue to strengthen against the COP).

136.   Based on this presentation, it would have been standard market practice for Mayagüez to purchase 6-12 month "plain vanilla" currency options to purchase COP with its projected USD revenues.  In that way, Mayagüez would greatly benefit if, as anticipated by Citigroup, the USD/COP exchange rate significantly increased over the course of 2015. Mayagüez, however, was not in a position to take advantage of this market standard, "plain vanilla" instrument because it was struggling with its growing losses under the Currency Trades.

(c)   <u>Mayagüez's Demands that Citigroup Keep its Promises</u>

137.   The USD/COP exchange rate did, in fact, significantly increase and exceeded COP 2,600 by July 2015.

138.   From July 2015 to October 2015 prior to the second tranche going into effect, Mayagüez demanded that Citigroup keep its promises to amend.  Citigroup refused to comply, without providing any reason.

139.   Shortly after the second tranche of the January 2015 Currency Trade came in effect, in December 2015, when Mayagüez had started to incur tens of millions of dollars of losses to Citigroup, Mr. Chacin, Citibank Colombia's CCO, called Mayagüez's CEO to apologize for the effects on Mayagüez of the Currency Trades and expressly admitted that the Currency Trades were ill-suited and detrimental for Mayagüez.

140.   Additionally, from November 2015 to March 2016, Mayagüez had numerous conversations with Citigroup regarding how Mayagüez could pay the MTM value of the January 2015 Currency Trade and cancel it.  In those conversations, Mayagüez repeatedly reminded Citigroup that, to convince Mayagüez to enter into the January 2015 Currency Trade, Citigroup had falsely promised that it would amend the January 2015 Trade, if and when the USD/COP

36

exchange rate exceeded COP 2,600 and in any case, before the second tranche went into effect. Senior Citigroup officials, including Mr. Polania, never denied Mayagüez's claims.

(d)      Outcome of the January 2015 Currency Trade

141.    In December 2015, the exchange rate between Colombian pesos and U.S. dollars hit a high of COP 3,356—a figure vastly higher than the COP 2,090 strike price in the second tranche of the January 2015 Currency Trade, which took effect in December 2015.  As a result, under the second tranche of the January 2015 Currency Trade, from December 2015 to February 2016, Mayagüez paid approximately USD 8 million to Citibank.

142.    As of March 2016, the MTM value of the second tranche of the January 2015 Currency Trade, combined with the amount still owed under the July 2014 Currency Trade, was approximately USD 68 million in favor of Citibank.

143.    In March 2016, after making interim payments of approximately USD 8 million and to avoid incurring further amounts purportedly due to Citibank, Mayagüez (i) obtained a loan for approximately USD 44 million from a Colombian financial institution and paid this USD 44 million to Citibank; and (ii) from March to September 2016, has paid and will pay approximately USD 16 million to Citibank, cancelling the January 2015 Currency Trade and in satisfaction of all amounts owed thereunder and in respect of the July 2014 Currency Trade.

III.    **Mayagüez's Harm Resulting from Defendants' Misrepresentations and Material Omissions**

144.    Defendants never explained the risks of the "exotic" Currency Trades to Mayagüez, but instead assured Mayagüez that the Currency Trades represented an appropriate hedging instrument and were safe.  In so doing, Defendants misrepresented the terms and risks of the Currency Trades.  Defendants knew that their representations concerning the Currency

37

Trades were material and were not true, and omitted material information.  Defendants intended for their client Mayagüez to rely on these statements.

145.    Moreover, Defendants made promises they knew to be false to induce Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade.  Defendants promised that they would amend the January 2015 Currency Trade, as they had amended other Currency Trades in the past, when the January 2015 Currency Trade became detrimental to Mayagüez. Concerned about incurring additional losses by entering into the January 2015 Currency Trade, Mayagüez entered into the trade based solely on Defendants' promises to amend.  However, Defendants knew that their promises were false and never intended to keep them because Defendants specifically designed the January 2015 Currency Trade to be unduly risky to Mayagüez.  From December 2015 to March 2016, Citigroup executives in Colombia apologized for the consequences of the Currency Trades on Mayagüez and never even denied that Mayagüez had entered into the Currency Trades based on Defendants' fraudulent representations and material omissions.

146.    Mayagüez reasonably relied, to its detriment, on Defendants' statements in entering into the Currency Trades, including the fraudulent promises to amend the January 2015 Currency Trade.   In purchasing the Currency Trades, Mayagüez relied upon Defendants' representations and assurances regarding the terms and risks of the Currency Trades, including the scope of protection the Currency Trades would provide to Mayagüez.  Mayagüez received, reviewed and relied upon Citigroup's representations about the terms of the Currency Trades, which purported to describe how the Currency Trades would protect Mayagüez's financial results.   In fact, they did just the opposite.   Furthermore, Mayagüez reasonably relied on

Defendants' promises to amend the January 2015 Currency Trade, which Defendants knew they would not do.

147.    The Currency Trades were ill-suited to Mayagüez's financial needs and Defendants designed them to reap large profits for themselves, in exchange for a small and capped upside potential for Mayagüez.  As a result of the Currency Trades, Mayagüez has suffered significant monetary damages.  Indeed, Mayagüez entered the Currency Trades with the goal of protecting its USD export revenues against currency fluctuations, but the Currency Trades resulted in Mayagüez incurring liabilities more than double the size of its annual export revenues.  Purported hedges were in fact a leveraged financial time bomb.

148.    Mayagüez did not uncover, and could not have uncovered, Defendants' misrepresentations regarding the terms and risks of the Currency Trades or regarding the promises to amend the January 2015 Currency Trade at the time they were entered into because the information necessary to make such an assessment was in the peculiar, unique and special knowledge of Defendants, who structured the Currency Trades.

149.    But for the misrepresentations and material omissions in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers, among others, and but for the fraudulent promises to amend the January 2015 Currency Trade, Mayagüez would not have entered into the Currency Trades, because those representations and omissions were material to its decision to acquire the Currency Trades, as described above.

150.    The materially false and misleading statements of facts and omissions made by Defendants in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and

2013 Offers, among others, as well as the fraudulent promises to amend the January 2015 Currency Trade,  directly and proximately caused Mayagüez damage.  Contrary to Defendants' assertions regarding the suitability of the Currency Trades to Mayagüez's financial situation, the Currency Trades were not suited to Mayagüez's needs and did not provide it with the protection it had requested and that Defendants had promised to deliver.  Mayagüez was saddled with complex, expensive and ineffective currency transactions it never would have purchased if it had understood their terms and risks, and for which it paid too much and received too little.

## FIRST CAUSE OF ACTION

### Willful Violation of Article 2341 of the Colombian Civil Code
### (Against Defendants Citigroup and Citibank)

151.    Pursuant to Federal Rule of Civil Procedure 44.1, Mayagüez hereby gives notice of its intention to rely on the law of Colombia.

152.    Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

153.    Under Article 2341 of the Colombian Civil Code, a party is liable for any damages that it willfully causes to another party.

154.    This claim arises from Mayagüez's entering into the Currency Trades.

155.    Defendants made false and/or misleading representations to Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers.  Specifically, Defendants knowingly falsely represented to Mayagüez that the Currency Trades were:  (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.

156.    Additionally, Defendants fraudulently concealed material information from Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers.  Specifically, Defendants knowingly fraudulently concealed from Mayagüez that the Currency Trades:   (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendants.

157.    The representations and omissions at issue are identified and are summarized in Paragraphs 71 to 96 above.

158.    Additionally, Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

159.    Defendants failed to keep their promises and did not amend the January 2015 Currency Trade, causing tens of millions of dollars in damages to Mayagüez.

160.    The promises at issue are identified and are summarized in Paragraphs 131 to 136 above.

161.    Defendants knew, recklessly disregarded and/or should have known, that their representations and omissions concerning the Currency Trades were false and/or misleading at the time they were made.  Likewise, Defendants knew, recklessly disregarded and/or should have

known, that their promises concerning the January 2015 Currency Trade were false and/or misleading at the time they were made.

162.   Defendants' fraudulent representations and material omissions concerning the Currency Trades, including their fraudulent promises regarding the January 2015 Currency Trade, injured Mayagüez, in an amount to be proven at trial.

## SECOND (ALTERNATIVE) CAUSE OF ACTION

### Fraudulent Inducement (Alternative to First Cause of Action)
### (Against Defendants Citigroup and Citibank Regarding All Currency Trades)

163.   Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

164.   This claim arises from Mayagüez's entering into the Currency Trades.

165.   Mayagüez has performed all of the material conditions, covenants and promises required to be performed in accordance with the terms of the Currency Trades, sustaining severe financial damages as a result.

166.   Defendants made false and/or misleading representations to Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers.  Specifically, Defendants knowingly falsely represented to Mayagüez that the Currency Trades were:  (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.

167.   The representations at issue are identified and are summarized in Paragraphs 71 to 96 above.

168.   Defendants knew, or recklessly disregarded the fact, that their representations concerning the Currency Trades were false and/or misleading at the time they were made.

Defendants made the false and misleading statements with an intent to induce Mayagüez's reliance and to defraud Mayagüez.

169.    Mayagüez, as an unsophisticated investor, justifiably relied on Defendants' false and misleading representations.

170.    Had Mayagüez known the true facts regarding the Currency Trades, it would not have purchased the Currency Trades, and would have selected a far safer financial product, such as "plain vanilla" forwards or call options.

171.    As a result of the foregoing, Mayagüez has the right to rescind the fraudulently induced Currency Trades and to require Defendants to refund all sums paid in connection with the Currency Trades.  In the alternative, Mayagüez has suffered damages according to proof, in an amount to be proven at trial.

### THIRD (ALTERNATIVE) CAUSE OF ACTION

**Fraudulent Concealment (Alternative to First Cause of Action)
(Against Defendants Citigroup and Citibank Regarding All Currency Trades)**

172.    Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

173.    This claim arises from Mayagüez's entering into the Currency Trades.

174.    Mayagüez has performed all of the material conditions, covenants and promises required to be performed in accordance with the terms of the Currency Trades, sustaining severe financial damages as a result.

175.    Defendants fraudulently concealed material information from Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers.  Specifically, Defendants fraudulently concealed from

Mayagüez that the Currency Trades:  (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendants.

176.    The omissions at issue are identified and are summarized in Paragraphs 71 to 96 above.

177.    Defendants knowingly concealed this information from Mayagüez, or concealed this information from Mayagüez with reckless disregard for the truth, with an intent to induce Mayagüez's reliance and to defraud Mayagüez.

178.    Mayagüez justifiably relied on Defendants' material omissions.

179.    Had Mayagüez understood the Currency Trades, it would not have entered into them.  Defendants, in contrast to Mayagüez, knew that the Currency Trades were detrimental to Mayagüez and thus, it was apparent to Defendants, and Defendants knew, that at the time they made their representations to Mayagüez that Mayagüez was mistaken regarding its understanding of the trades and risks of the Currency Trades.   Defendants had superior knowledge regarding the Currency Trades because they structured the Currency Trades and thus, Defendants had a duty to disclose to Mayagüez, who was an unsophisticated investor, that the Currency Trades:  (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendants.

180.    As a result of the foregoing, Mayagüez has the right to rescind the fraudulently induced Currency Trades and to require Defendants to refund all sums paid in connection with the Currency Trades.  In the alternative, Mayagüez has suffered damages according to proof, in an amount to be proven at trial.

## FOURTH (ALTERNATIVE) CAUSE OF ACTION

### Fraudulent Inducement (Alternative to First Cause of Action)
### (Against Defendants Citigroup and Citibank Regarding The January 2015 Currency Trade)

181.   Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

182.   This claim arises from Mayagüez's entering into the January 2015 Currency Trade.

183.   Mayagüez has performed all of the material conditions, covenants and promises required to be performed in accordance with the terms of the January 2015 Currency Trade, sustaining severe financial damages as a result.

184.   Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that:  (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

185.   Mayagüez relied on these promises because (i) Citigroup had been its bank for many years and thus, Mayagüez, as an unsophisticated investor, trusted Citigroup; (ii) Defendants had similarly amended the November 2013 Currency Trade thrice by increasing the strike price over the USD/COP exchange rate, preventing Mayagüez from incurring any losses; and (iii) Defendants had likewise amended the July 2014 Currency Trade, (a) folding Mayagüez's existing debt into the January 2015 Currency Trade; and (b) setting the strike price

of the first tranche of the January 2015 Currency Trade at COP 2,600, above the USD/COP exchange rate.

186.   Defendants failed to keep their promises and did not amend the January 2015 Currency Trade, causing tens of millions of dollars in damages to Mayagüez.

187.   The promises at issue are identified and are summarized in Paragraphs 131 to 136 above.

188.   Defendants knew, or recklessly disregarded the fact, that their promises concerning the January 2015 Currency Trade were false at the time they were made.  Defendants made the false promises with an intent to induce Mayagüez's reliance and to defraud Mayagüez.

189.   Mayagüez justifiably relied on Defendants' false promises.

190.   Had Mayagüez known that Defendants would never amend the January 2015 Currency Trade, it would not have not entered it and would have cancelled the July 2014 Currency Trade by paying its MTM value.

191.   As a result of the foregoing, Mayagüez has the right to rescind the fraudulently induced January 2015 Currency Trade and to require Defendants to refund all sums paid in connection with January 2015 Currency Trade.   In the alternative, Mayagüez has suffered damages according to proof, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Negligent Violation of Article 2341 of the Colombian Civil Code
### (Against Defendants Citigroup and Citibank)

192.   Pursuant to Federal Rule of Civil Procedure 44.1, Mayagüez hereby gives notice of its intention to rely on the law of Colombia.

193.   Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

194.    Under Article 2341 of the Colombian Civil Code, a party is liable for any damages that it negligently causes to another party.

195.    This claim arises from Mayagüez's entering into the Currency Trades.

196.    Defendants made false and/or misleading representations to Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers.  Specifically, Defendants knowingly falsely represented to Mayagüez that the Currency Trades were:  (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.

197.    Additionally, Defendants fraudulently concealed material information from Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers.  Specifically, Defendants knowingly fraudulently concealed from Mayagüez that the Currency Trades:  (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendants.

198.    The representations and omissions at issue are identified and are summarized in Paragraphs 71 to 96 above.

199.    Additionally, Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that:  (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect,

Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

200.   Defendants failed to keep their promises and did not amend the January 2015 Currency Trade, causing tens of millions of dollars in damages to Mayagüez.

201.   The promises at issue are identified and are summarized in Paragraphs 131 to 136 above.

202.   Defendants knew, recklessly disregarded and/or should have known that their representations and omissions concerning the Currency Trades were false and/or misleading at the time they were made.  Likewise, Defendants knew, recklessly disregarded and/or should have known that their promises concerning the January 2015 Currency Trade were false and/or misleading at the time they were made.

203.   Defendants' fraudulent representations and material omissions concerning the Currency Trades, including their fraudulent promises regarding the January 2015 Currency Trade, injured Mayagüez, in an amount to be proven at trial.

### SIXTH (ALTERNATIVE) CAUSE OF ACTION

**Negligent Misrepresentation (Alternative to Fifth Cause of Action)**
**(Against Defendants Citigroup and Citibank Regarding All Currency Trades)**

204.   Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

205.   Defendants are sophisticated, global financial institutions, focused on providing large corporate and government clients with "solutions" to complex financial issues.  Mayagüez is a small Colombian sugar company that is unfamiliar with complex financial operations and instruments.

206.    By 2012, Mayagüez had been the Defendants' client for at least three years. Mayagüez had come to rely on and trust the Defendants and their financial expertise and products.

207.    It was Defendants who first approached Mayagüez to promote their Currency Trades in 2012.

208.    Defendants knew that Mayagüez was unsophisticated and inexperienced with "exotic" financial instruments like the Currency Forwards.  Defendants had complete financial information regarding Mayagüez and thus, knew that it was critical for Mayagüez to successfully manage its USD/COP currency fluctuation risks by entering into "plain vanilla" currency forwards or currency options.  Defendants thus targeted Mayagüez to lure it into entering the "exotic" Currency Trades that Defendants had designed and that were more profitable to Defendants than the "plain vanilla" alternatives.

209.    By the time Mayagüez entered into the January 2015 Currency Trade, Mayagüez had been Defendants' client for over half a decade.

210.    In light of the historic relationship between Defendants and Mayagüez; Defendants' knowledge of Mayagüez's hedging needs; and Defendants' expertise in complex currency forwards, in contrast with Mayagüez's lack of financial experience and sophistication, Defendants knew that Mayagüez would use the information they provided about the terms and risks of the Currency Forwards in an attempt to hedge Mayagüez's risks.  Thus, Defendants had a special relationship with Mayagüez, and therefore a duty to Mayagüez to provide it with true, correct and accurate information about the Currency Trades, including regarding their risks.

211.    Defendants' material representations and omissions set forth above were false, and Defendants' representations, including in the August 2012 Email, August 2012 Presentation,

December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers, omitted material statements of fact.

212.    Defendants falsely represented to Mayagüez that the Currency Trades were: (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.  Equally important, Defendants failed to disclose that the Currency Trades:  (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendants.

213.    The representations and omissions at issue are identified and are summarized in Paragraphs 71 to 96 above.

214.    Defendants knew, recklessly disregarded or should have known facts demonstrating that their representations and omissions concerning the Currency Trades were false and/or misleading at the time they were made.

215.    Defendants knew that Mayagüez would rely on their representations to decide whether to enter into the Currency Trades.

216.    Mayagüez intended to rely and act upon the Defendants' representations because they wanted to better hedge their currency fluctuation risks.

217.    Mayagüez justifiably and reasonably relied on Defendants' false representations and misleading omissions.

218.    Had Mayagüez known the true facts regarding the Currency Trades, it would not have purchased the Currency Trades, and would have selected a far safer financial product, such as "plain vanilla" forwards or call options.

219.    As a result of the foregoing, Mayagüez has the right to rescind the Currency Trades and to require Defendants to refund all sums paid in connection with the Currency

Trades.  In the alternative, Mayagüez has suffered damages according to proof, in an amount to be proven at trial.

## SEVENTH (ALTERNATIVE) CAUSE OF ACTION

**Negligent Misrepresentation (Alternative to Fifth Cause of Action)**
**(Against Defendants Citigroup and Citibank Regarding the January 2015 Currency Trade)**

220.    Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

221.    Defendants are sophisticated, global financial institutions, focused on providing large corporate and government clients with "solutions" to complex financial issues.  Mayagüez is a small Colombian sugar company that is unfamiliar with complex financial operations and instruments.

222.    By 2012, Mayagüez had been the Defendants' client for at least three years. Mayagüez had come to rely on and trust the Defendants and their financial expertise and products.

223.    It was Defendants who first approached Mayagüez to promote their Currency Trades in 2012.

224.    Defendants knew that Mayagüez was unsophisticated and inexperienced with "exotic" financial instruments like the Currency Forwards.  Defendants had complete financial information regarding Mayagüez and thus, knew that it was critical for Mayagüez to successfully manage its USD/COP currency fluctuation risks by entering into "plain vanilla" currency forwards or currency options.  Defendants thus targeted Mayagüez to lure it into entering the "exotic" Currency Trades that Defendants had designed and were more profitable to Defendants than the "plain vanilla" alternatives.

225.    By the time Mayagüez entered into the January 2015 Currency Trade, Mayagüez had been Defendants' client for over half a decade.

226.    In light of the historic relationship between Defendants and Mayagüez; Defendants' knowledge of Mayagüez's hedging needs; and Defendants' expertise in complex currency forwards, in contrast with Mayagüez's lack of financial experience and sophistication, Defendants knew that Mayagüez would use the information they provided about the terms and risks of the Currency Forwards in an attempt to hedge Mayagüez's risks.  Thus, Defendants had a special relationship with Mayagüez, and therefore a duty to Mayagüez to provide it with true, correct and accurate information about the Currency Trades, including regarding their risks.

227.    Defendants made false promises regarding their intention to amend the January 2015 Currency Trade.

228.    Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that:  (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

229.    Mayagüez relied on these promises because:  (i) Citibank had been its bank for many years and thus, Mayagüez trusted Citibank; (ii) Defendants had similarly amended the November 2013 Currency Trade thrice by increasing the strike price over the USD/COP exchange rate, preventing Mayagüez from incurring any losses; and (iii) Defendants had likewise amended the July 2014 Currency Trade, (a) folding Mayagüez's existing debt into the January

2015 Currency Trade; and (b) setting the strike price of the first tranche of the January 2015 Currency Trade at COP 2,600, above the USD/COP exchange rate.

230.    The promises at issue are identified and are summarized in Paragraphs 131 to 136 above.

231.    Defendants knew, recklessly disregarded or should have known facts demonstrating that their promises regarding the January 2015 Currency Trade were false at the time they were made.

232.    Defendants knew that Mayagüez would rely on their representations to decide whether to enter into the January 2015 Currency Trade.

233.    Mayagüez intended to rely and act upon the Defendants' promises because they wanted to better hedge their currency fluctuation risks.

234.    Mayagüez justifiably and reasonably relied on Defendants' false promises to amend the January 2015 Currency Trade.

235.    Had Mayagüez known that Defendants did not intend to amend the January 2015 Currency Trade, it would not have entered into it, and would have cancelled the July 2014 Currency Trade by paying its MTM value.

236.    As a result of the foregoing, Mayagüez has the right to rescind the January 2015 Currency Trade and to require Defendants to refund all sums paid in connection with the January 2015 Currency Trade.  In the alternative, Mayagüez has suffered damages according to proof, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Violation of Article 863 of the Colombian Commercial Code
### (Against Defendants Citigroup and Citibank)

237.     Pursuant to Federal Rule of Civil Procedure 44.1, Mayagüez hereby gives notice of its intention to rely on the law of Colombia.

238.     Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

239.     Under Article 863 of the Colombian Commercial Code, a party is liable to another party for any damages it causes by acting in bad faith when negotiating a contract or a contract amendment.

240.     This claim arises from Mayagüez's entering into the Currency Trades.

241.     Defendants acted in bad faith because their material representations and omissions set forth above to induce Mayagüez to enter into the Currency Trades, including the promises to amend the January 2015 Currency Trade, were fraudulent.  Specifically, Defendants made false and/or misleading representations to Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers. Specifically, Defendants knowingly falsely represented to Mayagüez that the Currency Trades were:  (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez.

242.     Additionally, Defendants fraudulently concealed material information from Mayagüez regarding the Currency Trades, including in the August 2012 Email, August 2012 Presentation, December 2012 Email, December 2012 Spreadsheet, October 2013 Email, October 2013 Presentation and 2012 and 2013 Offers.  Specifically, Defendants knowingly fraudulently

concealed from Mayagüez that the Currency Trades: (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendants.

243.    The representations and omissions at issue are identified and are summarized in Paragraphs 71 to 96 above.

244.    Additionally, Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that: (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

245.    Defendants failed to keep their promises and did not amend the January 2015 Currency Trade, causing tens of millions of dollars in damages to Mayagüez.

246.    The promises at issue are identified and are summarized in Paragraphs 131 to 136 above.

247.    Defendants' fraudulent representations and material omissions concerning the Currency Trades, including their fraudulent promises regarding the January 2015 Currency Trade, injured Mayagüez, in an amount to be proven at trial.

### NINTH (ALTERNATIVE) CAUSE OF ACTION

**Unjust Enrichment (Alternative to First, Fifth and Eighth Causes of Action)
(Against Defendants Citigroup and Citibank)**

248.    Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

249.   In misleading Mayagüez into purchasing the Currency Trades, Defendants unjustly took for themselves profits derived from the Currency Trades, at the direct expense of Plaintiff.

250.   Defendants' economic benefit is a direct and proximate result of Defendants' unjust and unconscionable conduct, specifically, knowingly and intentionally misrepresenting and omitting material information about the terms and risks of the Currency Trades, in order to sell the Currency Trades to Mayagüez and reap large profits.  But for Defendants' unjust and inequitable conduct, Defendants would not have earned these profits, nor would Mayagüez have incurred the substantial liabilities it did under the Currency Trades.  Defendants' misconduct therefore enabled Defendants to unjustly retain value to which they are not properly entitled.

251.   As a result of this misconduct, Defendants have been unjustly enriched at Mayagüez's expense.  Mayagüez therefore requests that the Court grant the relief requested in this Ninth Cause of Action, to prevent the unjust enrichment of the Defendants and direct the Defendants to make restitution to Mayagüez in an amount to be proven at trial.

### TENTH (ALTERNATIVE) CAUSE OF ACTION

**Promissory Estoppel (Alternative to First, Fifth and Eighth Causes of Action)**
**(Against Defendants Citigroup and Citibank Regarding the January 2015 Currency Trade)**

252.   Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

253.   This claim arises from Mayagüez's entering into the January 2015 Currency Trade.

254.   Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that:  (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at

the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

255.    Mayagüez relied on these promises because:  (i) Citibank had been its bank for many years and thus, Mayagüez trusted Citibank; (ii) Defendants had similarly amended the November 2013 Currency Trade thrice by increasing the strike price over the USD/COP exchange rate, preventing Mayagüez from incurring any losses; and (iii) Defendants had likewise amended the July 2014 Currency Trade, (a) folding Mayagüez's existing debt into the January 2015 Currency Trade; and (b) setting the strike price of the first tranche of the January 2015 Currency Trade at COP 2,600, above the USD/COP exchange rate.

256.    Defendants failed to keep their promises and did not amend the January 2015 Currency Trade, causing tens of millions of dollars in damages to Mayagüez.

257.    The promises at issue are identified and are summarized in Paragraphs 131 to 136 above.

258.    Defendants knew, or recklessly disregarded the fact, that their promises concerning the January 2015 Currency Trade were false at the time they were made.  Defendants made the false promises with an intent to induce Mayagüez's reliance and to defraud Mayagüez.

259.    Mayagüez justifiably relied on Defendants' false promises.

260.    Had Mayagüez known that Defendants would never amend the January 2015 Currency Trade, it would not have not entered it and would have cancelled the July 2014 Currency Trade by paying its MTM value.

261.    As a result of the foregoing, Mayagüez has the right to rescind the January 2015 Currency Trade and to require Defendants to refund all sums paid in connection with the January 2015 Currency Trade.  In the alternative, Mayagüez has suffered damages according to proof, in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### Unconscionability
### (Against Defendants Citigroup and Citibank)

262.    Mayagüez repeats and re-alleges the allegations set forth above as though fully set forth herein.

263.    The Currency Trades were procedurally unconscionable.   Defendants are sophisticated financial institutions that preyed upon the fact that Mayagüez lacked any sophistication or expertise in dealing with complex currency trades, and that Mayagüez trusted Defendants based on their years-long relationship.  There was no opportunity for Mayagüez to negotiate the terms of the Currency Trades and, in fact, there was no negotiation.  Defendants engaged in deception by failing to explain and deliberately misleading Mayagüez about the terms of the Currency Trades, and by falsely promising to amend the trades.  As a result of Defendants' false statements and omissions, the gross disparity in the parties' sophistication and expertise, the enormous complexity of the language in the trade confirmations and the fact that the Currency Trades were presented by Defendants without any opportunity for negotiation of the terms, Mayagüez lacked any meaningful choice regarding the Currency Trades.

264.    The Currency Trades were substantively unconscionable because the terms of the Currency Trades were unreasonably favorable to Defendants.  In particular, it was unreasonable to create unlimited risk for Mayagüez and the potential for substantial profit for Defendants.  This was especially unreasonable given that the potential benefit to Mayagüez was strictly

limited and that the purpose of the Currency Trades was to reduce the risk to Mayagüez from fluctuations in the exchange rate.  The July 2014 Currency Trade was also unreasonable in using a period of two years and eleven months, and the January 2015 Currency Trade was unreasonable for extending that period and therefore creating greater potential liability for Mayagüez with essentially no benefit, given that potential payments to Mayagüez were strictly capped.  The July 2014 Currency Trade was also unreasonable because it used a USD 6 million notional value when calculating potential payments to Defendants, and only a USD 3 million notional value when calculating potential payments to Mayagüez.  The January 2015 Currency Trade was also unreasonable in using a strike price for the second tranche that was substantially below the then-current exchange rate, the result of which was that unless the exchange rate immediately fell greatly, Mayagüez would have to pay enormous monthly payments to Defendants.

265.    No reasonable business would have entered into the Currency Trades had it known and understood the terms of those agreements, and had it not received promises that the agreements would be amended.  In particular, no reasonable business would take on unlimited risk where its potential gain was capped at a very modest amount.   And no reasonable business would take on unlimited risk in a currency trade that had the goal of mitigating currency risk.

266.    Mayagüez never knew that the Currency Trades created unlimited risk for it and never knowingly accepted the terms, despite these unfair terms.

267.    As a result of the foregoing, Mayagüez has the right to rescind the Currency Trades and to require Defendants to refund all sums paid in connection with the Currency Trades.  In the alternative, Mayagüez has suffered damages according to proof, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Mayagüez respectfully requests that this Court enter judgment in favor of Mayagüez against Defendants:

268. Awarding damages sustained as a result of Defendants' wrongdoing, including:

     (a)     The return of all sums paid by Mayagüez in connection with the Currency Trades, or, in the alternative, awarding damages in an amount to be proven at trial;

     (b)     Mayagüez's fees and expenses incurred in bringing this action; and

     (c)     Prejudgment interest at the maximum legal rate applicable to a judgment issued by the Court entering such judgment.

269. Rescission of the January 2015 Currency Trade.

270. Such other and further relief as this Court may deem just and proper.

271. Mayagüez reserves the right to seek all remedies available at law and equity.

DATED:   New York, New York
         January 13, 2017

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By:  /s/ Gabriel Soledad
       Gabriel Soledad
        (gabrielsoledad@quinnemanuel.com)

       Juan P. Morillo
        (juanmorillo@quinnemanuel.com)
        (*pro hac vice* application pending)

       Daniel Pulecio-Boek
        (danielpulecioboek@quinnemanuel.com)
        (*pro hac vice* application pending)

       777 6th Street, NW 11th Floor
       Washington, D.C. 20001
       Telephone:  (202) 538-8000
       Fax:  (202) 538-8100

       Daniel Cunningham
        (danielcunningham@quinnemanuel.com)

       51 Madison Avenue, 22nd Floor
       New York, New York  10010
       Telephone:  (212) 849-7000
       Fax:  (212) 849-7100

       *Attorneys for Mayagüez, S.A.*

61