**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAYAGÜEZ S.A.,

                    Plaintiff,

          -against-                                    **Case No. 16 Civ. 06788 (PGG)**

CITIGROUP, INC.,
CITIBANK, N.A.,

                    Defendants.


**PLAINTIFF'S OPPOSITION TO  DEFENDANTS'**
**MOTION TO DISMISS MAYAGÜEZ'S FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................1

COUNTERSTATEMENT OF FACTS ................................................................................3

      A.    Mayagüez's Managing Of Risk From Currency Fluctuation ..................................3

      B.    Defendants' Misrepresentations And Omissions..................................................4

      C.    The Three Currency Trades ................................................................................5

      D.    The Claims ............................................................................................................8

ARGUMENT ....................................................................................................................8

I.     THE AMENDED COMPLAINT STATES CLAIMS UNDER COLOMBIA LAW .........................................................................................................................8

II.    THE AMENDED COMPLAINT STATES A CLAIM FOR FRAUDULENT INDUCEMENT AND CONCEALMENT UNDER NEW YORK LAW ........................14

      A.    The Amended Complaint Satisfies The Element Of Justifiable Reliance ............14

            1.    Mayagüez did not disclaim reliance on Defendants' misrepresentations and omissions.................................................14

            2.    Mayagüez's reliance was justifiable based on the facts alleged. ..............19

      B.    The Amended Complaint Satisfies The Element Of A Misrepresentation Or Omission ......................................................................................................21

            1.    Misrepresentations ....................................................................................21

            2.    Omissions..................................................................................................22

      C.    The Amended Complaint Satisfies The Element Of Scienter ..............................25

III.   THE AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENT MISREPRESENTATION UNDER NEW YORK LAW ..................................................25

IV.   THE AMENDED COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT UNDER NEW YORK LAW ................................................................27

V.    THE AMENDED COMPLAINT STATES A CLAIM FOR PROMISSORY ESTOPPEL UNDER NEW YORK LAW ........................................................................28

i

VI.    THE AMENDED COMPLAINT STATES A CLAIM FOR
UNCONSCIONABILITY ...................................................................................................30

    A.    Mayagüez Alleges Procedural Unconscionability .................................................31

    B.    Mayagüez Alleges Substantive Unconscionability................................................33

CONCLUSION..............................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*,
    96 F. Supp. 3d 182 (S.D.N.Y. 2015).................................................................. 12

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    2013 WL 837536 (S.D.N.Y. Mar. 6, 2013) ...................................................... 27

*Aris Multi-Strategy Offshore Fund, Ltd. v. Devaney*,
    2009 WL 5851192 (N.Y. Sup. Ct. Dec. 14, 2009) .......................................... 21

*Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*,
    997 N.Y.S.2d 97, 2014 WL 3288335 (N.Y. Sup. Ct. 2014)............................. 19

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*,
    57 F.3d 146 (2d Cir. 1995)................................................................................ 23

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
    115 A.D.3d 128 (1st Dep't 2014) ..................................................................... 19

*Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.*,
    2016 WL 2622013 (W.D.N.Y. May 5, 2016) ................................................... 12

*Bayerische Landesbank, N.Y. Branch v. Barclays Capital, Inc.*,
    902 F. Supp. 2d 471 (S.D.N.Y. 2012)............................................................... 20

*Brennan v. Bally Total Fitness*,
    198 F. Supp. 2d 377 (S.D.N.Y. 2002)........................................................ 32, 33

*Brunetti v Musallam*,
    11 A.D.3d 280 (1st Dep't 2004) ....................................................................... 20

*Caiola v. Citibank, N.A., N.Y.*,
    295 F.3d 312 (2d Cir. 2002).......................................................................  16, 17

*Capital Z Fin. Services Fund II v. Health Net, Inc.*,
    43 A.D.3d 100 (1st Dep't 2007) .................................................................  12, 13

*CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*,
    2009 WL 2033048 (S.D.N.Y. July 13, 2009) .................................................. 17

*Chem. Bank v. City of Jamestown*,
    122 A.D.2d 530 (4th Dep't 1986)..................................................................... 29

*Clark v. Kitt*,
    2014 WL 4054284 (S.D.N.Y. Aug. 15, 2014), *aff'd*, 619 F. App'x 34 (2d Cir.
    2015) .................................................................................................................. 35

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir. 1994)......................................................................... 22

*Coleman & Assocs. Enters., Inc. v. Verizon Corp. Servs. Grp., Inc.*,
    125 A.D.3d 520 (1st Dep't 2015) ............................................................... 30

*Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp.*,
    2009 WL 935665 (S.D.N.Y. Apr. 7, 2009)................................................. 13

*Cox v. NAP Constr. Co.*,
    10 N.Y.3d 592 (2008) ................................................................................. 28

*Cruz v. McAneney*,
    31 A.D.3d 54 (2d Dep't 2006) .................................................................... 28

*CUnet, LLC v. Quad Partners, LLC*,
    2017 WL 945937 (Mar. 7, 2017) ............................................................... 12

*Curtis Props. Corp. v. Greif Cos.*,
    236 A.D.2d 237 (1st Dep't 1997) ............................................................... 28

*Danann Realty Corp. v. Harris*,
    5 N.Y.2d 317 (1959) ....................................................................... 16, 17, 18

*Dart Brokerage Corp. v. Am. Commerce Ins. Co.*,
    2013 WL 5966901 (S.D.N.Y. Nov. 7, 2013) ............................................. 12

*Deerfield Commcn's Corp. v Chesebrough-Ponds, Inc.*,
    68 N.Y.2d 954 (1986) ................................................................................. 23

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012)........................................................ 23

*Eisen v. Venulum Ltd.*,
    2017 WL 1136136 (W.D.N.Y. Mar. 27, 2017)........................................... 35

*Emfore Corp. v. Blimpie Assocs., Ltd.*,
    51 A.D.3d 434 (1st Dep't 2008) ................................................................. 17

*Equitable Lumber Corp. v. IPA Land Dev. Corp.*,
    38 N.Y.2d 516 (1976) ................................................................................. 34

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    2002 WL 31426310 (S.D.N.Y. Oct. 29, 2002), *clarified on denial of*
    *reconsideration*, 2003 WL 288988 (S.D.N.Y. Feb. 7, 2003) .................... 16, 27

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)........................................................................ 19

*Fin. One Public Co. v. Lehman Bros. Special Financing, Inc.*,
    414 F.3d 325 (2d Cir. 2005)..................................................................... 9, 10

*First Nationwide Bank v. 965 Amsterdam, Inc.*,
    212 A.D.2d 469 (1st Dep't 1995) ............................................................... 17

*Freudenberg v. E\* Trade Financial Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................. 21

*Frontline Processing Corp. v. Merrick Bank Corp.*,
   2014 WL 837050 (S.D.N.Y. Mar. 3, 2014) ....................................................... 11

*Gillman v. Chase Manhattan Bank, N.A.*,
   73 N.Y.2d 1 (1988) .............................................................................. 31, 35

*Gross Found., Inc. v. Goldner*,
   2012 WL 6021441 (E.D.N.Y. Dec. 4, 2012) ..................................................... 12

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
   748 F.2d 729 (2d Cir. 1984)............................................................................. 16

*Grupo Sistemas Integrales de Telecomunicacion S.A.de C.V. v. AT&T Commc'ns, Inc.*,
   1996 WL 312535 (S.D.N.Y. June 10, 1996) .................................................... 24

*Gutstadt v. Nat'l Fin. Partners Corp.*,
   2013 WL 5859550 (N.Y. Sup. Ct. Oct. 22, 2013) ........................................... 12

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Mkts., LLC*,
   910 N.Y.S.2d 762 (Sup. Ct. 2010) .................................................................. 24

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
   723 F. Supp. 976 (S.D.N.Y. 1989) .................................................................. 30

*Hettinger v. Kleinman*,
   733 F. Supp. 2d 421 (S.D.N.Y. 2010)............................................................. 12

*Hotel Capital LLC v. Wells Fargo Bank*,
   951 N.Y.S.2d 86 (Sup. Ct. 2012).................................................................... 25

*HSH Nordbank AG v. UBS AG*,
   95 A.D.3d 185 (1st Dep't 2012) ............................................................... 19, 22

*Icebox-Scoops v. Finanz St. Honore, B.V.*,
   676 F. Supp. 2d 100 (E.D.N.Y. 2009) ............................................................ 30

*IKB Int'l S.A. v. Morgan Stanley*,
   142 A.D.3d 447 (1st Dep't 2016) .................................................................... 25

*In re MF Global Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................. 21

*Industralease Automated & Sci. Equip. Corp. v. R.M.E. Enterprises, Inc.*,
   58 A.D.2d 482 (2d Dep't 1977) ...................................................................... 32

*Innovative BioDefense, Inc. v. VSP Techs., Inc.*,
   2013 WL 3389008 (S.D.N.Y. July 3, 2013) ............................................... 11, 12

*Int'l Elecs., Inc. v. Media Syndication Global, Inc.*,
   2002 WL 1897661 (S.D.N.Y. Aug. 17, 2002) ................................................. 30

*JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*,
  2010 WL 4868142 (N.Y. Sup. Ct. 2010) ......................................................... 18

*JPMorgan Chase Bank, N.A. v. Godfrey Ltd. P'ship*,
  2012 WL 10007863 (N.Y. Sup. Ct. July 16, 2012) ........................................ 34

*Kimmell v. Schaefer*,
  89 N.Y.2d 257 (1996) ..................................................................................... 26

*Knieriemen v. Bache Halsey Stuart Shields Inc.*,
  74 A.D.2d 290 (1st Dep't 1980), *overruled on other grounds* ................... 10, 12

*Krock v. Lipsay*,
  97 F.3d 640 (2d Cir. 1996)........................................................................... 10, 11

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
  10 F. Supp. 3d 504 (S.D.N.Y. 2014)...................................................... 19, 24, 27

*Lorne v. 50 Madison Ave. LLC*,
  32 Misc. 3d 1226(A), 2011 WL 3274258 (N.Y. Sup. Ct. June 20, 2011) ....... 19

*Manufacturers Hanover Trust Co. v. Yanakas*,
  7 F.3d 310 (2d Cir. 1993)................................................................................. 16

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
  87 A.D.3d 287 (1st Dep't 2011) ...................................................................... 24

*MBIA Ins. Corp. v. J.P. Morgan Sec. LLC*,
  997 N.Y.S.2d 99 (N.Y. Sup. Ct. 2014) ............................................................ 23

*MBIA Ins. Corp. v. Royal Bank of Can.*,
  28 Misc. 3d 1225(A), 2010 WL 3294302 (N.Y. Sup. Ct. 2010) ..................... 17

*McBeth v. Porges*,
  171 F. Supp. 3d 216 (S.D.N.Y. 2016)............................................................... 11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Group, LLC*,
  19 A.D.3d 273 (1st Dep't 2005) ...................................................................... 22

*Morad v. Morad*,
  27 A.D.3d 626 (2d Dep't 2006) ....................................................................... 35

*N. Grp. Inc. v. Merrill, Pierce, Fenner & Smith Inc.*,
  2014 WL 3728501 (N.Y. Sup. Ct. July 25, 2014), *aff'd*, 135 A.D.3d 414 (1st
  Dep't 2016) ...................................................................................................... 22

*Nat'l Oil Well Maintenance Co. v. Fortune Oil & Gas, Inc.*,
  2004 WL 1886293 (S.D.N.Y. Aug. 24, 2004)................................................... 29

*Nat'l Union Life Ins. Co. v. Casmalia Res. Ltd.*,
  1990 WL 102199 (S.D.N.Y. July 11, 1990) ..................................................... 35

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  89 F. App'x 287 (2d Cir. 2004)........................................................................ 20

*P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*,
    301 A.D.2d 373 (1st Dep't 2003) ................................................................................ 24

*Pan Am Corp. v. Delta Air Lines, Inc.*,
    175 B.R. 438 (S.D.N.Y. 1994) .................................................................................... 30

*Perrotti v. Becker, Glynn, Melamed & Muffly LLP*,
    82 A.D.3d 495 (1st Dep't 2011) ................................................................................. 20

*Rawson Food Servs., Inc. v. TD Bank, N.A.*,
    2014 WL 809210 (D.N.J. Feb. 28, 2014) ................................................................. 15

*Republic Nat'l Bank v. Hales*,
    75 F. Supp. 2d 300 (S.D.N.Y. 1999), *aff'd*, 4 F. App'x 15 (2d Cir. 2001) ...................... 17

*Rescildo v. R.H. Macy's*,
    187 A.D.2d 112 (1st Dep't 1993) ............................................................................... 10

*Rowe v. Great Atl. & Pac. Tea Co.*,
    46 N.Y.2d 62 (1978) ................................................................................................. 32

*Sathe v. Bank of New York*,
    1990 WL 58862 (S.D.N.Y. 1990) .............................................................................. 29

*SCM Grp., Inc. v. McKinsey & Co.*,
    2011 WL 1197523 (S.D.N.Y. Mar. 28, 2011) ........................................................... 11

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
    2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ............................................................. 11

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    2017 WL 1207836 (S.D.N.Y. Mar. 31, 2017) ..................................................... 26, 27

*Simar Holding Corp. v. GSC*,
    87 A.D.3d 688 (2d Dep't 2011) ................................................................................. 33

*Simmtech Co. v. Citibank, N.A.*,
    2016 WL 4184296 (S.D.N.Y. Aug. 3, 2016) ...................................................... 17, 27

*Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros.
Int'l, Ltd.*,
    268 A.D.2d 373 (1st Dep't 2000) .............................................................................. 19

*Solutia Inc. v. FMC Corp.*,
    385 F. Supp. 2d 324 (S.D.N.Y. 2005) ....................................................................... 19

*Sorenson v. Bridge Capital Corp.*,
    30 A.D.3d 1144 (1st Dep't 2006) .............................................................................. 17

*Spinelli v. Nat'l Football League*,
    2016 WL 3926446 (S.D.N.Y. July 15, 2016), *on reconsideration in part*, 2016
    WL 7441696 (S.D.N.Y. Dec. 23, 2016) ............................................................. 31, 32

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001) .................................................................. 26, 27

*Susman v. Commerzbank Capital Mks. Corp.,*
    95 A.D.3d 589 (1st Dep't 2012) ................................................................. 30

*TIAA Global Invs., LLC v. One Astoria Square LLC,*
    127 A.D.3d 75 (1st Dep't 2015) ................................................................. 18

*Trainum v. Rockwell Collins, Inc.,*
    2017 WL 1093986 (S.D.N.Y. Mar. 9, 2017) ........................................ 26, 27

*Twinlab Corp. v. Paulson,*
    283 A.D.2d 570 (2d Dep't 2001) ................................................................ 12

*Urban Holding Corp. v. Haberman,*
    162 A.D.2d 230 (1st Dep't 1990) ............................................................... 29

*UST Private Equity Inv'rs Fund, Inc. v. Salomon Smith Barney,*
    288 A.D.2d 87 (1st Dep't 2001) ................................................................ 19

*Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,*
    149 F.3d 134 (2d Cir. 1998) ...................................................................... 19

*Washington v. Kellwood Co.,*
    2009 WL 855652 (S.D.N.Y. Mar. 24, 2009) ............................................. 30

*White Plains Hous. Auth. v. Getty Props. Corp.,*
    2014 WL 7183991 (S.D.N.Y. Dec. 16, 2014) ........................................... 35

## STATUTES AND RULES

Colombia Law Article 2341 .................................................................................. 8

Colombia Law Article 863 .................................................................................... 8

Fed. R. Civ. P. 9(b) ............................................................................................. 26

## PRELIMINARY STATEMENT

This case concerns currency trades between Plaintiff Mayagüez S.A. ("Mayagüez"), a Colombian sugar producer, and Defendants Citigroup, Inc. ("Citigroup") and Citibank, N.A. ("Citibank"). The purpose of those trades was—at least as requested and as represented—to reduce the risk to Mayagüez from currency fluctuations between the U.S. dollar and the Colombian peso. Instead, contrary to Defendants' assurances, the trades created unlimited risk for Mayagüez while posing minimal risk for Defendants, and, as to one trade, virtually ensured substantial losses for Mayagüez. In moving to dismiss, Defendants do not deny that the trades made no sense for Mayagüez, putting the entire company at risk under the auspices of transactions that were supposedly meant to reduce risk and orchestrating a trade that was a recipe for Mayagüez to lose money. According to the Amended Complaint, these Defendants calculated to prey upon a party inexperienced in complex financial transactions with egregiously unfair trades—based on false promises about what the trades would do and how Defendants would amend them—and thereby violated Colombia and New York law.

*First*, Mayagüez states claims under Colombia law. Defendants do not dispute that the Amended Complaint satisfies the elements of those claims or that, absent a choice-of-law provision, Colombia law applies. They argue only that the choice-of-law provision in the ISDA Master Agreement demands application of New York law. While insisting that Mayagüez be held to the express terms of the agreements, however begrudging or harsh, Defendants fail to apply the same principle to the choice-of-law provision. That provision, by its terms, does *not* apply to all claims related to the agreement, but rather states: "*This Agreement* will be governed by and construed in accordance with the laws of the State of New York." Mot. Ex. A, Schedule Part 4(h) (emphasis added). The Second Circuit and this Court consistently hold that this exact language applies *only* to contract claims, *not* tort claims. None of the Colombia law claims are contract

1

claims; they are tort claims to which the choice-of-law provision does not apply.

*Second*, Mayagüez states a claim for fraudulent inducement and fraudulent concealment under New York law.[1]  Mayagüez clearly identified the who, what, where, and when of  Defendants' false misrepresentations and omissions.  Defendants argue principally that Mayagüez could not justifiably rely on their misrepresentations and omissions.  But the supposed disclaimers of reliance prevent reliance only on "investment advice" and "recommendation[s]" and expressly allow for reliance on "information and explanations."  Mot. Ex. A, Schedule Part 4(m).  Defendants repeatedly provided false information and explanations about the terms and risks of the trades.  Alternatively, if the disclaimer covered all communications, as Defendants suggest, it would be the kind of generic disclaimer that is unenforceable under New York law.

*Third*, Mayagüez states a claim for negligent misrepresentation under New York law.  Defendants and Mayagüez had a special relationship enabling such a claim because Defendants had special knowledge of these exotic financial transactions, there was a longstanding relationship of trust with Defendants, and Defendants knew Mayagüez would rely on the misrepresentations.  Defendants mistakenly try to equate "special" relationship with "fiduciary" relationship, but the latter is not a predicate for negligent misrepresentation.  And many cases have held that a client's relationship with a bank can give rise to a claim for negligent misrepresentation.

*Fourth*, Mayagüez states a claim for unjust enrichment under New York law.  Defendants argue that a party may not recover for unjust enrichment where there is a contract, but this principle does not apply where, as here, the unjust enrichment occurred as a result of conduct—in

---

[1]    All of the New York law claims except for unconscionability are pled in the alternative, and thus need be reached only if (contrary to established law) this Court holds that New York law applies to the tort claims at issue here.  The unconscionability claim is not pled in the alternative because it (as a contract claim) does fall within the choice-of-law provision.

particular, Defendants' false and misleading statements—outside the contract itself.

*Fifth*, Mayagüez states a claim for promissory estoppel under New York law because Defendants made clear promises to amend the currency transactions, upon which Mayagüez justifiably relied. Defendants are on the wrong side of well-established law in arguing that the mere presence of a contract forecloses this claim.

*Finally*, Mayagüez states a claim for unconscionability because Defendants took advantage of Mayagüez's trust and lack of expertise to sell Mayagüez currency transactions that were egregiously unreasonable, creating unlimited risk and near-certain losses to Mayagüez. Without attempting to defend the substance of the transactions, Defendants assert that Mayagüez made its choice by entering into the transactions. But the unconscionability doctrine exists precisely to protect unsophisticated buyers against being duped by predatory sellers into entering outrageous agreements, which is exactly what occurred here. If Defendants' arguments were adopted, banks would have free license to enter the most unjust deals with clients, mask the unfairness in impenetrable complexity, and provide false information in convincing clients to enter the deals before papering it all over. That is not the law and should not become the law.

## COUNTERSTATEMENT OF FACTS

### A.   Mayagüez's Managing Of Risk From Currency Fluctuation

Mayagüez is a Colombian company that sells sugar both in Colombia and abroad, including the United States. Am. Compl. ¶ 19. Most of Mayagüez's expenses are incurred in Colombian pesos ("COP"), but it earns money in U.S. dollars ("USD") for its foreign sales. *Id.* ¶¶ 20-21. Because exports represent approximately 20% of its revenues, it is important for Mayagüez to protect itself from wide fluctuations in the USD/COP exchange rate. *Id.* ¶¶ 24, 32.

To manage this risk, Mayagüez has historically used "plain vanilla" currency forwards, whereby Mayagüez agreed to purchase a certain amount of COP in the future at a particular ex-

change rate, with the purchase price payable in a specified amount of USD.  *Id.* ¶¶ 32-33.  From 2006 to 2013, Mayagüez hedged through plain vanilla forwards with the Colombian government and private Colombian financial institutions, including Citibank, S.A., Citibank's Colombian subsidiary ("Citibank Colombia").  *Id.* ¶¶ 38-40.  These forward contracts typically involved notional values of approximately USD 2 million with terms of 6 to 12 months.  *Id.* ¶ 40.

In 2009, in anticipation of possibly entering into currency forwards with Citibank, Mayagüez executed the ISDA Master Agreement.  *Id.* ¶ 45.  In 2011, Mayagüez entered into a separate master agreement with Citibank Colombia.  *Id.* ¶ 48.

By 2012, Mayagüez had been Citibank's client for approximately three years and had come to trust and rely on Citibank and on its financial expertise, especially in regard to currency hedging transactions.  *Id.* ¶ 50.  At that time, Defendants' employees offered Mayagüez a complex currency forward transaction called a "limited compensation collar."  *Id.* ¶ 49.  Citigroup refers to it as an "exotic product."  *Id.* ¶ 62.  In particular, Citigroup offered to purchase a capped amount of Mayagüez's USD at a better (*i.e.*, higher) strike price (expressed in COP) than other banks, and in return for this limited benefit, Citigroup demanded: (i) that the trade have a term significantly longer than six to twelve months; and (ii) if the USD strengthened so that the actual USD/COP exchange rate exceeded the strike price, Mayagüez would have to make monthly payments to Citigroup.  *Id.* ¶ 64.  These payments had no limit.  *Id.* ¶ 65.

## B.    Defendants' Misrepresentations And Omissions

Although a plain vanilla forward was ideal for Mayagüez's hedging needs, Mayagüez agreed to the trades at issue ("Currency Trades") based on Citigroup's false and misleading representations and material omissions.  *Id.* ¶ 71.  These misrepresentations and omissions occurred in (*inter alia*) an August 8, 2012 email and presentation, a December 7, 2012 email and spreadsheet, an October 21, 2013 email and presentation, and additional 2012-2013 meetings and cor-

respondence. *Id.* ¶¶ 72-91. These misrepresentations included that the Currency Trades were tailored for Mayagüez, reduced Mayagüez's risk of exposure from changes in the USD/COP exchange rate, reduced potential claims against Mayagüez, and operated exactly like plain vanilla forwards with respect to payments. *Id.* ¶¶ 76-77, 81, 85. In these communications, Defendants omitted to mention that Mayagüez had unlimited potential risk, even while strictly limiting risk to Defendants. *Id.* ¶¶ 79, 81, 83, 84, 86, 88. Defendants knew their representations and explanations to Mayagüez were false and misleading and that the Currency Trades were detrimental to Mayagüez. *Id.* ¶¶ 91, 92. From at least 2012 to 2016, Citigroup requested and received from Mayagüez detailed financial information including its audited financial statements, and thus Citigroup knew that the Currency Trades could threaten Mayagüez's existence. *Id.* ¶¶ 97-98.

Had Mayagüez understood the Currency Trades, it would not have entered into them. *Id.* ¶ 92. The Currency Trades were enormously complex and impossible to understand for an unsophisticated client like Mayagüez. *Id.* ¶ 93. Mayagüez entered into the Currency Trades in reliance on Defendants' misrepresentations and omissions, based on its relationship with Defendants and Defendants' expertise. *Id.* ¶ 96.

### C.    The Three Currency Trades

In November 2013, Citibank Colombia and Mayagüez entered into the first Currency Trade (the "November 2013 trade"). *See id.* ¶¶ 100-06. During the first quarter of 2014, the USD/COP exchange rate was on the rise, which would require Mayagüez to begin making payments to Citibank Colombia, but Citigroup agreed to amend the terms three times to prevent that from happening. *Id.* ¶¶ 108-10. The November 2013 trade elapsed prior to the end of its term, in December 2016, because Citibank Colombia had paid to Mayagüez the maximum amount of COP 1,656 million (approximately USD 850,000). *Id.* ¶ 111.

In July 2014, Citibank Colombia and Mayagüez entered into the second Currency Trade

(the "July 2014 trade"). *Id.* ¶ 112. The term of the trade was two years and eleven months, and for that period, each month Citibank Colombia had to purchase U.S. dollars from Mayagüez at a strike price of COP 2,090, based on a Mayagüez notional amount of USD 3 million. *Id.* ¶ 114. Mayagüez was permitted to receive a maximum of COP 3 billion (approximately USD 1.5 million) from Citibank Colombia. *Id.* ¶ 115. However, if the exchange rate exceeded COP 2,090 per USD 1, Mayagüez had to pay Citibank Colombia the difference between the actual exchange rate and the strike price of COP 2,090, multiplied by USD 6 million (*i.e.*, double the notional amount that applied to fluctuations favorable to Mayagüez). *Id.* ¶ 117. Moreover, the July 2014 trade imposed no limit on how much Mayagüez had to pay to Citibank Colombia. *Id.* ¶ 118.

In late 2014, the exchange rate reached a high of COP 2,446.35 to USD 1, and Mayagüez made payments to Citibank Colombia of approximately USD 670,000. *Id.* ¶ 121. By January 2015, on a mark-to-market basis, Mayagüez owed approximately *USD 34.9 million* to Citibank Colombia (which is the amount Mayagüez would have to pay to cancel the transaction). *Id.* ¶ 121-22. This amount dwarfed the company's total export revenues for 2014. *Id.* ¶ 121. Around that time, Mayagüez informed Citigroup that it wanted to cancel the July 2014 trade by paying the USD 34.9 million. *Id.* ¶ 123. Citigroup instead convinced Mayagüez, through fraudulent misrepresentations, explanations, and omissions, to "kick[] the can" by entering a new trade. *Id.*

In January 2015, Citibank and Mayagüez entered into the third Currency Trade (the "January 2015 trade"). *Id.* ¶ 124. The term of the trade was three years. *Id.* ¶ 127. In the first tranche (through November 2015), Citibank had to sell COP to Mayagüez at a strike price of COP 2,600, based on a notional amount of USD 6 million. *Id.* ¶¶ 126, 129. In the second tranche (starting in December 2015), Citibank had to sell COP to Mayagüez at a strike price of COP 2,090, based on a notional amount of USD 7.5 million. *Id.* ¶¶ 126, 130. In January 2015,

when Citigroup structured the trade, the exchange rate was approximately COP 2,400 to USD 1. *Id.* ¶ 130. Thus, *unless there was a dramatic drop in the exchange rate, Mayagüez would incur substantial and unlimited losses with certainty starting in December 2015*. *Id.* There was no limit on potential Mayagüez losses, but Citibank losses (and thus Mayagüez gains) were capped at approximately USD 800,000 for the first tranche and USD 650,000 for the second. *Id.* ¶ 128.

Only due to its reliance on false promises made by Defendants did Mayagüez agree to the January 2015 trade. *Id.* ¶¶ 125, 131. Defendants falsely promised that they would (1) defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 trade at the end of the January 2015 trade, folding that debt into a new trade; and (2) increase the strike price of the January 2015 trade above the USD/COP exchange rate if the exchange rate exceeded COP 2,600 during the first tranche, or in any event, before the second tranche went into effect. *Id.* ¶¶ 125, 131. Mayagüez relied on these promises as it did based on its longstanding relationship with Defendants and Defendants' willingness to amend prior trades. *Id.* ¶ 132.

In the first quarter of 2015, the COP/USD exchange rate rose and Mayagüez informed Citigroup that it wanted to cancel the January 2015 trade, which at that time would require Mayagüez to pay Citigroup USD 44.5 million. *Id.* ¶ 134. Citigroup convinced Mayagüez not to cancel by promising to amend the trade if and when the USD/COP exchange rate exceeded COP 2,600 and, in any case, before the second tranche took effect. *Id.* The exchange rate continued to rise, exceeding COP 2,600, yet Citigroup refused Mayagüez's demands that it keep its promise to amend; instead, Citigroup apologized to Mayagüez and admitted that the Currency Trades were ill-suited and detrimental for Mayagüez. *Id.* ¶¶ 138-39. By December 2015, the exchange rate reached a high of COP 3,356, and as of March 2016, the total amounts owed (under mark-to-market value) for the July 2014 and January 2015 trades was approximately USD 68 million in

favor of Citibank. *Id.* ¶¶ 141-42. By March 2016, Mayagüez paid approximately USD 52 million to Citibank (funded mostly via a loan from a Colombian financial institution) and has paid or will pay the remaining USD 16 million for the sake of cancelling the trades. *Id.* ¶ 143.

### D.    The Claims

The Amended Complaint brings three claims under Colombia law, based on Defendants willfully causing harm to Mayagüez through their fraudulent representations and omissions (Am. Compl. ¶¶ 151-62); negligently causing harm to Mayagüez through their fraudulent representations and omissions (*id.* ¶¶ 192-203); and causing harm to Mayagüez by acting in bad faith through their material representations and omissions (*id.* ¶¶ 237-47).

In the alternative to the Colombia law claims, if this Court determined that Colombia law does not apply, Mayagüez brings claims under New York law for fraudulent inducement and fraudulent concealment (*id.* ¶¶ 162-91); negligent misrepresentation (*id.* ¶¶ 204-36); unjust enrichment (*id.* ¶¶ 248-51); and promissory estoppel (*id.* ¶¶ 252-61). In addition, and *not* in the alternative, Mayagüez brings a claim for unconscionability under New York law. *Id.* ¶¶ 262-67.

Defendants seem to misunderstand the Amended Complaint by asserting that the Colombia law claims are pled in the alternative to the New York claims. Mot. 9. To be clear, and as evident in the description of each cause of action, the Colombia law claims are the primary claims and (except for unconscionability) the New York claims are pled only in the alternative.

## ARGUMENT

## I.    THE AMENDED COMPLAINT STATES CLAIMS UNDER COLOMBIA LAW

Defendants do not dispute that the Amended Complaint satisfies all of the elements for violations of Articles 863 and 2341 under Colombia law, which are Mayagüez's First, Fifth, and Eighth causes of action. Nor do Defendants dispute that, absent a choice-of-law provision that governs these claims, Colombia law would apply here given that (i) Mayagüez is a Colombian

company; (ii) Defendants made fraudulent representations and omissions to Mayagüez in Co-

lombia; (iii) Defendants acted, at least in part, through employees located in Colombia; and (iv)

Mayagüez suffered injury in Colombia.  Am. Compl. ¶ 18.  Instead, Defendants' *only* response

(Mot. 33-35) to the Colombia law claims is that they are supposedly barred by the choice-of-law

provision in the ISDA Master Agreement.

Defendants' argument conflicts with the plain text of the provision and the uniform, gov-

erning case law interpreting it.  The choice-of-law provision states:  "This Agreement will be

governed by and construed in accordance with the laws of the State of New York."  Mot. Ex. A,

Schedule Part 4(h); *see also id.*, ISDA Master Agreement Part 13(a).  By its terms, this provision

applies only to what "*[t]his Agreement*" governs and how it is construed.  Unlike the much

broader choice-of-forum clause, it does not apply to all claims related to the agreement.[2]

Courts have agreed that the language of the choice-of-law provision here governs only

contract claims, not tort claims.  In *Finance One Public Co. v. Lehman Bros. Special Financing,*

*Inc.*, 414 F.3d 325 (2d Cir. 2005), the Second Circuit considered the choice-of-law provision in

the ISDA Master Agreement, with the exact same language at issue here.  *Id.* at 332.  *Finance*

*One* held that the scope of the choice-of-law provision is itself a question governed by the law of

the forum, *i.e.*, New York law.  *Id.* at 332-33.  And it recognized a "reluctance on the part of

New York courts to construe contractual choice-of-law clauses broadly to encompass extra-

---

[2]  The choice-of-forum provision states:  "*With respect to any suit, action or proceedings* ***relating to any dispute arising out of or in connection with*** *this Agreement* ('Proceedings'), each party irrevocably … submits … to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City."  Mot. Ex. A, ISDA Master Agreement Part 13(b) (emphasis added).  Under Defendants' interpretation, the choice-of-law clause would follow the text of the choice-of-forum clause, applying New York law to every claim related to any dispute connected to the agreement. But the parties agreed to a choice-of-law provision that is, quite conspicuously, narrower.

contractual causes of action." *Id.* at 334.  Indeed, because "[t]he forum-selection and choice-of-law clauses use different language[,] there is no reason to think that they have the same scope." *Id.* at 335.  It therefore held that, "as a matter of New York law, extra-contractual setoff rights fall outside the scope of the choice-of-law clause in the Master Agreement and Schedule." *Id.* The same reasoning and holding follow here:  Mayagüez's extra-contractual claims, *i.e.*, all claims other than the one for unconscionability, are not covered by the choice-of-law provision.

Defendants argue (Mot. 34) that *Finance One* is distinguishable because it concerned a claim for setoff rights.  But this ignores the reasoning in *Finance One*, which applies to tort claims generally, not just to setoff claims:  "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." *Fin. One*, 414 F.3d at 335.  The distinction between contract and tort claims is the one endorsed by New York courts. *Id.* at 334 ("'That the parties agreed that their contract should be governed by an expressed pro-cedure does not bind them as to causes of action sounding in tort ....'") (quoting *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 74 A.D.2d 290, 293 (1st Dep't 1980), *overruled on other grounds*, *Rescildo v. R.H. Macy's*, 187 A.D.2d 112 (1st Dep't 1993)); *id.* at 335 (noting that *Knieriemen* held that the language is "not broad enough to reach tort claims incident to the con-tractual relationship").  Thus, there is no legal basis to limit *Finance One* to setoff claims.

In any event, the Second Circuit has applied the same rule to claims for fraud.  *See Krock v. Lipsay,* 97 F.3d 640 (2d Cir. 1996).  To quote the Second Circuit's holding in *Krock*:  "Under New York law, a choice-of-law provision indicating that the *contract* will be governed by a cer-tain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract." *Id.* at 645 (citations omitted); *see also id.* ("While a choice-of-

10

law provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort.") (quotation marks omitted). *Krock* therefore concluded that, for a choice-of-law provision providing that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts," there was "no way such language can be read broadly enough to apply to fraudulent misrepresentation." *Id.* This holding, too, is on point and confirms that the "governed by and construed" language in the choice-of-law provision at issue here cannot apply to the Colombia law claims.

Numerous other cases are in accord and apply the principle to a wide variety of tort claims, including all of the claims brought in the Amended Complaint (aside from unconsciona-bility). For instance, this Court has held that a provision stating that the agreement "'shall be governed by, and construed in accordance with, the internal laws of the State of Delaware'" does "not cover Plaintiff's claims for fraudulent and negligent misrepresentation." *McBeth v. Porges*, 171 F. Supp. 3d 216, 223-24 (S.D.N.Y. 2016).[3] Similarly, an unjust enrichment claim is outside an agreement providing that it "'shall be governed by and construed in accordance with the laws of … Kansas'" because "extra-contractual claims are outside the scope of contractual choice-of-law provisions." *SCM Grp., Inc. v. McKinsey & Co.*, 2011 WL 1197523, at *7 (S.D.N.Y. Mar. 28, 2011) (Gardephe, J.) (quotation marks omitted).[4] New York state court cases are in accord.[5]

---

[3]   *See also Frontline Processing Corp. v. Merrick Bank Corp.*, 2014 WL 837050, at *12 n.4 (S.D.N.Y. Mar. 3, 2014) (provision stating that "this Agreement and all rights and obligations hereunder … are governed by and construed in accordance with the laws of the State of New York" did not cover fraud and negligent misrepresentation); *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, 2013 WL 3389008, at *5 (S.D.N.Y. July 3, 2013) (provision stating that "'[t]his Agreement shall be ... construed in accordance with the laws of ... New York as to all matters'" did not cover fraud and unjust enrichment claims); *Sedona Corp. v. Ladenburg Thalmann & Co.*, 2005 WL 1902780, at *14-15 (S.D.N.Y. Aug. 9, 2005) (similar).

[4]   While it is well established that tort claims for fraud or negligent misrepresentation are not governed by a choice-of-law provision like the one at issue here, "[s]ome controversy

Defendants ignore virtually all of these cases, instead relying on two, *Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.*, 2016 WL 2622013 (W.D.N.Y. May 5, 2016), and *Capital Z Financial Services Fund II v. Health Net, Inc.*, 43 A.D.3d 100 (1st Dep't 2007), both of which are inapposite.  In *Bausch & Lomb*, the court recognized that "language in a choice-of-law provision indicating that the *contract* will be governed by a certain body of law is insufficient to determine which law will govern *tort claims arising out of* that contract."  2016 WL 2622013, at *8.  The court held the claims covered by the choice-of-law provision only because the provision was broader, covering "'[t]his Agreement *and all claims related to it*.'"  *Id.*  Likewise, in *Capital Z*, the court considered a choice-of-law provision with language substantially broader than that at issue here and in the myriad cases discussed above.  43 A.D.3d at 104, 109 (acknowledging that "limited choice of law provisions may not determine claims of fraud," but that the provision at issue was not so limited because it covered "'all issues' concerning 'enforcement of the rights

_____

appears to exist as to whether a claim for unjust enrichment is governed by a contract's enforceable choice-of-law provision." *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 233 (S.D.N.Y. 2015).  The better and more accepted view is that unjust enrichment is not a contract claim and therefore falls outside the choice-of-law provision.  *See, e.g.*, *CUnet, LLC v. Quad Partners, LLC*, 2017 WL 945937, at *6 (Mar. 7, 2017); *Dart Brokerage Corp. v. Am. Commerce Ins. Co.*, 2013 WL 5966901, at *2 (S.D.N.Y. Nov. 7, 2013); *Innovative BioDefense*, 2013 WL 3389008, at *5; *Gross Found., Inc. v. Goldner*, 2012 WL 6021441, at *11 (E.D.N.Y. Dec. 4, 2012); *Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 444 (S.D.N.Y. 2010); *Gutstadt v. Nat'l Fin. Partners Corp.*, 2013 WL 5859550, at *3 (N.Y. Sup. Ct. Oct. 22, 2013).  Regardless, none of Mayagüez's Colombia law claims is based on a theory of unjust enrichment, but rather on Defendants' fraudulent, negligent, and bad-faith conduct, in particular in making misrepresentations and omissions.  Accordingly, even if unjust enrichment were governed by the choice-of-law provision, that would not defeat any of the Colombia law claims.  Rather, the only result would be that Mayagüez could bring an unjust enrichment claim under New York law *in addition to* those claims.

[5]   *See Twinlab Corp. v. Paulson,* 283 A.D.2d 570, 571 (2d Dep't 2001) (provision that the "validity, interpretation, construction and performance" of the agreement would be governed by and construed in accordance with New York law did not cover RICO claim); *Knieriemen*, 74 A.D.2d at 293 (provision stating "that '[t]his contract shall be governed by the laws of the State of New York'" does "not bind them as to causes of action sounding in tort'"); *Gutstadt*, 2013 WL 5859550, at *3 (same for breach of fiduciary duty, fraud, and unjust enrichment).

and duties of the parties'") (citation omitted).  This Court has distinguished *Capital Z* on this basis.  *Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp.*, 2009 WL 935665, at *24 n.15 (S.D.N.Y. Apr. 7, 2009).  Indeed, it is implausible that the First Department in *Capital Z* overruled its own prior case law, Second Circuit case law, and numerous district court decisions *sub silentio*, without any court subsequently understanding *Capital Z* to have overthrown longstanding, uniform precedent in the startling fashion that Defendants now suggest.

Because the Colombia law claims are tort claims, not contractual claims, the choice-of-law provision is inapplicable.  The Amended Complaint brings three claims under Colombia law, concerning Defendants' willful, negligent, and bad faith conduct that caused harm to Mayagüez through their fraudulent representations and omissions.  Am. Compl. ¶¶ 151-62, 192-203, 237-47.  Just as in the numerous cases discussed above, none of these claims concerns a violation of the agreement itself; as such, the law that "governs" the agreement and how the agreement should be "construed" are irrelevant to those claims.  While Defendants contend (Mot. 35) that the Colombia law claims "pertain to the ISDA Master Agreement," the dispositive question is simply whether the claims are contract claims or tort claims.  And the Colombia claims are plainly tort claims.  *See* Arrubla-Paucar Decl. ¶¶ 21, 27.  The only hook Defendants have for positing (Mot. 34 n.40, 35) that the agreement "governs" the Colombia law claims such that it must be "construed" is that the agreement addresses the question of reliance.  But even that strained reasoning is mistaken in its premise, for justifiable reliance is not, in fact, an element of the Colombia law claims.  *See* Arrubla-Paucar Decl. ¶¶ 21, 27.[6]

---

[6]   Even if justifiable reliance were an element (and it is not), Defendants cite no cases adopting their argument, and for good reason.  *First*, it would apply only to the reliance element, but choice-of-law is conducted relative to an entire claim, not element by element.  And there is no basis for treating the other elements of the Colombia law claims as being governed by New

## II.    THE AMENDED COMPLAINT STATES A CLAIM FOR FRAUDULENT INDUCEMENT AND CONCEALMENT UNDER NEW YORK LAW

### A.    The Amended Complaint Satisfies The Element Of Justifiable Reliance

The Amended Complaint expressly alleges that Mayagüez relied on Defendants' false representations and omissions, and that this reliance was justifiable given Mayagüez's relationship with Defendants and Defendants' superior knowledge in an extraordinarily complex field. *See* Am. Compl. ¶¶ 132-33, 146, 169, 185.

### 1.    Mayagüez did not disclaim reliance on Defendants' misrepresentations and omissions.

Defendants argue (Mot. 16-22) that Mayagüez disclaimed reliance on Defendants' misrepresentations, but this argument fails on several grounds.

*First*, none of the supposed disclaimers cover the misrepresentations and concealment alleged here.  The provision Defendants focus on is that Mayagüez "is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into that Transaction."  Mot. Ex. A, Schedule Part 4(m); *see also* Mot. Ex. E § E (same).  Defendants argue that "the ISDA Master Agreement unambiguously provides that Mayagüez agreed to no-reliance provisions covering all statements made by Defendants and that none of those statements would constitute investment advice."  Mot. 22.  But that is simply not what the provision says.  It states that communications cannot be relied upon as "investment advice" or "recommendation," and then excludes from those categories "information and explana-

York law.  *Second*, Defendants identify no disparity between New York and Colombia law over how to "interpret" the supposed disclaimers of reliance; the question is how those supposed disclaimers affect the viability of a claim against Defendants.  And it would be discordant to have that question answered by New York law as to Colombia law claims.

14

tions."  It makes no sense to create this exclusion unless it was done to show that Mayagüez *can* rely upon information and explanations.  As Mayagüez alleged, Defendants provided information and explanations about the trades that were false and misleading.  Am. Compl. ¶ 47. Mayagüez also relied on Defendants' promise to amend the January 2015 trade, which clearly does not constitute investment advice or a recommendation, but rather information.

A district court examining this language made the same point in denying a motion to dismiss:  "[T]his passage appears to permit reliance on 'information and explanations,' but not 'advice' and 'recommendation[s].'  The statements at issue in this case could plausibly belong in either of these categories."  *Rawson Food Servs., Inc. v. TD Bank, N.A.*, 2014 WL 809210, at *5 (D.N.J. Feb. 28, 2014).  Also, the co-chairs of a drafting committee organized by the Federal Reserve Bank explained in 1995 that contractual provisions that clarify relationships between parties in the financial markets should permit a counterparty to rely on the factual accuracy of statements made about a trade.  *See* Morillo Decl. Ex. A at 3 ("The intent of this Section was merely to describe what Participants should do if they wished to enter into an advisory relationship where one Participant would provide recommendations or investment advice to the other.  It was not intended to protect or condone inaccurate or intentionally misleading factual statements. Furthermore, the Principles do not and could not modify the common law rules of fraud.").[7]

*Second*, to the extent the disclaimers were interpreted to include "all statements made by Defendants" (Mot. 22), they would constitute the kind of boilerplate provisions that are unenforceable as a matter of New York law.  "[A] general merger clause is ineffective to exclude parol evidence to show fraud in inducing the contract."  *Danann Realty Corp. v. Harris*, 5 N.Y.2d

---

[7]    The Drafting Committee published "The Principles and Practices for Wholesale Financial Market Transactions" on August 17, 1995.  One of the co-chairs of that committee was Gay H. Evans, the Chair of ISDA's Board of Directors at that time.

317, 320 (1959).  Only a "specific disclaimer" concerning "the very matter as to which [the plaintiff] now claims it was defrauded" suffices.  *Id.*  "[T]o be considered sufficiently specific to bar a defense of fraudulent inducement under *Danann*, a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim."  *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993).

The Second Circuit has considered language from the ISDA Master Agreement almost identical to the supposed disclaimers at issue here.  *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 330 (2d Cir. 2002) ("[T]he Confirmation specifically provided that Caiola would not be relying on Citibank's advice or recommendations, that he would make his own investment decisions, and that Citibank would not be his fiduciary or advisor.").  The court was "not persuaded that these disclaimers barred Caiola from relying on Citibank's oral statements" because "[t]his disclaimer is general, not specific, and says nothing about" the particular misrepresentations regarding what Citibank would do in the future in their trading relationship.  *Id.*[8]; *see Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 2002 WL 31426310, at *6 (S.D.N.Y. Oct. 29, 2002), *clarified on denial of reconsideration*, 2003 WL 288988 (S.D.N.Y. Feb. 7, 2003) (holding the disclaimers in the ISDA Master Agreement too generalized to defeat reliance).

Likewise, here, the supposed disclaimers say nothing about the particular inaccurate explanations, misrepresentations, and omissions that Defendants made.  These concern assurances that the trades would reduce potential claims against Mayagüez, Am. Compl. ¶ 76, reduce risk for Mayagüez, *id.* ¶ 77, were tailored for Mayagüez, *id.* ¶ 81, and operated like plain vanilla for-

---

[8]     *Caiola* applies federal law, but its standard for evaluating the specificity of the disclaimer is indistinguishable from New York law.  *Caiola*, 295 F.3d at 330 ("A disclaimer is generally enforceable only if it 'tracks the substance of the alleged misrepresentation....'") (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984), which applied New York law).

wards, *id.* ¶ 85; and that Defendants would amend the January 2015 trade, *id.* ¶ 131.  The sup-

posed disclaimer language does not specifically identify any of these inaccurate explanations,

misrepresentations, and omissions, and therefore does not preclude reliance on them.  Indeed,

Defendants cite no case barring reliance on these kinds of misrepresentations based on the gen-

eral disclaimer language at issue here.  The cases Defendants rely upon (Mot. 16-17 & nn.11-12)

are inapposite, involving disclaimers far more specific than the language at issue here.[9]  The few

cases with disclaimer language similar to the language at issue here are likewise inapposite on

their facts and could not in any event overcome the binding precedent in *Caiola*.[10]

---

[9]   *See First Nationwide Bank v. 965 Amsterdam, Inc.*, 212 A.D.2d 469, 471 (1st Dep't 1995) (disclaimer regarding "rel[iance] on its representations as to the income and condition of the property"); *Sorenson v. Bridge Capital Corp.*, 30 A.D.3d 1144, 1145 (1st Dep't 2006) (not describing the disclaimer or addressing the specificity issue, but the briefing below makes clear the specificity:  "[Bridge] makes no representation or warranty as to the work, materials, appliances, equipment, or fixtures in the Unit …."  Defendants' Mem. of Law in Support of Motion to Dismiss, *Sorenson v. Bridge Capital Corp.*, *available at* 2005 WL 6488525 (1st Dep't 2005).); *Danann*, 5 N.Y.2d at 320 ("The Seller has not made and does not make any representations as to the physical condition, rents, leases, expenses, operation or any other matter or thing affecting or related to the aforesaid premises …."); *Emfore Corp. v. Blimpie Assocs., Ltd.*, 51 A.D.3d 434, 435 (1st Dep't 2008) (not describing the disclaimer, but as noted in the lower court opinion, it is specific:  "Operator acknowledges that [defendants] *have not made,* and Operator *has not relied* on any representations … regarding financing, net profits, [etc.] of Blimpie restaurants generally or of any specific Blimpie restaurant."  *Emfore Corp v. Blimpie Associates, Ltd.*, 2006 WL 6091794, at *4 (N.Y. Sup. Ct. Sept. 14, 2006)); *MBIA Ins. Corp. v. Royal Bank of Can.*, 28 Misc. 3d 1225(A), 2010 WL 3294302, at *32 (N.Y. Sup. Ct. 2010) (holding that "the disclaimers were specific with regard to the risks inherent in the collateral").

[10]   *See Simmtech Co. v. Citibank, N.A.*, 2016 WL 4184296, at *14 (S.D.N.Y. Aug. 3, 2016) (stating that non-reliance provision "cannot be ignored," but basing its holding of no reliance on other factors); *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, 2009 WL 2033048, at *5 (S.D.N.Y. July 13, 2009) ("[T]he fraud assertion is inconsistent with the Disclaimer discussed above *and* with the CDO Contract's express provisions permitting demands for additional collateral.") (emphasis added); *Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 316 (S.D.N.Y. 1999), *aff'd*, 4 F. App'x 15 (2d Cir. 2001) (noting disclaimer language in addition to language in the ISDA Master Agreement); *JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 2010 WL 4868142, at *6-7 (N.Y. Sup. Ct. 2010) (holding disclaimer barred only generalized misrepresentation that JP Morgan "misrepresent[ed] 'the potentially ruinous risks'" of the transactions).

*Third*, even if the disclaimers were specific rather than general, they would still be unenforceable. A specific disclaimer is ineffective "where 'the facts represented are . . . matters peculiarly within the [representing] party's knowledge, and the other party [lacks] the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation.'" *TIAA Global Invs., LLC v. One Astoria Square LLC*, 127 A.D.3d 75, 87 (1st Dep't 2015) (quoting *Danann Realty*, 5 N.Y.2d at 322). The Amended Complaint sufficiently alleges that the fraud was peculiarly within Defendants' knowledge. *See id.* ¶ 148.

Defendants argue (Mot. 19) that this exception applies only where the "defendant allegedly had access to concealed *factual* information unique to the transaction." But Defendants had particular factual information about whether, *e.g.*, the trades were really tailored to Mayagüez, the trades would reduce risk for Mayagüez, and Defendants intended to amend the January 2015 trade. Defendants miss the mark by suggesting (Mot. 19) that "neither Mayagüez nor Defendants knew how currency rates would move in the future"; the misrepresentations do not concern a promise about how currency rates would move, but about how movement of rates would affect Mayagüez and whether the trade was designed to reduce that risk or simply to enrich Defendants.

To the extent Defendants suggest their greater expertise should not matter because Mayagüez could have figured this out with help from its own expert, this argument obviously does not apply to the promise to amend the January 2015 trade. As to the other misrepresentations, it is almost always true that a plaintiff could have hired its own expert who might have discovered the truth, and such a requirement would effectively destroy the special knowledge exception. Recognizing as much, courts have required only that "'a party would face high costs in determining the truth or falsity' of representations." *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 340 (S.D.N.Y. 2005) (quoting *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d

134, 136 (2d Cir. 1998)).  It was reasonable to rely on statements made within Defendants' pecu-

liar knowledge rather than hiring another major dealer (presumably the only other entity that

could provide similar knowledge) to perform the same function as Defendants.[11]  At a minimum,

there is a factual question here that should not be resolved on the pleadings.[12]

### 2.   Mayagüez's reliance was justifiable based on the facts alleged.

Defendants argue (Mot. 22-23) that reliance was not justifiable regardless of the dis-

claimers, but these arguments are erroneous and ignore the principle that the reasonableness of

reliance almost always entails a factual inquiry insusceptible to resolution on a motion to dis-

miss.  *See, e.g.*, *Bayerische Landesbank, N.Y. Branch v. Barclays Capital, Inc.*, 902 F. Supp. 2d

---

[11]   The cases Defendants rely upon are inapposite.  In one, the court did not consider the
peculiar knowledge exception and the case concerned particular representations for monoline
insurers.  *See Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*, 997 N.Y.S.2d 97, 2014
WL 3288335, at *2-3 (N.Y. Sup. Ct. 2014).  In another, the plaintiff was "a sophisticated
institutional investor" and its contention "that it was unable itself to acquire the information
needed independently … is without support in the record."  *Societe Nationale D'Exploitation
Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l, Ltd.*, 268 A.D.2d 373, 374 (1st
Dep't 2000).  In another, the plaintiffs were "sophisticated" institutional investors and "plaintiffs
[had] not alleged any facts from which it could logically be inferred that defendants' access to
the relevant information was superior to the access afforded to plaintiffs …."  *UST Private
Equity Inv'rs Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87, 89 (1st Dep't 2001).  And in
the last, the plaintiff was once again sophisticated (in fact, a bank) and "the true nature of the risk
being assumed could have been ascertained from reviewing market data or other publicly
available information."  *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195 (1st Dep't 2012).

[12]   In addition to the specific clause in the ISDA Master Agreement concerning reliance,
Defendants note language (Mot. 17-18, 20) about Mayagüez assuming the risks, but that is not
specific to the misrepresentations and omissions, and in any event, does not defeat reliance.  *See,
e.g.*, *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 115 A.D.3d 128, 138 (1st
Dep't 2014) ("boilerplate statements regarding the speculative and risky nature of investing in
mortgaged-backed CDOs" not sufficiently specific); *Lorne v. 50 Madison Ave. LLC*, 32 Misc. 3d
1226(A), 2011 WL 3274258, at *4-5 (N.Y. Sup. Ct. June 20, 2011) (similar).  That is especially
true here given that there is an express reliance provision that makes clear Mayagüez can rely on
information and explanations from Defendants.

Similarly, Defendants cite (Mot. 18) supposed disclaimers that Defendants were not
acting as a fiduciary and Mayagüez would perform its own examination, but under well-
established law, such statements do not make reliance on Defendants' statements unjustifiable.
*See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 406-07 (2d Cir. 2015);
*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 525 (S.D.N.Y. 2014).

471, 474 (S.D.N.Y. 2012); *Brunetti v Musallam*, 11 A.D.3d 280, 281 (1st Dep't 2004).

*First*, Defendants argue (Mot. 22) that Mayagüez could not rely on Defendants' representa-tions in lieu of the terms of the Currency Trades.  But the cases Defendants cite require a clear conflict between the contract and the misrepresentations outside the contract.  *See, e.g.*, *Perrotti v. Becker, Glynn, Melamed & Muffly LLP*, 82 A.D.3d 495, 498-99 (1st Dep't 2011).  Defendants fail to identify where the confirmations refute the misrepresentations they made.  In particular, nothing in the confirmations expressly contradicts the representations that the trades would re-duce risk for Mayagüez, that the trades were tailored for Mayagüez, that payments operated like plain-vanilla forwards, and that Defendants would amend the January 2015 trade.  To the extent that Defendants suggest that Mayagüez could have figured out that the trades were actually in-creasing its risk and not tailored for its needs, they cite no case law suggesting that this kind of implicit conflict precludes reliance.  At best, this is simply another way of arguing that Maya-güez should have hired an expert to determine whether Defendants' explanations and representa-tions were accurate and truthful, which is meritless for the reasons discussed *supra* at 18-19.

*Second*, Defendants suggest (Mot. 23) that Mayagüez's reliance was not justifiable be-cause it is a sophisticated party.  "'Sophisticated' entities can justifiably rely on fraudulent statements," however, and whether such entities did so in particular case "is a genuine issue of material fact."  *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x 287, 294-95 (2d Cir. 2004).  In any event, Mayagüez is a Colombian sugar producer, not a bank, and it was not sophisticated with respect to the exotic financial transactions at issue here.  *See* Am. Compl. ¶ 43.  Mayagüez's lack of experience with the transactions at least raises a fac-tual question as to whether the reliance was justifiable.  *See, e.g.*, *Aris Multi-Strategy Offshore*

*Fund, Ltd. v. Devaney*, 2009 WL 5851192, at *8 (N.Y. Sup. Ct. Dec. 14, 2009).[13]

### B. The Amended Complaint Satisfies The Element Of A Misrepresentation Or Omission

Mayagüez has alleged numerous misrepresentations and omissions by Defendants in emails, presentations, and in-person meetings.  *See* Am. Compl. ¶¶ 71-96, 125, 131-43.

#### 1. Misrepresentations

As to the fraudulent misstatements, Defendants argue (Mot. 26) that their statements were mere "puffery" or statements of opinion.  But "misrepresentations of existing facts" are not puffery.  *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 305 (S.D.N.Y. 2013); *see also Freudenberg v. E* Trade Financial Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010).  The alleged inaccurate explanations and misrepresentations concern existing facts:

- "'[T]his structured product allows the sugar factory to be covered by the highest coverage rate that any other type of financial product could offer, therefore reducing the claims for compensation against the company.'"  Am. Compl. ¶ 76.

- "'The hedging costs will be better than the ones in a regular forward.'"  *Id.* ¶ 77.

- "'The proposed structured products reduce the risk of exposure to which the sugar factory is exposed due to the fluctuation of market factors such as the exchange rates.'"  *Id.* ¶ 77.

- "[T]he Currency Trades were; (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez."  *Id.* ¶ 81.

- "[P]ayments in the Currency Trades operated 'exactly' as payments in 'plain vanilla' forwards."  *Id.* ¶ 85.

Such statements go well beyond mere puffery.  The cases Defendants cite (Mot. 26 & n.27) do

---

[13]   For the January 2015 trade, Defendants also argue (Mot. 23) that reliance was unreasonable because modifications had to be in writing.  But the cases Defendants rely upon deal only with a conflict between the oral promise and the written contract.  There is no such conflict here because the trades did not prohibit amendment.  Nor does Defendants' argument in any way apply to the promise to amend that occurred after the trades, made to induce Mayagüez not to cancel.

not help them because one held that the statements *did* support a fraud claim, *see Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994); one concerned the element of reliance (not the existence of a misrepresentation), *see HSH Nordbank*, 941 N.Y.S.2d at 64-65; and the last concerned only generic statements about a product, not (as here) statements about its specific characteristics and performance, *see N. Grp. Inc. v. Merrill, Pierce, Fenner & Smith Inc.*, 2014 WL 3728501, at *6 (N.Y. Sup. Ct. July 25, 2014), *aff'd*, 135 A.D.3d 414 (1st Dep't 2016) ("[P]laintiffs do not contend that Mulligan made any representations about the features and value of any particular CMBS bond at the time plaintiffs were considering purchasing it.  Rather, the only representations allegedly made pertained to Merrill's CMBS bond offerings in general ….").[14]

As to the promise to amend the January 2015 trade, that promise was specific regarding who made it, what the amendment would do, and what conditions would trigger the amendment. *See supra* at 7.  Contrary to Defendants' suggestion (Mot. 26-27), Mayagüez alleged that Defendants did not intend to perform the promise at the time it was made.  *See* Am. Compl. ¶¶ 133, 145.  The allegations are thus sufficient to support a fraud claim.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Group, LLC,* 19 A.D.3d 273, 275 (1st Dep't 2005) ("An expression or prediction as to some future event, known by the author to be false … , is deemed a statement of a material existing fact, sufficient to support a fraud action." (quotation marks omitted)).[15]

### 2.   Omissions

As to the fraudulent omissions, Defendants argue (Mot. 24) that the features of the trades

---

[14]   Defendants also suggest (Mot. 26 & n.28) that the factual statements were not false, but Defendants ignore the specific allegations to the contrary.  *See, e.g.*, Am. Compl. ¶¶ 78, 85.

[15]   To the extent Defendants suggest (Mot. 26-27) that promises of what they would do in the future can never give rise to a claim for fraudulent misrepresentation, the law is to the contrary:  where the promise was false when made and is (as here) collateral to (rather than in conflict with) the contract, it can give rise to a fraud claim.  *See Deerfield Commcn's Corp. v Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986).

were disclosed in the trade confirmations.  But Defendants cite nothing in the confirmations dis-

closing the facts that the trades created unlimited risk for Mayagüez and had the potential to gen-

erate much more substantial earnings for Defendants than would "plain vanilla" forwards.  *See*

Am. Compl. ¶¶ 83, 86, 88, 92.  Rather, Defendants cite generally (Mot. 13) to the trade confir-

mations and presentations without identifying any language that disclosed these omissions.

Defendants also argue (Mot. 24-25) that they had no duty to disclose.  "[A]n affirmative

duty to disclose material information may arise from" (a) "the need to complete or clarify one

party's partial or ambiguous statement"; (b) "from a fiduciary or confidential relationship be-

tween the parties"; or (c) "where: (1) one party has superior knowledge of certain information;

(2) that information is not readily available to the other party; and (3) the first party knows that

the second party is acting on the basis of mistaken knowledge."  *Banque Arabe et Internationale*

*D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 155 (2d Cir. 1995) (citations and quota-

tion marks omitted).  All three sources of a duty to disclose are satisfied here.

*First*, there were partial and ambiguous statements from Defendants regarding the nature

of the trades and the potential risk to Mayagüez that made it misleading for Defendants then not

to disclose the unlimited risk of loss.  *See MBIA Ins. Corp. v. J.P. Morgan Sec. LLC*, 997

N.Y.S.2d 99, 99 (N.Y. Sup. Ct. 2014) (duty to disclose where defendant bank had made mislead-

ing and partial disclosure to plaintiff about mortgage backed securities); *Dodona I, LLC v.*

*Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 648-49 (S.D.N.Y. 2012) (duty to disclose where

there were partial disclosures in offering materials that did not fully disclose conflict of interest).

*Second*, there was a special relationship between the parties.  The parties' longstanding

relationship, sharing of confidential information, and reliance on Defendants' expertise (*see su-*

*pra* at 4-5) more than suffice to establish a special relationship, particularly for a factual question

23

being challenged on a motion to dismiss.[16]  None of the cases Defendants cite (Mot. 25 & n. 25)

concerns such a relationship.  *See, e.g.*, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87

A.D.3d 287, 296–97 (1st Dep't 2011) (finding no special relationship where the parties both had

expertise in the subject matter and there was no longstanding relationship).

*Finally*, Defendants have superior knowledge that created a duty of disclosure.  To begin

with, this issue generally cannot be resolved at the motion-to-dismiss stage.  *See P.T. Bank Cent.*

*Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 378 (1st Dep't 2003).  Moreover, Mayagüez

clearly alleged that Defendants had superior knowledge, which was not readily available to Ma-

yagüez, and that Defendants intended that Mayagüez rely upon Defendants' omissions.  Am.

Compl. ¶¶ 78, 92, 98, 144, 148, 208, 210, 215, 224, 226.  Defendants argue (Mot. 25) that the

confirmations set forth the transactions' terms, but as discussed *supra* at 23, they did not disclose

the omissions at issue.  Defendants also suggest (Mot. 25) that Mayagüez could have consulted a

financial advisor, but a party can always consult an expert.  That alone does not allow the other

party with expertise not to disclose.  *See Harbinger Capital Partners Master Fund I, Ltd. v. Wa-*

*chovia Capital Mkts., LLC*, 910 N.Y.S.2d 762 (Sup. Ct. 2010) (duty to disclose where defendant

bank had information about client's financials); *Hotel Capital LLC v. Wells Fargo Bank*, 951

N.Y.S.2d 86 (Sup. Ct. 2012) (duty to disclose where defendant bank had "superior and exclusive

knowledge of facts that materially affected the value of the Note").

---

[16]  *See Grupo Sistemas Integrales de Telecomunicacion S.A.de C.V. v. AT&T Commc'ns, Inc.*, 1996 WL 312535, at *9 (S.D.N.Y. June 10, 1996) (finding confidential relationship where defendant knew assurances were necessary to induce plaintiff to enter into contract, and defendant had superior information as to equipment sold to plaintiff); *LBBW Luxemburg*, 10 F. Supp. 3d at 525 (finding "confidential relationship" for sophisticated entities engaging in arm's length transaction, where defendants had "superior expertise and experience as well as special access to relevant data and models that gave it superior knowledge in this transaction").

C.      **The Amended Complaint Satisfies The Element Of Scienter**

Mayagüez more than adequately pleaded Defendants' fraudulent intent. "All that is re-quired to defeat a motion to dismiss a fraud claim for lack of scienter is 'a rational inference of actual knowledge.'" *IKB Int'l S.A. v. Morgan Stanley*, 142 A.D.3d 447, 450 (1st Dep't 2016). Here, it is more than "rational" to believe that Defendants intended to mislead Mayagüez given the clearly inaccurate explanations, misstatements and omissions regarding facts within Defend-ants' knowledge and expertise, as well as the extraordinarily lopsided nature of the trades, in-cluding the January 2015 trade which (absent the promised amendment) would almost certainly lead to large losses for Mayagüez. Defendants argue (Mot. 27-28) that the facts belie scienter because Citigroup restructured transactions prior to the January 2015 trade. But these restructur-ings served the purpose of continuing to encourage Mayagüez to dig itself deeper until Defend-ants finally refused to restructure, just like a con man allowing someone to double-down on a rigged bet. By no means does the restructuring disprove scienter, especially considering that this is a factually loaded issue and one arising on a motion to dismiss.

## III.    THE AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENT MISREPRESENTATION UNDER NEW YORK LAW

"To prevail on a claim of negligent misrepresentation under New York law, a plaintiff must show (1) the existence of a special or privity-like relationship imposing a duty on the de-fendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Trainum v. Rockwell Collins, Inc.*, 2017 WL 1093986, at *3 (S.D.N.Y. Mar. 9, 2017) (quotation marks omitted).[17]   For the latter two ele-

---

[17]    Contrary to Defendants' suggestion (Mot. 28), and while there is a divide in the district courts on the issue, the better view is that the heightened pleading standard of Rule 9(b) does not apply to the negligent misrepresentation claim. *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 2017 WL 1207836, at *17-18 (S.D.N.Y. Mar. 31, 2017). In any event, the

ments, Defendants rest (Mot. 28) on the same arguments they made for the fraud claim, and those arguments fail for the reasons discussed above.

The Amended Complaint more than adequately alleges a special relationship between the parties. "In determining '[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified,' a fact finder is to consider three factors: 'whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.'" *Trainum*, 2017 WL 1093986, at \*4 (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996)). Because "whether a special relationship exists is essentially a factual inquiry," it generally does not provide a basis for dismissal at the pleading stage. *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001).

The Amended Complaint alleges that Defendants had special knowledge with respect to these exotic financial transactions, that there was a longstanding relationship of trust with Defendants, and that Defendants knew Mayagüez would rely on the misrepresentations. *See* Am. Compl. ¶¶ 144, 210, 226. Such allegations amply suffice to withstand a motion to dismiss. Indeed, this Court accepted similar allegations in a recent case:

> They argue that Credit Suisse and Merrill Lynch provided only occasional brokerage services to Silvercreek, which is insufficient to create liability for negligent misrepresentation. ... But Silvercreek's allegations about the relationship paint a different picture: a "long-standing relationship" that included the banks' providing Silvercreek with information that they knew would be used by Silvercreek in making its investment decisions. ... Given that the determination of whether a special relationship exists is essentially a factual inquiry, ... these allegations are sufficient to survive the motion to dismiss.

---

Amended Complaint satisfies the Rule 9(b) standard by pleading specific facts establishing the elements of the claim, and Defendants identify no lack of specificity.

*Silvercreek Mgmt.*, 2017 WL 1207836, at \*18 (quotation marks omitted).  Many other cases likewise recognize a special relationship, at least at the pleading stage, based on a bank's relationship with its client and the bank's expertise.[18]

Defendants nonetheless argue (Mot. 29) that there is no special relationship because this was an arm's length commercial arrangement.  In doing so, they ignore the numerous cases holding that a bank's relationship with its client may suffice, depending on the factual circumstances, and rejecting any *per se* rule that "arm's length" transactions cannot occasion a claim for negligent misrepresentation.  *See, e.g.*, *Trainum*, 2017 WL 1093986, at \*4-5 (rejecting arm's-length transaction argument); *Eternity Global*, 2002 WL 31426310, at \*7 (same).  Three of the cases Defendants cite (Mot. 29 & n.30) hold only that, *absent* some showing of a special relationship, mere engagement in an arm's length transaction does not itself ground a claim for negligent misrepresentation (and the fourth, *Simmtech*, 2016 WL 4184296, at \*15, does not deal with a negligent misrepresentation claim at all, but whether there was a fiduciary relationship sufficient for a breach of fiduciary duty claim).  Here, as discussed above, a special relationship is alleged.[19]

## IV.   THE AMENDED COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT UNDER NEW YORK LAW

To state a claim for unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'"  *Cruz v. McAneney*, 31 A.D.3d 54, 59 (2d Dep't 2006) (citations omitted).  Mayagüez alleges that Defendants unjustly enriched themselves at Mayagüez's expense through their intentional misrepresentations and omissions.

---

[18]   *See, e.g.*, *Eternity Global*, 2002 WL 31426310, at \*7; *Suez Equity Inv'rs*, 250 F.3d at 103-04; *LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 526-27; *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2013 WL 837536, at \*6 (S.D.N.Y. Mar. 6, 2013).

[19]   Defendants also argue (Mot. 29) that the supposed disclaimers of reliance belie a special relationship, but this argument fails for the reasons set forth above.

Am. Compl. ¶¶ 249-51.  Defendants argue that a party may not recover for unjust enrichment "'where the parties have entered into a contract that governs the subject matter.'"  Mot. 29 (quoting *Cox v. NAP Constr. Co.*, 10 N.Y.3d 592, 607 (2008)).  However, this principle does not apply where, as here, the unjust enrichment occurred as a result of conduct outside the contract itself.  *See, e.g.*, *Curtis Props. Corp. v. Greif Cos.*, 236 A.D.2d 237, 239 (1st Dep't 1997) ("[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where ... the contract does not cover the dispute in issue.").  Indeed, some of Defendants' conduct—in particular, convincing Mayagüez not to cancel the January 2015 trade because Defendants would amend the agreement, *see* Am. Compl. ¶ 134—occurred *after* the agreement such that the conduct could not possibly be covered by it.  Defendants also argue (Mot. 30) that Mayagüez fails to show that any enrichment here was unjust, but such an argument ignores essentially the entirety of the Amended Complaint, which explains that Defendants bore minimal risk, offloaded upon Mayagüez uncontainable risk, duped Mayagüez into entering the transactions based on false assurances, and profited by preying upon Mayagüez's trust in those assurances.

## V.   THE AMENDED COMPLAINT STATES A CLAIM FOR PROMISSORY ESTOPPEL UNDER NEW YORK LAW

Under New York law, a claim for promissory estoppel has three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance; and (3) injury by reason of reliance.  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995).  All of these elements are satisfied here (and Defendants do not dispute the element of injury).

*First*, as discussed *supra* at 7, Defendants made clear and unambiguous promises to amend the January 2015 trade.  These promises more than suffice to establish a claim for promissory estoppel.  *See, e.g.*, *Sathe v. Bank of New York*, 1990 WL 58862, at *2 (S.D.N.Y. 1990) (promises that employees would not lose benefits or compensation were sufficiently clear for

promissory estoppel claim).  Defendants suggest (Mot. 32) that these promises are unenforceable because they are "conditional," but the lone case they cite held only that estoppel was inapplicable where the defendant represented that a closing was "anticipated" but "there were conditions yet to be met."  *Chem. Bank v. City of Jamestown*, 122 A.D.2d 530, 531 (4th Dep't 1986).  Here, in contrast, the promises concerned not what might happen in the future, but what Defendants would do themselves—in the case of the USD 34.9 million debt, regardless of future events, and in the case of the strike price, upon the occurrence of certain events that then in fact occurred.

*Second*, Mayagüez alleged numerous facts supporting its reasonable reliance on Defendants' promises.  *See supra* at 20-21.  Defendants argue (Mot. 32) that there can be no reasonable reliance where the promise is contrary to a written contract containing a merger clause.  They thereby ignore the promise to amend that was given after the January 2015 trade (and therefore was not subject to the merger clause) to induce Mayagüez not to cancel.  *See* Am. Compl. ¶ 134.  Such a promise is not covered by the merger clause.  *See, e.g.*, *Nat'l Oil Well Maintenance Co. v. Fortune Oil & Gas, Inc.*, 2004 WL 1886293, at *8 (S.D.N.Y. Aug. 24, 2004).  Nor does the merger clause cover the promises to amend made before the January 2015 trade because these promises do not conflict with the agreement.  *See, e.g.*, *Urban Holding Corp. v. Haberman*, 162 A.D.2d 230, 231 (1st Dep't 1990).  There is nothing in the agreement that bars Defendants from amending the agreement as they promised to do.  Defendants also suggest (Mot. 32) that reliance was unreasonable, but any such argument fails for the reasons discussed *supra* at 20-21.

*Finally*, Plaintiffs argue (Mot. 30-31) that the existence of a contract bars a claim for promissory estoppel.  This argument is wrong as a matter of law:  "In New York, the doctrine of promissory estoppel applies both in situations where there purports to be a signed writing between the parties governing their conduct and in situations where no writing exists."  *Pan Am*

29

*Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 510 (S.D.N.Y. 1994).  In particular, promises subsequent to a contract are subject to claims for promissory estoppel.  *See Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 115 (E.D.N.Y. 2009); *Washington v. Kellwood Co.*, 2009 WL 855652, at *9 (S.D.N.Y. Mar. 24, 2009).  And promises prior to the agreement are subject to a promissory estoppel claim where, as here, they are not inconsistent with the agreement.  *See Int'l Elecs., Inc. v. Media Syndication Global, Inc.*, 2002 WL 1897661, at *1 (S.D.N.Y. Aug. 17, 2002) (denying dismissal of promissory estoppel claim based on promise to renew a contract).  Defendants rely upon *Susman v. Commerzbank Capital Mks. Corp.*, 95 A.D.3d 589 (1st Dep't 2012), but that case simply upheld a ruling that a promissory estoppel claim was "duplicative of the breach of contract claim."  *Id.* at 590.  Here, there is no breach of contract claim and no prospect of duplication.  And subsequent cases citing *Susman* clarified that the issue is whether there is a "duty independent of the contracts."  *Coleman & Assocs. Enters., Inc. v. Verizon Corp. Servs. Grp., Inc.*, 125 A.D.3d 520, 521 (1st Dep't 2015).  Here, the duty arose from the promises to amend, independent of the agreement itself.[20]

## VI.   THE AMENDED COMPLAINT STATES A CLAIM FOR UNCONSCIONABILITY

The Amended Complaint more than adequately alleges facts establishing that the agreements were unconscionable as a matter of New York law.  "An unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and

---

[20]   The other cases Defendants cite (Mot. 30-31 & n.34) are likewise inapposite.  One held only (after trial) that "the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract."  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 831 F. Supp. 94, 113 (E.D.N.Y. 1993), *aff'd in part, vacated in part*, 47 F.3d 39 (2d Cir. 1995).  Similarly, *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976 (S.D.N.Y. 1989), concerned a contract that "authorized [the defendant's] conduct" such that the promissory estoppel claim would be "inconsistent with the terms of a contract."  *Id.* at 993.  Here, as discussed above, there is no inconsistency between the promises and the agreement.

business practices of the time and place as to be unenforcible according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988) (quotation marks omitted). The doctrine "is a flexible one and the concept of unconscionability is intended to be sensitive to the realities and nuances of the bargaining process." *Id.* (quotation marks omitted). "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made …." *Id.* In "exceptional cases," however, "a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Id.* at 12.

### A.    Mayagüez Alleges Procedural Unconscionability

Mayagüez lacked any meaningful choice regarding the Currency Trades because there was no negotiation of the terms, there was a gross disparity in sophistication and expertise, the trades were enormously complicated, Mayagüez trusted Defendants based on their years-long relationship, and Defendants deliberately misled Mayagüez about the terms of the transaction and the promise to amend it. Such circumstances lead courts to find procedural unconscionability. *See Spinelli v. Nat'l Football League*, 2016 WL 3926446, at *5 (S.D.N.Y. July 15, 2016), *on reconsideration in part*, 2016 WL 7441696 (S.D.N.Y. Dec. 23, 2016) (procedural inadequacy given defendant's unwillingness to negotiate key terms and fundamental misrepresentations during negotiations); *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 383-84 (S.D.N.Y. 2002) (procedural inadequacy where, *inter alia*, there was unequal bargaining power, lack of negotiation, and failure to explain key terms). Given the fact-specific nature of the inquiry, a determination as to unconscionability should at least await development of a factual record.

*First*, Defendants argue (Mot. 12) that Mayagüez is a large corporation that was familiar with the types of currency transactions at issue here. As explained above, however, Mayagüez is

not remotely sophisticated in these types of transactions.[21]  Defendants assert that Mayagüez's prior entry into plain-vanilla forwards sufficed to familiarize it with the far more complex financial transactions at issue here.  That assertion is not only unsupported but directly contrary to the allegations of the Amended Complaint.  Although Defendants also suggest (Mot. 12) that the absence of a fiduciary duty precludes unconscionability, the lone case they cite (*Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 68-69 (1978)) says nothing about a fiduciary relationship.

*Second*, Defendants argue (Mot. 12) that there was an opportunity for negotiation.  But this attempt to dispute the factual allegations in the Amended Complaint is unavailing.  Defendants suggest that there were discussions, but do not identify them, and certainly do not show that Mayagüez had a chance to negotiate key terms.  To the extent Defendants assert that the amendments of trades constitute negotiation, they fail to note that the amendments were themselves not subject to negotiation and profoundly injurious to Mayagüez.  Defendants also suggest that Mayagüez could have entered into currency transactions with other banks, but that possibility cannot defeat an unconscionability claim, as (absent a monopoly) someone can always choose to deal with a different party, just as the plaintiffs could in cases like *Spinelli* and *Brennan*.  Moreover, it is doubtful that, for the January 2015 trade, there was real opportunity for Mayagüez to enter into a currency trade with someone other than Defendants because that trade was premised on a promise to defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade, with debt to Defendants getting folded into a new trade.  Am. Compl. ¶ 125.

---

[21]   To the extent Defendants suggest (Mot. 11) that a corporation cannot bring a claim for unconscionability, that suggestion has no support and any general presumption to that effect does not apply where one corporation lacks expertise regarding the contract at issue.  *See Industralease Automated & Sci. Equip. Corp. v. R.M.E. Enterprises, Inc.*, 58 A.D.2d 482, 489-90 (2d Dep't 1977) (finding disclaimers in contract between two companies was unconscionable where the party challenging the contract "did not pretend to have equal expertise in the field").

*Third*, Defendants argue (Mot. 12-14) that the terms were clear in the trade confirmations themselves.  As discussed *supra* at 21-25, however, the terms were anything but clear, as evident from the fact that Defendants cite no language in the confirmations showing that Mayagüez's risk was unlimited or that Mayagüez would incur large losses with certainty absent a dramatic drop in the exchange rate.  Am. Compl. ¶ 130.[22]  Defendants cite cases (Mot. 14) for the proposition that procedural unconscionability cannot be "based solely" on unawareness of the terms but, as discussed above, that is not the sole basis for procedural unconscionability here.

### B.    Mayagüez Alleges Substantive Unconscionability

"A contract is substantively unconscionable where its terms are unreasonably favorable to the party against whom unconscionability is claimed."  *Brennan*, 198 F. Supp. 2d at 382.  "Examples of unreasonably favorable contractual provisions are virtually limitless but include inflated prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty."  *Simar Holding Corp. v. GSC*, 87 A.D.3d 688, 690 (2d Dep't 2011) (quotation marks omitted).  Mayagüez explained in the Amended Complaint that the terms were unreasonably favorable to Defendants because: (1) they create unlimited risk for Mayagüez; (2) the trades had terms of approximately three years, thereby creating greater potential liability for Mayagüez with essentially no benefit, given that potential payments to Mayagüez were strictly capped; (3) the July 2014 trade used a USD 6 million notional value when calculating potential payments to Defendants, and only a USD 3 million notional value when calculating potential payments to Mayagüez; and (4) the January 2015 trade used a strike price for the sec-

---

[22]    As to Defendants' suggestion (Mot. 13) that their presentations disclosed concealed information, those presentations do not disclose the unlimited risk to Mayagüez or the near-certain loss that would result from the second tranche of the January 2015 trade.  And Defendants ignore that the presentations themselves state, falsely, that "[t]he proposed structures reduce exposure to risk," Mot. Ex. I at 13, and that "[t]he returns function exactly like those of a traditional forward."  Mot. Ex. J at 3.

ond tranche that was substantially below the then-current exchange rate, so that, unless the exchange rate fell greatly, Mayagüez would have to make enormous monthly payments to Defendants.  Am. Compl. ¶ 264.  These terms created unlimited risk for trades that were supposedly designed to reduce risk, and posed near-certain losses for Mayagüez.  If these terms are not unconscionable, then banks would have *carte blanche* to make transactions ever more complex to hide that they are designed only to benefit themselves at the expense of trusting customers.

Defendants make no attempt to explain why these terms were in fact fair or reasonable to Mayagüez, and ignore entirely the fact that the strike price for the second tranche of the January 2015 trade was substantially below the then-current exchange rate, leading to near-certain losses for Mayagüez.  Instead, Defendants argue (Mot. 14-15) simply that Mayagüez accepted the terms.  But the same can be said of any case involving unconscionability; the whole point of the doctrine is that even agreed contracts will not be enforced when they are, as here, extraordinarily unjust.[23]  At the very least, the question of unconscionability cannot be resolved at the pleading

---

[23]    The only cases Defendants cite are ones where the terms were far less egregious than the ones at issue here and far easier for the plaintiffs to discern.  *See JPMorgan Chase Bank, N.A. v. Godfrey Ltd. P'ship*, 2012 WL 10007863, at *10 (N.Y. Sup. Ct. July 16, 2012) (holding on summary judgment early termination provision not unconscionable where "the method for calculating the amount due upon an early termination is fair to Godfrey" and "it was clearly pointed out to Godfrey in the transactional documents that an early termination might result in a large up-front payment being due"); *Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d 516, 523 (1976) (holding on summary judgment that "the provision for payment of attorney's fees does not fail on the ground of unconscionability" where there was "relative equality of bargaining power" and "the contract was signed by defendant's president, a member of the New York Bar"); *Gillman*, 73 N.Y.2d at 11 ("The contract concerned a type of commercial transaction routinely entered into in the course of Jamaica Tobacco's business and one with which Frohlich was necessarily familiar from his several years of running the business."); *Morad v. Morad*, 27 A.D.3d 626, 627 (2d Dep't 2006) ("The agreement was not unconscionable, as it provided the husband with multiple and meaningful bargained-for benefits …").  Defendants also note (Mot. 11) that other courts have found the terms of ISDA Master Agreements not unconscionable.  To be clear, Mayagüez does not challenge the terms in the template for the ISDA Master Agreement, but rather the terms peculiar to the transactions with Defendants.

34

stage given the clear factual allegations of gross unreasonableness.  *See Nat'l Union Life Ins. Co. v. Casmalia Res. Ltd.*, 1990 WL 102199, at *5 n.3 (S.D.N.Y. July 11, 1990).[24]

Finally, even if this case did not meet the requirement of procedural unconscionability, it presents the exceptional situation where there is a claim based on substantive unconscionability alone.  As discussed above, the January 2015 trade would almost certainly cause substantial losses to Mayagüez.  And both the July 2014 and January 2015 trades substantially increased risks to Mayagüez, contrary to their avowed and ostensible purpose.  Indeed, the unfairness here is even more egregious than in the case cited by the New York Court of Appeals as allowing a claim based on substantive unconscionability alone.  *See Gillman*, 73 N.Y.2d at 12 (citing *State v. Wolowitz*, 96 A.D.2d 47, 68 (2d Dep't 1983), identifying a case where a seller charged the plaintiffs four times the value of a freezer); *see also Eisen v. Venulum Ltd.*, 2017 WL 1136136, at *13-14 (W.D.N.Y. Mar. 27, 2017) (holding that arbitration clause was unconscionable even in the absence of procedural unconscionability).

## CONCLUSION

Defendants' motion to dismiss should be denied.

---

[24]    Defendants attempt (Mot. 8, 14) to go outside the pleadings by citing letters and emails between the parties.  *See* Mot. Exs. F-H.  This correspondence should not be considered on a motion to dismiss.  *See, e.g.*, *White Plains Hous. Auth. v. Getty Props. Corp.*, 2014 WL 7183991, at *2 (S.D.N.Y. Dec. 16, 2014); *Clark v. Kitt*, 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014), *aff'd*, 619 F. App'x 34 (2d Cir. 2015).  In any event, that correspondence contains only generic supposed disclaimers of reliance that are irrelevant for the same reasons discussed above for the other supposed disclaimers.

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: /s/  Gabe Soledad
  Gabriel Soledad
   (gabrielsoledad@quinnemanuel.com)

  Juan P. Morillo
   (juanmorillo@quinnemanuel.com)
   (*pro hac vice* application granted)

  Daniel Pulecio-Boek
   (danielpulecioboek@quinnemanuel.com)
   (*pro hac vice* application granted)

  777 6th Street, NW 11th Floor
  Washington, D.C. 20001
  Telephone: (202) 538-8000
  Fax: (202) 538-8100

  Daniel Cunningham
   (danielcunningham@quinnemanuel.com)

  David M. Cooper
   (davidcooper@quinnemanuel.com)
   (application for admission pending)

  51 Madison Avenue, 22nd Floor
  New York, New York 10010
  Telephone: (212) 849-7000
  Fax: (212) 849-7100

  *Attorneys for Mayagüez, S.A.*

36