USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/28/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAYAGÜEZ S.A.,

Plaintiff,

- against -

CITIGROUP, INC. and CITIBANK, N.A.,

Defendants.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 6788 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff Mayagüez, S.A., alleges claims under Colombian and New York law against Defendants Citigroup, Inc. and Citibank, N.A. Plaintiff's claims arise out of Defendants' alleged misrepresentations and omissions in connection with a series of "exotic" hedging transactions that they promoted and entered into with Plaintiff. Mayagüez alleges that as a result of these hedging transactions, it suffered losses of $64 million. The Amended Complaint alleges claims under the Colombian Civil and Commercial Codes, unconscionability under New York law, and pleads – in the alternative as to the Colombian claims – fraudulent concealment and inducement, negligent misrepresentation, promissory estoppel, and unjust enrichment under New York law. (Am. Cmplt. (Dkt. No. 15))

Defendants have moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Defendants contend that Plaintiff's claims must be determined under New York law, pursuant to a choice of law provision contained in an agreement that governs the parties' transactions. (Def. Br. (Dkt. No. 22) at 43-45) Defendants further contend that Plaintiff's New York claims fail for a multitude of reasons, including a failure to plead facts demonstrating – as to the fraud-based claims – justifiable reliance, an actionable misstatement or

omission, or scienter (id. at 25-38); as to negligent misrepresentation – a special relationship (id. at 38-39); and as to unjust enrichment and promissory estoppel – justification for setting aside the applicable written agreement. (Id. at 39-43) As to Plaintiff's unconscionability claim, Defendants argue that (1) in cases involving commercial transactions between corporations, New York courts presume a lack of unconscionability; and (2) the agreement at issue has been found not unconscionable by other courts. (Id. at 43-45) Finally, Defendants contend that Plaintiff's claims under Colombian law must be dismissed because the parties' agreement provides that New York law will govern. (Id. at 20-25)

The Court concludes that the choice of law provision in the parties' agreement is limited to contract-based claims, and does not address Plaintiff's tort and other non-contractual claims. Because Defendants' motion to dismiss the Amended Complaint's tort and other non-contractual claims is premised on the notion that New York law governs – as a result of the choice of law provision – the motion to dismiss will be denied as to the tort and other non-contractual claims.

However, Plaintiff's unconscionability claim is contract-based and is subject to the choice of law provision. The Court further concludes that Plaintiff fails to state a claim for unconscionability under New York law. Accordingly, Defendants' motion to dismiss will be granted as to the Amended Complaint's Eleventh Cause of Action for unconscionability, but will otherwise be denied.

2

# BACKGROUND

## I.   FACTS[1]

### A.   Plaintiff's Need to Hedge

Plaintiff Mayagüez is a Colombian sugar producer and refiner. (Am. Cmplt. (Dkt. No. 15) ¶ 12) Defendant Citigroup is a multinational banking and financial services corporation incorporated in Delaware, and Defendant Citibank is a national banking association chartered under the laws of the United States. (Id. ¶¶ 13-14) Non-party Citibank, S.A. ("Citibank Colombia") is Citibank's Colombian subsidiary. (Id. ¶ 39)

Mayagüez sells sugar in Colombia and abroad, including in the United States. (Id. ¶ 19) Because Mayagüez's operations are in Colombia, most of its expenses are paid in Colombian pesos. (Id. ¶ 20) When Mayagüez sells sugar abroad, however, it always receives payment in U.S. dollars. (Id. ¶ 21) Mayagüez exports approximately 20% of its sugar production. (Id. ¶ 24)

In order to hedge for the risk of fluctuations in the peso/dollar exchange rate, Mayagüez has entered into currency forward contracts[2] since 2006. (Id. ¶ 36) Between 2006 and 2013, Mayagüez primarily hedged through "plain vanilla" currency forward contracts offered by the Colombian government. (Id. ¶ 38) In this type of currency forward contract, Mayagüez and the Government entity would agree to exchange pesos and dollars at a specific exchange rate (the "strike price") on a specific date in the future. For example, if Mayagüez

---

[1] Unless otherwise noted, the following facts are drawn from the Amended Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[2] A currency forward contract locks in an exchange rate for the purchase or sale of a particular currency on a future date. (Id. ¶ 33)

wished to lock in an exchange rate of 2,000 pesos to one dollar, it could enter into a currency

forward contract with the Colombian government in which the parties agreed that the

government would purchase a set amount of dollars from Mayagüez six months in the future at

an exchange rate of 2,000 pesos to one dollar. Without this currency forward agreement, if the

Colombian peso appreciated in six months, Mayagüez would receive fewer pesos in exchange

for the dollars it received from selling sugar abroad. Accordingly, this type of currency forward

contract protected Mayagüez from the risk of the peso appreciating.

Before 2014, Mayagüez only hedged through "plain vanilla" forward contracts

that were offered by the Colombian government and other Colombian private financial

institutions, including Citibank Colombia. (Id. ¶ 39) The claims in this case arise from

Plaintiff's decision – in late 2013 – to enter into more "exotic" hedging transactions with

Defendants. The parties agree that the 2014 and 2015 transactions they entered into are

governed by the International Swaps and Derivatives Association, Inc. ("ISDA") Master

Agreement (the "ISDA Master Agreement") that Mayagüez entered into with Citibank on July

28, 2009. (Id. ¶¶ 8, 124 n.12; Def. Br. (Dkt. No. 22) at 45)[3]

## B. The November 2013 Currency Trade

In 2012, Citigroup, Citibank, and Citibank Colombia promoted to Mayagüez a

different type of currency forward contract – a "limited compensation collar" – which Plaintiff

refers to as Currency Trades. (Id. ¶ 49) This was an "exotic" financial product with which

Mayagüez was unfamiliar. (Id. ¶ 62) Defendants represented that this hedging product was

---

[3] The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Filing system.

specially tailored to Mayagüez's specific needs. (Id. ¶ 63) The Amended Complaint describes

the Currency Trades as follows:

> . . . With the Currency Trades, Citigroup offered to purchase a capped amount of Mayagüez's U.S. dollars at a better (i.e., higher) strike price (expressed in [pesos]) than other banks. In return for this limited benefit, Citigroup demanded: (i) that the trade have a term significantly longer than six to twelve months; and (ii) more importantly, that if the [U.S. dollar] strengthened so that the actual [U.S. dollar/Colombian peso] exchange rate exceeded the strike price, Mayagüez would have to make monthly payments to Citigroup.

> . . . These payments had no limit and depended on the difference between the actual exchange rate and the strike price. The Currency Trades therefore provided very limited protection to Mayagüez (due to the cap on the amount of [U.S. dollars] Citigroup agreed to buy), but significant potential payments by Mayagüez to Citigroup.

(Id. ¶¶ 64-65)

Mayagüez alleges that Citigroup made a number of false and misleading

statements to Mayagüez to induce it to enter into the November 2013 Currency Trade. These

false and misleading statements included the following:

> that other sugar factories had decided to diversify from the "plain vanilla" currency forward contracts to the new hedging product that Citigroup was recommending (id. ¶ 73);

> that the new hedging product would provide Mayagüez with better protection against unexpected currency depreciation and fluctuations in exchange rates, and that Mayagüez's hedging costs would be reduced (id. ¶¶ 76-78);

> that the new hedging product was tailored to Mayagüez hedging needs, and was the best hedging option for Mayagüez (id. ¶¶ 76-78, 86-87); and

> that "payments in the Currency Trades operated 'exactly' as payments in 'plain vanilla' forwards." (Id. ¶ 85)

The Amended Complaint further alleges that Citigroup's statements were

misleading because they did not disclose "the unlimited exposure Mayagüez would suffer by

entering into the Currency Trades," and that "Mayagüez would have to make unlimited payments to Citigroup if the [Colombian peso] lost value against the [U.S. dollar]." (Id. ¶¶ 83- 84).

### 1.     Terms of the November 2013 Currency Trade

In November 2013, Citibank Colombia and Mayagüez entered into the first "Currency Trade." (Id. ¶ 100; see also Hakki Decl., Ex. C (Dkt. No. 23-4) (November 2013 Trade Confirmation))[4]  Under the terms of this transaction, Mayagüez purchased a series of calls from Citibank Colombia, and Citibank Colombia purchased a series of puts from Mayagüez. The puts and calls were European-style[5] and had expiration dates in intervals of about a month each.  The term of the transaction was 22 months – from January 2014 to October 2015.  (Id. ¶ 100 & tbl. A)  The strike price of these options was at an exchange rate of 2,020 pesos for one U.S. dollar – a higher strike price than the "plain vanilla" currency forward contracts being offered at that time[6] –  and the notional value was $2 million.[7]  (Id. ¶ 101 & tbl. A)

In this transaction, Mayagüez and Citibank Colombia did not actually exchange U.S. dollars for Colombian pesos on the expiration dates.  Instead, the parties would make

---

[4]  The Court has considered the contracts and trade confirmations attached to the Hakki declaration (Hakki Decl. (Dkt. No. 23) Exs. A-E) because they are "integral" to Mayagüez's Amended Complaint.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted).

[5]  "European-style" means that the option can be exercised only on a specific date in the future (the "expiration date"), whereas "American-style" means the option can be exercised at any point up to the expiration date.

[6]  For example, at the time Mayagüez entered into this Currency Trade, other banks were offering "plain vanilla" currency forward contracts with strike prices of approximately 1,800 and terms of 6 to 12 months.  (Id. ¶ 66)

[7]  The "notional value" is a set amount of U.S. dollars that Citibank Colombia was agreeing to purchase from Mayagüez at a particular exchange rate on a particular date in the future.  (Id. ¶ 34)

payments to each other in pesos based on the difference between the actual exchange rate and the strike price. For example, if the actual exchange rate was 2,010, Citibank Colombia would pay Mayagüez the notional value multiplied by the difference between the strike price and the actual exchange rate – in this example, 20 million pesos. Conversely, if the strike price were 2,030, Mayagüez would have to pay Citibank Colombia the notional value multiplied by the difference between the actual exchange rate and the strike price – in this example, also 20 million pesos. However, the total amount of compensation that Citibank Colombia would have to pay Mayagüez in this Currency Trade was capped at 900 million pesos. (Id. tbl. A)[8] There was no similar cap for payments that Mayagüez owed Citibank Colombia. Finally, if either party wanted to terminate the agreement before the term elapsed, it had to pay the "mark to market value" – meaning that the parties had to value the remaining puts and calls transactions according to exchange rates projected by Citigroup and pay the entire value to the other party. (Id. ¶ 69)

## 2. Amendments to the November 2013 Currency Trade

During the first quarter of 2014, the peso to dollar exchange rate increased. This increase meant that Mayagüez had to make payments to Citibank Colombia under the terms of the November 2013 Currency Trade. Citigroup agreed to three amendments to this trade that, in the aggregate, benefitted Mayagüez. (Id. ¶ 108) On February 13, 2014, Citigroup agreed that the strike price would rise to a floor of 2,060 pesos and a ceiling of 2,090 pesos for one half of the trade, and that the strike price would increase to 2,075 for the other half of the trade. The

---

[8] Payments between the parties were not netted out in calculating the 900 million peso cap. For example, if in month 1 Citibank Colombia paid Mayagüez 20 million pesos, in month 2 Mayagüez paid Citibank Colombia 20 million pesos, and in month 3 Citibank Colombia paid Mayagüez 20 million pesos, Citibank Colombia would have paid 40 million pesos towards the 900 million peso cap, and not 20 million.

term of the trade was also extended to December 2016. (Id. ¶ 109) On February 26, 2014, Citigroup agreed that the strike price for the first half of the trade would increase to 2,073 pesos. (Id.) And on April 16, 2014, Citigroup agreed that the maximum amount payable to Mayagüez would increase to 1,656 million pesos. This last amendment also reduced the strike price for both "halves" of the trade to 2,060 pesos from July 2014 to December 2016. The November 2013 Currency Trade elapsed prior to the expiration of its term because Citibank Colombia paid Mayagüez 1,656 million pesos – the maximum amount payable to Mayagüez under the third amendment. (Id. ¶ 111)

C.     **July 2014 Currency Trade and Aftermath**

Citibank Colombia and Mayagüez entered into a second Currency Trade in July 2014. (See Hakki Decl., Ex. D (Dkt. No. 23-5) (July 2014 Trade Confirmation)) Under this Currency Trade, the strike price was 2,090 pesos, the term of the trade ran through July 2017, and the cap on payments from Citibank Colombia to Mayagüez was 3,000 million pesos. (Id. ¶¶ 113-15 & tbl. C) This trade differed from the November 2013 Currency Trade in that any payments owed to Citibank Colombia by Mayagüez were based on a notional value of $3 million, whereas any payments that Mayagüez owed to Citibank Colombia were based on a notional value of $6 million. (Id. tbl. C) The effect of this term was that – for the same absolute fluctuation in currency value – the payment Mayagüez owed to Citibank Colombia would be twice as large. For example, if the exchange rate was 2,100 on the trade date, Mayagüez would have to pay Citibank Colombia 60 million pesos. If the exchange rate at the time of the trade was 2,080, however, Citibank Colombia would have to pay Mayagüez 30 million pesos. The trade also had a mark to market buyout provision. (Id. ¶ 119)

During the second half of 2014, the exchange rate increased. (Id. ¶ 120) As a result, in November and December 2014, Mayagüez made payments to Citibank Colombia of

approximately $670,000. (Id. ¶ 121)  In January 2015, it would have cost Mayagüez $34.9 million to buy out the remainder of the July 2014 Currency Trade based on the contract's mark to market provision. (Id.)

In October 2014, Mayagüez informed Citigroup that it wanted to pay the mark to market value of the contract to exit the July 2014 Currency Trade. (Id. ¶ 123)  In response, Citigroup suggested that Mayagüez instead enter into a new transaction. (Id. ¶ 123)

### D. January 2015 Currency Trade

#### 1. Terms of the Trade

In January 2015, Citibank (not Citibank Colombia) and Mayagüez entered into the third Currency Trade.[9] (Hakki Decl., Ex. E (Dkt. No. 23-6) (January 2015 Trade Confirmation))  The January 2015 Currency Trade consisted of two "tranches."  The first tranche had a term from January 2015 to November 2015.  In this tranche, Citibank's payments to Mayagüez were capped at 2,100 million pesos, the strike price was 2,600 pesos, and the notional value was $6 million. (Id. ¶ 129 & tbl. D)  The second tranche had a term that ran from December 2015 to January 2018.  The strike price from December 2015 to July 2017 was 2,090 pesos, and the strike price from August 2017 to January 1208 was 2,385 pesos.  Citibank's payments to Mayagüez were capped at 1,500 million pesos, and the notional value was $7.5 million. (Id. ¶ 130 & tbl. D)  The trade also had a mark to market buyout provision. (Id. ¶ 134)

In persuading Mayagüez to enter into the January 2015 Currency Trade, Citigroup falsely represented that (1) it would defer the $34.9 million payment Mayagüez owed on the July 2014 Currency Trade to the end of the January 2015 Currency Trade, thereby "folding that debt

---

[9] One day after entering into this trade, Citibank Colombia assigned its claims against Mayagüez under the July 2014 Currency Trade to Citibank. (Id. ¶ 124)

into a new trade"; and (2) if the exchange rate exceeded 2,600 – or in any case before the second tranche took effect – Citigroup would amend the trade to increase the strike price. (Id.)

**E.**      **Aftermath**

In the first quarter of 2015, Mayagüez informed Citigroup that it wanted to cancel the January 2015 Currency Trade by paying the mark to market value of approximately $44.5 million. According to Mayagüez, "Citigroup assured Mayagüez that cancelling the January 2015 Currency Trade was unnecessary because Citigroup would amend it, if and when the [peso/dollar] exchange rate exceeded [] 2,600 [pesos] and in any case, before the second tranche took effect." (Id. ¶ 134) During the first quarter of 2015, Citigroup also made a presentation to Mayagüez that included peso/dollar exchange rate projections that predicted that the exchange rate would increase. (Id. ¶ 135)

By July 2015, the exchange rate exceeded 2,600. (Id. ¶ 137) Between July 2015 to October 2015, Mayagüez demanded that Citigroup amend the January 2015 Currency Trade, but Citigroup refused to do so. (Id. ¶ 138) In December 2015, the exchange rate reached a high of 3,356, and from December 2015 to February 2016, Mayagüez paid approximately $8 million to Citibank. (Id. ¶ 141) In March 2016, Mayagüez obtained a loan of about $44 million from a Colombian financial institution and paid this amount to Citibank. (Id. ¶ 143) In addition, from March to September 2016, Mayagüez paid Citibank about $16 million to cancel the January 2015 Currency Trade and to resolve all amounts owed under the July 2014 Currency Trade.

**II.**      **PROCEDURAL HISTORY**

The Complaint was filed on August 9, 2016 in Supreme Court of the State of New York, New York County. Defendants removed the case to this Court on August 29, 2016. (Dkt. No. 1) Mayagüez filed the Amended Complaint on January 13, 2017. (Dkt. No. 15) The Amended Complaint alleges three claims under Colombian law: willful violation of Article

2341 of the Colombian Civil Code (id. ¶¶ 151-62); negligent violation of Article 2341 of the

Colombian Civil Code (id. ¶¶ 192-203); and violation of Article 863 of the Colombian

Commercial Code. (id. ¶¶ 237-247) In the alternative, the Amended Complaint pleads causes of

action under New York law, including fraudulent inducement and fraudulent concealment (id.

¶¶ 163-91); negligent misrepresentation (id. ¶¶ 204-36); unjust enrichment (id. ¶¶ 248-251); and

promissory estoppel. (Id. ¶¶ 252-61) The Amended Complaint also pleads an unconscionability

claim under New York law – not as an alternative to the Colombian causes of action but in

addition to those claims. (Id. ¶ 262-67)

Pending before this Court is Defendants' motion to dismiss the Amended

Complaint. (Dkt. Nos. 21-29)

## DISCUSSION

### I.    RULE 12(b)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)),

and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v.

Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507

11

F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Moreover, "[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted).

## II.  THE LAW GOVERNING PLAINTIFF'S CLAIMS

### A.  Choice of Law Provision in the ISDA Master Agreement

The Amended Complaint pleads that the July 2014 and January 2015 Currency Trades are governed by the ISDA Master Agreement. (Am. Cmplt. (Dkt. No. 15) ¶ 124 n.12)[10]

The ISDA Master Agreement entered into by Mayagüez and Citibank provides that "[t]his Agreement will be governed by and construed in accordance with the law specified in the Schedule." (Hakki Decl., Ex. A (Dkt. No. 23-1) § 13(a) (ISDA Master Agreement)) The

---

[10] It appears that the November 2013 Currency Trade is governed by the Local Framework Agreement, which provides for the application of Colombian law. (See Hakki Decl., Ex. B. (Dkt. No. 23-2) § 15.14 (Local Framework Agreement) ("[t]he Framework Agreement Documents shall be governed by the laws of the Republic of Colombia"). The parties do not address this issue in their briefing, however, and in any event it does not appear that Mayagüez suffered losses in connection with the November 2013 Currency Trade.

attached Schedule provides that "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York." (ISDA Master Agreement Schedule (Dkt. No. 23-1) § 4(h)) As to forum selection, the ISDA Master Agreement, as amended by the Schedule, provides that "[w]ith respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably . . . submits . . . to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City." (ISDA Master Agreement § 13(b)(i)(2); ISDA Master Agreement Schedule § 4(i)).

## B. Analysis

### 1. Whether the Choice of Law Provision in the ISDA Master Agreement Applies to Plaintiff's Tort and Other Non-Contractual Claims

Other than Plaintiff's unconscionability claim, the Amended Complaint pleads strictly tort and non-contractual causes of action. For example, the Colombian causes of action – for willful violation of Article 2341, negligent violation of Article 2341, and violation of Article 863 – all sound in fraud and negligence. Under Article 2341, "'whomever commits a crime or any guilty act, which has caused a harm to another, is obligated to repair it, regardless of the principal penalty that the law may impose on the guilty act or crime committed.'" (Arrubla-Paucar Decl. (Dkt. No. 29) ¶ 19 (quoting Colombia Civil Code, art. 2341))[11] This provision encompasses "false representations, false promises or fraudulent omissions that cause an injury, whether intentional or negligent." (Id. ¶ 23) Under Article 863 of the Colombian Commercial Code, parties in any private relationship "'must proceed in good faith during the pre-contractual

---

[11] The Court may consider this Arrubla-Paucar declaration as evidence of foreign law under Fed. R. Civ. P. 44.1, which provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

13

period, or they will repair any injuries they may cause.'" (Id. ¶ 24 (quoting Colombia

Commercial Code, art. 863)) "A party is liable under Article 863 if, while negotiating a contract,

the party engages in any disloyal or non-transparent conduct in order to gain advantage over the

other party, causing it an injury." This article "encompasses false representations, false promises

or fraudulent omissions when negotiating a contract." (Id. ¶¶ 28-29)

      Mayagüez's New York fraudulent inducement, fraudulent concealment, and

negligent misrepresentation claims likewise sound in tort, while Plaintiff's promissory estoppel

and unjust enrichment are non-contractual in nature.[12] See, e.g., NCC Sunday Inserts, Inc. v.

World Color Press, Inc., 759 F. Supp. 1004, 1011 n.11 (S.D.N.Y. 1991) ("[P]romissory estoppel,

by definition, is a claim outside the contract . . . ."); SCM Grp., Inc. v. McKinsey & Co., 10 Civ.

2414 (PGG), 2011 WL 1197523, at *1-3 (S.D.N.Y. Mar. 28, 2011) (noting that unjust

enrichment is an "extra-contractual claim[]")).

      Accordingly, the question presented is whether a choice of law provision stating

that "[t]his Agreement will be governed by and construed in accordance with the laws of the

State of New York" (ISDA Master Agreement Schedule (Dkt. No. 23-1) § 4(h)) is broad enough

to encompass Plaintiff's tort and other non-contractual causes of action.

      Although New York courts "will enforce a choice-of-law clause so long as the

chosen law bears a reasonable relationship to the parties or the transaction," Welsbach Elec.

Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629 (2006) – as discussed below – New York does

not read a choice of law provision that appears, by its terms, to address only the governing law

---

[12]  Mayagüez's promissory estoppel and unjust enrichment claims under New York law are pled
in the alternative, "if this Court determine[s] that Colombia law does not apply." See Am.
Cmplt. (Dkt. No. 15) ¶¶ 248-61; Pltf. Opp. (Dkt. No. 27) at 17).

for purposes of interpreting the contract, to encompass tort and other non-contractual causes of action.

For example, in <u>Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.</u>, 414 F.3d 325 (2d Cir. 2005), Finance One – a Thai company – entered into a derivatives trading relationship with Lehman Brothers-affiliated companies under an ISDA Master Agreement. <u>Id.</u> at 328. The Schedule to the ISDA Master Agreement contained language substantially identical to the language at issue here: "This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." <u>Id.</u> at 332. Lehman attempted to set-off the amount it owed Finance One in connection with certain derivatives transactions against the amount Finance One owed Lehman under certain bills of exchange, and Finance One sued Lehman for the full amount it was owed under the derivatives contracts. <u>Id.</u> at 329.

The Second Circuit held that the choice of law provision did not encompass the question of set-off rights. In so holding, the court noted that New York courts are reluctant to "construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action." <u>Id.</u> at 334. The fact that the contract at issue – as here – contained a broader forum selection clause (<u>see</u> ISDA Master Agreement (Dkt. No. 23-1) § 13(b)(i)2); ISDA Master Agreement Schedule § 4(i)) did not alter the result: "Based on New York courts' reluctance to read choice-of-law clauses broadly, . . . together with the fact that the parties could have, but did not, include within their agreement a provision creating setoff rights, we hold that as a matter of New York law, extra-contractual setoff rights fall outside the scope of the choice-of-law clause." <u>Id.</u> at 335.

Defendants argue that <u>Finance One</u> is distinguishable, because the set-off right at issue there did not arise from the ISDA Master Agreement. (Def. Reply (Dkt. No. 24) at 11) But Plaintiff's tort claims don't arise from the ISDA Master Agreement either. In any event, the Second Circuit, district courts in this Circuit, and New York courts all apply this principle even where the rights at issue are closely related to contractual rights and obligations.

For example, in <u>Krock v. Lipsay</u>, 97 F.3d 640 (2d Cir. 1996), a Massachusetts trust (Wedgestone) made a loan to College Point Associates that was secured by land and by two personal guarantees. <u>Id.</u> at 643. A brochure prepared by the mortgage broker stated that the property was 42 acres and could be "developed 'as-of-right,'" and an appraisal performed on behalf of the borrower valued the property at $16.4 million. <u>Id.</u> The agreement between the personal guarantors and Wedgestone stated that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts."[13] <u>Id.</u> at 643. After the borrower defaulted and Wedgestone initiated foreclosure proceedings, it discovered that the property was only 21 acres, was subject to restrictions on development, and was worth only $1.6 million. <u>Id.</u> at 644. Wedgestone brought suit against, among others, the borrower, the guarantors, and the appraiser for fraud, constructive trust, unjust enrichment, fraudulent conveyance, and to enforce the personal guarantees. <u>Id.</u>

The Second Circuit held that New York law – and not Massachusetts law – governed Wedgestone's claims. In so holding, the court noted that, "[u]nder New York law, a choice-of-law provision indicating that the <u>contract</u> will be governed by a certain body of law does not dispositively determine the law which will govern a claim of <u>fraud</u> arising incident to

---

[13] Although the choice of law provision pointed to Massachusetts law, the Second Circuit applied New York choice of law principles. <u>See id.</u> at 645.

the contract." Id. at 645 (emphasis in original). The Second Circuit went on to state that "in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." Id. (quoting Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994)). Under the choice of law provision at issue in Krock – which is very similar to the choice of law provision at issue here – the Second Circuit concluded that there was "no way such language can be read broadly enough to apply to fraudulent misrepresentation." Id.

This Court applied the same principle in SCM Group, Inc. v. McKinsey & Co., Inc., 10 Civ. 2414 (PGG), 2011 WL 1197523 (S.D.N.Y. Mar. 28, 2011). In that case, SCM – a management consulting firm – sued McKinsey for fees in connection with helping McKinsey to develop and recruit insurance companies to provide it with a financial vehicle to reduce tax liability for its managing directors. SCM, 2011 WL 1197523, at *1-3. Security Benefit Life Insurance Company was chosen to develop this financial product, which was a variable annuity. McKinsey, Security Benefit, and their subsidiaries entered into agreements that "govern[ed] the marketing of the variable annuity to McKinsey directors as well as the parties' 'overall relationship.'" Id. at *2. SCM and Security Benefit entered into a "Consulting Agreement," which provided that Security Benefit would pay SCM a fee equal to .03% of the net assets of the variable annuity. Id. Although McKinsey was not a signatory to the Consulting Agreement, SCM alleged that McKinsey was the source of the funds Security Benefit would use to pay SCM, and Security Benefit had no obligation – under the Consulting Agreement – to pay SCM's fee until Security Benefit had received the necessary funds from McKinsey. Id. at *6. SCM also alleged that McKinsey had made an oral promise to SCM to invest at least $100 million in the

variable annuity product. Id. at *1-2. The Consulting Agreement provided that it "shall be governed by and construed in accordance with the laws of the State of Kansas." Id. at *7.

In a subsequent lawsuit against McKinsey, SCM claimed that McKinsey had not invested $100 million in the variable annuity product, and that as a result SCM was not "fairly compensated for the services it had rendered." Id. at *3. This Court held that SCM's claim for unjust enrichment against McKinsey was not subject to the choice-of-law clause in the Consulting Agreement, because "'[u]nder New York law, . . . extra-contractual claims are outside the scope of contractual choice-of-law provisions.'" Id. at *7 (quoting Comprehensive Habilitation Servs., Inc. v. Commerce Funding Corp., 5 Civ. 9640 (PKL), 2009 WL 935665, at *10 (S.D.N.Y. Apr. 7, 2009)).

New York courts apply the same principle. In what the Second Circuit describes as the "leading New York case" (see Finance One, 414 F.3d at 334) – Knieriemen v. Bache Halsey Stuart Shields – plaintiff lost $21,824.90 as the result of investing with a commodities broker in Louisiana, and was charged $23,926.52 for commissions and taxes and $532.11 in interest. Knieriemen, 74 A.D.2d 290, 292-93 (1st Dep't 1980). Plaintiff sued the broker for breach of contract, negligence, and fraud. The agreement between the broker and plaintiff stated that "[t]his contract shall be governed by the laws of the State of New York." Id. at 293. The First Department held, however, "[t]hat the [fact the] parties agreed that their contract should be governed by an expressed procedure does not bind them as to causes of action sounding in tort, and, as to the tort causes of action, there is no reason why all must be resolved by reference to the law of the same jurisdiction." Id. at 293 (citations omitted). The First Department then applied Louisiana law in determining whether (1) punitive damages were available; and (2)

contributory negligence and assumption of risk defenses could be asserted as to the negligence claim. Id. at 294-95.

None of the cases cited by Defendants (see Def. Br. (Dkt. No. 22) at 43-44) are to the contrary. In each instance, the choice of law provision at issue is worded more broadly than the choice of law clause here. For example, in Capital Z Financial Services Fund II, L.P. v. Health Net, Inc., 43 A.D.3d 100 (1st Dep't 2007), four limited partnerships invested $100 million in the stock of Superior to help it fund the acquisition of four workers' compensation insurers from Health Net's predecessor. Id. at 101. Superior and Health Net entered into a purchase agreement for the insurers, which included certain representations and warranties, as well as a voting agreement. Both agreements contained a choice of law provision stating that Delaware law "shall govern all issues concerning the validity of this Agreement, the construction of its terms and the interpretation and enforcement of the rights and duties of the parties." Id. at 103. The limited partnerships sued for, inter alia, breach of the implied covenant of good faith and fair dealing under the voting agreement -- because Health Net had misrepresented the insurers' financial condition -- and fraudulent inducement, because Health Net had misrepresented the value of the investment based on the insurers' financial condition. Id. at 105. The First Department held that these claims were subject to the choice of law clause: "While a limited choice of law provision may not apply to determine claims of fraud, the challenged claims here fall squarely within the broad terminology used in the choice of law provisions. In fact, all of plaintiffs' claims require 'construction of [the] terms [of the Purchase and Voting Agreements] and the interpretation and enforcement of the rights and duties of the parties [under them.]'" Id. at 109 (citing Finance One, 414 F.3d at 332; Turtur, 26 F.3d at 309-10).

Similarly, in Bausch & Lomb Inc. v. Mimetogen Pharmaceuticals, Inc., 14 Civ. 6640 (FPG), 2016 WL 2622013 (W.D.N.Y. 2016), a contract between the parties granted Bausch & Lomb an option to purchase a license to use a solution created by Mimetogen to treat dry eye syndrome. Id. at *1. The contract provided that if a clinical trial for the solution was "completely successful" or "successful," Bausch & Lomb was required to purchase the option. If the trial was "partially successful," "inconclusive," or "not successful," Bausch & Lomb could exercise the option, extend the option to conduct an additional clinical trial, or not exercise the option. Id. If the clinical trial was "partially successful" or "inconclusive," and Bausch & Lomb decided not to exercise the option and not to extend it, it had to pay Mimetogen a $20 million fee. Id. at *2. The parties disputed whether the results of the clinical trial were "inconclusive" or "not successful," and Bausch & Lomb decided not to exercise the option. Id. at *4-5. Bausch & Lomb then sued for a declaratory judgment that it did not owe Mimetogen the $20 million. Id. at *1. Mimetogen brought counterclaims against Bausch & Lomb for breach of contract. It also sued Valeant – which had purchased Bausch & Lomb – for tortious interference with contract. Valeant was engaged in discussions to purchase Allergan – another pharmaceutical company that makes dry eye products – and Mimetogen claimed that Bausch & Lomb had become less interested in the transaction with Mimetogen after Valeant announced the Allergan acquisition. Id. at *2. The contract provided that "[t]his Agreement and all claims related to it, its execution or the performance of the parties under it, shall be construed and governed in all respects according to the laws of the State of New York." Id. at *6. Relying in part on Capital Z, see id.

at *8, the court found that the choice of law provision was broad enough to encompass all of Mimetogen's claims, including the tortious interference claim. Id.[14]

The choice of law provisions in Capital Z and Bausch & Lomb contain language much broader than the language at issue here. In Capital Z, the choice of law clause covered "all issues concerning . . . enforcement of the rights and duties of the parties," Capital Z, 43 A.D.3d at 103 (emphasis added), and in Bausch & Lomb, the choice of law clause covered "[t]his Agreement and all claims related to it, its execution or the performance of the parties under it." Bausch & Lomb, 2016 WL 2622013, at *6 (emphasis added). Here, the choice of law clause provides only that "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York." (ISDA Master Agreement Schedule (Dkt. No. 23-1) § 4(a)) Given the significant language differences in the choice of law provisions at issue in these cases, Capital Z and Bausch & Lomb do not support Defendants' argument that the choice of law clause at issue here encompasses tort and other non-contractual claims.

Finally, the cases cited in Defendants' Reply (see Reply (Dkt. No. 24) at 9-12) are inapposite because they all concern either the interpretation of a forum selection clause or apply non-New York choice of law. See Weingrad v. Telepathy, Inc., 5 Civ. 2024 (MBM), 2005 WL 2990645, at *4 (S.D.N.Y. Nov. 7, 2005) ("A forum selection clause cannot 'be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship.'" (quoting Anselmo v. Univision Station Grp., Inc., 92 Civ. 1471 (RLC), 1993 WL 17173, at *2 (S.D.N.Y. Jan. 15, 1993); Direct Mail Prod. Servs. Ltd. v. MBNA Corp., 99 Civ. 10550 (SHS), 2000 WL

---

[14] Although Valeant was not a signatory to the contract between Bausch & Lomb and Mimetogen, the court held that Mimetogen was "estopped from avoiding the choice-of-law provision" as to its tortious interference claim. Id. at *7.

1277597, at *5-7 (S.D.N.Y. Sept. 7, 2000) (analyzing forum selection clause); Young Women's

Christian Ass'n of U.S., Nat'l Bd. v. HMC Ent., Inc., 91 Civ. 7943 (KMW), 1992 WL 279361, at

*4 (S.D.N.Y. Sept. 25, 1992) (analyzing forum selection clause); Nw. Airlines, Inc. v. Astraea

Aviation Servs., Inc., 111 F.3d 1386, 1392 (8th Cir. 1997) (applying Minnesota choice of law);

Ne. Data Sys., Inc. v. McDonnell Douglas Comp. Sys. Co., 986 F.2d 607, 609 (1st Cir. 1993)

(applying Massachusetts choice of law); Moses v. Bus. Card Exp., Inc., 929 F.2d 1131, 1139-40

(6th Cir. 1991) (applying Michigan and Alabama choice of law).

 The Court concludes that the choice of law provision in the ISDA Master

Agreement and Schedule do not cover Plaintiffs' tort and other non-contractual claims.

  **2. Whether the Law Applicable to Plaintiff's**
   **Tort and Other Non-Contractual Claims**
   **Should be Determined on the Current Record**

 As numerous courts in this district have cautioned, choice of law analysis is a

fact-intensive inquiry that is generally inappropriate to resolve on a motion to dismiss. See, e.g.,

Speedmark Transp., Inc. v. Mui, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011) ("Defendants also

allege that Massachusetts substantive law applies to the February 19, 2002 employment

agreements and that, under Massachusetts law, the agreements are void. Such a choice-of-law

determination is premature on this motion to dismiss, since the record lacks facts necessary to

conduct the context-specific 'center of gravity' or 'grouping of contacts' analysis required by

New York's choice-of-law principles." (citation omitted)); Meserole v. Sony Corp. of Am., Inc.,

8 Civ. 8987 (RPP), 2009 WL 1403933, at *5 n.6 (S.D.N.Y. May 19, 2009) ("[A]t this early stage

of the litigation, . . . a detailed choice of law analysis would be premature." (citation omitted));

First Union Nat'l Bank v. Paribas, 135 F. Supp. 2d 443, 453 (S.D.N.Y. 2001) ("[I]t is premature

to make a definitive choice of law ruling both because it is not yet clear that there is a conflict

between New York and English law and because the litigation is at a preliminary stage."
(citations omitted))

Here, neither side has briefed the issue of whether Colombian or New York law applies to Plaintiff's tort and other non-contractual claims in the event that the choice of law provision contained in the ISDA Master Agreement and Schedule is found inapplicable. Having determined that this choice of law provision does not apply to Mayagüez's tort and other non-contractual claims, it would be premature – absent the development of an appropriate factual record and proper briefing – to determine whether New York or Colombian law applies to those claims.

## III. PLAINTIFF HAS NOT ADEQUATELY PLED AN UNCONSCIONABILITY CLAIM

### A. New York Law Applies to Plaintiff's Unconscionability Claim

Because Mayagüez's unconscionability claim is a contract-based claim, it is subject to the choice of law provision in the ISDA Master Agreement and Schedule. See, e.g., Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121-25 (2d Cir. 2010) (choice of law clause provided for application of New York law; court therefore applied New York law in determining whether an arbitration agreement was unconscionable); Wework Cos. V. Zoumer, 16 Civ. 457 (PKC), 2016 WL 1337280, at *2, *5-6 (S.D.N.Y. Apr. 5, 2016) (same); Guardian Life Ins. Co. of Am. v. Liberty Wealth Strategies, LLC, 13 Civ. 2047 (JPO), 2014 WL 3715386, at *2-4 (S.D.N.Y. July 28, 2014) (choice of law clause provided for application of New York law; court therefore applied New York law in determining whether promissory notes were unconscionable); Frankel v. Citicorp Ins. Servs., Inc., 80 A.D.3d 280, 286-90 (2d Dep't 2010)

(where choice of law clause provided for application of South Dakota law, court analyzed whether an arbitration clause was unconscionable under South Dakota law).[15]

## B. Legal Standard

"'The doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties.'" NML Capital v. Republic of Argentina, 621 F.3d 230, 237 (2d Cir. 2010) (quoting United States v. Martinez, 151 F.3d 68, 74 (2d Cir. 1998) (internal quotation marks omitted)). Under New York law, "[i]n general, an unconscionable contract has been defined as one which is so grossly unreasonable as to be unenforcible because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." King v. Fox, 7 N.Y.3d 181, 191 (2006). "An unconscionable bargain is one which no person in his or her senses and not under delusion would make on the one hand, and no honest and fair person would accept on the other, the inequality being so strong as manifest as to shock the conscience and confound the judgment of any person of common sense." Morad v. Morad, 27 A.D.3d 626, 626 (2d Dep't 2006) (citing Christian v. Christian, 42 N.Y.2d 63, 71 (1977);

---

[15] As noted above, it is not clear from the Amended Complaint whether any aspect of Plaintiff's claims are premised on the November 2013 Currency Trade. It appears that any claim premised on the November 2013 Currency Trade would be governed by Colombian law, because the choice of law provision in the Local Framework Agreement – which governs the November 2013 Currency Trade – provides for the application of Colombian law. (See Local Framework Agreement (Dkt. No. 23-2) § 15.14) Because (1) it is not clear that any of Plaintiff's claims are premised on the November 2013 Currency Trade; (2) only the terms of the July 2014 and January 2015 Currency Trades are cited in Plaintiff's unconscionability claim (see Am. Cmplt. (Dkt. No. 15) ¶¶ 262-67; Pltf. Opp. (Dkt. No. 27) at 39-44); and (3) Plaintiff has not briefed unconscionability under Colombian law, this Court has assumed that Plaintiff's unconscionability claim is directed at the July 2014 and January 2015 Currency Trades. As discussed above, because unconscionability is a contract-based claim, Plaintiff's unconscionability claim as to the July 2014 and January 2015 Currency Trades is governed by New York law.

<u>Yuda v. Yuda</u>, 143 A.D.2d 657, 658 (2d Dep't 1988)); <u>see also</u> <u>Morris v. Castle Rock Entm't,</u> <u>Inc.</u>, 246 F. Supp. 2d 290, 295 (S.D.N.Y. 2003) (quoting <u>Doctor's Assocs., Inc. v. Jabush</u>, 89 F.3d 109, 113 (2d Cir. 1996)) (same).

"A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made – i.e., 'some showing of an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."'" <u>Gillman v. Chase Manhattan Bank, N.A.</u>, 73 N.Y.2d 1, 10 (1988) (quoting <u>New York v. Avco Fin. Serv. of N.Y. Inc.</u>, 50 N.Y.2d 383, 389 (1980)).

"The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction (<u>see</u>, UCC 2-302 [2]), whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." <u>Id.</u> at 10-11; <u>see also</u> <u>Passelaigue v. Getty Images (US), Inc.</u>, 16 Civ. 1362 (VSB), 2018 WL 1156011, at *5 (S.D.N.Y. Mar. 1, 2008) (same).

"'[T]he substantive element [of unconscionability] looks to the content of the contract, per se,'" <u>Nayal v. HIP Network Servs. IPA, Inc.</u>, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (quoting <u>State v. Wolowitz</u>, 96 A.D.2d 47, 67 (2d Dep't 1983)), and "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged. While determinations of unconscionability are ordinarily based on the court's conclusion that both the procedural and substantive components are present, there have been exceptional cases where a provision of the contract is so outrageous

as to warrant holding it unenforceable on the ground of substantive unconscionability alone."

Gillman, 73 N.Y.2d at 12 (citations omitted). An unconscionable contract is one which "'is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforcible according to its literal terms.'" Id. at 10 (quoting Mandel v. Liebman, 303 N.Y. 88, 94 (1951)).

Procedural and substantive unconscionability are weighed on a "sliding scale" – "'the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa.'" David v. #1 Mktg. Serv., Inc., 113 A.D.3d 810, 812 (2d Dep't 2014) (quoting Simar Holding Corp. v .GSC, 87 A.D.3d 688, 690 (2d Dep't 2011)). Furthermore, "'the doctrine of unconscionability has little applicability in the commercial setting because it is presumed that businessmen deal at arm's length with relative equality of bargaining power.'" Master Lease Corp. v. Manhattan Limousine, Ltd., 177 A.D.2d 85, 90 (2d Dep't 1992) (quoting Gillman, 135 A.D.2d 488, 491 (2d Dep't 1987), aff'd, 73 N.Y.2d 1)); see also NML Capital, 621 F.3d at 238 ("Argentina has pointed to no authority – and we are aware of none – finding an agreement involving parties of like sophistication unenforceable on substantive unconscionability grounds.").

Although Plaintiff argues that, "[g]iven the fact-specific nature of the inquiry, a determination of unconscionability should at least await development of a factual record" (Pltf. Opp. (Dkt. No. 27) at 40), "'[t]he determination of unconscionability is a matter of law for the Court to decide.'" I.C. ex rel. Solovsky v. Delta Galil USA, 135 F. Supp. 3d 196, 211 (S.D.N.Y. 2015) (quoting Simar, 87 A.D.3d at 690); see Fleischmann Distilling Corp. v. Distillers Co. Ltd., 395 F. Supp. 221, 233 n.18 (S.D.N.Y. 1975) ("The determination of unconscionability is a question of law properly before the court on a motion to dismiss or on motion for summary

judgment."); see also Passelaigue, 2018 WL 1156011, at *5 (granting motion to dismiss; where Plaintiff did not allege any facts that "[p]laintiff's bargaining power, experience, and/or education were limited or [that] [p]laintiff was under any sort of duress or pressure to sign the [contract] without reading it," there were no "allegations that [plaintiff's counterparty] did anything so as to effectively deprive [p]laintiff of a meaningful choice," and the contract was not procedurally unconscionable); Fox v. Int'l Conference of Funeral Serv. Examining Bds., 242 F. Supp. 3d 272, 289 (S.D.N.Y. 2017) (granting motion to dismiss; where plaintiff did not allege any facts regarding the reasonableness of contract's terms and where there was "'nothing shocking'" about the contractual terms (quoting Mattei v. Int'l Conference of Funereal Serv. Examining Bds., 15 Civ. 139 (RP), 2015 WL 5125799 (W.D. Tex. Sept. 1, 2015)), plaintiff had failed to plead unconscionability); Cybercreek Entm't, LLC v. U.S. Underwriters Ins. Co., 16 Civ. 424 (EAW), 2016 WL 7374233, at *5-7 (W.D.N.Y. Dec. 20, 2016) (granting motion to dismiss; plaintiff's allegations that insurance policy was procedurally unreasonable – because signatory was "neither a legal[] nor insurance professional" and had "no opportunity to negotiate specific terms of the policy" – were insufficient to allege procedural unconscionability; plaintiff also did not establish substantive unconscionability where contract term at issue bound both parties).

C.   **Analysis**

1.   **Plaintiff Has Not Pled Procedural Unconscionability**

With respect to the July 2014 Currency Trade, Plaintiff has pled no facts suggesting that it lacked "meaningful choice" whether to enter the Currency Trades. Indeed, the facts pled in the Amended Complaint suggest the opposite conclusion: Mayagüez could have gone elsewhere to obtain "plain vanilla" currency forward contracts, and it was perfectly free to do so. Although Mayagüez argues as to the January 2015 Currency Trade that "it is doubtful

that . . . there was real opportunity for Mayagüez to enter into a currency trade with someone other than Defendants because that trade was premised on a promise to defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade" (Pltf. Opp. (Dkt. No. 27) at 41), the Amended Complaint suggests that Plaintiff did have another option: pay the $34.9 million mark to market value and exit the July 2014 Currency Trade. (Am. Cmplt. (Dkt. No. 15) ¶ 125) Indeed, the Amended Complaint alleges that Mayagüez was planning to make this payment before Citigroup allegedly made false promises that induced Plaintiff to enter into the January 2015 Currency Trade. (Id.) Thus, even with respect to the January 2015 Currency Trade, Mayagüez has not pled facts demonstrating that it lacked "meaningful choice."

Unconscionability claims are commonly dismissed where plaintiff has not pled a lack of meaningful choice. For example, in Passelaigue v. Getty Images (US), Inc., a fashion model hired to work for Clinique did a photo shoot with a photographer to test a concept for a Clinique advertising campaign. Passelaigue, 2018 WL 1156011, at *1. After the photo shoot, the photographer asked the model if he could use the photos for his portfolio and professional website as an example of his work. The model then signed a release. Id. The release contained terms much broader than the photographer had represented, however, and permitted the photographer to use the photographs for "editorial, trade, advertising, packaging or other purposes in any manner or medium," and limited any monetary damages arising out of the photographer's use of the photographs to $500. Id. at *2. The model argued that these terms were unconscionable, id. at *4, but the court concluded that the model had not adequately alleged unconscionability and granted defendant's motion to dismiss.

In so holding, the court noted that

there are no allegations that suggest that (1) [p]laintiff's bargaining power, experience, and/or education were limited, or (2) [that] [p]laintiff was under any

sort of duress or pressure to sign the Release without reading it, and she admits that she signed it as a 'professional courtesy.' In other words, there are no allegations that [the photographer] did anything so as to effectively deprive Plaintiff of a meaningful choice. Under the circumstances, the Release was not procedurally unconscionable.

Id. at *5.

Similarly here, there are no allegations that Mayagüez was under any pressure or duress to agree to the Currency Trades. Mayagüez is a large Colombian corporation that had gross revenues of approximately $208 million dollars in 2013 and $181 million in 2014. (Am. Cmplt. (Dkt. No. 15) ¶¶ 22-23) Mayagüez had also used currency forward contracts since 2006. (Id. ¶ 36) In short, Mayagüez has not alleged facts suggesting that it lacked "meaningful choice." See also Dabriel, Inc. v. First Paradise Theaters Corp., 99 A.D.3d 517, 520-21 (1st Dep't 2012) (reversing denial of motion to dismiss where "'plaintiffs failed to plead anything regarding an alleged lack of meaningful choice . . . and . . . were free to walk away from the . . . negotiations at any time'" (quoting Accurate Copy Serv. of Am., Inc. v. Fisk Bldg. Assocs. L.L.C., 72 A.D.3d 456, 457 (1st Dep't 2010))).

An unconscionability claim was likewise dismissed in Cybercreek Entertainment, LLC v .U.S. Underwriters Insurance Co., 16 Civ. 424 (EAW), 2016 WL 7374233 (S.D.N.Y. Dec. 20, 2016). In that case, defendant had issued an insurance policy to plaintiff providing coverage for "physical damage and business losses to plaintiff's restaurant and outdoor and indoor driving range." Id. at *1. The policy allowed defendant to cancel the policy on ten days' notice if plaintiff did not pay the premium, or on thirty days' notice for any other reason. Id. Plaintiff alleged that it attempted to make certain improvements to the property that defendant had recommended, but that defendant nonetheless cancelled the policy. Id. at *2. Plaintiff then

sued defendant for breach of contract and argued that the cancellation clause was unconscionable. Id.

The court granted defendant's motion to dismiss, finding that plaintiff had not pled unconscionability. As to procedural unconscionability, plaintiff's signatory alleged that he was "neither a legal[] nor insurance professional," but did not claim that he was "inexperienced in running a business." Id. at *6. Moreover, "[p]laintiff [had] entered into at least two insurance policy contracts before the one at issue." Id. The court concluded that plaintiff had not pled facts demonstrating "that it lacked meaningful choice in entering into the agreements. Although Plaintiff claims that it had no opportunity to negotiate specific terms of the policy, '[i]t is noteworthy that [Plaintiff was] free to walk away from the . . . negotiations at any time' and obtain insurance from another provider.'" Id. (quoting Dabriel, 99 A.D.3d at 520).

Similarly here, Mayagüez had entered into currency forward contracts for years before the Currency Trades; was not forced to enter into the Currency Trades; was "free to walk away from the negotiations at any time"; and was free to contract with other financial institutions for hedging products or services.

In Sol Group Marketing Co. v. Am. President Lines, LTD, 14 Civ. 9929 (SHS), 2016 WL 205444 (S.D.N.Y. Jan. 15, 2016), the court likewise granted defendant's motion to dismiss an unconscionability claim. Plaintiff sold and distributed produce, and defendants were a shipping company and its agent. Id. Defendants agreed to ship 700 containers of melons to plaintiff, and supplied a schedule outlining the volume of containers defendants could ship each week. Id. at *2. The contract between the parties disclaimed that defendants were bound by any weekly schedule, however, and contained a merger clause. Id. at *2-3. The contract also included a liquidated damages provision, which provided that if defendant failed to ship 700

30

containers, it would pay plaintiff $350 for each container below the 700 container minimum. Id. at *3. Plaintiff sued for, inter alia, fraudulent inducement and sought a declaratory judgment that the liquidated damages provision was unenforceable. Id. at *4.[16]

On a motion to dismiss, the court held that plaintiff had not pled procedural unconscionability. The court noted that plaintiff "is a sophisticated party" and that its "conclusory contention that it suffered from an inequity of bargaining power is belied by its allegations that it was able to negotiate both a [discount] and an amendment to the contract." Id. at *7. The court further noted that "there is no allegation that [defendant] was [plaintiff's] sole option for shipping melons." Id. Moreover, plaintiff had "not alleged in its complaint that it did not have time to read and understand the agreement." Id.

Similarly here, Mayagüez is a large and sophisticated business; it had entered into currency forward contracts in the past; it could have entered into financial hedging agreements with any number of financial institutions; it has not alleged that it did not have sufficient time to read and understand the Currency Trades; and it was able to negotiate favorable amendments to the first Currency Trade. The Court concludes that Mayagüez has not adequately pled procedural unconscionability.

The cases cited by Plaintiff (see Pltf. Opp. (Dkt. No. 27) at 40) are not to the contrary. In Spinelli v. National Football League, 96 F. Supp. 3d 81 (S.D.N.Y. 2015), plaintiffs were professional photographers who licensed their photographs, including photos taken at NFL games and practices. In 2004, the NFL entered into a licensing agreement with Getty Images,

---

[16] Although plaintiff contended that the liquidated damages provision was unenforceable because it was a contract of adhesion and was unreasonable, the court found that these allegations were "equivalent to the two elements that must be met to find unconscionability: procedural unconscionability and substantive unconscionability." Id. at *6.

31

under which Getty acquired rights to license photographs of NFL content. This agreement

covered photographs for which Getty owned the copyright, as well as plaintiffs' photographs.

Getty entered into agreements with each of the plaintiffs for the right to license their works,

including their NFL photographs. In 2009, the NFL solicited bids for exclusive commercial

licensing rights, and eventually selected the Associated Press as its sole commercial licensor of

NFL photographs. As a result, Plaintiffs lost their right to sell commercial licenses of their NFL

photographs through Getty: if they wanted to commercially license these photographs, they

would have to transition their entire NFL collections to the AP. However, Plaintiffs had both

NFL-related and non-NFL-related content with Getty, and Getty allegedly "threatened to remove

Plaintiffs' other sports content from its distribution networks and/or terminate its relationship

with Plaintiffs entirely if they did not agree to continue licensing their NFL content through

Getty even after its commercial licensing deal with the NFL expired, and made it clear that it

would not 'welcome back' any contributors who moved their NFL content to AP should Getty

ever regain the rights to license NFL content in the future." Id. at 94. This situation presented

Plaintiffs with an "impossible choice" – Plaintiffs were forced to choose between "losing

commercial licensing opportunities for their NFL content by not going to AP or giving up

commercial licensing opportunities for their non-NFL content by leaving Getty." Id.

        After the agreement with the AP expired, the NFL entered into a new agreement

with the AP providing that the NFL could use AP-owned and Contributor Photographs royalty-

free for a wide range of uses. Plaintiffs challenged this provision as unconscionable. Spinelli,

13 Civ. 7398 (RWS), 2016 WL 3926446 (S.D.N.Y. July 15, 2016). The Spinelli court found that

Plaintiffs had alleged procedural unconscionability. As the Spinelli court put it, while "take it or

leave it tactics (and a general refusal to negotiate) are permitted when the party in an inferior

bargaining position can simply contract with a suitable replacement[,] . . . there were no other opportunities for Plaintiffs to engage in their livelihood of photographing NFL football games other than to accept the Contributor Agreements with the AP, which was their primary source of income. Further, not signing with AP would have meant losing access to all of the NFL photos they had already taken since AP had a retroactive exclusive license over all NFL photographs." Id. at *3-4 (citations omitted).[17]

Here, the circumstances are not nearly as dire. Mayagüez could have entered into currency forward contracts with any number of financial institutions, and there would have been no negative consequences for Mayagüez if it had never entered into the Currency Trades.

Similarly, in Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377 (S.D.N.Y. 2002), plaintiff – a Bally employee – complained to a Bally attorney, Fred Infante, that she was being sexually harassed by her manager. Id. at 379. Bally took no action, and to avoid her manager, plaintiff moved to a different Bally facility. While working at the new facility, plaintiff was required to attend a meeting about sexual harassment conducted by Infante. When the meeting ended, Infante distributed a sixteen-page, single-spaced agreement "that he described as containing procedures for bringing employment discrimination claims." Id. Infante did not disclose that the agreement contained a mandatory arbitration clause. Id. at 380. When an employee asked what would happen if she did not sign the agreement, Infante said that "anyone who did not sign the Agreement would not be considered for a promotion." Id. Given these facts, the court found – after a bench trial – that the agreement was procedurally unconscionable. Plaintiff lacked a "meaningful choice" when she signed the agreement; Infante had used high-

---

[17] The Spinelli court later found that plaintiffs had waived their unconscionability claims because they had ratified the contracts by performance. Spinelli, 2016 WL 7441696, at *2-3 (S.D.N.Y. Dec. 23, 2016).

pressure tactics; and plaintiff reasonably believed that she would be terminated if she did not sign the agreement. Id. at 383. Here, there was no such pressure for Mayagüez to enter into the Currency Trades.

Mayagüez has not shown procedural unconscionability, because it has not alleged facts demonstrating that it lacked "meaningful choice" in entering into the Currency Trades. See King, 7 N.Y.3d at 191 ("In general, an unconscionable contract has been defined as one which is so grossly unreasonable as to be unenforcible because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."); Gillman, 73 N.Y.2d at 10 ("A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made – i.e., 'some showing of an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."'") (quoting Avco, 50 N.Y.2d at 389))

### 2. The Terms of the Currency Trades Are Not So Extreme as to Justify a Finding of Unconscionability in the Absence of Procedural Unconscionability

An inability to demonstrate procedural unconscionability is generally fatal to an unconscionability claim. Indeed, courts applying New York law often do not address substantive unconscionability after concluding that procedural unconscionability has not been shown. See Sol Grp.., 2016 WL 205444, at *7 ("[plaintiff's] failure to allege procedural unconscionability and its status as a sophisticated party are enough to dismiss its request for a declaration that the liquidated damages clause is unenforceable"); Passelaigue, 2018 WL 1156011, at *5 & n.6 (court concluded that plaintiff had not shown procedural unconscionability; "in light of this finding, [the court] need not consider whether the damages cap itself was substantively unconscionable"); Tarulli v. Circuit City Stores, Inc., 333 F. Supp. 2d 151, 158 (S.D.N.Y. 2004) ("Having found

the procedural element of an unconscionability claim not satisfied, this Court need not address the Plaintiff's substantive unconscionability arguments."). Although there have been "exceptional cases where a provision of [a] contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone," Gillman, 73 N.Y.2d at 12, Plaintiff has made no such showing here.

Mayagüez argues that the terms of the Currency Trades are substantively unconscionable because (1) they create "unlimited risk for Mayagüez and the potential for substantial profit for Defendants"; (2) the terms of the trades are too long; (3) the July 2014 Currency Trade used a $6 million notional value for calculating potential payments to Defendants, and only a $3 million notional value when calculating potential payments to Mayagüez; and (4) the January 2015 Currency Trade used a strike price for the second tranche that was substantially below the then-current exchange rate. (Am. Cmplt. (Dkt. No. 15) ¶ 264)

The Court concludes, however, that the terms of the Currency Trades are not "so overbalanced in favor of [Citibank] as to be found substantively unconscionable." Gillman, 73 N.Y.2d at 12. Here, in return for a strike price that would benefit Mayagüez if the exchange rate decreased, Mayagüez was required to make payments to Citibank if the exchange rate increased. There is a logic to this trade-off – if the exchange rate decreases, Mayagüez is protected better than in a "plain vanilla" currency forward contract, because the strike price is higher. If the exchange rate increases, although Mayagüez has to make payments to Citigroup, Mayagüez is in a better position to make these payments, because it will be making more money from its sugar exports (as it will receive more pesos given the increase in the exchange rate).

Mayagüez makes much of the fact that the Currency Trades created "unlimited risk" for Mayagüez. Although true in a literal sense, the risk is only "unlimited" in the sense that

Mayagüez is exposed to infinite liability if the U.S. dollar becomes worthless. Mayagüez also obscures Citibank Colombia's risk in these Currency Trades. For example, Mayagüez alleges that under the November 2013 Currency Trade, "the potential gain to Mayagüez, and the potential risk to Citibank, was strictly limited to approximately USD 450,000." (Am. Cmplt. (Dkt. No. 15) ¶ 102) While Citibank Colombia's payments to Mayagüez were capped at 900 million pesos – which converts to about $450,000 at the strike price – this figure does not accurately reflect Citibank's real-world potential losses. If the Colombian peso rapidly appreciated, for example, Citibank Colombia stood to lose much more than $450,000. Suppose the peso appreciated such that the exchange rate became 1:1. Under the terms of this Currency Trade, Citibank Colombia would be obligated to pay Mayagüez 900 million pesos (the maximum compensation), which would be worth $900 million in the open market.

As to the length of the Currency Trades, this Court finds no issue, because increased length of these contracts increased the risk to both sides.

As to the difference in the notional value for Mayagüez and Citibank Colombia in the July 2014 Currency Trade, although unfavorable to Mayagüez, this difference is not "so outrageous" as to hold the contract unconscionable in the absence of procedural unconscionability. See VoiceAge Corp. v. RealNetworks, Inc., 926 F. Supp. 2d 524, 532 (S.D.N.Y. 2013) ("[A] bad bargain, even a terrible bargain, is not ipso facto substantively unconscionable.")

Finally, Mayagüez points to the strike price for part of the second tranche of the January 2015 Currency Trade, which began in December 2015 and ended in July 2017. The Currency Trade provided for a strike price of 2,090, while the actual exchange rate in January 2015 was 2,400. (Am. Cmplt. (Dkt. No. 15) ¶ 130 & tbl. D) Thus, unless the currency rate

dropped between January 2015 and December 2015, Mayagüez would – as of December 2015 – consistently owe monthly payments to Citibank. However, the strike price for the first tranche – that ran from January 2015 to November 2015 – was 2,600. (Id. tbl. D) Because the exchange rate in January 2015 was 2,400, unless the currency rate suddenly increased, Citibank would be required to make payments to Mayagüez. Given these circumstances, the terms of the January 2015 Currency Trade are not so outrageous as to justify finding the term unconscionable absent procedural unconscionability.

Although "[t]here is no general test for measuring the reasonableness of a transaction," Sablosky v. Edward S. Gordon Co., 73 N.Y.2d 133, 138 (1989), courts commonly find – on motions to dismiss – that allegations of substantive unconscionability are insufficient. For example, in Dabriel, Inc. v. First Paradise Theaters Corp., 99 A.D.3d 517 (1st Dep't 2012), plaintiff entered into a lease agreement with defendant to rent a movie theater in the Bronx in 2009. The lease provided that defendant had made no representations with respect to the physical condition of the building. The lease also provided that plaintiff would execute two promissory notes – personally guaranteed by its principal – obligating plaintiff to pay defendant $1,464,582.20 over two overlapping payment periods. Id. at 518. Plaintiff later defaulted, but the parties reached an agreement in which defendant waived the rent arrears and deferred monthly payments on the promissory notes in exchange for an increase in rent and additional guarantees. Plaintiffs later sued to set aside the promissory notes and the personal guarantees as unconscionable. Id. at 517-19. Defendant moved to dismiss, but the trial court denied the motion. On appeal, the First Department reversed, holding that "[t]here is nothing inherent in the notes and the lease guaranty which suggests that the terms were 'unreasonably favorable' to the defendant." Id. at 521 (quoting Gillman, 73 N.Y.2d at 12).

37

Similarly, in VoiceAge Corp. v. RealNetworks, Inc., 926 F. Supp. 2d 524 (S.D.N.Y. 2013), plaintiff agreed to license technology to defendant, and defendant agreed to pay plaintiff a royalty based on the number of downloads of content distributed by defendant that incorporated that technology. Id. at 525-27. Plaintiff then sued defendant for non-payment, and defendant claimed that the agreement was unconscionable. On a motion for judgment on the pleadings, the court held that the agreement was not unconscionable, stating that "a bad bargain, even a terrible bargain, is not ipso facto substantively unconscionable. If that were so, companies would be incentivized to hire incompetent deal makers and fire those highly skilled; the law does not require or support such perverse teaching." Id. at 532; see also Cybercreek, 2016 WL 7374233, at *6-7 (granting motion to dismiss; cancellation clause permitting both parties to cancel the contract at any time without cause was not substantively unconscionable); Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC, 832 F. Supp. 2d 194, 203 (E.D.N.Y. 2010) (granting motion to dismiss; disclaimer of warranties was not substantively unconscionable; "looking at the bargain at the time it was struck, there is simply no reason to conclude that it was 'so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms'. . . . The fact that this contract's complete disclaimer of warranties has ended up having harsh consequences . . . cannot change the conclusion that the disclaimer here is enforceable as part of the bargain struck between the parties at the time they entered the contract." (quoting Gillman, 73 N.Y.2d at 10)). Similarly here, even though the Currency Trades ended up being a "bad bargain" for Mayagüez, none of the contractual terms at issue were "'so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place

38

as to be unenforceable according to [their] literal terms.'" Gillman, 73 N.Y.2d at 10 (quoting Mandel, 303 N.Y. at 94).

Both of the cases cited by Plaintiff (see Pltf. Opp. (Dkt. No. 27) at 44) are distinguishable. In Jones v. Star Credit Corp., 59 Misc. 2d 189 (Sup. Ct. Nassau Cty. 1969), plaintiffs were welfare recipients who agreed to purchase a freezer for $900 after a sales call. After credit charges, credit life insurance, credit property insurance, and sales tax, the purchase price of the freezer was $1,234.80. The freezer itself had a maximum retail value of $300. Id. at 190. A New York state court held that the sale was unconscionable. Although the case is cited for the proposition that substantive unconscionability alone can render a contract unconscionable, see Wolowitz, 96 A.D.2d at 68 (citing Jones for the proposition that "there may be extreme cases where a contractual term is so outrageous and oppressive as to warrant a finding of unconscionability irrespective of the contract formation process), the language of Jones indicates that the court also had procedural unconscionability concerns:

> The very limited financial resources of the purchaser, known to the sellers at the time of the sale, is entitled to weight in the balance. Indeed, the value disparity itself leads inevitably to the felt conclusion that knowing advantage was taken of the plaintiffs. In addition, the meaningfulness of choice essential to the making of a contract can be negated by a gross inequality of bargaining power.

Jones, 59 Misc. 2d at 192 (citing Williams v. Walker-Thomas Furniture Co., 350 F.2d 445 (D.C. Cir. 1965)).

Eisen v. Venulum, Ltd., 244 F.Supp.3d 324 (W.D.N.Y. 2017), also cited by Plaintiff (Pltf. Opp. (Dkt. No. 27) at 44), is likewise not on point. In Eisen, plaintiff invested $122,480.64 in defendant, a wine company. When he later told defendant's principal that he wanted to liquidate his holdings, defendant said that plaintiff would have to invest another $100,000 and sign a new investment contract before he would be allowed to do so. Plaintiff then

invested the additional $100,000 and signed the new contract, which contained an arbitration clause requiring that any dispute arising under the contract would be resolved by binding arbitration in the British Virgin Islands applying British Virgin Islands law. After defendant threatened plaintiff with the loss of his entire investment, plaintiff signed a third contract, which contained an arbitration clause stating that any dispute between plaintiff and the company would be "finally settled by binding arbitration in the British Virgin Islands applying British Virgin Islands law in accordance with the Rules of Arbitration of the International Chamber of Commerce." Id. at 329-32.

Plaintiff later sued defendant for violations of the Securities Act and the Securities Exchange Act, and defendant moved to compel arbitration pursuant to the third contract. The court held that the third contract was unconscionable and void against public policy, as the arbitration clause requiring the application of British Virgin Islands law was an attempt to "avoid the requirements of [the] federal securities laws." Id. at 344. The court found the arbitration clause unconscionable because it required plaintiff "to forgo any application of the federal protections provided to him." Id. at 345.

Here, the concerns that drove the Jones and Eisen decisions are not present. Mayagüez has not argued that it had "limited financial resources," nor do the alleged facts suggest a "gross disparity in bargaining power." There is likewise no argument that Mayagüez surrendered rights that would make the Currency Trades void as against public policy.

Acknowledging that the 2014 and 2015 Currency Trades turned out badly for Mayagüez, the terms of the Trades are not "so outrageous" as to justify a finding that they are unconscionable in the absence of procedural unconscionability. Accordingly, Mayagüez's unconscionability claim will be dismissed. See Gillman, 73 N.Y.2d at 12 (it is the "exceptional

case[] where a provision of [a] contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone"); see also VoiceAge, 926 F. Supp. 2d at 532 ("[A] bad bargain, even a terrible bargain, is not ipso facto substantively unconscionable.").

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted as to the Amended Complaint's Eleventh Cause of Action, for unconscionability, but is otherwise denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 21).

It is further ORDERED that there shall be a conference in this matter on **April 12, 2018 at 11:15 a.m.** in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

Dated: New York, New York
       March 27, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge