## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAYAGÜEZ S.A., | Case No. 16 Civ. 06788 (PGG) (JLC) |
| Plaintiff, | |
| - against - | ORAL ARGUMENT REQUESTED |
| CITIGROUP, INC., CITIBANK N.A., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND ......................................................................................2

    A.   Mayagüez's Experience with Currency Hedging.................................2

    B.   Governing Framework Agreements .....................................................3

    C.   Mayagüez's Hedging Policies and Procedures ....................................4

    D.   Presentations Prior to the First Currency Trade .................................5

    E.   Mayagüez and Citibank Colombia Enter Into the First Currency Trade ..................6

    F.   Mayagüez and Citibank Colombia Enter Into the Second Currency Trade ..............7

    G.   The USD Unexpectedly And Dramatically Appreciates Against The COP .............8

    H.   Mayagüez and Citibank Colombia Amend The Second Currency Trade ..................9

    I.   Mayagüez and Citibank Enter The Third Currency Trade................................9

    J.   Mayagüez Commences Litigation....................................................11

APPLICABLE LEGAL STANDARDS.....................................................................11

I.    SUMMARY JUDGMENT STANDARD ............................................ 11

II.   REQUIRED ELEMENTS OF MAYAGÜEZ'S COLOMBIAN LAW CLAIMS 12

III.  REQUIRED ELEMENTS OF MAYAGÜEZ'S NEW YORK LAW CLAIMS .. 15

ARGUMENT ...........................................................................................................16

I.    MAYAGÜEZ WAS NOT DECEIVED, MISLED OR MISINFORMED AND DEFENDANTS DID NOT ACT WITH AN INTENT TO CAUSE HARM, IN BAD FAITH, OR WITH "FAULT" OR "NEGLIGENCE" ............................................. 16

    A.   The Record Shows *No* Misstatements Or Misleading Omissions By Defendants – Much Less Made With An Intent To Cause Harm, In Bad Faith, Or With "Fault" or Negligence.................................................................................................18

        1.   There Is No Evidence Of A Misstatement Of Fact Concerning The Currency Trades ....................................................................................................18

        2.   There is No Evidence That Defendants Omitted Material Information – Or Information Of Any Kind – Concerning The Currency Trades ....................................20

    B.   Mayagüez Cannot Show "Legitimate Ignorance" Regarding The Risks Or Issues Of Which It Complains Or Justifiable Reliance On Alleged Statements By Defendants ......22

        1.   Mayagüez Had Extensive Experience with Non-Plain Vanilla Hedges ..............23

        2.   Mayagüez Was Fully Aware Of The Amount Hedged By The Second And Third Currency Trades And That Its Ethanol Sales Were Taken Into Account In Connection With Those Trades .................................................................................24

        3.   Unbeknownst to Defendants, Mayagüez Failed To Self-Inform As Required By Colombian Law .........................................................................................26

        4.   Mayagüez Expressly Represented It Was Not Relying on Citibank or Citibank

Colombia ............................................................................................................27

II.   MAYAGÜEZ DOES NOT HAVE A VIABLE PROMISSORY ESTOPPEL OR
UNJUST ENRICHMENT CLAIM ................................................................ 29

   A.   Defendants Did Not Make Any False or Unfulfilled Promises To Mayagüez .........29

   B.   Mayagüez Cannot Show Unjust Enrichment .........................................................30

III.   THERE IS NO EVIDENCE THAT WOULD ESTABLISH LIABILITY AS TO
CITIGROUP, INC. FOR ANY OF MAYAGÜEZ'S CLAIMS .................................. 30

IV.   MAYAGÜEZ CANNOT SHOW THAT DEFENDANTS CAUSED RECOVERABLE
DAMAGES ........................................................................................... 32

   A.   Defendants Did Not Cause Mayagüez's Purported Losses.......................................32

   B.   Even If Mayagüez Could Prove That Defendants Caused Its Losses, Mayagüez
Would Only Be Entitled To Actual Losses As To Which It Offers No Proof.................34

CONCLUSION ...........................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases** **Page**

*Aaron Ferer and Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112 (2d. Cir. 1984) ...........................................................................................26

*Abdelhamid v. Altria Group, Inc*., 515 F. Supp. 2d 384 (S.D.N.Y. July 27, 2007)...................................................................................................................13

*Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98 (2d Cir. 2012) ......................15

*Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397 (S.D.N.Y. 2011)....................29

*Baena v. Woori Bank*, 515 F. Supp. 2d 414 (S.D.N.Y. 2007)...................................13

*Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 149 A.D.3d 146 (N.Y. App. Div. 2017)...........................................................................33

*Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112 (2d Cir. 1991)........................12

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335 (S.D.N.Y. 2013) ...............................................................................................31

*CDO Plus Master Fund v. Wachovia Bank, N.A.*, No. 07 Civ. 11078, 2009 WL 2033048 (S.D.N.Y. July 13, 2009)..................................................................30

*Cox v. NAP Constr. Co.*, 891 N.E.2d 271 (N.Y. 2008)............................................30

*Creazioni Artistiche Musicali, S.R.L. v. Carlin America, Inc*., No. 14-CV-9270 (RJS), 2016 WL 7507757 (S.D.N.Y. Dec. 30, 2016), *aff'd*, 747 F. App'x 3 (2d Cir. 2018) ...............................................................................................13

*Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 831 F. Supp. 94 (E.D.N.Y. 1993), *aff'd in relevant part*, 47 F.3d 39 (2d Cir. 1995) ....................................29

*In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011) ............32

*Dodona I LLC v. Goldman Sachs & Co*., 132 F. Supp. 3d 505 (S.D.N.Y. 2015)..............23, 30

*Dollman v. Mast Indust.*, 731 F. Supp. 2d 328 (S.D.N.Y. 2010) ..............................31

*Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506 (S.D.N.Y. 1997) ..................35

*End Line Inv'rs, Ltd. v. Wells Fargo Bank, N.A*., No. 16 Civ. 7009 (Gardephe, J.), 2018 WL 3231649 (S.D.N.Y. Feb. 27, 2018) .............................................16

*Fantazia Int'l Corp. v. CPL Furs New York, Inc.*, 67 A.D.3d 511 (N.Y. App. Div. 2009)..................................................................................................32

*Ferguson v. Hannover Ruckversicherungs-Akteiengesellschaft*, No. 04 CIV. 9254 (PKL), 2007 WL 2493692 (S.D.N.Y. Aug. 21, 2007) ...................................... 12

*Fernandez v. City of New York*, No. 17 CIV. 789 (Gardephe, J.), 2020 WL 2086191 (S.D.N.Y. Apr. 30, 2020) .................................................................... 12

*Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224 (S.D.N.Y. 1995) ................................... 29

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994) .................. 12

*Ginsburg Dev. Comps. v. Carbone*, 134 A.D.3d 890 (N.Y. App. Div. 2015) ......................... 15

*Grumman Allied Indus. Inc. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir. 1984) ...................... 28

*HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146 (D.N.J. 2009) .................................................................................. 13

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) ........................................................... 12

*Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000) .......................... 16, 20

*Jana L. v. W 129th St. Realty Corp.*, 22 A.D.3d 274 (N.Y. App. Div. 2005) ......................... 23

*Kaplan v. Reed Smith LLP*, 919 F.3d 154 (2d Cir. 2019) ........................................... 30

*Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, No. 17 CIV. 6334 (Gardephe, J. ), 2020 WL 2614765 (S.D.N.Y. May 22, 2020).................................................................................................. 16, 28

*Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D.3d 504 (N.Y. App. Div. 2017) .................... 34

*Laub v. Faessel*, 297 A.D.2d 28 (N.Y. App. Div. 2002).............................................. 32

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980) ........................................................ 34

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)...................................... 33

*Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*, 42 Misc. 3d 858 (Sup. Ct. 2013), *modified on other grounds*, 123 A.D.3d 413 (N.Y. App. Div. 2014) ................................ 34

*Lykins v. IMPCO Techs., Inc.*, No. 15 CIV. 2102 (Gardephe, J.), 2018 WL 3231542 (S.D.N.Y. Mar. 6, 2018)................................................................ 11

*Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430 (Gardephe, J.) (S.D.N.Y. 2015)................................................................... 30, 31

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007)................................ 11

*Mendez v. JFK Medical Ctr. Ltd. P'Ship*, No. 17-80866-CIV, 2018 WL 5045210 (S.D. Fla. Sept. 4, 2018).................................................................. 31

iv

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171 (2d Cir. 2007).................................................................................................................15

*Miller v. Citicorp*, No. 95 Civ. 9728, 1997 WL 96569 (S.D.N.Y. Mar. 4, 1997)....................31

*Matter of Morris v. New York State Dep't of Taxation and Fin.*, 82 N.Y.2d 135....................31

*Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454 (S.D.N.Y. 2016), *aff'd by* 759 F. App'x 42 (2d Cir. 2019) (Gardephe, J)...................................................................28, 34

*Payday Advance Plus, Inc. v. Findwhat.com, Inc*., 478 F. Supp. 2d 496 (S.D.N.Y. 2007) .......................................................................................................30

*Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile S.A.*, No. 08 CIV. 11371, 2012 WL 967301 (NRB) (S.D.N.Y. Mar. 12, 2012)....................................................11, 13

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42 (2d Cir. 1993)..........................................................................................15

*Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377 (1992) .................................................................................................16

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, 68 F.3d 1478 (2d Cir. 1995)........................................................................................................................15

*Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300 (S.D.N.Y. 1999) ........................................27

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978)............................................35

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 684 F. Supp. 27 (S.D.N.Y. 1988) ..............................................................................32

*Sanchez v. City of New York*, No. 18 CIV 1259 (Gardephe, J.), 2020 WL 2094097 (S.D.N.Y. May 1, 2020) .................................................................12

*Scott v. Harris*, 127 S.Ct. 1769 (2007).......................................................................................12

*Sec. & Exch. Comm'n v. Aly*, No. 16 CIV. 3853 (Gardephe, J.), 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) ..................................................................12

*Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74 (App. Div. 2000) ......................................20

*Silberman v. Innovation Luggage, Inc*., No. 01 CIV. 7109 (GEL), 2003 WL 1787123 (S.D.N.Y. Apr. 3, 2003) ...................................................................12

*Steele v. Delverde S.R.L.*, 662 N.Y.S.2d 30 (App. Div. 1997)...............................................29

*Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, 966 N.Y.S.2d 349 (Sup. Ct. 2012) .........................................................................................................33

*U.S. Commodity Futures Trading Comm'n v. eFloorTrade, LLC*, No. 16 CIV.
7544 (Gardephe, J.), 2018 WL 10625588 (S.D.N.Y. Sept. 21, 2018) .............................. 11

*U.S. v. Bestfoods*, 524 U.S. 51 (1998) ........................................................................... 31

*UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485
(S.D.N.Y. 2003) ........................................................................................................ 15

**Statutes**

Fed. R. Civ. P. 44.1 ............................................................................................... 12, 13

Fed. R. Civ. P. 56(a) .................................................................................................. 11

Fed. R. Civ. P. 56(c) .................................................................................................. 12

**Other Authorities**

Colombian Civil Code, Article 2341 ................................................................... *passim*

Colombian Commercial Code, Article 863 .......................................................... *passim*

Defendants Citibank, N.A. (Citibank) and Citigroup, Inc. (together, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment on all claims asserted against them by plaintiff Mayagüez, S.A. ("Mayagüez").

## PRELIMINARY STATEMENT

Mayagüez is a large sugar and ethanol producer based in Colombia. Because Mayagüez derives a significant portion of its revenue from exports and other sales pegged to the U.S. Dollar ("USD"), it regularly enters into currency hedging transactions with banks to attempt to limit its exposure to fluctuations in the USD/Colombian Peso ("COP") exchange rate. This litigation relates exclusively to three such transactions between Mayagüez and defendant Citibank, N.A. ("Citibank") or non-party Citibank Colombia S.A. ("Citibank Colombia") in 2013, 2014, and 2015 (the "Currency Trades").

The crux of Mayagüez's case is that Defendants allegedly misled it into entering the Currency Trades, allegedly taking advantage of Mayagüez's supposed inexperience with transactions of this nature. After the production of hundreds of thousands of pages of documents and the completion of more than twenty fact and expert depositions, it is clear that Mayagüez was neither deceived, inexperienced, nor injured. In particular, it is now clear that:

Mayagüez had previously entered into dozens of currency hedging transactions, including an earlier transaction that had the same type of structure as the Currency Trades did, capping the bank's potential payments but not the company's.

Every aspect of the Currency Trades was expressly and accurately disclosed to Mayagüez in writing.

Mayagüez cannot point to a single document suggesting it was misled.

Even after extensive deposition preparation, Mayagüez's own witnesses could not explain how or by what means Mayagüez was deceived.

Mayagüez represented in writing repeatedly that it was not relying on Defendants for

1

information they provided in deciding to enter into the Currency Trades.

A dramatic and wholly unexpected spike in the USD/COP exchange rate – and not anything Defendants did – actually caused Mayagüez's losses, which Mayagüez's own executives effectively admitted in testimony.

In short, Mayagüez's case has fallen apart.  Whether Colombian or New York law governs, there are no genuine issues of material fact to be tried.  There was no misrepresentation of any kind, no reasonable reliance (under New York law) or requisite diligence (under Colombian law) on Mayagüez's part, and no legally cognizable damages or injury.  For these reasons, and others explained below, the Court should grant summary judgment in Defendants' favor and dismiss this action.

## FACTUAL BACKGROUND[1]

Mayagüez is a large multinational sugar and ethanol producer, with sales in Colombia, the United States, and other countries.[2]  It derives significant revenues from exports denominated in USD, as well as domestic sales indexed to the USD,[3] but its costs are primarily in COP.[4]  For this reason, if the USD/COP rate increases, each dollar of Mayagüez's USD revenue covers more of its COP expenses.  If the USD/COP rate decreases, the opposite is true.  Accordingly, Mayagüez regularly contracts to hedge against – *i.e.*, limit its exposure to – depreciation of the USD against the COP.[5]

### A.  Mayagüez's Experience with Currency Hedging

Between 2008 and 2013, Mayagüez executed as many as forty transactions per year

---

[1] Defendants respectfully refer the Court to Defendants' Statement of Undisputed Material Facts ("SUMF") and the Appendix containing Defendant's Exhibits ("DEX") thereto.  This summary of undisputed facts is provided for the Court's convenience.

[2] *See* SUMF ¶ 1; *see also* First Amended Complaint (Dkt. No. 15) ("FAC") ¶ 12.

[3] *See* SUMF ¶¶ 1, 2, 22, 23.

[4] *See* SUMF ¶¶ 6.

[5] *See id*.; SUMF ¶¶ 6, 22, 23.

with various banks in an attempt to hedge the USD/COP exchange rate.[6]  This included "plain vanilla" hedges – *i.e.*, where Mayagüez and a bank agreed to exchange USD for COP at a specified price (the "strike price") on specified future dates – and, as Mayagüez referred to them, "non-plain vanilla hedges."[7]  The amount that Mayagüez might have to pay to its counterparty was calculated in the same basic way in plain vanilla hedges and the Currency Trades:  (a) the amount of the hedge (the "notional") multiplied by (b) the difference between the agreed strike price and the market exchange rate on the payment date.[8]

In 2008, Mayagüez entered into a USD/COP hedge with Citibank similar to the Currency Trades at issue here (the "2008 Transaction").[9]  There, Mayagüez had the right to sell to Citibank, and Citibank had the right to buy from Mayagüez, USD every month for six months at a strike price of 1,885 COP/USD.[10]  As explained below, there was a fully-disclosed and mutually agreed-upon cap on the amount of payments that Mayagüez could receive, and if the cap was reached, the transaction would terminate, but there was no such cap for payments to Citibank.  Mayagüez has never claimed to have misunderstood the terms of the 2008 Transaction, despite its striking similarity to the Currency Trades.

### B.  Governing Framework Agreements

In 2009, in anticipation of entering into additional hedges, Mayagüez and Citibank entered into an ISDA Master Agreement and related documentation governing currency hedging transactions between them, including the Currency Trades (the "ISDA").[11]  The ISDA clearly confirmed that each party had independently evaluated and elected to enter into the Currency Trades and that neither was relying on the other for advice:

(1) **No Reliance**. [Mayagüez] is acting for its own account, and it has made its own

---

[6] *See* SUMF ¶ 33-35.
[7] *See* SUMF ¶¶ 24, 34, 40-42.
[8] *See* SUMF ¶ 26.
[9] *See* SUMF ¶¶ 36-39.
[10] *See* SUMF ¶¶ 36-39.
[11] *See* SUMF ¶ 12.

independent decision to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of [Citibank] as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from [Citibank] any assurance or guarantee as to the expected results of that Transaction.

(2) **Evaluation and Understanding**. [Mayagüez ] is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assume, the financial and other risks of that Transaction.

(3) **Status of Parties**. [Citibank] is not acting as a fiduciary for or an advisor to it in respect of that Transaction.[12]

The ISDA provided that these understandings would govern all hedges between the parties, and that Mayagüez would receive trade confirmations for each transaction confirming and evidencing the specific financial terms.[13]

In 2011, Mayagüez and Citibank Colombia entered into a similar master agreement (the "Contrato Marco Local Para Instrumentos Financieros Derivados") (the "Colombian ISDA").[14]   As in the ISDA, Mayagüez represented that it understood the  trades and comprehensively disclaimed reliance on Citibank Colombia:

[Mayagüez] knows and understands the legal nature, characteristics and risks inherent to the Transactions, is acting at its own initiative and account and has reviewed at its own behest, or through its own legal or financial advisors, the implications of signing the Documents of the Framework Agreements and of entering into and executing each and every Transaction between the Parties under the Framework Agreement.[15]

### C.  Mayagüez's Hedging Policies and Procedures

In 2011 and 2012, unbeknownst to Defendants and Citibank Colombia, Mayagüez's auditor PricewaterhouseCoopers ("PwC") identified "significant deficienc[ies]" in Mayagüez's hedging policies, which PwC concluded, "prevent[ed] the Company from making objective

---

[12] *See* SUMF ¶¶ 15-16.

[13] *See* SUMF ¶ 13, including DEX 15 at 8302-31.

[14] *See* SUMF ¶ 20.

[15] *See* SUMF ¶ 20, including; DEX 16 at 9832-79.

decisions to reduce its exposure to adverse market movements and protect the Company's assets."[16]  PwC recommended that Mayagüez adopt policies and procedures that aligned with the strategies approved by and risk appetite of Mayagüez's board.[17]  As of the termination of the Currency Trades, Mayagüez still had not implemented PwC's recommendations.[18]

### D.  Presentations Prior to the First Currency Trade

In 2012 and 2013, Citibank Colombia and Mayagüez discussed potential hedging transactions.[19]  One possibility discussed was a "limited compensation" transaction, similar to the 2008 Transaction, where Mayagüez would agree to a cap on its compensation in exchange for a more favorable strike price.[20]  In 2012, Citibank Colombia provided a presentation to Mayagüez that explicitly explained that the limited compensation provision meant that if the "maximum compensation" cap was reached, the transaction would terminate early.[21]  The presentation also stated, accurately, that in exchange for limiting its compensation, Mayagüez would be able to trade at "better" rates (*i.e.*, a better strike price) than in a non-capped transaction.[22]  In October 2013, Citibank Colombia made a similar presentation, which stated:

> If the market rate ends up being above the established strike rate, the customer will have to compensate the bank in accordance with the exchange rate difference presented between the structure's strike rate and the market exchange rate.[23]

Citibank Colombia sent an updated presentation in October 2013 setting forth exactly what would happen if the COP/USD rate increased above the strike price (the rate in the hedge) – *i.e.*, Mayagüez would pay Citibank and the amount would grow as the USD appreciated[24]:

---

[16] *See* SUMF ¶¶ 222.
[17] *See* SUMF ¶¶ 222.
[18] *See* DEX 8 at 3138, 3140; *see also* SUMF ¶¶ 58.
[19] *See* SUMF ¶¶ 61-87.
[20] *See* SUMF ¶¶ 61-64, 68.
[21] SUMF ¶ 63; DEX 38 at 6676.
[22] SUMF ¶ 64; DEX 38 at 6674.
[23] SUMF ¶ 69; DEX 20 at 9178.
[24] SUMF ¶ 70; DEX 45 at 4347.

| Period | Date | USDCOP | Strike Price | Reference Forward | Compensation: (COP x Dollar) | Compensation: Accum (COP x Dollar) | Compensation: Hedge | Compensation: Remaining |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | - | 1,000,000,000 |
| 1 | 30-Nov-13 | 1,885 | 1,970 | 1,891 | 85 | 85 | 170,000,000 | 830,000,000 |
| 2 | 30-Dec-13 | 1,895 | 1,970 | 1,895 | 75 | 160 | 150,000,000 | 680,000,000 |
| 3 | 30-Jan-14 | 1,905 | 1,970 | 1,901 | 65 | 225 | 130,000,000 | 550,000,000 |
| 4 | 28-Feb-14 | 1,915 | 1,970 | 1,906 | 55 | 280 | 110,000,000 | 440,000,000 |
| 5 | 28-Mar-14 | 1,925 | 1,970 | 1,911 | 45 | 325 | 90,000,000 | 350,000,000 |
| 6 | 28-Apr-14 | 1,935 | 1,970 | 1,916 | 35 | 360 | 70,000,000 | 280,000,000 |
| 7 | 28-May-14 | 1,945 | 1,970 | 1,921 | 25 | 385 | 50,000,000 | 230,000,000 |
| 8 | 28-Jun-14 | 1,955 | 1,970 | 1,926 | 15 | 400 | 30,000,000 | 200,000,000 |
| 9 | 28-Jul-14 | 1,965 | 1,970 | 1,931 | 5 | 405 | 10,000,000 | 190,000,000 |
| 10 | 28-Aug-14 | 1,975 | 1,970 | 1,936 | 0 | 405 | -10,000,000 | 190,000,000 |
| 11 | 28-Sep-14 | 1,985 | 1,970 | 1,941 | 0 | 405 | -30,000,000 | 190,000,000 |
| 12 | 28-Oct-14 | 1,995 | 1,970 | 1,947 | 0 | 405 | -50,000,000 | 190,000,000 |
| 13 | 28-Nov-14 | 2,005 | 1,970 | 1,954 | 0 | 405 | -70,000,000 | 190,000,000 |
| 14 | 28-Dec-14 | 2,015 | 1,970 | 1,962 | 0 | 405 | -90,000,000 | 190,000,000 |
| 15 | 28-Jan-15 | 2,025 | 1,970 | 1,969 | 0 | 405 | -110,000,000 | 190,000,000 |
| 16 | 28-Feb-15 | 2,035 | 1,970 | 1,977 | 0 | 405 | -130,000,000 | 190,000,000 |
| 17 | 28-Mar-15 | 2,045 | 1,970 | 1,985 | 0 | 405 | -150,000,000 | 190,000,000 |
| 18 | 28-Apr-15 | 2,055 | 1,970 | 1,995 | 0 | 405 | -170,000,000 | 190,000,000 |
| 19 | 28-May-15 | 2,065 | 1,970 | 2,001 | 0 | 405 | -190,000,000 | 190,000,000 |
| 20 | 28-Jun-15 | 2,075 | 1,970 | 2,007 | 0 | 405 | -210,000,000 | 190,000,000 |
| 21 | 28-Jul-15 | 2,085 | 1,970 | 2,014 | 0 | 405 | -230,000,000 | 190,000,000 |
| 22 | 28-Aug-15 | 2,095 | 1,970 | 2,021 | 0 | 405 | -250,000,000 | 190,000,000 |
| 23 | 28-Sep-15 | 2,105 | 1,970 | 2,028 | 0 | 405 | -270,000,000 | 190,000,000 |
| 24 | 28-Oct-15 | 2,115 | 1,970 | 2,035 | 0 | 405 | -290,000,000 | 190,000,000 |

All these presentations contained similar disclaimers as described above, including that Citibank Colombia was not serving as Mayagüez's advisor and that Mayagüez must conduct its own independent analysis.[25]   The presentations and communications in 2012 and 2013 were primarily between employees of non-party Citibank Colombia and Mayagüez's Treasurer (Hector Fabio Alarcon) and then-CFO (Ludwig Chvatal), who discussed the Currency Trades with Mayagüez's CEO (Mauricio Iragorri).[26]

### E.  Mayagüez and Citibank Colombia Enter Into the First Currency Trade

Mayagüez executed the first Currency Trade on November 6, 2013 (the "First Currency Trade").[27]   The terms of this trade were documented in a trade confirmation that Mayagüez signed, and were also summarized in communications between Citibank Colombia and Mayagüez.[28]  The parties agreed to sell (Mayagüez) or buy (Citibank) $2 million per month, for twenty-two months, at a strike price of 2,020 COP/USD, with a maximum compensation amount for Mayagüez of 900 million COP.   Citibank Colombia sent Mayagüez monthly valuation updates for the transaction.[29]

---

[25] DEX 20 at 9181; DEX 38 at 6682.
[26] SUMF ¶ 61, 67, 72.
[27] SUMF ¶ 88; DEX 50.
[28] *See* SUMF ¶¶ 89-92; DEX 07 at Nos. 6, 20.
[29] SUMF ¶ 111.

6

When the COP/USD rate rose above the 2,020 strike price, the parties executed the first amendment to the First Currency Trade in February 2014, which increased the term of the trade to January 2017 in exchange for increasing the strike price to 2,075.[30]  In connection with that amendment, Mayagüez executed a letter acknowledging that it was seeking to "take advantage of the current market window"[31] and representing that it was "not relying on the advice of Citibank for legal, tax, accounting or investment matter . . . and that it will determine, without reliance upon Citibank, the economic risks and merits, [. . .] of the Transaction and that it will be capable of assuming such risk."[32]

Subsequently, as the USD depreciated, Mayagüez received payments under this trade. As Mayagüez began approaching the agreed-upon maximum compensation amount, the parties amended the trade in April 2014 to increase this amount while decreasing the strike price slightly.  Mayagüez continued receiving payments until Citibank Colombia paid Mayagüez its maximum compensation amount in July 2014 and the trade terminated early with Mayagüez earning a handsome payment.[33]

### F.  Mayagüez and Citibank Colombia Enter Into the Second Currency Trade

Mayagüez and Citibank Colombia executed the second Currency Trade in July 2014 (the "Second Currency Trade").[34]  Mayagüez then asked for and received various proposals from Citibank Colombia.[35]  Based on the preference of its CEO, Mayagüez selected a structure with leverage (*i.e.*, a notional amount that was larger if Mayagüez had to make payments to Citibank than if Citibank had to make payments to Mayagüez) that allowed Mayagüez to benefit from an even higher strike price.[36]  Under the Second Currency Trade, the parties agreed to sell

---

[30] SUMF ¶ 113.
[31] SUMF ¶¶ 119.
[32] SUMF ¶¶ 120.
[33] SUMF ¶ 127-29.
[34] SUMF ¶¶ 142-43.
[35] SUMF ¶ 130-40.
[36] SUMF ¶ 137-41; DEX 85 at 3549.

(Mayagüez) or buy (Citibank), from September 2014 to July 2017, $3 million a month if the market rate ("spot" rate) was below the 2,090 COP/USD strike price, and $6 million a month if the spot rate was above the strike price.[37]   The transaction had a maximum compensation amount for Mayagüez of 3 billion COP.[38]   As Mayagüez understood, the larger notional amounts for this trade took into account its USD exposure from to its ethanol sales[39] – for which the prices were based on a public formula set by the Colombian government that included the USD/COP rate as an input.[40]   In the words of Mayagüez's 30(b)(6) witness:

> Q.  Mayagüez was aware of the indexation of local ethanol sales in Colombia to U.S. dollars . . . during the period of time of 2012 to 2016?
> A.  Yes.  In fact, it was always known that there is an indexation from the revenue from dollars to the price – to the international price that's to the exchange rate.[41]

### G.   The USD Unexpectedly And Dramatically Appreciates Against The COP

When Mayagüez executed the Second Currency Trade, the COP/USD rate was below 2,000, but it rose sharply to approximately 3,500 by March 2016, more than 50% higher than the strike price for the Second Currency Trade and the median forecasts at the time[42]:



---

[37] SUMF ¶¶ 142-43.
[38] SUMF ¶¶ 142-43.
[39] *See* SUMF ¶¶ 132-35, 146.
[40]DEX 17 at ¶ 88 (formula from Colombian government determines the price of ethanol in which "[t]he COP/USD exchange rate appears as one of the inputs").
[41] DEX 4 103:15-104:7; *see also id*. at 45:11-18; SUMF ¶¶ 49, 134.
[42] SUMF ¶¶ 149, 151; DEX 19 ("Stulz Rpt.") at Ex. 5A.

This dramatic and perhaps unprecedented spike in the exchange rate triggered Mayagüez's payment obligations in accordance with the fully and accurately disclosed terms of the Second Currency Trade, and as had been explained could occur in presentations prior to the trade.[43]

### H. Mayagüez and Citibank Colombia Amend The Second Currency Trade

In November 2014, Mayagüez discussed internally that a decline in the price of oil had caused a depreciation of the COP – which had increased Mayagüez's payment obligations under the Second Currency Trade – and considered whether to attempt again to delay its payment obligations by amending the strike price.[44]  In December 2014, with the approval of its Board and full knowledge of the Second Currency Trade's results, Mayagüez prepared to restructure the trade and signed a letter acknowledging the over $30 million mark-to-market valuation ("MTM") of the trade (against Mayagüez) at that time.  The letter requested that Citibank restructure the trade "not only to continue hedging the forecasted exposure generated by our sugar exports production and ethanol sales but also [to] take advantage of the current market level."[45]  This letter, approved by the Mayagüez CEO, again represented that Mayagüez was "not relying on the advice of Citibank for legal tax, accounting or investment matters . . . and it will make an independent analysis and decision" as to the trade."[46]

### I. Mayagüez and Citibank Enter The Third Currency Trade

As the USD continued appreciating,[47] and after additional discussion with Citibank Colombia,[48] Mayagüez elected to terminate the Second Currency Trade and executed a third Currency Trade with Citibank in January 2015 (the "Third Currency Trade").[49]  Rather than terminating the Second Currency Trade by "paying the positive substantial mark-to-market"

---

[43] SUMF ¶¶ 70, 82, 143.
[44] SUMF ¶¶ 152, 162.
[45] *See* SUMF ¶¶ 171, 174-75.
[46] *See* SUMF ¶ 176.
[47] *See* SUMF ¶¶ 151, 180.
[48] *See* SUMF ¶¶ 183-84.
[49] *See* SUMF ¶¶ 188-91.

(approximately $35 million), which had grown due to the "strong devaluation" of the COP, Mayagüez chose to "embed the current MTM into the strike price of the [Third Currency Trade], receiving a lower strike price than current market levels" during one tranche.[50]  Mayagüez would "pay back" the amounts owed through a lower strike price without making substantial cash payments.  Mayagüez effectively decided to "double down" on its considered "market view" that "right now there is a spike in the [COP/USD rate]."[51]

The Third Currency Trade[52] was thus structured to reflect Mayagüez's belief that the USD would start depreciating by the end of 2015.  Under its first tranche, from January 2015 to November 2015, Mayagüez would sell, or Citibank would buy $6 million a month at a strike price of 2,600, with a maximum compensation amount of 2.1 billion COP.  Under its second tranche, Mayagüez would sell, or Citibank would buy $7.5 million a month at a strike price of 2,090 from December 2015 to July 2017, and at a strike price of 2,385 from August 2017 to January 2018.  The second tranche had a maximum compensation amount of 1.5 billion COP.[53] Mayagüez contemporaneously executed another letter representing *again* that it was not relying on Citibank and would independently analyze the advisability of the trade.[54]

In the following months, contrary to Mayagüez's expectations, the COP/USD exchange rate continued to rise, up to over 3,000 in August 2015, further increasing the amount Mayagüez owed.[55]  Although the parties discussed potential amendments,[56] on December 7, 2015, Iragorri informed the Board that the MTM had increased to $67.7 million against

---

[50] *See* SUMF ¶ 186.
[51] *See* SUMF ¶¶ 181-83.
[52] *See* SUMF ¶¶ 181-83.
[53] *See* SUMF ¶¶ 103-05.
[54] *See* SUMF ¶ 186 (reflecting, among other things, the same representation that Mayagüez would "determine, without reliance upon Citi, the economic risks and merits, [. . .] of the Transaction and that it will be capable of assuming such risk").
[55] SUMF ¶¶ 76; 205; 207; 238; *See* DEX 19 at Ex. 5A.
[56] *See* SUMF ¶¶ 198-202.

Mayagüez due to "an unexpected devaluation."[57]   Mayagüez terminated the Third Currency

Trade in March 2016.[58]

### J.   Mayagüez Commences Litigation

Mayagüez filed this action in New York Supreme Court in August 2016, and

Defendants removed the case to this Court.   Mayagüez's operative FAC asserts claims for:

alleged "willful" and "negligent" violations of Article 2341 of the Colombian Civil Code and

violations of Article 863 of the Colombian Commercial Code; in the alternative, New York

common law claims for fraudulent inducement, fraudulent concealment, negligent

misrepresentation, unjust enrichment, and promissory estoppel; the New York law claim for

unconscionability was dismissed in this Court's March 28, 2018 Order (Dkt. No. 36).   Fact and

expert discovery are both completed.

## APPLICABLE LEGAL STANDARDS

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any material

fact" and the movant "is entitled to judgment as a matter of law."   *U.S. Commodity Futures

Trading Comm'n v. eFloorTrade, LLC*, No. 16 CIV. 7544 (Gardephe, J.), 2018 WL 10625588,

at *6 (S.D.N.Y. Sept. 21, 2018) (citing Fed. R. Civ. P. 56(a)).   "A fact is material when it might

affect the outcome of the suit under governing law."   *Pegasus Aviation IV, Inc. v. Aerolineas

Austral Chile S.A.*, No. 08 CIV. 11371, 2012 WL 967301, at *4,*6 (NRB) (S.D.N.Y. Mar. 12,

2012) (applying federal summary judgment standard to foreign law claims) (quoting *McCarthy

v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).   "'When no rational jury could

find in favor of the nonmoving party because the evidence to support its case is so slight, there

is no genuine issue of material fact and a grant of summary judgment is proper.'"   *Lykins v.

---

[57] *See* SUMF ¶¶ 206-07.  Citibank typically hedged its currency exposure on an aggregate
basis, such that, across currency hedges, it would have a neutral position.  *See* SUMF ¶ 32.
[58] *See* SUMF ¶ 216.

*IMPCO Techs., Inc.*, No. 15 CIV. 2102 (Gardephe, J.), 2018 WL 3231542, at *7 (S.D.N.Y. Mar. 6, 2018) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  "'Rule 56.1 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'" *Fernandez v. City of New York*, No. 17 CIV. 789 (Gardephe, J.), 2020 WL 2086191, at *6 (S.D.N.Y. Apr. 30, 2020) (quoting *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991)).

At summary judgment, the Court draws factual inferences in favor of the non-movant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007) (citing Fed. R. Civ. P. 56(c)).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . .  [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Sanchez v. City of New York*, No. 18 CIV 1259 (Gardephe, J.), 2020 WL 2094097, at *4 (S.D.N.Y. May 1, 2020) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).  "[C]ontradictory testimony only establishes a 'genuine' issue for trial if it leads to a different legal outcome." *Sec. & Exch. Comm'n v. Aly*, No. 16 CIV. 3853 (Gardephe, J.), 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018).

Solely for purposes of this motion (and reserving all rights), Defendants assume that either Colombian or New York law governs because the outcome is the same either way – summary judgment should be granted in favor of Defendants.

## II.      REQUIRED ELEMENTS OF MAYAGÜEZ'S COLOMBIAN LAW CLAIMS

On summary judgment, courts are afforded "quite a bit of flexibility" when determining issues of foreign law. *Ferguson v. Hannover Ruckversicherungs-Akteiengesellschaft*, No. 04 CIV. 9254 (PKL), 2007 WL 2493692, at *18 n.8 (S.D.N.Y. Aug. 21, 2007).  A court may consider "any relevant materials, including testimony." Fed. R. Civ. P. 44.1; *see, e.g.*, *Silberman v. Innovation Luggage, Inc*., No. 01 CIV. 7109 (GEL), 2003 WL 1787123, at *12

(S.D.N.Y. Apr. 3, 2003) (considering "the expert testimony, including the deposition testimony of plaintiffs' own expert," which was entirely "contrary" to [plaintiff's] argument).    In considering materials that meet the standards set forth in Fed. R. Civ. P. 44.1, a court may "give them whatever probative value the Court thinks they deserve." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2444 (3d. ed. 1998)). Further, a court is not bound by the unsupported factual assertions of an expert witness on foreign law. *See id.* at 148-49.  Courts in this district have dismissed cases based on their assessment and application of non-U.S. law. *See, e.g.*, *Pegasus Aviation*, 2012 WL 967301 at *6-*9 (granting summary judgment to defendants based on Argentine law).[59]

Under Article 2341 of the Colombian Civil Code and Article 863 of the Colombian Commercial Code, the first element Mayagüez must prove is that Defendants (i) intentionally engaged in conduct to cause Mayagüez harm ("*dolo*"), or engaged in conduct with "*culpa*" ("fault," or under Mayagüez's expert's translation, "negligence") ("extra-contractual" claims under Art. 2341),[60] or (ii) did not act with "good faith" without "*culpa*" ("fault" or "negligence")

---

[59] *See also Creazioni Artistiche Musicali, S.R.L. v. Carlin America, Inc.*, No. 14-CV-9270 (RJS), 2016 WL 7507757, at *5-*9 (S.D.N.Y. Dec. 30, 2016), *aff'd*, 747 F. App'x 3 (2d Cir. 2018) (granting motion to dismiss under Italian law); *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 425-26 (S.D.N.Y. 2007) (granting in part motion to dismiss under Korean law); *Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 397 (S.D.N.Y. July 27, 2007) (granting motion to dismiss under Egyptian law).

[60] *See, e.g.*, Supreme Court of Justice, Civil Cassation Chamber, August 3, 2004, Case No. 7447, Judge Rapporteur: Edgardo Villamil Portilla at 4, 26 ("Dunogué Decl. Ex. 2") (cited in Declaration of Diego Muñoz-Tamayo, October 30, 2019 ("Dunogué Decl. Ex. 7") ¶¶ 116-18 and Declaration of Javier Tamayo Jaramillo, January 14, 2020 ("Dunogué Decl. Ex. 5") ¶ 102) (holding that, under Article 2341, the plaintiff has the responsibility to establish that there was culpable conduct, the existence of damages, and the causal relationship between the conduct and the damage).

during pre-contractual dealings ("pre-contractual" claims under Art. 863[61]).[62]   There is no dispute that "*dolo*" under Article 2341 means "engaging in an act or omission with the intent to cause damage to another party."[63]   According to Mayagüez's purported Colombian law expert, "*culpa* . . . denotes a conduct . . . with a lack of diligence, a lack of care, lack of prudence, and improvidence," and whether "there was *culpa* or not committed by the person who[m] the other party seeks to attribute *culpa* to" must take into account all of the "acts and circumstances."[64]   Generally, Colombian courts have found *culpa* only where violations of law can be clearly established, such as a homicide, or for clear departures from basic standards of care and diligence, such as when a bank violated banking law by failing to validate its customer's identity prior to opening an account.[65]

Importantly, Colombian law recognizes that both sides to a transaction have a "self-information duty," which "refers to all diligent and responsible people's duty to act proactively as much as they can to inform themselves of a transaction they're entering into."[66]   To succeed on a claim that a defendant failed adequately to inform its counterparty, a plaintiff must show its "ignorance [was] legitimate so that they cannot ignore information that they should know or would have known if they had behaved diligently."[67]

The second and third elements of an Article 2341 claim require Mayagüez to establish (2) that it suffered recoverable losses, which were (3) caused by Defendants' alleged conduct,

---

[61] Defendants reserve all rights in connection with the argument that Mayagüez is not entitled under Colombian law to pursue the extra- and pre-contractual claims it asserts where the parties entered into and were acting pursuant to executed agreements, but Defendants show here that, even if Articles 2341 and 863 were potentially applicable here, Defendants are entitled to summary judgment.

[62] *See, e.g.*, Dunogué Decl. Ex. 7 ¶¶ 51-52.

[63] Dunogué Decl. Ex. 5. ¶41; *accord* Dunogué Decl. Ex. 7 ¶ 21.

[64] *See, e.g.*, Deposition of Diego Muñoz Tamayo, Feb. 28, 2020 ("Dunogué Decl. Ex. 8") 52:7-53:5 (describing the scope of "culpa" for civil liability).

[65] *See, e.g.*, Dunogué Decl. Ex. 2 at 2, 18-19 (cited in Dunogué Decl. Ex. 7 ¶¶ 116-18).

[66] Dunogué Decl. Ex. 8, 99:7-15.

[67] Dunogué Decl. Ex. 8, 93:7-94:8.

such that there is a "cause and effect relationship" that is not broken by an external cause, including the plaintiff's own actions.[68]   Colombian law limits Mayagüez's recovery to "emerging damages which means actual losses," which cannot be hypothetical and must be "duly proved in the process and the burden of proof is borne by the victim." [69]

## III.   REQUIRED ELEMENTS OF MAYAGÜEZ'S NEW YORK LAW CLAIMS

Under New York law, fraud and negligent misrepresentation require a false representation of material fact or the concealment of material information in order to induce action.[70]   Mayagüez must also prove that it justifiably relied on the misrepresentation or omission.[71]   To prove fraudulent concealment or negligent misrepresentation, Mayagüez must also show that Defendants had a special or privity-like relationship with Mayagüez that would have imposed a particular duty toward it.[72]

Specifically, a plaintiff must show by "clear and convincing evidence" that (1) the defendant made a material false representation, (2) with the intent to defraud the plaintiff, (3) the plaintiff reasonably relied on the misrepresentation, and (4) the plaintiff suffered damage because of that reliance.  *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 181 (2d Cir. 2007).  A plaintiff alleging fraudulent concealment must show "the additional element that the defendant had a duty to disclose the material information."  *UniCredito Italiano*

---

[68] *See, e.g.*, Dunogué Decl. Ex. 7 ¶¶ 51, 54, 64 (Colombian civil liability requires that the conduct caused the damage); Dunogué Decl. Ex. 5 ¶¶ 54-55; Supreme Court of Justice. Civil Chamber. Decision of May 14, 2019. Judge Rapporteur Margarita Cabello Blanco. Case File:1697-2019 ("Dunogué Decl. Ex. 4") (cited in Dunogué Decl. Ex. 5 ¶¶ 89, 92, 95) (explaining that if defendant's conduct was not the sole cause of damages, its liability may be reduced or eliminated).

[69] *See, e.g.*, Dunogué Decl. Ex. 7 ¶ 26; Dunogué Decl. Ex. 2 at 19-23 (cited in Dunogué Decl. Ex. 7 ¶¶ 116-18).

[70] *See generally Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 47 (2d Cir. 1993); *Ginsburg Dev. Comps. v. Carbone*, 134 A.D.3d 890, 894 (N.Y. App. Div. 2015).

[71] *See Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, 68 F.3d 1478, 1484 (2d Cir. 1995).

[72] *See, e.g.*, *id.* at 1483-84; *Ginsburg Dev. Comps.*, 134 A.D.3d at 894.

*SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 497 (S.D.N.Y. 2003).

A plaintiff alleging negligent misrepresentation under New York law must show that: "(1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information; (2) the defendant negligently provided incorrect information; and (3) the plaintiff reasonably relied upon the information given." *Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, No. 17 CIV. 6334 (Gardephe, J. ), 2020 WL 2614765, at *12 (S.D.N.Y. May 22, 2020). "Accordingly, in order for 'a party [to] recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations, there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *Id.* (quoting *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382 (1992)). Further, "the alleged misrepresentation must be factual in nature and not promissory or relating to future events." *End Line Inv'rs, Ltd. v. Wells Fargo Bank, N.A.*, No. 16 Civ. 7009 (Gardephe, J.), 2018 WL 3231649, at *7 (S.D.N.Y. Feb. 27, 2018) (quoting *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

## **ARGUMENT**

## I. **MAYAGÜEZ WAS NOT DECEIVED, MISLED OR MISINFORMED AND DEFENDANTS DID NOT ACT WITH AN INTENT TO CAUSE HARM, IN BAD FAITH, OR WITH "FAULT" OR "NEGLIGENCE"**

The gravamen of Mayagüez's Colombian and New York law claims is that Defendants allegedly "knowingly misrepresented the terms and risks" of the Currency Trades, which Mayagüez was too "unsophisticated" to assess and entered into "only because it relied upon the [alleged] false statements, omissions and promises of Defendants."[73] After the production of

---

[73] FAC ¶¶ 2, 7; *see also, e.g.*, FAC ¶ 6 (alleging that Defendants "falsely stat[ed]" and "fraudulently omi[tted]" characteristics and risks of the Currency Trades); ¶ 18 (alleging "Defendants made fraudulent representations, concealed material information and made false promises to Mayagüez"); ¶ 47 (alleging that Defendants "provided to Mayagüez information and explanations about the terms and conditions of the Currency Trades that were false and/or

hundreds of thousands of pages of documents and over twenty depositions, the record is crystal clear that there is no genuine dispute on this fundamental issue. Mayagüez was neither misled nor misinformed by Defendants, neither intentionally, nor in "bad faith," nor negligently. Defendants are thus entitled to summary judgment on all of Mayagüez's claims. In particular, there is no genuine dispute that:

- All the terms of the Currency Trades were accurately disclosed to Mayagüez in trade confirmations (the "Trade Confirmations"), which Mayagüez signed.[74]

- The trades were also summarized accurately in clear emails sent to Mayagüez.

- There were no factual misstatements or misleading omissions in the related presentations and communications concerning currency trades.

- To the extent Mayagüez claims that Defendants failed to disclose that Mayagüez could have what it hyperbolically calls "unlimited losses" – i.e., the Currency Trades did not "cap" Mayagüez's potential payments – the presentations Mayagüez received indicated (i) that its payments, if the USD appreciated, would work similarly to that of a plain vanilla hedge (which Mayagüez was well aware meant that they would increase with no "cap" given its prior experience with other hedges) and (ii) that, by contrast, if the USD depreciated past a certain level, the payments to Mayagüez would be capped..

- There is no evidence of a false statement to Mayagüez, the withholding of material information, or that Mayagüez did not understand the Currency Trades. To the contrary, document after document show steps taken by Citibank and Citibank Colombia (even though they owed no such obligation) to confirm that the trades were accurately and sufficiently discussed with and approved by Mayagüez, including senior and knowledgeable executives.

- Contrary to their patently false allegations (*see* FAC at ¶¶ 36-43), Mayagüez had many years of experience with currency hedging and had repeatedly entered into non-"plain vanilla" currency transactions – including the 2008 Transaction.

---

misleading"); ¶ 49 (alleging that "[b]ased on the misrepresentations and material omissions of [Citigroup, Citibank and Citibank Colombia] employees about the terms and risks, Mayagüez entered into the Currency Trades"); ¶ 71 (alleging that "Mayagüez agreed to the Currency Trades based on Citigroup's false and misleading representations and material omissions"); ¶ 96 (alleging that Mayagüez agreed to enter into the Currency Trades "[i]n reliance on the false and misleading representations and material omissions"); ¶ 99 (same); ¶¶ 155-56, 196-97 (First and Fifth Causes of Action based on allegations that Defendants "made false and/or misleading representations" and "fraudulently concealed material information"); ¶ 241 (Eighth Cause of Action based on allegations that Defendants made "material representations and omissions . . . [that] were fraudulent" and "fraudulently concealed material information").
[74] All record cites for each of these material facts, as to which there is no genuine dispute, are set forth below and, as specifically referenced below, in the SUMF.

- Mayagüez chose the Second Currency Trade, which hedged a larger amount for a longer duration than Mayagüez's prior hedges, among proposed alternatives, with full disclosure that higher strike prices would increase the notional amounts and duration of the trades.

- Mayagüez also understood that the increased notional amounts of the Second Currency Trade reflected its USD exposure from its ethanol sales, the price of which was based on a public formula set by the Colombian government, and tied to the USD/COP rate.

- Mayagüez repeatedly agreed and represented in signed documents that it was not relying on Citibank (or Citibank Colombia), which Mayagüez expressly acknowledged were not its advisors, and that it had independently evaluated the Currency Trades – all statements that Mayagüez's CEO testified were true.

- Contrary to its signed representations, and unbeknownst to Defendants at the time, Mayagüez did not have a policy or process in place to evaluate currency hedges and ignored PwC's recommendations to remedy the "significant deficiencies" in its currency hedging controls.

### A. The Record Shows *No* Misstatements Or Misleading Omissions By Defendants – Much Less Made With An Intent To Cause Harm, In Bad Faith, Or With "Fault" or Negligence

#### 1. There Is No Evidence Of A Misstatement Of Fact Concerning The Currency Trades

There is no genuine dispute that Defendants did not make any misstatements of fact concerning the Currency Trades. Mayagüez indisputably received accurate and complete documentation reflecting all of material terms and features of the Currency Trades. Mayagüez does not dispute that it received, executed, and understood the ISDA Agreement and Colombian ISDA, or that they govern the Currency Trades.[75] There is also no dispute that, under these agreements, Mayagüez received and signed Trade Confirmations reflecting all material terms of the three Currency Trades and their amendments.[76] The evidence is also clear that Mayagüez received emails from non-party Citibank Colombia simply and accurately summarizing the Currency Trades, such as[77]:

---

[75] SUMF ¶¶ 12-14, 19-21.

[76] SUMF ¶¶ 89, 93, 95, 98-100, 103-05, 108.

[77] DEX 57 at 0136 (email dated July 31, 2014 from Polania to Alarcon, cc Chvatal and others reflecting above terms of the Second Currency Trade).

```
Mayagüez SA Sells USD / Buys Pesos
Structure:          Forward with Limited Compensation
Start Date:         Sep 25, 2014
End Date:           Jul 14, 2017
Amount per          3MM USD
Strike:             2090
Maximum Compensation: 3,000,000,000 COP
Leverage: 2:1
```

- if spot < strike Mayagüez sells 3MM per date
- if spot> strike Mayagüez sells 6MM per date

There is also no evidence of any misstatement of fact in any presentation and other communication provided to Mayagüez prior to the First Currency Trade.[78]  Indeed – and this alone should be dispositive – no Mayagüez deponent could point to any actual misstatement of fact by Defendants.  Rather, Mayagüez deponents testified to the conclusion that there *must* have been fraud because Mayagüez ended up owing large amounts.  When pressed to identify any misstatement, Mayagüez's 30(b)(6) deponent contended simply that *because* the Currency Trades had "dramatic" economic consequences for Mayagüez, there was *ipso facto* "deceit":

> Q. Do you believe that anyone . . . from Citibank acted with bad faith? . . .
> A. The only thing I can say is that the transaction had dramatic consequences for Mayagüez. . .Therefore, I considered the product deceitful.[79]

Mayagüez's Treasurer Alarcon testified similarly in his individual capacity:

> Q. Can you point me to any statement in the [October 2013 Presentation] that you now believe was incorrect?
> A. In light of the results obtained in 2016, we can say that this proposal is inadequate, is inappropriate, starting with the amounts that were handled. . . .
> Q. So are you saying that what was incorrect . . . is that the U.S. dollar COP exchange rate that it showed for 2015 was different than what the exchange rate ended up being in 2015? …

---

[78] *See* FAC ¶¶ 62-91; *see also* SUMF ¶¶ 228-235.

[79] *See, e.g.*, DEX 4 ("Mayagüez 30(b)(6) Dep. Tr.") 148:22-149:12; *see also id.* at 129:24-131:17 ("Q. Did Citibank ever make any misrepresentations to Mayagüez in connection with the currency trades at issue in this litigation?  A. No, it's that we always relied in Citibank. . . . Q. Was anything that Citibank ever said to you or to Mr. Chvatal in connection with the currency trades false? A. That they had told us?  No."); *Id*. at 160:2-7 ("Q: Is it your testimony that Citibank made false statements to Mayagüez?  A: Yes. That is correct, they presented a product that didn't turn out the results that they initially proposed."); *Id*. at 128:23-129:5 ("Q: Mr. Alarcon, in any of the communications, call, meetings, e-mails, any type of communication that you had, that you and Mr. Chvatal had with Citi, did Citibank ever make any misrepresentations? A: Well, I don't know if they did that."); *see also* SUMF ¶¶ 229.

A. Yes, that is true. It is different. It is different to what happened in 2015."[80]

Mayagüez cannot point to any evidence in the record that the way the Currency Trades worked was misrepresented, and it is undisputed that Mayagüez was aware that its payment obligations were tied to the future USD/COP exchange rate.  In a similar case, the Colombian Supreme Court declined to find culpable conduct where the plaintiff alleged that a commercial project developed by defendants contained fewer parking spots than anticipated in defendants' advertising materials.[81]  The court held that the "architecture plan was subject to changes" such that "the actual amount [of parking spots] to be built could only be known when the final plan was approved" and plaintiffs "had known that the project was subject to modifications."[82]  For the same reason, there is no genuine dispute that the Currency Trades could not and did not predict Mayagüez's payment obligations under the Currency Trades based on future, unknown changes to the COP/USD rate, and accordingly Mayagüez cannot establish culpable conduct under Colombian law.  Similarly, under New York law, "promises of future output", which were not present representations of existing fact, are just the sort of representations about future events that cannot support a claim for negligent misrepresentation (or, even more so, fraudulent misrepresentation).[83]

### 2.  There is No Evidence That Defendants Omitted Material Information – Or Information Of Any Kind – Concerning The Currency Trades

There is likewise no genuine dispute that Defendants did not omit any material facts.

---

[80] DEX 4 ("Alarcon Dep. Tr.") 65:4-69:3; *see also id.* at 149:25-150:11 ("Q. Do you believe that Mr. Polania ever lied to you? . . .  A. If I go back to the presentation of the July of 2014 of the product that he proposed, the totality, looking at everything in general, I do think that it was a fraud because at no time did the expectations or the estimations indicate us that we were going to lose $67 million or whatever it was."); *see also* SUMF ¶¶ 229.

[81] Dunogué Decl. Ex. 07 ¶ 87 (describing Supreme Court of Justice. Judge Rapporteur Manuel Ardila Velasquez. December 13, 2001. File. 6775, ("Dunogué Decl. Ex. 01") which held that defendant was not liable under Article 863).

[82] Dunogué Decl. Ex. 01 (cited in Dunogué Decl. Ex. 7 ¶¶ 78, 87) at 16-17.

[83] *Hydro Inv'rs.*, 227 F.3d at 21 (2d Cir. 2000); *Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (App. Div. 2000).

To the extent Mayagüez claims that Defendants failed to disclose that Mayagüez could have what it hyperbolically calls "unlimited losses" – *i.e.*, that the Currency Trades did not "cap" Mayagüez's payments – Mayagüez's 30(b)(6) deponent eviscerated that claim by testifying that he knew there was typically no "cap" on such payments in the Company's hedges.[84] Mayagüez's CEO similarly testified that "[t]he difference between the strike and the exchange rate[,] either up or down[,] would always be the amount that Mayagüez would have to pay in any simple future [*i.e.*, any plain vanilla forward,]"[85] without any cap on the resulting payment obligations.

Further, there is no dispute that Mayagüez received substantial information about the limited compensation structure, including numerous presentations before entering into the First Currency Trade that included a table (reproduced *supra* at P.6) showing how Mayagüez's payment obligations would grow as the USD appreciated and indicating that such payments would work in the same way as in a traditional/plain vanilla forward (*i.e.*, as Mayagüez was well aware, without a cap).[86] By the time Mayagüez entered into the Second and Third Currency Trades, it could draw on its years of experience with hedges, and with the changing MTM of the First Currency Trade.[87]

Similarly, there is no dispute that Mayagüez received Trade Confirmations[88] and presentations[89] fully and accurately disclosing that Mayagüez's proceeds from the Currency Trades were *capped*.  Mayagüez understood this, and as the COP/USD exchange rate moved in its favor, Mayagüez amended the First Currency Trade to increase the compensation cap and

---

[84] *See* DEX 4 at 55:11-13 ("Yes, in the plain vanilla transaction, . . . there was no limit either to pay or to receive."); *see also* DEX 5 at 128:21-24 ("Q. In plain vanilla forwards, is there a cap on potential losses? A. There are no caps in plain vanilla."); *see also* SUMF ¶¶ 29-30.

[85] DEX 3 ("Iragorri Dep. Tr.") 67:10-13; *see also* SUMF ¶ 27.

[86] *See, e.g.*, DEX 45 at 4347; DEX 20 at 9176; SUMF ¶ 70.

[87] *See, e.g.*, DEX 90; 95; *see also* SUMF ¶¶ 155, 160.

[88] SUMF ¶¶ 89, 93, 95, 98-100, 103-05, 108.

[89] SUMF ¶¶ 61-64, 77-80.

eventually received this increased maximum compensation, as the trade terminated when the cap was reached.[90]   Accordingly, at the time of entering into the Second and Third Currency Trades, Mayagüez had extensive, first-hand experience with the operation of the cap and cannot claim it was deceived as to the operation of its terms.  The cap was not hidden, but rather a fully disclosed basic element of the bargain.  Mayagüez sought a strike price more favorable than the market rate, and Citibank Colombia offered to provide this if a cap were put in place.[91] Mayagüez focused on the strike price and knowingly accepted these limited compensation terms:  Mayagüez's CEO first claimed in his deposition that he was unaware of the terms of the trade, but when confronted with contemporaneous emails that clearly communicated the terms, he responded that "what was important for me at the moment was [the] strike" – and he apparently disregarded the rest.[92]

There is simply no evidence of the withheld information or that Mayagüez did not understand the Currency Trades.  Indeed, even though not required of Defendants, document after document shows steps Defendants took to confirm that the trades were accurately and sufficiently discussed with and approved by Mayagüez, including senior and knowledgeable individuals such as its CFO and CEO.[93]

> **B.  Mayagüez Cannot Show "Legitimate Ignorance" Regarding The Risks Or Issues Of Which It Complains Or Justifiable Reliance On Alleged Statements By Defendants**

The record is equally clear that Mayagüez's key allegations about itself – including that it was unable to assess the Currency Trades and could only rely on Defendants as financial advisors – were false.  Mayagüez cannot show that it (i) lacked the ability or opportunity to assess and understand, and was "legitimately ignorant" of, the risks of the Currency Trades or

---

[90] SUMF ¶¶ 96-97, 127-129.
[91] SUMF ¶¶ 64, 78, 85, 137, 140-141.
[92] SUMF ¶¶ 141, 144, including DEX 03 at 97:12-16.
[93] *See* SUMF ¶¶ 68-70, 74-87, 99-101, 103-108, 130-148, 179, 183.

(ii) justifiably relied on any alleged false or misleading statements in deciding to enter into the Currency Trades.

To determine liability for Articles 2341 or 863 under Colombian law, "[a]ll of the relevant circumstances should be considered," including the "knowledge, expertise, experience and the technical capacity for evaluation" of the plaintiff and the defendant.[94]  A plaintiff cannot succeed unless its "ignorance [is] legitimate so that they cannot ignore information that they should know or would have known if they had behaved diligently."[95] Similarly, under New York law, an alleged omission is not actionable if plaintiff could have acquired allegedly withheld information via "the exercise of ordinary intelligence."[96]

### 1.  Mayagüez Had Extensive Experience with Non-Plain Vanilla Hedges

One of Mayagüez's primary contentions is that it never entered into currency hedges other than "plain vanilla" trades.[97]  Discovery exposed this as false.  Internal Mayagüez documents confirm that it had repeatedly entered into "exotic"/non-"plain vanilla" currency hedges, in addition to over a dozen plain vanilla forwards with at least five financial institutions, since 2008.[98]  Indeed, Mayagüez entered into the 2008 Transaction with Citibank that shared

---

[94] *See* Dunogué Decl. Ex. 8, 85:16-19 (scope of the duty of information is determined in part by the plaintiff's ability to self-inform, which depends on "their personal skills, their level of emotional and educational development, their level of experience in life, technical or professional background"); *see also* Dunogué Decl. Ex. 5 ¶¶ 81, 83 (to assess plaintiff's claim that "it was deceived by its counterparty, a relevant issue under Colombian law is whether the plaintiff is familiar with or was capable of being familiar with the transactions and accepted to assume the risks of the contract offered to it.  Indeed, whether liability derived from the good faith duty to inform arises depends in part on whether the plaintiff had or should have had knowledge of the transactions offered and the risks that the same might generate").

[95] *See* Dunogué Decl. Ex. 8, 93:7-94:8.

[96] *Jana L. v. W 129th St. Realty Corp.*, 22 A.D.3d 274, 278 (N.Y. App. Div. 2005) (reversing denial of summary judgment); *see also Dodona I LLC v. Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 516 (S.D.N.Y. 2015) (granting summary judgment as to common law fraudulent concealment claims and rejecting "conclusory allegations" that "defendants had 'asymmetric information'" because after "discovery, [p]laintiffs must point to [] evidence showing [d]efendants possessed and failed to disclose some material, non-public information").

[97] *See, e.g.*, FAC ¶¶ 36-43.

[98] *See* SUMF ¶¶ 36-39.

many of the same features as the Currency Trades, including that it was structured as a series of monthly put and call option pairs and contained a compensation cap that applied only in the event of a USD depreciation.[99]  Mayagüez ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.[100]   Accordingly, the record is clear that Mayagüez had years of experience with comparable hedges.

### 2. Mayagüez Was Fully Aware Of The Amount Hedged By The Second And Third Currency Trades And That Its Ethanol Sales Were Taken Into Account In Connection With Those Trades

Mayagüez's contention that it was somehow misled into hedging a larger amount, and for a longer duration as part of the Second Currency Trade[101] is also foreclosed by the record. Mayagüez chose the Second Currency Trade among alternatives with full disclosure that higher strike prices required increased notional amounts and duration of the trades.[102]  Mayagüez also understood that the larger notional amounts took into account its USD exposure related to its ethanol sales, as Alarcon testified:

> Q. Mayagüez understood and there was no hiding of the fact that ethanol sales were being included as part of the revenues to be hedged in connection with the second currency trade?  A. We understood it.[103]

Mayagüez sold ethanol since at least 2007.[104] ████████████████████████████

---

[99] SUMF ¶¶ 36-39; *see* Mayagüez's July 25, 2018 Letter to the Court (Dkt. No. 55) at 2-3 (stating that Defendants sold a "limited compensation collar" product to Mayagüez in 2008).
[100] *See* DEX 06 at (tab 2011) and (tab 2013) (natively produced attachment to DEX 6 at 9277); *see also* SUMF ¶¶ 40-42; DEX 19 at ¶ 65.
[101] *See* FAC ¶¶ 40, 113; *see also* SUMF ¶¶ 98-99, 130-48.
[102] *See, e.g.*, DEX 86 at 7861; DEX 3 at 97:12-16 ("[w]hat was important for me at the moment was [the] strike"); DEX 42 at 178378-81; DEX 05 at 61:17-62:6; *see also* SUMF ¶¶ 74, 138-39,141.
[103] *See* DEX 05 at 114:14-20; *see also* DEX 74 at 443250 (Feb. 12, 2014 Citibank Colombia internal call report noting that discussion about revising Mayagüez's exposure to include ethanol); DEX 59 AT 10246 (December 2014 Off-Market Letter) and DEX 83 AT 27619 (January 2015 Off-Market Letter) (both noting that Mayagüez was restructuring trade to hedge its "sugar exports production and ethanol sales"); SUMF ¶¶ 135, 175, 186.
[104] *See* DEX 4 at 27:9-15 (Mayagüez has earned revenue from sale of ethanol since 2007).

████████████████████████████████.[105]  The prices for Mayagüez's ethanol sales were based on a public formula set by the Colombian government and were tied to the USD exchange rate.[106]  Citibank Colombia discussed Mayagüez's ethanol sales and related USD exposure, including through a spreadsheet that expressly set forth the government's formula for the price of ethanol, and provided a sensitivity analysis that allowed Mayagüez to see how changes in the COP/USD rate could affect its expected ethanol revenues when all other inputs remained the same.[107]  There is no dispute that Mayagüez could not have conducted its business without being aware of the factors that would impact the price of ethanol, one of its major products, and had years of actual experience concerning the relationship between ethanol prices and the USD/COP rate.  Indeed, Mayagüez's 30(b)(6) witness and its CEO ██████████████████ ██████████████████████████████████████████████████[108]  Accordingly, there is no genuine dispute that Mayagüez was aware that, and was not "legitimately ignorant" that, its ethanol sales were exposed to USD/COP exchange rate risks, and that the Second Currency Trade hedged part of this exposure.

There can be no liability under Colombian Law – or New York law concerning alleged fraud or negligent misrepresentations – where, as here, the plaintiff knew or reasonably could have known the very information it alleges was omitted or misrepresented.[109]  That alone must

---

[105] *See* DEX 76 (tab "PYG MAM" in original), (tab "P&L MO-MO" in English translation); *see also* SUMF ¶¶ 2, 46, 121.

[106] DEX 17 at ¶ 88 (formula from Colombian government determines the price of ethanol in which "[t]he COP/USD exchange rate appears as one of the inputs").

[107] *See* DEX 30 at 9995; DEX 30 at 9998; *see also* SUMF ¶¶ 132-34.

[108] *See, e.g.*, DEX 04 at 45:11-18; 103:15-104:7; DEX 03 at 35:22-36:18 (describing the factors that impact Colombian ethanol prices including the USD/COP exchange rate); *see also, e.g.*, DEX 32 at 14370 ████████████████████████████████ DEX 1 at 28185 (██████████████ ████████████████████████████████████████████ *see also* SUMF ¶¶ 23, 48, 49, 135.

[109] Dunogué Decl. Ex. 8, 93:7-94:8 ("the pre-contractual duty to inform implies that one of the parties has information unbeknownst to the other party" and the "parties' ignorance must be legitimate so that they cannot ignore information they should know or would have known if they had behaved diligently"); *see, e.g.*, Dunogué Decl. Ex. 1 (cited in Dunogué Decl. Ex. 7 ¶

end this case.

### 3. Unbeknownst to Defendants, Mayagüez Failed To Self-Inform As Required By Colombian Law

To the extent Mayagüez contends it was not sufficiently aware of the terms and risks of the Currency Trades prior to entering into them, this was due to its own failure to inform itself and conduct normal diligence, contrary to its signed representations.  For years, Mayagüez ignored the recommendations of its external auditor to develop a written policy and a process to evaluate currency hedging.  According to a 2016 presentation to Mayagüez's board, but unbeknownst to Defendants and Citibank Colombia, PwC identified in 2011 that Mayagüez lacked formally documented policies or procedures for executing hedges, and recommended that Mayagüez put in place such policies and procedures "that the company must take into account when performing hedging transactions, which must be aligned with the strategies defined by administration and approved by the Board of Directors."[110]

Again in 2012, PwC reviewed Mayagüez's "hedging strategy procedures," and identified deficiencies to Mayagüez including the "lack of guidelines for the early liquidation of positions" that "prevents the Company from making objective decisions to reduce its exposure to adverse market movements and protect the Company's assets."[111]   PwC recommended defining such guidelines "consistent with the risk appetite of the Board of

---

78) at 16-17, 23 (where plaintiff claimed defendant omitted information about number of parking spots in a commercial project, Court held defendant was not liable under Article 863 because it did not know how many spots there would be and plaintiff was aware that the number of spots was subject to change based on project's design).  Similarly, under New York law, claims for misrepresentation or fraudulent concealment are not viable where "all of the information that plaintiffs now claim was concealed from them was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part."  *Aaron Ferer and Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d. Cir. 1984).

[110] *See* DEX 08 at 13141; *see also* SUMF ¶ 220.

[111] *See* DEX 08 at 13145; *see also* SUMF ¶ 222.

Directors."[112]  By 2016, Mayagüez still had not implemented PwC's recommendations.[113]

Mayagüez's CEO admitted this, testifying that, when it represented to Citibank that it was

"entering into the transaction consistent with Mayagüez's internal policies," Mayagüez "didn't

have a policy for hedges or for futures."[114]

Similarly, Mayagüez's 30(b)(6) witness testified that Mayagüez did not analyze the

Trade Confirmations describing the terms and structures of the Currency Trades:  "*We were*

*simply looking at the strikes that we had agreed upon,* but the rest of the [trade confirmation],

we didn't understand it.  *We didn't analyze it.*"[115]  Defendants cannot be held liable – under

either Colombian or New York law – for Mayagüez's choice to enter into the Currency Trades

because of the strike prices offered, but without considering the equally well disclosed other

terms of the transaction, and the risk of an unexpected devaluation of the COP.[116]

### 4.   Mayagüez Expressly Represented It Was Not Relying on Citibank or Citibank Colombia

Under New York law, claims for fraudulent misrepresentation can succeed only if

plaintiffs show they reasonably relied on defendant's misrepresentation.[117]  Here there is no

dispute that Mayagüez explicitly represented in both the ISDA and the Colombian ISDA that it

---

[112] *See* DEX 08 at 13145; *see also* SUMF ¶ 222.

[113] *See* DEX 08 at 13138, 13140.

[114] DEX 03 at 73:9-17; *see* DEX 04 at 22:16-22 ("Q. From the period of time of 2012 through 2016, can you describe any policies or procedures that Mayagüez had in connection with currency hedging transactions?  A. There were no policies."); SUMF ¶ 221.

[115] *See* DEX 04 at Tr., 82:13-16; *see also* SUMF ¶¶ 224.  Mayagüez also did not use financial advisors until close to nearly a year after entering into the Third Currency Trade.  *See* DEX 04 at 57:6-11; *see also* SUMF ¶ 224.

[116] The Colombian Supreme Court has declined to find liability under Article 863 where plaintiffs were aware that the terms of a project were subject to change, thus precluding them from claiming defendants made a misrepresentation. Dunogué Decl. Ex. 01 (Colombian Supreme Court of Justice 2001) at 16-17, 23.

[117] *See* Legal Standard - Section III *supra*; *see also, e.g.*, *Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 316-17 (S.D.N.Y. 1999) (granting summary judgment where non-reliance provision in ISDA-governed swap agreement precluded finding of reasonable reliance).

was not relying on Citibank or Citibank Colombia when entering into the transactions.[118]   In addition, Mayagüez also expressly represented, in numerous executed letters, that Mayagüez "is not relying on the advice of Citibank . . . [and] will determine, without reliance upon Citi, the economic risks and merits . . .of the Transactions and that it will be capable of assuming such risk."[119]   Mayagüez's CEO testified that these representations were accurate.[120] Accordingly, there is no genuine dispute that Mayagüez did not and could not justifiably rely on Defendants in connection with the Currency Trades.

These undisputed facts separately entitle Defendants to summary judgment as to Mayagüez's inducement and misrepresentation claims under New York law.  As Your Honor recently held in *Kirschner*, Mayagüez "cannot overcome disclaimers in these agreements that are fatal to its negligent misrepresentation claim," as these agreements "contain a clear disclaimer of the 'special relationship' and 'duty of care' alleged by" Mayagüez.[121]   Similarly, the non-reliance provisions doom Mayagüez's fraud claims.[122]

Colombian law likewise allows parties to contractually accept the inherent risks of a contract. [123]   A party's express representations and disclaimers are necessarily another part of

---

[118] *See* SUMF ¶¶ 12-21.

[119] DEX 72 (February 2014 Letter) at 7909; DEX 59 at 10246 (December 2014 Letter); DEX 83 at 27619 (January 2015 Letter); *see also* SUMF ¶¶ 101, 119-20, 186.

[120] DEX 03 at 74:4-25; *see also* SUMF ¶ 179.

[121] 2020 WL 2614765 at *13.

[122] *See, e.g.*, *JPMorgan Chase Bank*, 920 N.Y.S.2d at 9 (ISDA Agreement and transaction confirmations containing non-reliance provisions bar claims of fraud and negligent misrepresentation); s*ee also Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 466 (S.D.N.Y. 2016)  (granting motion to dismiss in part because the ISDA Agreement explicitly disclaimed reliance on investment advice), *aff'd by* 759 F. App'x 42, 48 (2d Cir. 2019) (Gardephe, J); *Grumman Allied Indus. Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) (granting summary judgment because plaintiff contractually disclaimed reliance on representations at issue and enjoyed absolute access to all information necessary to confirm representations); *Hales*, 75 F. Supp. 2d at 316-17 (S.D.N.Y. 1999) (granting summary judgment where non-reliance provision in ISDA-governed swap agreement precluded finding of reasonable reliance).

[123] *See* Dunogué Decl. Ex. 5 ¶ 82, Munoz Decl. ¶ 24.

the "acts and circumstances" to be considered under Colombian law:  if a plaintiff affirms that he has analyzed the transactions, accepts the risks that such transactions entail, and is not relying on the defendant, then there can be no basis to find that the defendant acted with "*culpa*" by allegedly not providing enough information to the plaintiff. [124]

## II.   MAYAGÜEZ DOES NOT HAVE A VIABLE PROMISSORY ESTOPPEL OR UNJUST ENRICHMENT CLAIM

### A.  Defendants Did Not Make Any False or Unfulfilled Promises To Mayagüez

Mayagüez's New York law promissory estoppel claim also fails[125] as do its Colombian law claims to the extent they are based on an alleged unfulfilled promise to amend the Third Currency Trade to increase the strike price if the exchange rate exceeded 2,600, or otherwise before the second tranche took effect.[126]  First, "[i]n New York, the doctrine of promissory estoppel . . . [is] a rule applicable only in the absence of an enforceable contract" – and it is undisputed that the parties entered into enforceable contracts here.  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 831 F. Supp. 94, 112 (E.D.N.Y. 1993), *aff'd in relevant part*, 47 F.3d 39, 45 (2d Cir. 1995).[127]  Accordingly, Mayagüez's promissory estoppel claim must fail as a matter of law.  Even if Mayagüez could establish that the written agreements between the parties were unenforceable (which it cannot), discovery revealed no support for Mayagüez's allegation of a promise, and Mayagüez's Treasurer confirmed that no such promise existed.[128]

---

[124] *See* Deposition of Javier Tamayo, Feb. 19, 2020 ("Dunogué Decl. Ex. 6") 197:19 – 198:9.

[125] For promissory estoppel, Mayagüez must show: (1) a promise that is sufficiently clear and unambiguous; (2) reasonable and foreseeable reliance on the promise; and (3) injury caused by the reliance." *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414-15 (S.D.N.Y. 2011); *Steele v. Delverde S.R.L.*, 662 N.Y.S.2d 30, 31 (App. Div. 1997).

[126] *See* FAC ¶ 140; *see also* SUMF ¶¶ 236.

[127] *See also, e.g.*, *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1234 (S.D.N.Y. 1995) (dismissing promissory estoppel claim because "an express contract was in effect").

[128] *See* DEX 05 at 133:25-134:13 ("Q.  [I]n connection with the January 2015 trade . . . did anyone at Citi promise Mayagüez that Citi would increase the strike price of that January 2015 trade or restructuring above the exchange rate, if the exchange rate exceeded 2,600 pesos . . .? A. There were no promises, and the restructuring of 2015 was made by Citibank based on some conversations that we had with them."); *see also* SUMF ¶¶ 236.

Accordingly, this supposed promise, disavowed by Mayagüez's own witnesses, cannot form the basis of any claim. [129]

### B.  Mayagüez Cannot Show Unjust Enrichment

Mayagüez cannot succeed on its unjust enrichment claim either.[130]  The law clearly precludes recovery for unjust enrichment "where the parties have entered into a contract that governs the subject matter."[131]  It is undisputed that the parties entered into such a contract, and therefore the unjust enrichment claim fails as a matter of law.[132]  Further, even if Mayagüez could establish that the agreements were not valid (which it cannot), there is no genuine dispute that Defendants were not unjustly enriched against equity and good conscience.[133]

### III.  THERE IS NO EVIDENCE THAT WOULD ESTABLISH LIABILITY AS TO CITIGROUP, INC. FOR ANY OF MAYAGÜEZ'S CLAIMS

Mayagüez's theory of liability against Citigroup, Citibank's corporate parent, is that Citigroup "conducts business both directly and through Citigroup's subsidiaries, including Citibank and Citibank Colombia" (*see* FAC ¶ 51), and that employees of Citibank and Citibank Colombia are employees of Citigroup or ultimately reported to employees who reported to officers of Citigroup (*see id.* ¶¶ 51-61).  The record is clear, however, that Citigroup did not engage in or direct conduct related to the Currency Trades, and that Mayagüez has not shown and cannot show that the corporate veil should be pierced here.[134]

---

[129] *See* FAC ¶¶ 158-61, 199-201 (First and Fifth Causes of Action based on allegations that Defendants "made false promises"); ¶¶ 241, 244-47 (Eighth Cause of Action based on allegations that Defendants made promises in bad faith and "fraudulent promis[es]").

[130] Mayagüez would need to establish that: (1) Defendants were enriched, (2) at Mayagüez's expense, and (3) equity and good conscience mitigate against permitting Defendants to retain what Mayagüez is seeking to recover.  *Dodona I, LLC*, 132 F. Supp. 3d at 512.

[131] *See Cox v. NAP Constr. Co.*, 891 N.E.2d 271, 278 (N.Y. 2008); *CDO Plus Master Fund v. Wachovia Bank, N.A.*, No. 07 Civ. 11078, 2009 WL 2033048, at *8 (S.D.N.Y. July 13, 2009); *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 504 (S.D.N.Y. 2007).

[132] *See* SUMF ¶¶ 12-21, 89-93, 98-100, 103-106.  .

[133] *See Kaplan v. Reed Smith LLP*, 919 F.3d 154, 160 (2d Cir. 2019).

[134] "It is well-settled that New York's choice-of-law rules dictate that 'the law of the state of incorporation determines when the corporate form will be disregarded.'" *Martin Hilti Family*

As an initial matter, the record is clear the non-party Citibank Colombia and Citibank employees engaged in negotiating, structuring and communicating with Mayagüez concerning the Currency Trades were not employees of Citigroup[135] – and, even if there were any overlap in any employees between these entities, this would not suffice to hold Citigroup liable.[136]

Under New York law, a party seeking to pierce the corporate veil must show that: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[137]   Delaware law also requires that, to pierce the corporate veil, the plaintiff meet "a two-pronged test focusing on (1) whether the [two entities] in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." *Martin Hilti* 137 F. Supp. 3d at 492 (Gardephe, J.).  This includes "[t]he central question" of whether the parent corporation "has complete domination and control over the entity such that it no longer ha[s] legal or independent significance of [its] own" and that "the

---

*Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 492 n.8 (Gardephe, J.) (S.D.N.Y. 2015). Citibank is chartered under the laws of the United States, and maintains a principal place of business in New York.  *See* Defendants' Answer (Dkt. No. 47) ¶ 14.  Citigroup is incorporated in Delaware.  *See id.* ¶ 13.

[135] *See* SUMF ¶ 11.

[136] *See, e.g., U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."); *Dollman v. Mast Indust.*, 731 F. Supp. 2d 328, 341 (S.D.N.Y. 2010) (dismissing parent company at summary judgment where plaintiff's complaint "concerned [its] subsidiary" exclusively and "there is no obvious need to pierce the corporate veil"); *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 350 (S.D.N.Y. 2013) ("That a subsidiary shares employees, officers, and directors with a parent does not permit the corporate form to be disregarded."); *see also Mendez v. JFK Medical Ctr. Ltd. P'Ship*, No. 17-80866-CIV, 2018 WL 5045210, at *4 (S.D. Fla. Sept. 4, 2018) (dismissing parent company at summary judgment and holding that "overlap in the board of directors and the officers of its subsidiaries does not destroy [its] legal identity"). Similarly, under Colombian law – if it were to apply to this issue – corporations are not extra-contractually liable for actions or omissions by employees of their affiliates or subsidiaries. Dunogué Decl. Ex. 5 ¶ 60.

[137] *Matter of Morris v. New York State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141(1993); *see also Miller v. Citicorp*, No. 95 Civ. 9728, 1997 WL 96569, at *9 (S.D.N.Y. Mar. 4, 1997) (subsidiary must be "mere dummy" of parent to pierce veil).

corporation effectively must exist as a sham or shell through which the parent company perpetrates injustice." *Id.* at 492 (internal quotation marks omitted). Thus, in determining whether to pierce the corporate veil under either New York or Delaware law, courts consider allegations of disregarding corporate formalities, siphoning or intermingling of funds, inadequate capitalization, or that the corporation is a mere sham, among others.[138]

There is no genuine dispute that the record shows no indication whatsoever that Citigroup exercised complete domination and control over Citibank, generally and with respect to the Currency Trades, and used such domination to commit a wrong against Mayagüez or perpetuate an injustice. Citigroup is entitled to summary judgment.

## IV.  MAYAGÜEZ CANNOT SHOW THAT DEFENDANTS CAUSED RECOVERABLE DAMAGES

### A.  Defendants Did Not Cause Mayagüez's Purported Losses

There is no genuine dispute that Defendants did not cause Mayagüez's purported losses and, accordingly, Mayagüez's claims fail for this additional reason under both Colombian[139] and New York law.[140] Under the First Currency Trade, Mayagüez *received* payments, up to the maximum amount, so it had no losses.[141] Mayagüez entered into the Second Currency Trade, under which it ultimately made payments when the USD dramatically appreciated, contrary to

---

[138] *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011); *accord Fantazia Int'l Corp. v. CPL Furs New York, Inc.*, 67 A.D.3d 511, 512 (N.Y. App. Div. 2009).

[139] *See* Dunogué Decl. Ex. 7 ¶¶ 51, 54, 64 (Colombian civil liability requires the "existence of a necessary and efficient cause and effect relationship between the conduct and the damage"); Dunogué Decl. Ex. 5 ¶¶ 51-53, 64 (Under Article 2341 and Article 863 plaintiff must prove its damages were caused by defendant's acts or omissions); Dunogué Decl. Ex. 4 (cited in Dunogué Decl. Ex. 5 ¶¶ 89, 92, 95) at 5.1 (explaining that it is necessary to evaluate other coincident and subsequent actions, including those of the plaintiff, that caused the damage to determine if the defendant's liability should be reduced or eliminated).

[140] *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 684 F. Supp. 27, 28 (S.D.N.Y. 1988) (granting summary judgment because plaintiffs failed to establish the "indispensable link between a defendant's conduct and a plaintiff's injury"); *Laub v. Faessel*, 297 A.D.2d 28, 31-32 (N.Y. App. Div. 2002) (under New York law, plaintiff must show that "misrepresentations directly caused the loss about which plaintiff complains".

[141] *See* SUMF ¶ 97.

market expectations.[142]  Subsequently, in 2015, even after having to make significant payments under the Second Currency Trade, Mayagüez entered into the Third Currency Trade with similar terms as the Second Currency Trade and, likewise, had to make payments to Defendants because of the USD's continued and unprecedented appreciation.[143]  Mayagüez's 30(b)(6) witness recognized that its "payments were directly and arithmetically related to the USD's significant appreciation," summing up the cause of Mayagüez's losses succinctly:  "Q. Was the negative mark-to-market of $32.9 million caused by the devaluation of the Colombian peso?  A. That is correct."[144]  Indeed, Mayagüez's CEO explained to the Board that the large MTM of the Third Currency Trade was due to the "unexpected devaluation" of the COP. [145]

Accordingly, Mayagüez cannot dispute that the alleged misstatements or omissions from presentations and communications from 2012 and early 2013 did not cause a recoverable loss. "When the plaintiffs' loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases and a plaintiff's claim fails when it has not proven that its loss was caused by the alleged misstatements as opposed to intervening events."[146]  Loss causation (or "adequate causality" under Colombian law[147]) "exists to prevent opportunistic investors from getting their money

---

[142] *See* SUMF ¶¶ 76, 102, 162, 205.

[143] *See* SUMF ¶¶ 188-89, 194, 197, 205.

[144] DEX 04 at 148:11-14; *see also* SUMF ¶¶ 76, 150-54, 237.

[145] DEX 130 at 103:16-104:13; *see* SUMF ¶ 207.

[146] *Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 149 A.D.3d 146, 149-50 (N.Y. App. Div. 2017); *accord Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005); *see also, e.g., Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, 966 N.Y.S.2d 349, at 11 (Sup. Ct. 2012) ("When a market-wide phenomenon (such as the financial crisis of 2007-2008) may have caused the loss, the plaintiff must … show that its loss was caused by the alleged misstatements as opposed to intervening events."); *see also* Dunogué Decl. Ex. 4 (cited in Dunogué Decl. Ex. 5 ¶¶ 89, 92, 95) at 5.1 (noting that the defendant's liability can be reduced or eliminated if a coincident or subsequent action caused the damage, including the plaintiff's action).

[147] Dunogué Decl. Ex. 5 ¶¶ 52, 53.

back when their losses had nothing to do with the subject representations." [148]  Mayagüez cannot make Defendants pay for the unexpected devaluation of the USD.

### B. Even If Mayagüez Could Prove That Defendants Caused Its Losses, Mayagüez Would Only Be Entitled To Actual Losses As To Which It Offers No Proof

Even if Mayagüez could point to a genuine dispute as to liability and causation (which it cannot), the unrebutted expert evidence and applicable law establish that Mayagüez is not entitled to the purported damages it seeks, *i.e.*, a full return of all payments it made under the Currency Trades. [149]  Under both New York and Colombian law, recovery for the damages suffered under the Currency Trades is limited to "actual losses" suffered by a plaintiff. [150]

As Defendants' expert economist (who has spent decades teaching and consulting on currency hedging) explained, Mayagüez's payments under the Currency Trades were, in economic substance, payments for insurance protection against the potential appreciation of the COP relative to the USD. [151]  It is axiomatic that "hedging performs an insurance function." *Leist v. Simplot*, 638 F.2d 283, 288 (2d Cir. 1980). [152]  Accordingly, in determining what constitutes "actual losses" here, "it would be inequitable to permit the insured [plaintiff] to have received the benefit of past coverage without cost and to permit the insurer [defendant] no

---

[148] *Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*, 42 Misc. 3d 858, 864 (Sup. Ct. 2013), *modified on other grounds*, 123 A.D.3d 413 (N.Y. App. Div. 2014); *see also* Dunogué Decl. Ex. 03 (Colombian Supreme Court of Justice 2018) at 26-27 (an "event or occurrence outside the sphere of activity or control" of the defendant breaks the causal link and exempts the defendant from liability).

[149] FAC ¶ 268.

[150] *See, e.g.*, Dunogué Decl. Ex. 08, 142:4-12 ("alleged damages have to be proven"); *see also* Dunogué Decl. Ex. 5 ¶¶ 47-48; Dunogué Decl. Ex. 02 (cited in Dunogué Decl. Ex. 7 ¶¶ 116-18) at 19-23 (plaintiff must prove non-hypothetical damages); *Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D.3d 504, 506 (N.Y. App. Div. 2017); *Negrete*, 187 F. Supp. 3d at 467-68 (granting motion to dismiss and limiting damages to actual pecuniary losses).

[151] *See, e.g.*, DEX 19 at ¶ 22; *see also* SUMF ¶ 22.

[152] The Court also recognized that speculative investors – not just hedgers – may also engage in derivatives. *Leist*, 638 F.2d at 288.  Mayagüez maintains, however, that it is a hedger, not a speculator, and used currency trades to hedge (*i.e.*, seek to insure against) risk.

compensation for the time it was at risk."[153]

Mayagüez's purported damages expert confirmed that he offered no opinion on what would constitute "actual losses" under the Currency Trades.[154]  Mayagüez's economist agreed with Defendants' expert that hedging transactions do not cause a loss simply because the risk insured against (here, a USD depreciation) does not occur; instead, the alleged injury must be evaluated *ex ante*, at the time of the transaction.[155]  Accordingly, even if Mayagüez could establish it is entitled to damages, which it cannot, its recovery must be limited to, at most, the actual losses it incurred when entering into the Currency Trades – as to which it makes no allegation and does not purport to offer any proof.[156]

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment in their favor on all claims.

---

[153] *Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 539 (S.D.N.Y. 1997). Further, even apart from the insurance context, it is settled law that a plaintiff cannot be put into a better position than it would have been absent the alleged fraud.  *See, e.g.*, *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 50 n.22 (2d Cir. 1978).

[154] DEX 31 at 68:23-69:3 ("Q. So you're not offering an opinion in this case as to what constitutes, if anything, the plaintiff's actual pecuniary loss?  A. No.").

[155] DEX 131 at 88:4-12 ("When one looks at financial risk and hedging, one has to decide the properties of a contract in order to decide whether it's a proper financial instrument for [one's] particular risk. And this analysis has to be done, of course, ex ante because you don't know what type of risk will happen in the future in the sense you can't forecast the point of risk management that is all about the unanticipated events.").

[156] ██████████████████████████████████████████████████████

Dated: July 9, 2020
New York, New York

Respectfully submitted,


By:  _/s/Adam S. Hakki_____
Adam S. Hakki
Agnès Dunogué
Daniel L. Sachs
SHEARMAN & STERLING LLP
599 Lexington Avenue New York, NY 10022
Tel: (212) 848-4000
Email: ahakki@shearman.com
Email: agnes.dunogue@shearman.com
Email: daniel.sachs@shearman.com

Counsel for Defendants Citigroup, Inc. and
Citibank N.A.