UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  _5/5/2021_____

-----------------------------------------------------------X

MAYAGÜEZ S.A.,                          :
                                        :
        Plaintiff,                      :
                                        :
        -against-                       :    16-CV-6788 (PGG)(JLC)
                                        :
CITIGROUP, INC. and CITIBANK, N.A.,     :
                                        :
        Defendants.                     :
                                        :
-----------------------------------------------------------X

## REPORT & RECOMMENDATION

## TABLE OF CONTENTS

I.    BACKGROUND ............................................................................... 1

   A.    Factual Background.................................................................. 1

      1.    Mayagüez and Citibank Enter Into an Agreement Governing Hedging Transactions................................................................ 3

      2.    First Currency Trade ........................................................... 5

      3.    July 2014 Presentation and Sensitivity Analysis ............................ 7

      4.    Second Currency Trade ...................................................... 8

      5.    Third Currency Trade ...................................................... 10

   B.    Procedural Background ........................................................... 11

II.   ANALYSIS.................................................................................... 13

   A.    Motions to Strike .................................................................. 13

      1.    Mayagüez's Motion to Strike.................................................. 13

      2.    Defendants' Letter Motion to Disregard Mayagüez's Reply Rule 56.1 Statement.................................................................... 18

   B.    Cross-Motions for Summary Judgment ........................................ 20

      1.    Applicable Legal Standards ................................................. 20

      2.    Choice of Law.............................................................. 21

      3.    Legal Standard for Claims Brought Under the Colombian Commercial Code ........................................................... 22

         a.    Culpa .................................................................. 24

         b.    Heightened Standard and Presumption of Negligence ................. 27

         c.    Liability Under Articles 2341 and 863 Is Not Precluded By The Parties' Governing Agreements ........................................ 30

         d.    Contractual Disclaimers .............................................. 32

   C.    Defendants' Motion for Summary Judgment .................................... 34

      1.    Colombian Law Claims ..................................................... 34

      2.    Negligence and Bad Faith Claims Under Article 2431 and Article 863 (Fifth and Eighth Causes of Action)...................................... 35

         a.    Misstatement or Omissions of Terms of Currency Trades............. 35

         b.    Sensitivity Analysis ................................................... 36

         c.    Selling Currency Trades as "Hedges" ................................. 43

         d.    Legitimate Ignorance.................................................. 46

          i.   Representations and Disclaimers ................................................. 46

          ii.   Mayagüez's Experience and Duty of Self-Information ............... 48

     e.   Causation and Damages .................................................... 50

     3.   Willful Misconduct Under Article 2341 (First Cause of Action)...... 52

     4.   Fraud and Negligent Misrepresentation Claims Under New York
     Law (Second, Third, Fourth, Sixth, and Seventh Causes of Action) ....... 56

     5.   Promissory Estoppel and Unjust Enrichment Claims (Ninth and
     Tenth Causes of Action)............................................................. 59

     6.   Citibank, N.A. and Citigroup's Liability Under Agency Theory ..... 63

   D.   Mayagüez's Summary Judgment Motion as to Its Colombian Law
   Claims ............................................................................................ 66

III.   CONCLUSION ....................................................................................... 66

**JAMES L. COTT, United States Magistrate Judge.**

**TO THE HONORABLE PAUL G. GARDEPHE, United States District Judge:**

In this highly contentious business dispute, Plaintiff Mayagüez S.A. alleges a variety of claims under both Colombian and New York law against Defendants Citigroup, Inc. and Citibank, N.A.  Mayagüez's claims arise out of Defendants' alleged misrepresentations and omissions in connection with a series of hedging transactions that they promoted and entered into with Mayagüez, and that, according to Mayagüez, caused losses of $68 million.  Before the Court, on referral for a report and recommendation, are Mayagüez's motion to strike portions of Defendants' Local Rule 56.1 Statement, Defendants' letter-motion requesting that the Court disregard Mayagüez's Reply Rule 56.1 Statement, and the parties' cross-motions for summary judgment.

## I.      BACKGROUND

### A.  Factual Background

Based on the parties' submissions, the following facts are undisputed unless otherwise indicated.[1]  Mayagüez is a Colombian manufacturing company that

---

[1] The parties' submissions in connection with Defendants' Motion for Summary Judgment are as follows (with the unredacted versions noted in bold): Defendants' Notice of Motion for Summary Judgment (Dkt. No. 149); Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") (Dkt. Nos. 150, **177**); Declaration of Agnès Dunogué in Support of Defendants' Motion for Summary Judgment ("Dunogué Decl.") (Dkt. Nos. 162, 167); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp.") (Dkt. Nos. 161, **165**); Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Def. Reply") (Dkt. Nos. 180, **181**); Declaration of Agnès Dunogué in Support of Mayaguez's Reply (Dkt. No. 185); Defendants' Rule 56.1 Statement ("Def. 56.1") (Dkt. Nos. 160, **179**); Plaintiff's Counterstatement to Defendants' Rule 56.1 Statement ("Pl. Resp.") (Dkt.

produces sugar and ethanol.  Pl. 56.1 ¶¶ 1–2.  Mayagüez sells its sugar and ethanol

domestically in exchange for Colombian pesos ("COP") and sells its sugar (but not

its ethanol) internationally in exchange for U.S. dollars ("USD").  *Id.* ¶¶ 3, 10, 18;

Def. 56.1 ¶ 1.  The sales revenue that Mayagüez receives in U.S. dollars comes

exclusively from its sugar exports.  Pl. 56.1 ¶ 25.

When Mayagüez sells certain products denominated in USD but incurs costs

in COP, it is exposed to financial risks from changes in the COP/USD exchange

rate.  Def. 56.1 ¶ 23.  As a result, Mayagüez has used financial contracts to mitigate

these exchange rate risks.  *Id.*  One way that Mayagüez has mitigated exchange

rate risks is to enter into currency hedges to protect itself from unanticipated

fluctuations in the COP/USD exchange rate.  Pl. 56.1 ¶¶ 27, 28.  Mayagüez's

practice of entering into these hedging trades began from at least as early as 2008

until at least up to the financial transactions at issue in this case.  Def. 56.1 ¶ 6.

---

Nos. 164, **166**); Defendants' Responsive Statement to Mayaguez's Statement of
Additional Material Facts (Dkt. Nos. 184, **186**).

The parties' submissions in connection with Plaintiff's Motion for Summary
Judgment are as follows: Plaintiff's Notice of Motion for Summary Judgment (Dkt.
No. 152); Plaintiff's Memorandum of Law in Support of its Motion for Summary
Judgment ("Pl. Mem.") (Dkt. Nos. 153, **155**); Declaration of Gabriel F. Soledad in
Support of Plaintiff's Motion (Dkt. No. **174**); Defendants' Memorandum of Law in
Opposition to Mayaguez's Motion for Summary Judgment ("Def. Opp.") (Dkt. Nos.
156, **182**); Declaration of Agnès Dunogué in Support of Defendants' Opposition (Dkt.
No. 158); Plaintiff's Reply Memorandum of Law in Further Support ("Pl. Reply")
(Dkt. Nos. 168, **171**); Plaintiff's Rule 56.1 Statement ("Pl. 56.1") (Dkt. Nos. **154,
159**); Defendants' Counterstatement to Mayaguez's Rule 56.1 Statement ("Def. 56.1
Resp.") (Dkt. Nos. 157, **183**); Plaintiff's Reply to Defendants' Counterstatement ("Pl.
56.1 Reply") (Dkt. Nos. 169, **172**).

Mayagüez entered into these hedging trades with a variety of financial institutions, including Defendant Citibank, N.A. ("Citibank").  Def. 56.1 ¶ 35.

Citibank is a national banking association based in the United States.  *Id.* ¶ 8.  It is a wholly-owned subsidiary of Citicorp, which in turn is a wholly-owned subsidiary of Citigroup.  *Id.*  Defendant Citigroup ("Citigroup," and together with Citibank, "Defendants") is a globally diversified financial services holding company also based in the United States.  *Id.* ¶ 9.  For the transactions at issue here, Mayagüez primarily interacted with employees of non-party Citibank Colombia ("Citibank Colombia"), an affiliate of Citibank with operations in Colombia.  *Id.* ¶¶ 10–11.

### 1.  Mayagüez and Citibank Enter Into an Agreement Governing Hedging Transactions

From 2008 to 2012, Mayagüez entered into hedging trades; some of these trades were so-called "plain vanilla" transactions while others were non-plain vanilla transactions.  Pl. 56.1 ¶ 34; Def. 56.1 ¶ 34.  Mayagüez's objective in entering into currency hedges was to reduce its exposure so that it would experience only "moderate" gains or losses.  Pl. 56.1 ¶ 29.  Hedging involves using financial instruments to reduce risk and, specifically with respect to this case, to decrease exposure to an exchange rate that cannot be forecasted.  Def. 56.1 ¶ 22.  One type of hedging contract is what the parties call a "plain vanilla forward," which is a contract between two parties to buy or sell currency at a pre-specified price (a "strike price") on a pre-specified future date for a pre-specified amount of that currency (a "notional amount").  *Id.* ¶¶ 24–25.  Under such a transaction, if the

foreign currency depreciates such that the market exchange rate (commonly referred to as the "spot") falls below the strike price, the hedging party (in this case Mayagüez) would be entitled to the pre-agreed, higher price for its foreign currency, and it would receive payments reflecting the difference between the strike price and the spot rate times the notional amount, thus protecting itself against a loss of revenue from the depreciation. *Id.* ¶ 26. On the other hand, if the foreign currency appreciates above the spot, the hedging party (Mayagüez) will have to make payments to its counterparty (here, Citibank) amounting to the difference between the spot and the strike rate times the notional amount. *Id.* ¶ 26.

Another type of hedging transaction relevant to this case is a "limited compensation forward," which differs from a plain vanilla forward in that, *inter alia,* there is a limit on the amount of compensation that one party (usually the hedging party) can receive, and if the maximum compensation amount is reached, the trade is automatically terminated. *Id.* ¶ 28. Like a plain vanilla forward, a limited compensation forward generally has no limit or cap to the amount of payments that the hedging party may need to make in the event that the foreign currency appreciates above the spot. *Id.* ¶ 29.

Mayagüez engaged in numerous hedging transactions with at least five financial institutions from 2008 to 2015. Def. 56.1 ¶ 35. In 2008, Mayagüez entered into a currency hedge with Citibank (the "2008 Citibank Trade"), which had a maximum compensation of COP 75 million such that Mayagüez could exercise its right to sell dollars at the strike price to Citibank until Mayagüez received COP 75

million, at which point the transaction would terminate.  Def. 56.1 ¶¶ 36–38; *see also* Def. 56.1, Exhibit ("DEX") 25; DEX 26.  The 2008 Citibank Trade did not have a limit on the payments that Mayagüez might have to make to Citibank.  Def. 56.1 ¶ 38.

Mayagüez and Citibank subsequently entered into a master agreement concerning hedging instruments on July 28, 2009 (the "ISDA Agreement") in anticipation of entering into additional hedging transactions.  *Id.* ¶¶ 12–14; *see* DEX 15.  On January 3, 2011, Mayagüez and Citibank Colombia separately entered into a master agreement that would govern anticipated hedging transactions in Colombia (the "Colombian ISDA Agreement").  DEX 16; Def. 56.1 ¶ 20; Pl. 56.1 ¶ 59.

## 2.  First Currency Trade

In August 2012, Maria Isabel Botero from Citibank Colombia sent a presentation to Mayagüez's Treasurer (Hector Alarcon) and Mayagüez's then-CFO (Ludwig Chvatal) about a limited compensation collar transaction (similar to a limited compensation forward), a structure which Citibank Colombia represented would "offer a better hedging rate . . . in exchange for limiting Mayagüez's gains." DEX 38 at MAYAGUEZ00006675; Def. 56.1 ¶ 61.  Following the presentation, Citibank Colombia provided Mayagüez with a spreadsheet on December 7, 2012 offering comparisons of different types of transactions, including limited compensation forwards.  Def. 56.1 ¶ 67; DEX 67.  Further discussions ensued and Citibank Colombia sent two additional presentations to Mayagüez in October 2013. Def. 56.1 ¶¶ 68–69.  The first presentation dated October 21, 2013 provided that "[i]f the market rate ends up being above the established strike rate, the client will

have to compensate the bank based on the exchange [rate] difference between the strike in the structure and the market exchange rate" and provided scenarios in which Citibank Colombia would have to pay Mayagüez. *Id.* ¶ 69. The second presentation dated October 28, 2013 provided one potential scenario in which Mayagüez would have to pay Citibank Colombia along with two scenarios in which Citibank would have to pay Mayagüez. *Id.* ¶ 70. These presentations contained disclaimers to the effect that Citibank Colombia was not serving as Mayagüez's advisor and that Mayagüez must conduct its own independent analysis. *Id.* ¶ 71. While the presentations and communications in 2012 and 2013 were between employees of Citibank Colombia and Mayagüez's Alarcon and Chvatal, the presentations were made by Citibank Colombia employees on behalf of Citibank, N.A. Pl. 56.1 Resp. ¶ 72; DEX 38 at MAYAGUEZ00006681 ("The counterparty is Citibank N.A."); DEX 45 at CITICOLOM00074353; DEX 20 at MAYAGUEZ0004981.

On November 6, 2013, Mayagüez entered into a currency trade with Citibank Colombia (the "First Currency Trade"). Def. 56.1 ¶¶ 66, 88. Leading up to the First Currency Trade, Mayagüez conducted its own analysis of the proposed transaction. *Id.* ¶ 66. The First Currency Trade, which was described as a "Forward with Limited Compensation," provided the following terms: (1) a 2,020 strike price; (2) a USD 2 million notional amount per month; (3) a maximum amount of compensation of COP 900 million; and (4) a tenor (or length of the contract) of 22 months. *Id.* ¶ 90; DEX 50. The First Currency Trade was amended on February 13, 2014,

February 26, 2014, and finally on April 16, 2014, each altering some of its terms. Def. 56.1 ¶¶ 94–96. On July 31, 2014, the First Currency Trade reached the maximum compensation to Mayagüez, and Mayagüez and Citibank Colombia signed an early termination agreement pursuant to which Citibank Colombia compensated Mayagüez. *Id.* ¶ 97.

### 3. July 2014 Presentation and Sensitivity Analysis

On July 10, 2014, David Polania, a Citibank Colombia employee, provided Chvatal and Alarcon with quotes for a new hedging transaction. DEX 81. On the following day, Polania emailed a spreadsheet containing a sensitivity analysis that provided information on the interaction between ethanol pricing in Colombia and the COP/USD exchange rate, or in other words how sensitive ethanol prices are to a fluctuation in the exchange rate (the "Sensitivity Analysis"). DEX 30 at CITICOLOM00009998. At this time, ethanol prices in Colombia were set by the Colombian government based on the highest of three formulas—(1) sugar-based formula; (2) gasoline-based formula; and (3) a fixed minimum decided by the Ministry of Mines and Energy—with a cap on the price such that it could not exceed the price of gasoline in Bogotá for the previous month. Pl. 56.1 ¶¶ 276–77. The Sensitivity Analysis provided by Citibank Colombia applied the sugar-based formula only and did not account for the other two formulas or the price cap. Pl. 56.1 ¶ 279; *see* Pl. Mem. at 24–25; Def. Reply at 5. The Sensitivity Analysis was designed so that the exchange rate could be manipulated while the rest of the variables in the sugar-based formula were held constant. Pl. 56.1 ¶ 281; *see* Pl. Ex. 53, Deposition Transcript of Rene M. Stulz ("Stulz Dep. Tr.") at 183:19–184:4,

7

185:13–18; Def. Reply at 5 n.14.  Citibank Colombia did not explicitly disclose these underlying assumptions (*i.e.,* application of the sugar-based formula and fixed variables) to Mayagüez in its Sensitivity Analysis.  Pl. 56.1 ¶ 282; DEX 30; *see* Def. Opp. at 24–25.  Using the sugar-based formula and holding the other variables constant, the Sensitivity Analysis examined the impact of the COP/USD exchange rate on the price of ethanol and, in turn, the projected exposure of Mayagüez's ethanol revenue to the US dollar.  DEX 30; Ex. 53, Stulz Dep. Tr. at 183:19–184:5; *see* Pl. 56.1 Resp. ¶ 133.  The results of the Sensitivity Analysis reflected a 1:1 correlation between ethanol prices and the exchange rate.  *See* Pl. Mem. at 25; Def. Opp. at 25; Pl. Ex. 53, Stulz Dep. Tr. at 197:10-15; *see also* Pl. Ex. 103 at CITICOLOM00009998.

### 4. Second Currency Trade

After the July 2014 presentation of the Sensitivity Analysis, and following further communications between the parties, Mayagüez and Citibank Colombia entered into a "Collar with Limited Compensation" for the sale of USD on July 31, 2014 (the "Second Currency Trade").  DEX 75; Def. 56.1 ¶ 98.  The Second Currency Trade provided (1) a 2,090 strike price; (2) a notional amount per month of USD 3 million if the strike price was above the spot on the trading date, and USD 6 million if the strike price was below the spot on the trading date; (3) a maximum amount of COP 3 billion that Mayagüez could receive under the contract; and (4) a tenor from September 2014 to July 2017.  Def. 56.1 ¶ 99.  In addition to hedging its sugar revenues, Mayagüez also included its ethanol sales as part of the USD-exposed revenues to be hedged in the Second Currency Trade.  *Id.* ¶ 135.  As a result of USD

appreciation against COP, the USD/COP spot rate rose above the 2,090 strike price by November 2014. *Id.* ¶ 158. Mayagüez and Citibank Colombia then began to discuss a restructuring, and Citibank Colombia thereafter provided quotes for restructuring the Second Currency Trade. *See* DEX 89, 96–99.

The Second Currency Trade was amended on December 18, 2014, and then restructured on December 29, 2014. Def. 56.1 ¶¶ 100–01. At the time of the restructuring, Mayagüez acknowledged in a letter to Citibank Colombia that the mark to market value of the original transaction (*i.e.*, the amount due) was approximately USD 30.1 million. *Id.* ¶ 174, DEX 87. Instead of terminating the transaction and paying the mark to market value, Mayagüez requested to restructure the Second Currency Trade with a strike price that would be lower than the strike price offered on the market. DEX 87. In an internal memorandum in January 2015, Citibank Colombia memorialized the request as follows:

> Mayagüez has requested Citi[bank] to restructure an outstanding FX hedge closed in June 2013 prior to strong devaluation period [that] occurred during the last 4 months. Outstanding hedge to be unwound . . . . Instead of terminating the outstanding hedges and paying the positive mark to market value to [Citibank Colombia], [Mayagüez] is willing to embed the current MTM into the strike price of the resulting transaction receiving a lower strike price than current market levels.

DEX 106 at 0610; Def. 56.1 ¶ 181.

The parties then engaged in discussions about a new currency trade and Mayagüez selected the type of restructuring transaction from the options provided by Citibank Colombia. DEX 107; Def. 56.1 ¶ 184. In anticipation of the new currency trade, Mayagüez and Citibank Colombia entered into an early termination agreement

unwinding the Second Currency Trade on January 13, 2015, pursuant to which

Mayagüez owed Citibank Colombia $34.9 million.  Def. 56.1 ¶¶ 102, 189; DEX 55 &

110.

### 5.  Third Currency Trade

In January 2015, Mayagüez entered into a third transaction with Citibank

(the "Third Currency Trade").  Def. 56.1 ¶ 103, Pl. Ex. 191.  Leading up to the Third

Currency Trade, Mayagüez executed a letter on January 9, 2015, stating the

purpose of the Third Currency Trade—to continue hedging forecasted exposure

generated by Mayagüez's sugar exports production and ethanol sales—and

acknowledging a mark to market value of approximately $32.9 million.  DEX 83;

Def. 56.1 ¶ 186.  Citibank Colombia also provided Mayagüez with a "supplemental

risk disclosure statement" prior to the Third Currency Trade that identified

"significant risks" in foreign currency structured forward contracts transactions,

including that the "[p]otential losses can be very substantial." DEX  108; Def. 56.1 ¶

187.  Upon reviewing its terms, Mayagüez's Board approved the Third Currency

Trade transaction during a meeting on January 22, 2015.  DEX 112 & 113.

After Mayagüez entered into the Third Currency Trade, the COP/USD

exchange rate began to rise, and the parties started to consider potential scenarios

to restructure or amend the Third Currency Trade.  *See* Def. 56.1 ¶¶ 197–98, 200–

01.  After internal discussions at Mayagüez, *id.* ¶ 208, the parties agreed to

restructure the Third Currency Trade on February 24, 2016 and to partially unwind

it on March 9, 2016.  *Id.* ¶¶ 214–15.  However, the parties ultimately failed to reach

an agreement on further amendments to the Third Currency Trade and, on March

10

21, 2016, the parties decided to fully unwind the trade and entered an agreement, pursuant to which Mayagüez paid Citibank $44.1 million on March 23, 2016. *Id.* ¶¶ 108, 216.

### B. Procedural Background

Mayagüez brought this action in New York State court after which Defendants removed the case to the Southern District of New York pursuant to the Edge Act, 12 U.S.C. § 632, on August 29, 2016. Dkt. No. 1. Mayagüez filed its first amended complaint, the operative complaint in this action, on January 13, 2017, alleging eleven causes of action. Dkt. No. 15. Defendants thereafter moved to dismiss all of Mayagüez's causes of action for failure to state a claim. Dkt. No. 22. By Memorandum Opinion and Order dated March 28, 2018, the Court dismissed Mayagüez's eleventh cause of action for unconscionability for failure to state a claim under New York law, but denied Defendants' motion as to the other claims. Dkt. No. 36. The case then proceeded to both fact and expert discovery. At the conclusion of discovery, the parties requested permission to submit cross-motions for summary judgment, and the Court granted that request and set a briefing schedule. Dkt. No. 131.

The parties subsequently briefed the cross-motions and filed their respective submissions. In connection with the submissions, Mayagüez moved to strike Defendants' Rule 56.1 Statement and Defendants moved to strike Mayagüez's

"Reply" to Defendants' 56.1 Counterstatement.[2]  In addition, both parties moved to redact portions of their submissions and file other submissions under seal.[3]

On September 23, 2020, the parties' summary judgment motions and their related motions were referred to me for a report and recommendation.  Dkt. No. 188.  The Court preliminarily granted the parties' request to file redacted and/or sealed materials but retained discretion to reconsider its decision when it filed its report and recommendation.  Dkt. Nos. 190, 191.  The Court held oral argument on March 10, 2021 upon the parties' request.  *See* Dkt. No. 202 ("Tr.").

---

[2] The parties' submissions in connection with Mayaguez's motion to strike are as follows: Plaintiff's Notice of Motion to Strike Defendants' Local Rule 56.1 Statement of Undisputed Facts (Dkt. No. 140); Plaintiff's Memorandum of Law in Support of its Motion to Strike ("Pl. MTS Mem.") (Dkt. No. 141); Defendants' Memorandum of Law in Opposition to Mayaguez's Motion to Strike ("Def. MTS Opp.") (Dkt. No. 143); Declaration of Agnès Dunogué Regarding Exhibit A to Defendants' Memorandum of Law in Opposition to Mayaguez's Motion to Strike ("Dunogué MTS Decl.") (Dkt. No. 145); Plaintiff's Reply to Defendants' Opposition to Mayaguez's Motion to Strike ("Pl. MTS Reply") (Dkt. No. 142).

The parties' submissions in connection with Defendants' letter motion to disregard Mayaguez's Reply 56.1 Statement are as follows: Defendants' Letter Motion to Disregard Mayaguez's Reply 56.1 Statement ("Def. MTS Mem.") (Dkt. No. 192); Mayaguez's Response to Defendants' Letter Motion to Disregard ("Pl. MTS Opp.") (Dkt. No. 194).

[3] Plaintiff's Letter Motion to Seal (Dkt. No. 151); Defendants' Notice of Motion to File Under Seal and/or Redact Certain Materials in Support of Their Motion for Summary Judgment (Dkt. No. 173); Defendants Memorandum of Law in Support of Their Motion to Seal and/or Redact (Dkt. No. 175).

## II.  ANALYSIS

### A.  Motions to Strike

The Court will first address the parties' respective motions to strike before turning to the parties' summary judgment motions.[4]

### 1.  Mayagüez's Motion to Strike

Mayagüez has moved to strike portions of Defendants' Rule 56.1 Statement of Undisputed Facts ("Defendants' Rule 56.1 Statement") on the grounds that it violates the Local Civil Rules and Judge Gardephe's Individual Rules.  *See* Pl. MTS Mem. at 3–10.  Specifically, Mayagüez contends that (1) 120 paragraphs in Defendants' 56.1 Statement contain multiple factual assertions; (2) some paragraphs are not supported by factual citations; and (3) other paragraphs are supported by an affidavit of Andres Villaquiran, Mayagüez's former expert, that is inadmissible.  *Id.*  Defendants counter that they made a "good faith attempt" to summarize the relevant facts in a way that was consistent with the applicable rules and that the 120 paragraphs identified by Mayagüez contain background facts or "reference[] several components of the same overall fact or event." Def. MTS Opp. at 4, 6.  In any event, Defendants argue that there is no basis for striking any part of their 56.1 Statement as the Court may overlook this "sort of 'technical deficiency.'" *Id.* at 7.  As for Mayagüez's claims that their 56.1 Statement lacks factual support, Defendants contend that the appropriate remedy is to disregard the portions of any

---

[4] While the motions to strike are not dispositive and I could therefore make formal rulings as to them, they are inextricably tied to the dispositive motions.  Thus, for ease and consistency of review, all conclusions set forth in this Report will be in the form of recommendations rather than a hybrid of recommendations and rulings.

13

unsupported paragraphs rather than strike them. *Id.* at 8. Finally, Defendants claim that the affidavit at issue is admissible and therefore there is no basis to strike any paragraphs that rely on it. *Id.* at 10–11.

Local Rule 56.1 requires that a motion for summary judgment be supported by "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried" and, for each paragraph, a "citation to evidence which would be admissible." Local Rules of the United States District Courts for the Southern and Eastern District of New York, Rule 56.1(a) & (d) ("Local Civil Rule 56.1"). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Similarly, consistent with Local Rule 56.1, Judge Gardephe's Individual Rules mandate that each numbered paragraph in the Rule 56.1 Statement "must contain only one factual assertion . . . followed by a supporting citation to the record." Judge Gardephe's Individual Rules of Practice, Rule V.A.[5]

---

[5] Notably, both sides utterly failed to comply with the requirement that their Rule 56.1 Statements be "short and concise," as Defendants' 56.1 Statement is 60 pages and contains 241 Statements, while Mayagüez's Statement is 81 pages and contains 491 Statements (and their respective responses run in the hundreds of pages). These submissions did not streamline the consideration of the motions but instead made it infinitely more difficult to adjudicate them. It is frankly hard to understand why counsel thought these voluminous submissions – and the related motion practice – would serve the interests of their respective clients.

"A party seeking to strike a Rule 56.1 statement 'bears a heavy burden, as courts generally disfavor motions to strike.'" *Christians of California, Inc. v. Clive Christian New York, LLP*, No. 13-CV-275 (KBF), 2014 WL 3407108, at *2 (S.D.N.Y. July 7, 2014) (citing *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, No. 05-776 (DRH), 2007 WL 2728898, at *1 (E.D.N.Y. Sept. 2007)). Accordingly, "courts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and [instead] simply disregard any improper assertions." *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 (KAM), 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012) *adopted by* 2013 WL 1334271 (Mar. 28, 2013). Ultimately, the Court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz*, 258 F.3d at 73.

Relief in the form of striking non-compliant paragraphs is inappropriate here. It is certainly true that many paragraphs in Defendants' 56.1 Statement contain more than one fact in violation of both the Local Civil Rules and Judge Gardephe's Individual Rules. Defendants point out that some of these non-compliant paragraphs contain multiple facts that set forth the background of Mayagüez's business or a "streamlined" summary of the terms of certain agreements. Def. MTS Opp. at 5; *see, e.g.,* Def. 56.1 at ¶ 9 (summarizing background information on Citigroup); *id.* at ¶¶ 16–17 (providing excerpt of certain provisions in 2009 agreement). While not necessarily in compliance with the applicable rules, these paragraphs appear to be within their spirit and should not be struck simply because they have included more than one fact. The same cannot be said about the other

15

non-compliant paragraphs that contain multiple factual statements with a mix of both disputed and undisputed facts. *See, e.g.,* Def. 56.1 ¶ 46 (proffering that Mayagüez sold ethanol domestically and that ethanol revenues were exposed to COP/USD exchange rate risks because the price of ethanol includes COP/USD exchange rate as a variable). These paragraphs clearly violate both the Local and Individual Rules. Mayagüez nonetheless responded to each fact within these paragraphs, delineating between the facts it contests and those that it does not. In light of Mayagüez's clear and comprehensive responses, I recommend that the Court exercise its broad discretion to overlook the violations at issue here.

Mayagüez also argues that the Court should strike certain paragraphs in Defendants' 56.1 Statement that are not supported by factual citations or that cite to inadmissible evidence. It is well-established that, under Rule 56.1(d) of the Local Rules, "[e]ach statement . . . must be followed by citation to evidence which would be admissible." Rather than expend judicial resources addressing each of the paragraphs that Mayagüez identifies in its motion to determine whether it should be stricken, I recommend that those paragraphs lacking factual support or citing to inadmissible evidence simply be ignored. *See Emanuel v. Griffin*, No. 13-CV-1806 (JMF), 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015) ("[I]n deciding Defendants' motions for summary judgment, the Court will ignore all portions of Plaintiffs' Rule 56.1 Statement that contain 'improper legal argument and unsupported assertions.'") (citation omitted); *Sauerhaft v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, No. 05-CV-9087 (PGG), 2009 WL 1576467, at *8 (S.D.N.Y.

16

June 2, 2009) ("A court may decline to conduct a line-by-line analysis and instead simply disregard the allegations that are not properly supported.").

However, I will address the discrete issue concerning the admissibility of the Villaquiran affidavit. As to this issue, Mayagüez contends that Villaquiran's affidavit is inadmissible because it was not disclosed during discovery. Pl. MTS Mem. at 9. This argument is unpersuasive. As they point out in their response, Defendants identified Villaquiran as a source of relevant information during discovery and specifically informed Mayagüez that it may contact him, and in response Mayagüez had no objections. Def. MTS Opp. at 11; Dunogué MTS Decl., Ex. A (Dkt. No. 145-1) at 5. Mayagüez, therefore, was aware that Defendants might rely on Villaquiran during discovery and, in light of this context, the fact that Defendants submitted his affidavit in support of their summary judgment motion does not justify that it be struck. *See, e.g., Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 318 (S.D.N.Y. 2020) (disregarding plaintiff's objection to affidavit not produced in discovery where defendants identified affiant "as a witness at several points during discovery, and [plaintiff] chose not to depose her"); *Blake v. City of New York*, No. 05-CV-6652 (BSJ), 2007 WL 1975570, at *5 (S.D.N.Y. July 6, 2007) (denying motion to strike affidavit where moving party was on notice during discovery that affiant could be potential witness). Mayagüez does not address Defendants' argument in its reply papers. Rather, it emphasizes that the contents of Villaquiran's affidavit are inadmissible on evidentiary grounds. As stated above, I recommend that piecemeal rulings not be made as to the admissibility of

17

Defendants' submissions, but instead they be carefully reviewed and disregarded if any material, including Villaquiran's affidavit, is found to be inadmissible. *See, e.g.*, *Flaherty v. Filardi*, No. 03-CV-2167 (LTS) (HBP), 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("This Court will disregard those portions of Plaintiff's submission which are inappropriate, but will not expend limited judicial resources scrutinizing each line, especially in light of the fact that the Court concludes that the admissibility of Plaintiff's Affirmation does not affect the resolution of her motion for partial summary judgment[.]"); *DeSimone v. JP Morgan/Chase Bank*, No. 02-CV-7039 (RPP), 2004 WL 2978011, at *3 (S.D.N.Y. Dec. 22, 2004) ("In this opinion, any inappropriate portions of the Plaintiff's submissions have been disregarded, and this Court's analysis relies upon admissible evidence.").

For all these reasons, Mayagüez's motion to strike should be denied.

### 2. Defendants' Letter Motion to Disregard Mayagüez's Reply Rule 56.1 Statement

Following Defendants' submission of their Counterstatement to Mayagüez's 56.1 Statement, Mayagüez filed what amounts to a Reply Rule 56.1 statement that provides responses to Defendants' counterstatement. Defendants seek to strike this submission on the grounds that Mayagüez's Reply Rule 56.1 statement is not permitted under Local Rule 56.1. In response, Mayagüez contends that there are no rules prohibiting a reply and, in fact, courts routinely consider such replies.

While Local Rule 56.1 does not expressly prohibit a reply in further support of a Rule 56.1 statement, it does not permit such a submission either. *Capital Records, LLC v. Vimeo, LLC*, No. 09-CV-10101 (RA), 2018 WL 4659475, at *1

18

(S.D.N.Y. Sept. 10, 2018) ("Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts.").  Courts in this district have described a Reply Rule 56.1 statement as "a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules." *G.S. v. Pleasantville Union Free Sch. Dist.*, No. 19-CV-6508 (CS), 2020 WL 4586895, at *1 (S.D.N.Y. Aug. 10, 2020) (citation and quotations omitted).  Here, Mayagüez not only had a chance to file its own Rule 56.1 statement but also had an opportunity to respond to Defendants' 56.1 Statement—a reply thus gives Mayagüez a third shot at commenting on the facts in this case.[6]  Under these circumstances, Mayagüez's reply is unnecessary as this "Court is capable of determining whether [Defendants] improperly disputed a fact without needing [Mayagüez] to file a procedurally improper document explaining as much." *Id.*  To allow Mayagüez's Reply Rule 56.1 statement and permit Defendants to submit a sur-reply (as they have requested) would only serve to undermine Rule 56.1, which is meant "to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Thompson v. Spota*, No. CV-14-2473 (JMA) (AKT), 2018 WL 6163301, at *16 (E.D.N.Y. Aug. 23, 2018) (citations and quotations omitted), *adopted by* 2018 WL 4771901 (Sept. 30, 2018).

---

[6] In fact, a reply would amount to a fourth chance for Mayaguez to establish the relevant facts as Mayaguez included a Statement of Additional Material Facts in its Counterstatement to Defendants' Rule 56.1 Statement. *See* Pl. 56.1 Resp. at ¶¶ 243–61.

19

Accordingly, I recommend that Defendants' motion to have the Court disregard Mayagüez's Reply Rule 56.1 statement be granted.

### B.  Cross-Motions for Summary Judgment

#### 1.  Applicable Legal Standards

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Bolling v. City of New York*, No. 18-CV-5406 (PGG) (RWL), 2021 WL 961758, at *4 (S.D.N.Y. Mar. 15, 2021) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).  "A moving party can demonstrate the absence of a genuine issue of material fact 'in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'"  *Id.* at *5 (quoting *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017)).

"When considering a motion for summary judgment, the court is not to weigh the evidence but is instead 'required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'"  *Konteye v. New York City Dep't of Educ.*, No. 17-CV-2876 (GBD) (RWL), 2019 WL 3229068, at *2 (S.D.N.Y. July 18, 2019) (citing *Phillips v. DeAngelis*, 331 F. App'x 894–95 (2d Cir. 2009)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13-CV-793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir.2011)).

"[I]n opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise." *Guerra v. Trece Corp.*, No. 18-CV-625 (ER), 2020 WL 7028955, at *2 (S.D.N.Y. Nov. 30, 2020) (citing *Goenaga v. March of Dimes Birth Defects Found*, 51 F.3d 14, 18 (2d Cir. 1995)). Rather, "[t]o defeat a motion for summary judgment, the nonmoving party must provide hard evidence, from which a reasonable inference in [its] favor may be drawn." *Konteye*, 2019 WL 3229068, at *2 (internal quotations and citations omitted); *see Cuffee v. City of New York*, No. 15-CV-8916 (PGG) (DF), 2018 WL 1136923, at *4 (S.D.N.Y. Mar. 1, 2018) (plaintiff "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . [He] must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor.") (citations omitted).

## 2.  Choice of Law

Mayagüez contends in its moving papers that Colombian law applies and moves for summary judgment only on its Colombian claims.  Pl. Mem. at 12–16. Defendants, on the other hand, reserve their right to contest the applicable substantive law but assume for purposes of the cross-motions for summary

judgment that either Colombian or New York law governs.  Def. Mem. at 12.[7]

Given that Defendants have consented to the application of either law for purposes

of summary judgment, resolution of the choice of law issue is not necessary at this

stage.  Whether Defendants have waived their right to argue that Colombian law

does not apply is a question to be addressed in advance of trial if this Report and

Recommendation is adopted.[8]

### 3.  Legal Standard for Claims Brought Under the Colombian Commercial Code

With respect to Mayagüez's Colombian law claims, the parties disagree on

the legal standards that apply.  As a result, the Court will first determine the

appropriate standards to apply under Colombian law before addressing the merits

of the parties' cross-motions.  "In determining foreign law, the court may consider

any relevant material or source, including testimony, whether or not submitted by a

party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.

Courts enjoy broad discretion in deciding issues of foreign law.  *Abdelhamid v.

Altria Grp., Inc.*, 515 F. Supp. 2d 384, 395 (S.D.N.Y. 2007) ("Because of th[e]

latitude [provided by Rule 44.1], a court may reject even uncontradicted expert

testimony and reach its own decisions on the basis of [an] independent examination

of foreign legal authorities.") (citation omitted).

---

[7] At oral argument, Defendants explicitly stated that for purposes of summary judgment, they were amenable to the application of Colombian law.  Tr. at 37.

[8] At oral argument, Mayaguez sought summary judgment on the issue of whether Colombian law applies.  Tr. at 48.  However, this is essentially a legal question and because it is not disputed for purposes of the cross-motions, the Court need not resolve it at this juncture of the proceedings.

Mayagüez alleges that Defendants violated both Article 2341 and Article 863 of the Colombian Commercial Code.  Am. Compl. ¶¶ 151–62, 192–203, 237–47. Article 2341 provides that "whoever commits a crime or negligent act that has caused damage to another, is obligated to repair it."  Ex. 179, Ex. B ¶ 28; *see* Ex. 177 ¶ 20 n.6.  To establish liability under Article 2341, a plaintiff must prove: (1) defendants engaged in conduct with intent or *culpa* (fault or negligence); (2) plaintiff suffered harm or damages; and (3) a causal nexus between the conduct and the damage.  Ex. 177 ¶ 38; Pl. Mem. at 16–17; Def. Mem. at 13.  Article 863 sets forth liability in the context of pre-contractual dealings.  Ex. 177 ¶¶ 36, 64; *see* Def. Mem. at 13–14.  To establish liability under Article 863, a plaintiff must prove that (1) defendants did not act in good faith without *culpa* (fault or negligence), and (2) plaintiff was damaged by defendants' conduct.  Ex. 177 ¶¶ 64–66; Pl. Mem. at 18; Def. Mem. at 13–14.

Under Colombian law, good faith requires acting with honesty; acting with the caution, diligence, and care of a good and careful businessperson; and providing complete and accurate information regarding the prospective contract.  Ex. 179, Ex. B ¶ 41.  The duty to act with good faith also requires not acting with guile, malice, concealment, deception, and/or lack of care.  *Id.*; Ex. 177 ¶ 66.  Colombian jurisprudence also provides certain "secondary duties" that should be considered in assessing good faith under Article 863.  *See* Pl. Mem. at 18–20; Ex. 179, Ex. B ¶ 72; Def. Opp. at 10–11.  While the parties identify many secondary duties, the parties

23

agree that the duty of information is particularly relevant to this case.[9]  *See* Pl.

Mem. at 19; Def. Opp. at 10.  The duty of information is an obligation to provide the

other party with accurate, complete, and relevant information regarding a

prospective contract, and particularly in circumstances in which there is

information asymmetry or one party has special knowledge.  Pl. Mem. at 19; Ex.

179, Ex. B ¶¶ 74, 79–81; Dunogué Decl., Ex. 8, Deposition Transcript of Diego

Muñoz ("Muñoz Dep. Tr.") at 79:19–22 ("[T]he duty of information is limited to

informing about what is relevant and sufficient so as that a judicious and informed

decision can be made.").  As Defendants point out, the duty of information also

includes the duty of each party to self-inform.  Ex. 177 ¶¶ 78–79; Dunogué Decl.,

Ex. 8, Muñoz Dep. Tr. at 89:12–90:4; *see* Def. Opp. at 10.

### a.  Culpa

The element of *culpa* is satisfied where a party engages in conduct "with a

lack of diligence, a lack of care, lack of prudence, and improvidence," and should be

assessed in light of all acts and circumstances.  Dunogué Decl., Ex. 8, Muñoz Dep.

Tr. at 52:7–53:5.  With respect to the level of negligence needed to establish *culpa*

under Article 2341 and Article 863, the parties disagree.  Mayagüez argues that

there are three separate categories of negligence—gross negligence, ordinary

negligence, and slight negligence—any one of which, if proven, would satisfy its

burden of proof as to *culpa*.  Pl. Mem. at 17.  Defendants, on the other hand,

---

[9]  Mayagüez  also identifies the duty of fidelity, duty for professionals to protect the
interests of the client, duty of advice, duty of vigilance, and duty to respect
legitimate trust.  Pl. Mem. at 19–20; Ex. 179, Ex. B ¶¶ 88, 95–98.

contend that those categories pertain to claims for *contractual* liability only and, where *extracontractual* liability is alleged, as here, "slight negligence" is not sufficient to establish *culpa*.  Def. Mem. at 14; Def. Opp. at 11.  As explained below, "slight negligence" is not sufficient to establish *culpa*.

In support of its position, Mayagüez cites to the report prepared by its expert, Dr. Diego Munoz, in which he describes the three categories of negligence.  Pl. Mem. at 17 (citing Ex. 179 ¶ 21).  However, that section of the report discusses the categories of negligence in the context of contractual liability.  Ex. 179 at II.A, ¶ 22.  Indeed, Dr. Munoz later opines, under the "Extracontractual Liability" section, that "[i]n contrast to contractual liability, in extracontractual liability, negligence (*culpa*) is not divided into different categories."  *Id.* ¶ 29; *see also* Natalia M. Bartels & M. Stuart Madden, *A Comparative Analysis of United States and Colombian Tort Law: Duty, Breach, and Damages*, 13 Pace Int'l L. Rev. 59, 77 (2001) ("In contractual liability there are different levels of breach. There is only one level for breach [in] non-contractual liability.").

While it is true, as Mayagüez points out, that Dr. Munoz also opines that "the party that caused harm to another person will be liable regardless of the degree of negligence" and that a "party can be liable even for the slightest breach of the duty of care or diligence," Ex. 179 ¶ 29, he fails to cite any legal support for these opinions.  For this reason alone, Mayagüez has failed to establish that a slight negligence standard applies to the circumstances here.  *See, e.g., NML Cap., Ltd. v. Republic of Argentina*, No. 03-CV-8845 (TPG), 2013 WL 491522, at *3 (S.D.N.Y.

25

Feb. 8, 2013) (rejecting "expert's unsupported sworn opinion that a foreign country's law prohibits discovery"). Moreover, Dr. Munoz's analysis on this point is somewhat ambiguous. The fact that Defendants could be liable for the slightest *breach* does not necessarily support a standard of "slight negligence" as there is nothing to suggest that "slight breach" equates to "slight negligence." It is equally possible that Defendants could also "slightly" breach their duty under an ordinary negligence regime. At bottom, if slight negligence applied to the claims here, the Court would expect Dr. Munoz to explicitly state as much in his expert report and cite to legal authority for this point. Given his failure to do so, Mayagüez has not demonstrated that a "slight negligence" regime is appropriate here and, therefore, the Court rejects its applicability to this case. *See id.* at *3 (rejecting a party's interpretation of foreign law because, *inter alia*, the language found in applicable statute does not support interpretation); *see also Curtis v. Beatrice Foods Co.*, 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980) ("[F]ederal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities"), *aff'd*, 633 F.2d 203 (2d Cir. 1980).[10]

---

[10] The Court has also considered Mayaguez's argument that Defendants' expert, Dr. Francisco Javier Tamayo Jaramillo, acknowledged that "slight negligence" applies by testifying that *culpa* includes "negligence, which is equivalent to being uncareful" (Tamayo Ex. 178 at 79:8–10). This argument is meritless. Nothing in this testimony suggests that he acknowledged the application of "slight negligence" and, in fact, his testimony appears to be consistent with Mayaguez's definition of ordinary negligence. *See* Ex. 179, Ex. B ¶ 21 n.6 (defining "ordinary negligence" as "lack of diligence and care that persons normally exercise in their own affairs").

Defendants separately argue that *culpa* is only established "when the facts show violations of law or clear departures from basic standards of care and diligence."  Def. Reply at 7; *see* Def. Mem. at 14.[11]  Defendants' legal authority in support of this proposition is unavailing.  *See* Def. Reply at 7, n.24.  While liability in the cases cited by Defendants was established based on violations of law, departures from internal regulations, and failure to follow court instructions (*see id.*) (citing Dunogué Decl. Exs. 2, 13, 14), nothing in those cases suggests that this degree of misconduct is *required* to prove *culpa*.  Rather, these cases are consistent with the testimony of Defendants' expert, Dr. Tamayo, who described multiple forms of *culpa*, including the definition proffered by Mayagüez—"culpa for negligence, which is equivalent to being uncareful"—and the definition proffered by Defendants—"culpa for violation of regulations."  Ex. 178 at 79:08–16.  Accordingly, under Colombian law, Mayagüez does not need to prove that Defendants violated regulations or clearly departed from basic standards of care or diligence in order to establish *culpa* when proof of being uncareful is sufficient.

        b.  <u>Heightened Standard and Presumption of Negligence</u>

Mayagüez claims that Defendants face a "heightened standard" for their conduct under Colombian law, including a "higher level of diligence and professionalism," because financial entities "are considered 'repositories of public

---

[11] While Mayaguez agrees that such conduct would satisfy *culpa*, it claims that a violation of law or clear departure from basic standards is not necessary and, instead, *culpa* can be satisfied when a party is uncareful, imprudent, or acts without the necessary knowledge.  Pl. Opp. at 7.

trust' such that they must perform their activities with a higher level of 'diligence and professionalism.'"  Pl. Mem. at 20 (citing Ex. 179 ¶ 116).  According to Mayagüez, "Colombian Courts have consistently considered that financial entities have to perform their activities in accordance with a higher level of '*diligence and professionalism*."  Ex. 179 ¶ 116; *see id.* ¶ 117 ("The standard of diligence that is expected from financial entities corresponds to expert businesspersons who profit from such activity").  "[W]hen it comes to judging the fulfillment of [a banking entity's] obligations, it must be done with greater rigor than with respect to other [sic] common or ordinary businessperson, to the extent that the banking entity, as a specialized entrepreneurial organization, must be prepared to anticipate, avoid or control the damage deriving from its activity."  Ex. 179 ¶ 120; *see id.* ¶¶ 116–19.  Given this legal authority, and that Defendants have failed to rebut this case law, *see* Def. Opp. at 11 n.58, their conduct will be assessed in accordance with this more rigorous heightened standard of conduct in light of their status as financial entities.

Mayagüez also contends that "because banking involves a 'risky activity,' there is a 'presumption of negligence against' the banks" and, in this case, the Defendants.  Pl. Mem. at 21 (citing Ex. 179, Ex. B ¶ 122).  Defendants concede that this presumption of negligence against financial institutions exists in certain cases, but not in all cases.  Def. Opp. at 13.  According to Defendants, there is a presumption of negligence in cases involving an "obligation of result," (*i.e.*, where a party has an obligation to obtain a fixed and precise result for the counterparty, but the promised event is not produced) but not in cases, such as this one, involving an

"obligation of means" (*i.e.*, where a party is only required to place in the service of the counterparty the means available to it).  Def. Opp. at 14; Ex. 177 ¶¶ 90, 93. Defendants' argument is persuasive and, in fact, is supported by other legal authority addressing the presumption of negligence under Colombian law.[12]

Notably, Mayagüez does not explain why these distinctions are inapplicable. Instead, it merely repeats that the presumption applies without limitation because "banking involves risks."  Pl. Reply at 4 n.2.  While the case law cited by the parties supports the general proposition that "banking involves risks" (*see* Donogué Decl., Ex. 4 at 5), the Colombian Supreme Court recently addressed the liability regime as it applies to banks, opining that "banking activity cannot be qualified in a totalizing manner as 'dangerous'" and that "it is not appropriate to construct a general theory of financial institutions' liability basing it on their similarities, but losing sight of the fundamental differences that can arise between the many legal relationships that they engage in with their clients and with third parties" (Dkt. No. 205-1 at 68).[13]  Consistent with Defendants' position that the presumption of negligence

---

[12] *See, e.g.,* ALBERT H. KRITZER, *Limitation and exoneration of liability clauses in consideration of the degree of diligence assumed by the parties—Preliminary considerations*, 2 INTERNATIONAL CONTRACT MANUAL § 52:9 (December 2020 Update) ("Colombian case law states that in contractual matters, the creditor must prove the lack of diligence that it attributes to the debtor when the breached obligation is of best efforts, that is when the debtor is only oblige to employ its best efforts to obtain a result that in any case is not guaranteed. On the contrary, the negligence of the debtor is presumed when the obligation is to obtain a specific result, in which case it is not enough to employ best efforts or diligence.")

[13] While "dangerous activity" may not equate to "risky activity," as Mayaguez argues (Dkt. No. 206), the Colombian Supreme Court's discussion of this issue

depends on the obligations at issue, the Colombian Supreme Court emphasized that "[e]ach case is governed by very specific rules, therefore it is unproductive to try to build uniform case law guidelines to solve them."  Dkt. No. 205-1 at 68.

Accordingly, a presumption of negligence is applicable only in certain circumstances, such as cases involving a party's obligation to obtain a specific result.  Because this case does not involve obligations to obtain a specific result, a presumption of negligence does not apply.

        c.    <u>Liability Under Articles 2341 and 863 Is Not Precluded By The Parties' Governing Agreements</u>

It is undisputed that there can be extra-contractual liability under Articles 2341 and 863 despite the existence of a contract as long as the alleged misconduct occurred prior to the existence of the contract.  *See* Pl. Mem. at 21–22; Ex. 178 at 76:18–77:16; Pl. Reply 4–5.  To form a contract, Colombian law requires that a contract contain all essential elements.  *See* Ex. 178, Tamayo Dep. Tr. 183:23–186:2; Dunogué Decl., Ex. 8, Muñoz Dep. Tr. at 136:9–16, 137:24–139:22; Pl. Mem. at 23 n.5.

Here, Mayagüez alleges that Defendants engaged in misconduct leading up to the respective Currency Trades in 2014 and 2015.  The parties agree that, although the 2009 ISDA Agreement and the 2011 Colombian ISDA Agreement predated the alleged misconduct, these agreements lacked the essential terms required to form a contract, including duration, price, and quantity.  *See* Pl. Mem. at 22–23; Def. Opp.

---

makes it clear that it is addressing the entire liability regime, which would include "risky activity." (*see* Dkt. No. 205-1 at 68).

at 33; *see also* DEX 15.  They also agree that the subsequent Currency Trades

provided those missing essential terms and, in doing so, established a contract

between the parties.  *See* Pl. Mem. at 22–23; Def. Opp. at 33.  According to

Mayagüez, the contracts existed at the time that the parties executed the Currency

Trades, which provided those missing terms.  Pl. Mem. at 21–22.  Defendants, on

the other hand, latch on to a relation back theory, emphasizing that the 2009 ISDA

Agreement provides that "all 'Transactions are entered into in reliance on the fact

that this Master Agreement and all Confirmations form a single agreement between

the parties" and, therefore, while the execution of the Currency Trades provides the

essential terms, the Currency Trades simply completed the original framework

agreements and, as a result, the date of the original framework agreements is

controlling.  DEX 15 at 8302; Def. Opp. at 33; Def 56.1 ¶¶ 13–14.[14]  Defendants'

argument is unavailing.  As an initial matter, Defendants fail to cite any persuasive

legal authority for their theory that the Currency Trades relate back to the

framework agreement.[15]  Moreover, the language quoted by Defendants if anything

---

[14] The language in the 2011 Colombian ISDA similarly provides that "[t]he
agreement regulating and governing the Transactions shall consist of three parts,"
the "Documents of the Framework Agreements," including the Framework
Agreement and the "Confirmations of the respective Transactions." Def. Opp. at 33
(citing DEX 16 Section 1.1).

[15] Defendants rely on Dr. Tamayo's testimony confirming that "if new transactions
with different quantities and prices and durations are entered into pursuant to
contracts that are entered into pursuant to a framework agreement that states that
the framework or master agreement and all such trade confirmations or contracts
form a single agreement between the parties, . . . a party could bring claims under
Article 863 and 2341 . . . only in connection with conduct that occurred prior to the
entry into the framework agreement." Ex. 178, 201:17–202:7.  However, it is

weighs in favor of Mayagüez's position—that the framework agreement *and* the trade confirmations formed a single contract is consistent with the proposition that it was only when the parties executed the Currency Trades, which provided the essential terms, that a contract existed.  *See* Pl. Mem. at 22–23.

Accordingly, the framework agreements do not provide the necessary terms to constitute a contract.  *See* Ex. 178, Tamayo Dep. Tr. 185:8–13 ("The framework agreement can be more or less open.  And it is the judge who in a given moment will decide one way or another depending on the indetermination of the operations established in the contact.").  It was not until the parties agreed to the essential terms by executing the respective Currency Trades that the relevant contracts existed.  For these reasons, the date on which the Currency Trades, and not the framework agreements, were executed is when the contracts were formed and, therefore, Mayagüez should be able to rely on the alleged misconduct prior to the Currency Trades to establish extra-contractual liability under Articles 2341 and 863.

### d.  Contractual Disclaimers

As part of the acts and circumstances to be considered under Colombian law, Defendants argue that the Court should take into account Mayagüez's express representations or disclaimers in the contracts it executed.  Def. Mem. at 28–29.  First, Defendants argue that Mayagüez contractually accepted the risks of the

---

unclear whether these "different quantities and prices and durations" merely changed an existing framework agreement with all essential terms or not.  Without more context, such testimony is not sufficient to support Defendants' position here.

Currency Trades given the various disclaimers in the relevant contracts.  Def. Mem. at 28; *see, e.g.,* DEX 15 at MAYAGUEZ00008337–338 (provisions in ISDA Agreement that each party accept the risks of the transaction); DEX 87 (Mayagüez representing and warranting that it is not relying on advice of Citibank Colombia); Ex. 191 at 10216, 10222 (Third Currency Trade confirmations with provision that each party is not relying on any communications as investment advice or as a recommendation to enter into the transaction); DEX 83 (Mayagüez letter requesting to enter into the Third Currency Trade and representing it was not relying on the advice of Citibank Colombia).  In support, Defendants cite to their expert report and Article 1604 of the Colombian Civil Code, which they represent sets forth that "liability will be understood in the context of any special law provisions as well as express stipulation by the parties."  Dunogué Decl. Ex. 5 ¶ 82 n. 74 (quotations omitted); Def. Mem. at 28 n.123.  Mayagüez fails to directly dispute this authority. Rather, it cites Tamayo's testimony, in which he confirms that an assumption of risk only applies in the contractual context, (Pl. Opp. at 10 (citing Ex. 178 at 132:5–10)), and otherwise argues that parties cannot contractually limit liability "arising from willful misconduct (*dolo*)[,] gross negligence (*culpa grave*)," or a breach of good faith (Pl. Opp. at 9).  Even accepting its arguments that Colombian law does not permit Defendants to contractually limit or preclude liability, Mayagüez has not provided any authority to suggest that contractual disclaimers and representations should not be part of the liability assessment.  In the absence of such authority to

33

dispute Defendants' position, contractual disclaimers should be considered in the overall calculus in assessing *culpa*.

*          *          *

With the legal standards under Colombian law now established, the Court will turn to the merits of the cross-motions for summary judgment. Defendants have moved for summary judgment on all of Mayagüez's claims (causes of action one through ten). Mayagüez has moved for summary judgment on causes of action one, five, and eight under Colombian law. For the reasons set forth below, I recommend that Defendants' motion be granted in part and denied in part, and that Mayagüez's motion be denied (except as to one agency issue).

## C. Defendants' Motion for Summary Judgment

### 1. Colombian Law Claims

The parties have cross-moved for summary judgment on Mayagüez's first, fifth, and eighth causes of action under Colombian law.[16] For these claims, Mayagüez alleges that Defendants acted willfully or negligently in violation of Article 2341 of the Colombian Commercial Code and acted in bad faith in violation of Article 863 of the Colombian Commercial Code by, *inter alia*, (1) "knowingly falsely represent[ing] to Mayagüez that the Currency Trades were[] tailored for Mayagüez and as such, would satisfy its currency hedging needs[] and [] the best hedging alternative for Mayagüez," Am. Compl. ¶¶ 155, 196, 241; (2) "fraudulently

---

[16] As alternatives to its Colombian claims, Mayaguez pleads fraudulent inducement (second and fourth causes of action), fraudulent concealment (third cause of action), and negligent misrepresentation (sixth and seventh causes of action) under New York law.

conceal[ing] material from Mayagüez that the Currency Trades[] created unlimited exposure for Mayagüez[] and [] generated potentially very significant earnings for Defendants," *id.* ¶¶ 156, 197, 242; and (3) "knowingly fraudulently promising that[] Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade[] and [] if the USD/COP exchange rate exceeded COP 2,600, . . . . Defendants would amend the trade to increase the strike price," *id.* ¶¶ 158, 199, 244.  At their core, Mayagüez's Article 2341 and Article 863 claims rest on the allegations that Defendants engaged in misconduct by making a misleading presentation that caused Mayagüez to "overhedge" its USD revenues and by selling the Currency Trades as "hedges."

### 2. Negligence and Bad Faith Claims Under Article 2431 and Article 863 (Fifth and Eighth Causes of Action)

Viewing the record in the light most favorable to Mayagüez, Defendants fall short of establishing that they were not negligent or that they acted in good faith as a matter of Colombian law.

#### a. Misstatement or Omissions of Terms of Currency Trades

Defendants first argue that Mayagüez's negligence and bad faith claims are meritless because there is no evidence of any misstatement of fact or omission about the terms and risks of the Currency Trades as Mayagüez "received accurate and complete documentation reflecting" the material terms of the trades, Mayagüez confirmed that it understood the terms, and the Currency Trades functioned as

35

Defendants had represented.  Def. Mem. at 18–20.  Specifically, Defendants contend that Citibank Colombia informed Mayagüez that there was a cap on payments made by Mayagüez to Citibank Colombia, but not on payments made by Citibank Colombia to Mayagüez.  *Id.* at 20–21.  Mayagüez does not dispute these assertions (*see* Pl. Opp. at 15) and, indeed, the record supports Defendants' position.  *See, e.g.,* DEX 6, 50, 51, 56, 57, 61, 62, 75; *see also* DEX 45 at CITICOLOM00074343–344 (October 2013 presentation providing Mayagüez with general information on collar and forwards with limited compensation); DEX 38 (August 2012 presentation providing scenarios under collars with limited compensation).  Accordingly, to the extent that Mayagüez's claims are based on allegations that Defendants misstated, omitted, or otherwise acted negligently or in bad faith in providing the terms of the Currency Trades or explaining how the trades would function, those allegations are unsupported.

### b.  Sensitivity Analysis

Next, Defendants argue that they did not act negligently or in bad faith in connection with the Sensitivity Analysis.  As an initial matter, several facts are undisputed or otherwise clearly established based on the evidence in the record concerning the Sensitivity Analysis, including that Citibank Colombia only applied the sugar-based formula and allowed for the COP/USD exchange rate variable to be manipulated while the other variables were held constant, but did not explicitly disclose these assumptions.  *See* Pl. Mem. at 24–25; Def. Reply at 5; *see* Def. Opp. at 24–25; Pl. Ex. 53, Stulz Dep. Tr. at 183:19–184:4, 185:13–18, 197:10-15; *see also* Pl. Ex. 103 at CITICOLOM00009998.  It is also undisputed that the results of the

Sensitivity Analysis showed a 1:1 correlation.  *See* Def. Reply at 5.  Both Citibank

Colombia and Mayagüez were aware of the ethanol pricing formula during the

relevant period, albeit with varying degrees of knowledge.  *See* Ex. 1 (Deposition

Transcript of Mayagüez's 30(b)(6) witness) at 103:18–25, 108:22–109:19; Ex. 92

(Deposition Transcript of Hector Alarcon) at 98:16–99:4 (testifying that he sent

Polania from Citibank Colombia the information related to ethanol pricing and also

a link for more information); Ex. 2 (Deposition Transcript of David Polania) at

21:07–14.

What the parties dispute, however, is whether Citibank Colombia acted

negligently and in bad faith (1) by not explicitly disclosing that it only used a sugar-

based formula in its Sensitivity Analysis and that it held all variables constant

except for the COP/USD rate, and (2) by providing an analysis that showed a 1:1

correlation between the price of ethanol and the exchange rate.[17]

*First,* as Mayagüez points out, Defendants provided the sugar-based formula

under the caption "Estimated Price with Formula," but did not identify the formula

---

[17] Defendants contend that these theories of liability are not alleged in Mayaguez's complaint and, therefore, must be disregarded.  Def. Reply at 4.  However, as Mayaguez points out, its complaint sufficiently states a claim for negligence based, in part, on recommending and selling the Currency Trades and its theory of liability—although not specifically included in the complaint—is based on the same nucleus of operative facts.  Pl. Reply at 8–9; *see Avalon Risk Mgmt. Ins. Agency, L.L.C. v. Taylor,* No. 12-CV-3934 (LGS), 2015 WL 5459684, at *5 (S.D.N.Y. Sept. 16, 2015) (new legal theory is a "mere variation of the previously pleaded claim . . . based on the same nucleus of operative facts" that may be "considered at the summary judgment stage") (cleaned up).  Accordingly, Mayaguez's arguments on this issue should not be disregarded.

provided as the sugar-based formula and not the entire ethanol pricing formula.
DEX 30 at CITICOLOM00009998.  Defendants argue that applying the sugar-based
formula in their Sensitivity Analysis cannot be characterized as negligent because,
in part, there is no evidence to suggest that one of the other formulas in the ethanol
pricing formula or the cap applied during the relevant period.  Def. Reply at 5.
Whichever formula was used to set the price of ethanol during the relevant time
period, however, has little weight as to whether Defendants were negligent prior to
that period in applying only the sugar-based formula in their Sensitivity Analysis
(without disclosing that fact).[18]  Defendants also claim that presenting an analysis
of the sugar-based formula is not necessarily negligent as it is one of the three
possible outcomes.  *Id.* at 5–6.  This argument is more persuasive.  Indeed, if the
purpose of the Sensitivity Analysis was simply to demonstrate the possible exposure
of Mayagüez's ethanol revenues to the USD/COP exchange rate, it did so by
analyzing the sugar-based formula that contained the USD/COP exchange rate as a
variable.  But this argument ignores the fact that Defendants did not disclose that
they were only using the sugar-based formula.

Relatedly, Defendants also contend that Mayagüez was aware of the formula
and, therefore, there was no reason to explain that the price of ethanol was based
on the highest value of the three ethanol pricing formulas. Def. Reply at 4–5.  This

---

[18] This post-hoc rationalization of Defendants' decision to use just the sugar-based
formula is an almost identical strategy that Defendants accuse Mayaguez of
employing with respect to its expert's historical analysis of the price of ethanol. *See*
Def. Reply at 6.

argument misses the point. Mayagüez is not claiming that Defendants needed to describe how the ethanol pricing formula worked generally, but rather that Defendants should have disclosed that only the sugar-based formula was applied in the Sensitivity Analysis.

Significantly, the sugar-based formula itself is provided in the Sensitivity Analysis, and although it is not described as the sugar-based formula, Mayagüez certainly had the ability to identify that the formula used was the sugar-based formula. *See* DEX 30 at 9998. Moreover, the fact that the Sensitivity Analysis only showed one output further suggests that Mayagüez should have been aware that only one formula was being applied; if the Sensitivity Analysis had incorporated the entire ethanol pricing formula (which, as Mayagüez is aware, consists of three separate formulas), it would have presumably produced a total of three separate outputs (one for each formula).

As for the claims that Defendants acted negligently and in bad faith by holding all the variables constant except for the COP/USD exchange rate (without informing Mayagüez it was doing so), this issue also raises questions of fact. Defendants contend that the Sensitivity Analysis, by definition, holds variables constant to show the impact of one variable. Def. Reply at 5 n.14. That this analysis is shown under the title "Sensitivity Analysis to the Exchange Rate," (Ex. 98 at CITIDEFS00007709), certainly suggests that Defendants had manipulated the variables in some way to demonstrate how the exchange rate functions in the broader formula. Given Mayagüez's extensive background in hedging transactions

39

and financial instruments (*see* Pl. 56.1 ¶ 34; Def. 56.1 ¶¶ 34–35), it seems likely that Mayagüez would have known that a Sensitivity Analysis kept certain variables constant to demonstrate the impact of a specific variable.[19]

Nevertheless, as Mayagüez points out, there is evidence to suggest that it did not possess the level of knowledge that Defendants assign to it.  Pl. Opp. at 17 (citing to DEX 4 at 112:9–11 and DEX 3 at 35:25–36:18).  While it may be true that Mayagüez should have understood these assumptions without Citibank Colombia needing to explain them—which seems likely considering Mayagüez's background in these types of trades—there appears to be nothing in the record to establish this fact.  *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Hunter*, No. 07-CV-6682 (BSJ) (FM), 2012 WL 297838, at *2 (S.D.N.Y. Jan. 31, 2012) ("It is generally improper to decide the merits of a case at the summary judgment stage where the inquiry 'involves a dispute concerning state of mind and conflicting interpretations of perceived events.'") (citing *Schmidt v. McKay,* 555 F.2d 30, 37 (2d Cir.1977)).  Moreover, although Defendants generally avoided addressing their own obligations in their papers, they, too, have certain duties under Colombian law, including a duty to act with care and diligence.  Defendants simply have not established, for summary judgment purposes, that they complied with those duties when they failed to disclose the underlying assumptions of their Sensitivity Analysis to Mayagüez.

---

[19] Indeed, because Mayaguez knew that the ethanol pricing formula included many different variables, Mayaguez likely should have been aware that the analysis of one of those variables—the USD/COP exchange rate—had to involve, in part, assumptions as to the other variables.  *See* DEX 3, Iragorri Dep. Tr. at 35:22–36:6.

In sum, the fact that Defendants did not explicitly disclose these underlying assumptions in their Sensitivity Analysis raises issues of fact as to whether they may not have acted with the requisite level of diligence and care required of financial entities, or complied with their duty to provide complete information under Colombian law, as well as whether Mayagüez had the experience and knowledge to understand these assumptions on its own.[20]

*Second*, Mayagüez claims that the Sensitivity Analysis results, which reflected a 1:1 correlation, falsely suggested that Mayagüez's ethanol sales were exposed to exchange rate risk. *See* Pl. Opp. at 18. Defendants counter that it was not a mistake for Mayagüez to consider potential USD exposure of ethanol revenues. Def. Reply at 4. As an initial matter, the ethanol pricing formula includes COP/USD exchange rate as a variable in the sugar-based formula and the gasoline-based formula and, therefore, potentially had an impact on the price of ethanol. DEX 3, Deposition Transcript of Mauricio Iragorri ("Iragorri Dep. Tr.") at 35:22–36:6 (Iragorri testifying that the dollar is a variable in the formula); Ex. 27 ¶

---

[20] To the extent that it knew or should have known about the formula for ethanol prices, Mayaguez argues that this issue goes to damages and not liability but, in any event, there is no evidence to suggest Mayaguez knew how Citibank Colombia was misrepresenting the formula and correlation. Pl. Opp. at 17. Mayaguez argues that the testimony cited by Defendants shows that Mayaguez knew that exchange rate was a factor but not how it worked in the formula. Pl. Opp. at 17. However, under Colombian law, it is appropriate to take into consideration all acts and circumstances, which includes Mayaguez's knowledge about the ethanol revenue exposure and, in turn, whether its knowledge was such that it would have understood the Sensitivity Analysis and its parameters (*e.g.*, use of sugar-based formula and holding variables constant) even though Defendants did not disclose them.

88 (Expert Report of Pietro Veronesi stating that the COP/USD exchange rate appears as one of the inputs in the formula); Ex. 54 ¶ 177.  Accordingly, the parties' dispute is really whether Defendants' conduct in presenting the Sensitivity Analysis was negligent and in bad faith because of the *degree* to which it suggested that the USD/COP rate affected ethanol pricing.

Defendants claim that they did not conclude that a 1:1 correlation existed, but that the Sensitivity Analysis was an example of how the COP/USD rate *could have* impacted ethanol revenues.  Def. Reply at 5–6.  On this point, Mayagüez relies on its expert's historical analysis to demonstrate that the correlation between ethanol prices and the COP/USD rate was negative or, at best, positive but unstable depending on the time frame.  Pl. Opp. at 15; Pl. Mem. at 24–27.  While the historical analysis provides some insight into how the COP/USD rate affected ethanol pricing, the fact is that an *ex ante* analysis establishing an unstable positive correlation—or even a negative correlation—has little bearing on whether Defendants acted negligently or in bad faith at the time it presented its Sensitivity Analysis with a 1:1 correlation.

Mayagüez also argues that Defendants induced it into entering into the Currency Trades as it did not hedge ethanol sales "before Citi presented the idea" and "that Mayagüez did hedge ethanol after Citi's presentation (as Mayagüez would have done only if it then believed there was a 1:1 correlation)."  Pl. Opp. at 17–18.  But, at best, these arguments raise a plethora of fact issues as to whether Defendants' presentation of the Sensitivity Analysis was negligent or in bad faith as

it provided an example of how the exchange rate could interact with the ethanol pricing formula.  Moreover, it is unclear to what extent Mayagüez believed that there was a 1:1 correlation even though the exact formula used to establish ethanol prices and the multiple variables within that formula were not known at the time. As other courts have pointed out, "issues of negligence are generally not susceptible to resolution on summary judgment as unresolved issues of fact are often present." *James v. United States*, No. 99-CV-4238 (KTD), 2004 WL 829011, at *1 (S.D.N.Y. Apr. 16, 2004).

Viewing the record in the light most favorable to Mayagüez, there are factual issues that preclude summary judgment as to the negligence and bad faith claims.

### c.   Selling Currency Trades as "Hedges"

Defendants also argue that representing the Currency Trades as "hedges" was not negligent or a violation of their duty of good faith.  According to Mayagüez, Defendants sold the "Currency Trades as hedges when they did the opposite of what a hedge is supposed to do—they dramatically increased, rather than decreased, the risk to Mayagüez."  Pl. Opp. at 19.  Mayagüez argues that the Currency Trades were structured such that it would have incurred substantial losses if "the exchange rate moves either up or down outside a very narrow range" (*id.*) and, according to its expert, the Currency Trades were not "hedges" because a hedge "eliminates (to a large extent) the firm's exposure to foreign exchange risk," which was not the case with the Currency Trades (Pl. Mem. at 28; Ex. 27 ¶ 33).  Defendants do not directly address these issues, but instead argue that the fact that the Currency Hedges did not cover *all* of Mayagüez's exchange risk was fully disclosed to and understood by

43

Mayagüez and, therefore, cannot be a basis to deny their summary judgment motion.  Def. Reply at 4; *id.* at 4 n.9 (citing Veronesi testimony that the reason he opined that the Currency Trades were not hedges was because they capped the "maximum amount of payoff to Mayagüez" (Ex. 182 at 89:23–90:11)).

It does not appear that Mayagüez goes so far as to argue that a hedging transaction must cover *all* exposure.  *See* Pl. Mem. at 28 ("a hedge 'eliminate[s] (to [a] large extent) the firm's exposure to foreign exchange risk.'" (citing Ex. 27 ¶ 33)).  To the extent Mayagüez does argue that Defendants misrepresented the Currency Trades as hedges because they did not cover all of Mayagüez's exchange rate exposure or had a cap on compensation, such a claim is without merit.  The record establishes that Mayagüez understood that the Currency Trades did not cover all of its exposure and had a compensation cap, particularly given its experience with the maximum compensation cap in the First Currency Trade.  *See* Def. 56.1 ¶¶ 90, 97, 127, 128, 168.

With respect to Mayagüez's other arguments about how the Currency Trades increased risks and that Citibank Colombia sold the Currency Trades knowing that they did not serve Mayagüez's needs as a "Hedger" (*see* Pl. Opp. at 19; Pl. Mem. at 30), Defendants appear simply to rest on the fact that they fully disclosed the terms of the Currency Trades to Mayagüez.  Def. Mem. at 20–22.  There is some merit to this position.  Mayagüez reviewed and considered many potential scenarios prior to entering into the Currency Trade and rejected multiple trade proposals that appear to be more consistent with a hedging strategy.  Indeed, Mayagüez was concerned

44

with the strike price and, in order to get a more favorable strike price, it seemed willing to agree to terms that are contrary to Mayagüez's purported desire to hedge its foreign currency exposure.  DEX 30, Iragorri Dep. Tr. at 97:15–16 (Iragorri testifying that "[w]hat was important for me at the moment was the strike"); DEX 85 at 3549 (July 24, 2014 email in which Mayagüez declines scenarios with strike price of $1,973 and $1,983, respectively, with multiplier of $3 million for each party); DEX 86 at 7861 (July 31, 2014 email in which Mayagüez confirms trade with strike price of $2,090 and a multiplier of $3 million for payments that Citibank Colombia made to Mayagüez and a multiplier of $6 million for payments that Mayagüez made to Citibank Colombia); DEX 84 (Polania internal email stating that "[w]e made the proposal to decrease the % of leverage, which gave them a strike price of 2050 they don't like that level.").  To find Defendants liable for selling Currency Trades that are not hedges, as Mayagüez contends, but then turn a blind eye to the information Mayagüez had in its possession and Mayagüez's decision to focus on the strike price of the trades would be contrary to Colombian law requiring the Court to assess *culpa* in light of all acts and circumstances.

While the record comes close to establishing that Defendants were not negligent and did not act in bad faith in selling Currency Trades as "hedges" given the context, there are factual issues that cannot be resolved at this juncture, including, as Mayagüez argues (*see* Pl. Mem. at 29), whether it was negligent or bad faith to sell Currency Trades that functioned as hedges only if the exchange rate moved within a narrow range and to what extent Mayagüez's affirmative decision to

focus on the strike price to the detriment of other terms should weigh in assessing *culpa*.

### d.  Legitimate Ignorance

Under Colombian law, plaintiffs cannot establish liability under Articles 2341 or 863 unless their "ignorance [is] legitimate so that they cannot ignore information that they should know or would have known if they had behaved diligently." Dunogué Decl., Ex. 8 at 93:16–18.  Defendants argue that Mayagüez was not "legitimately ignorant" of the risks of the Currency Trades and, accordingly, summary judgment as to the Colombian law claims should be granted in their favor. Def. Mem. at 22–23.

### i.   Representations and Disclaimers

Defendants cite to representations and disclaimers in the relevant agreements, in which Mayagüez represented that it independently evaluated the Currency Trades, did not rely on Defendants' communications, did not rely on the advice of Citibank Colombia, assumed risks of the transaction, and acknowledged that Citibank Colombia was not acting as an advisor to Mayagüez.  *Id.*; DEX 15 at MAYAGUEZ00008337–338 (2009 ISDA Agreement providing, *inter alia*, that "[e]ach party . . . is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction."); *id.* ("The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction"); Def. Mem. at 4

(Colombian ISDA stating, *inter alia*, that Mayagüez "knows and understands the . . . risks inherent to the Transaction" (citing DEX 16)); DEX 72 (February 2014 letter from Mayagüez representing "it is not relying on the advice of Citi for . . . investment matters . . . [and] acknowledges that it will determine, without reliance upon Citi, the economic risks and merits . . .and it will be capable of assuming such risk."); DEX 59 (December 2014 letter from Mayagüez representing same); DEX 83 (January 2015 letter from Mayagüez representing same).

Mayagüez disputes the reach of the contractual disclaimers under Colombian law, contending that the disclaimers at issue here are "boilerplate" statements that are not specific enough to protect Defendants from any misrepresentations. Pl. Opp. at 11–12. On this point, Defendants contend that the representations were not "boilerplate" statements but "pertain precisely to the allegations at issue" since Mayagüez represented it would not rely on recommendation and advice but claims that Defendants improperly recommended the Currency Trades as a product that would suit Mayagüez's hedging needs. Def. Reply at 10 (citing Pl. Opp. at 3, 19). These representations must be afforded some weight, particularly considering Mayagüez's claims that it relied on Defendants' recommendations of the Currency Trades. *See* Pl. Opp. at 3, 19. For purposes of Defendants' summary judgment motion, however, these disclaimers present further factual questions that should be resolved by the trier of fact, including to what extent these representations undermine Mayagüez's reliance on Defendants' alleged misconduct in light of the other circumstances surrounding these Currency Trades.

ii.   <u>Mayagüez's Experience and Duty of Self-Information</u>

Defendants also argue that Mayagüez has not established reliance because it had all of the underlying information about the Currency Trades but failed to self-inform; it cannot now claim it did not understand the risks of the trades, including that there was a compensation cap, a larger notional amount based on ethanol revenues, and no limit on the amount it may have to pay to Citibank Colombia. Def. Reply at 11.

As discussed above, Defendants have persuasively argued that Mayagüez had knowledge of currency forwards given its prior experience, and that Mayagüez understood how payments to Citibank Colombia would work under the Currency Trades.  *See* Def. Mem. 23–24; Def. Reply at 11.  Indeed, the evidence establishes that Mayagüez had entered into numerous plain vanilla and non-plain vanilla trades with a variety of financial institutions, including a 2008 transaction with Citibank Colombia, which contained some of the same features as the Currency Trades.  Def. 56.1 ¶¶ 36–38, 40–42; DEX 25 (2008 Citibank Trade Confirmation); *see* Def. Mem. at 24.

Mayagüez counterss that Citibank Colombia failed to provide information about "any exchange-rate scenarios for the July 2014 and January 2015 Currency Trades, the potential for substantial losses to Mayagüez, and the unlimited risk to Mayagüez."  Pl. Opp. at 22.  However, these examples of additional information do not establish that Mayagüez was legitimately ignorant given its extensive experience.  *See* Dunogué Decl. Ex 8, Munoz Dep. Tr. at 85:8–22 (the impossibility

48

for a party to self-inform depends on the capacity that that person may have to self-inform, including personal skills, level of experience, professional background); Ex. 177 ¶ 83 ("[I]n assessing the claim by a plaintiff that it was deceived by its counterparty, a relevant issue under Colombian law is whether the plaintiff is familiar with or was capable of being familiar with the transaction and accepted to assume the risks of the contract offered to it."). Moreover, it appears that Mayagüez did not even attempt to analyze the trades, but simply agreed to the terms without its own due diligence. *See, e.g.,* DEX 4, Mayagüez 30(b)(6) Dep. Tr. at 82:13–16 ("We were simply looking at the strikes we had agreed upon, but the rest of the document [formalizing the proposed transaction], we didn't understand it. We didn't analyze it.").

While the evidence suggests that Mayagüez had enough information about the terms and conditions of the Currency Trades and did not self-inform, issues of fact exist that nonetheless prevent the grant of summary judgment to Defendants. Under Colombian law, Mayagüez's failure to self-inform must be the exclusive cause of the damage in order for there to be no liability. *See* Ex. 177 ¶ 55; *see also* Dunogué Decl. Ex. 8 ¶ 56 (no liability where plaintiff had full knowledge of the risks at stake and accepted financial product proposed by bank "because the presence of misstatements could be perfectly neutralized by the client given its knowledge of the product's risks . . . [plaintiff] could [not] be deceived[] because there was a balance of knowledge between it and the defendant."); *id.* ¶ 83, n.75 ("[C]ase law and leading scholars hold that the professional fulfills its duties of information and

49

advice when the client has the relevant information, opinions, and evaluations, whether because the professional itself has provided them to the client, or because the client has them at its disposal through other means, such as its own professional development or experience." (citing Suescún Melo, Jorge. *Private Law, Studies on Contemporary Civil and Commercial Law*. Vol. I. Bogotá. Ed. Legis. (2005) at 467)).

Because Mayagüez possessed information about the terms of the trades and had experience with other financial transactions over the years, there remain issues of fact as to whether Mayagüez had the requisite knowledge about the risks involved with hedging its ethanol revenues given the undisclosed assumptions in the Sensitivity Analysis. *See* Pl. Opp. at 24 ("[F]inancial entities must provide information that 'is complete and not partial, so that the receiver of the information may have an integral and detailed picture of the position it is in," and that "is fully comprehensible." (citing Ex. 179, Ex. B ¶ 152)). Viewing the ambiguities in Mayagüez's favor, the Court cannot conclude, as a matter of law, that Mayagüez's failure to self-inform was the exclusive cause of its alleged damages.

### e. Causation and Damages

Defendants separately argue that they did not cause Mayagüez's losses and, therefore, Mayagüez's claims fail under both Colombian and New York law. According to Defendants, Mayagüez had to make significant payments under the Second and Third Currency Trades because of the unprecedented appreciation of the US dollar, and not because of alleged misconduct by Defendants before the respective currency trades. Def. Mem. at 32–34. Defendants argue that, without

this market event, Mayagüez may not have incurred losses and, indeed, may have
"*received* greater payments under the Currency Trade due to the higher notional
amount."  Def. Reply at 15.  While there is contemporaneous evidence and witness
testimony that Mayagüez understood that the loss was due to the USD devaluation
in the market, *see* DEX 130, Deposition Transcript of Julian Vincente Holguin
("Holguin Dep. Tr.") at 104:5–104:13 (testifying that the Mayagüez board explained
that "there was an unexpected devaluation which created the effect of the loss");
DEX 4, Mayagüez 30(b)(6) Dep. Tr. at 148:11–14 (testifying that "negative mark-to-
market of 32.9 million" was caused by devaluation of Colombian peso), that
evidence alone is not sufficient to establish that Defendants did not cause the
losses.

Significantly, Defendants fail to address Mayagüez's argument that, but for
Defendants' alleged negligent and bad faith conduct, Mayagüez would have never
entered into the Currency Trades in the first place and, therefore, would not have
incurred any losses.  Pl. Opp. at 25–26.  There is no clear evidence in the record to
establish whether Mayagüez would have entered into the Currency Trades absent
the alleged misconduct.  It may very well be the case that Mayagüez would have
chosen not to enter any hedging trades if it had known the information it claims
Defendants withheld or misrepresented.  *See, e.g.*, DEX 3, Iragorri Dep. Tr. at
138:13–15 ("[i]f [Citi] had shown [Mayagüez] the nature of [the Currency Trade],
[Mayagüez] would have never entered into this product").  If so, then there may
have been multiple contributing causes to its losses.  It could equally be the case

that Mayagüez would have entered into the trades regardless of Defendants' alleged misconduct as the record suggests Mayagüez was concerned with the strike price to the detriment of other terms (*e.g.*, a less favorable multiple).  Either way, the issue of causation cannot be resolved at the summary judgment stage.

### 3. Willful Misconduct Under Article 2341 (First Cause of Action)

With respect to Mayagüez's first cause of action under Article 2341, I recommend that summary judgment be granted in Defendants' favor.  Unlike the negligence causes of action, Mayagüez claims that Defendants knowingly (1) provided false or misleading representations to Mayagüez that the Currency Trades were tailored for Mayagüez and were the best hedging alternative for Mayagüez, Am. Compl. ¶¶ 153, 155; (2) concealed material information that the Currency Trades created unlimited exposure for Mayagüez and generated potentially very significant earnings for Defendants, *id.* ¶ 155; and (3) made false promises to Mayagüez that it could amend the January 2015 currency trade, *id.* ¶¶ 158–59. Mayagüez has not proffered any evidence that Defendants acted with intent and, accordingly, its first cause of action alleging intentional misconduct should be dismissed.

First, even assuming that Defendants made misrepresentations in their presentation and Sensitivity Analysis about the ethanol pricing formula and the correlation between ethanol and the COP/USD exchange rate, there is no evidence to suggest that Defendants did so intentionally.  Indeed, as Defendants argue (Def. Reply at 5), Citibank Colombia employees believed that the ethanol revenues could

be exposed.  David Polania, the Citibank Colombia employee who carried out the analysis, testified that, as of 2014, he understood the impact of the exchange rate on the ethanol formula to mean that "if the exchange rate increased, then the price of ethanol would also increase, and if the dollar value decreased, then the price of ethanol would also decrease," but acknowledged that there were other factors that also impacted the price of ethanol besides the exchange rate.  Ex. 2 at 14:14–18; *see id.* at 14:19–15:07, 18:10–11.  There is nothing to suggest that Citibank Colombia represented a correlation that it did not believe existed at the time.  In fact, in February 2014, Polania discussed in internal emails that Mayagüez has USD exposure associated with its ethanol sales.  DEX 73 (Polania stating that the transaction is a "70% hedge ratio . . .  just hedging . . . the USD exposure associated to the sugar sales, they are not including the Ethanol exposure. When they add the USD exposure associated to the ethanol sales the hedge ratio is below 50%").  Accordingly, the evidence demonstrates that Citibank Colombia believed that Mayagüez's ethanol revenues were exposed to currency exchange risk and not, as Mayaguez alleges, that it was intentionally misrepresenting the exposure to induce Mayagüez into the currency trades.

Similarly, the evidence in the record also provides no basis for Mayagüez's allegations that Defendants intentionally concealed the terms of the Currency Trade.  Specifically, Mayagüez claims that Defendants knowingly concealed the terms of the Currency Trades, which created unlimited exposure for Mayagüez and potentially significant earnings for Defendants.  Am. Compl. ¶ 155.  However, there

is a dearth of evidence to support any concealment of the terms.  Rather, it is clear from the record that Mayagüez received trade confirmations that provided the terms of the Currency Trades.  DEX 7 at 6; DEX 75 (July 31, 2014 confirmation of Second Currency Trade); DEX 56 (December 18, 2014 first amendment to the Second Currency Trade); DEX 61 (January 20, 2015 confirmation of Third Currency Trade); DEX 62 (March 21, 2016 confirmation of restructured Third Currency Trade).

Mayagüez contends that Citibank Colombia failed to inform it about "the potential for substantial losses to Mayagüez, and the unlimited risk to Mayagüez" and falsely stated that the trades were "favorable to Mayagüez."  Pl. Opp. at 22.  But again, even assuming Defendants are at fault for these alleged omissions, Mayagüez does not offer any evidence that Defendants acted with intent. [21]   Indeed, Mayagüez characterizes Defendants' actions as "negligent[]" and done "in bad faith," but does not make any argument as to intent or willfulness.  Pl. Opp. at 22.

At most, the record establishes that Defendants were financially incentivized to have Mayagüez enter into the Currency Trades.  Ex. 127 at

---

[21] Mayaguez also argues that some of these confirmations were not provided to it until after the trade was executed.  Pl. Opp. at 20; *See* Mayaguez 56.1 Resp. ¶¶ 99, 253, 254.  It appears that, at the very least, Citibank Colombia sent a temporary confirmation with the material terms for the Second Currency Trade by email prior to the trade closing.  *See* DEX 57 (Citibank Colombia providing Mayaguez with a "temporary confirmation of the conditions" of the Secondary Currency Trade on July 31, 2014).  But, in any event, there is nothing to suggest that providing confirmations up to a week after the execution of the trades amounts to *intentionally concealing* material information about Mayaguez's exposure or the potential unlimited upside for Defendants.

CITICOLOM00000086–87 (with respect to unwinding the first currency trade, Robert McMillian from Citibank Colombia states "I DESPERATELY need it for July . . . we were talking yesterday . . . . The region was below 500k for the month . . . with mayagüez we[']ll hopefully get to something below running but respectible [sic]"); *see also* Ex. 128.  But this fact alone does not establish that Defendants intentionally made the alleged misrepresentations or omissions to induce Mayagüez into the Trade—if it did, nearly every business transaction gone awry could be used to establish intent.

It is well-established that, "where the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by 'point[ing] to an absence of evidence to support an essential element of the nonmoving party's' case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady v. Town of Colchester,* 863 F.2d 205, 210–11 (2d Cir. 1988)).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  Here, because Mayagüez has not identified any evidence in the record to support the intent required under Article 2341, I recommend that Defendants' summary judgment motion as to Mayagüez's first cause of action be granted.

### 4. Fraud and Negligent Misrepresentation Claims Under New York Law (Second, Third, Fourth, Sixth, and Seventh Causes of Action)

Defendants also move for summary judgment with respect to Mayagüez's New York law claims for fraudulent inducement (second and fourth causes of action), fraudulent concealment (third cause of action), and negligent misrepresentation (sixth and seventh causes of action). Specifically, Defendants argue that these claims should be dismissed because Mayagüez cannot establish that it reasonably relied on Defendants' alleged misrepresentations since Mayagüez represented in various agreements and letters that it was not relying on Citibank or Citibank Colombia. Def. Mem. at 28.

To sustain a claim for fraudulent inducement under New York law, "a plaintiff alleging fraud must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). "Fraudulent concealment claims have the additional element that the defendant had a duty to disclose the material information." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 494 (S.D.N.Y. 2017).

To prove negligent misrepresentation under New York law, a plaintiff must establish that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the

representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

Here, by signing the ISDA, Mayagüez agreed that it "is acting for its own account, and it has made its own independent decision to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment" and that it is "not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction." DEX 15 at 8337–38; Def. 56.1 ¶ 20. Mayagüez also made additional representations that it would not rely on the advice of Citibank in various letters. *See* DEX 72 (Mayagüez agreeing that it "will determine, without reliance upon Citi, the economic risks and merits, . . . of the Transaction"); DEX 59 & 83. Mayagüez concedes that it agreed not to rely on investment advice or recommendations but emphasizes that the disclaimers excluded reliance on information. Pl. Opp. at 31–32. The Court agrees that this distinction is clearly communicated in the ISDA, which provides that "it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction." DEX 15. Accordingly, the disclaimer can only apply to advice and recommendations, and not to information.

Mayagüez also argues that the disclaimers contain broad representations that are not specific enough to preclude its fraud and negligent misrepresentation claims. As the Second Circuit has opined, "[a] disclaimer is generally enforceable only if it "tracks the substance of the alleged misrepresentation." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 330 (2d Cir. 2002). Here, the disclaimer that Mayagüez would not rely on recommendations to enter the Currency Trades tracks the allegations that Citibank Colombia misrepresented the suitability of the Currency Trades. *See* DEX 15; Ex. 177 ¶¶ 81, 83. The disclaimers that Mayagüez did not rely on Citibank Colombia to determine the "economic risks or merits" similarly tracks the alleged misrepresentations that the Currency Trades were not hedges because they increase the exchange rate exposure. *See* DEX 72; Pl. Opp. at 3 (claiming "Citi acted negligently and in bad faith by selling the Currency Trades as hedges when they in fact increased the risk to Mayagüez").

However, while some of Mayagüez's allegations underlying its fraud and negligent misrepresentation claims are barred by these disclaimers, the disclaimers do not preclude all of the allegations. For instance, Mayagüez's claims largely rely on Defendants' presentation of the Sensitivity Analysis, which can appropriately be characterized as information and therefore do not fall under the disclaimers. Because the representations do not disclaim reliance on information (and

Defendants do not argue otherwise), these disclaimers do not bar the fraud and negligent misrepresentation claims in their entirety.[22]

Accordingly, Mayagüez's fraud and negligent misrepresentation claims should survive Defendants' summary judgment motion.

### 5. Promissory Estoppel and Unjust Enrichment Claims (Ninth and Tenth Causes of Action)

Finally, Defendants seek summary judgment on the remaining causes of action: unjust enrichment (ninth cause of action) and promissory estoppel (tenth cause of action). Mayagüez repeats the same general allegations discussed above (*i.e.*, Citibank Colombia's misrepresentations and omissions induced it to enter the Currency Trades) as the basis for its unjust enrichment claim (Am. Compl. ¶¶ 248–51) and alleges that Citibank Colombia made false promises about Mayagüez's options to amend or restructure the Second Currency Trade to convince Mayagüez to enter into the Third Currency Trade (*see id.* ¶¶ 252–61) as the basis for its promissory estoppel claim. Defendants argue that these claims fail as a matter of law because an enforceable contract existed that precluded any claims of unjust enrichment or promissory estoppel. Def. Mem. at 29. Defendants also contend that

---

[22] Defendants separately argue that they are entitled to summary judgment on the fraudulent inducement and negligent misrepresentation claims as the agreements disclaim the special relationship and duty of care alleged by Mayaguez. Def. Mem. at 28. In making this argument, they do not cite or otherwise refer to the exact disclaimer provisions on which they are relying. To the extent they rely on the same provisions as their other disclaimer arguments, those provisions lack the specificity required to preclude a duty of care or special relationship, as explained above. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, LLC, 783 F.3d 395, 406 (2d Cir. 2015) (disclaimers do not preclude finding of special relationship as they fall short of tracking the particular misrepresentation).

even if the promissory estoppel claim was not precluded on that basis, they made no promise on which a promissory estoppel claim could be based.  *Id.*  Mayagüez counters that the promissory estoppel claim is based on "promises and conduct by Citi that occurred *after* the [Second] Currency Trade was entered into, and do not pertain to conduct pursuant to the [Second] Currency Trade, but rather are in connection with restructuring or terminating that trade."  Pl. Opp. at 33.  Mayagüez therefore argues that its promissory estoppel claim is not precluded.  *Id.*  On reply, Defendants emphasize that there are valid contracts related to the termination and restructuring of the Second Currency Trade and cite to the two confirmation agreements.  Def. Reply at 13.

"Under New York law, the elements of promissory estoppel are (1) a clear and unambiguous promise, (2) a reasonable and foreseeable reliance by the party to whom the promise is made, and (3) injury sustained by the party asserting the estoppel by reason of his reliance."  *Exceed Holdings LLC v. Chicago Bd. Options Exch. Inc.*, No. 17-CV-8078 (RA), 2018 WL 4757961, at *3 (S.D.N.Y. Sept. 30, 2018) (citing *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 448 (S.D.N.Y. 2003)) (internal citations omitted).  "As a quasi-contract claim, promissory estoppel liability cannot lie where a valid contract governs the dispute."  *Exceed Holdings LLC*, 2018 WL 4757961, at *3.  Accordingly, "[u]nder New York law, claims of promissory estoppel . . . are precluded whenever a valid and enforceable contract governs the same subject matter of the claims."  *CUnet, LLC v. Quad Partners, LLC*, No. 16-CV-6327 (CM), 2017 WL 945937, at *6

(S.D.N.Y. Mar. 7, 2017); *Tobin v. The Rector*, No. 17-CV-2622 (LGS), 2017 WL

5466705, at *3 (S.D.N.Y. Nov. 14, 2017) ("This claim fails because the parties' valid

written agreement "precludes recovery under the cause[ ] of action sounding in

promissory estoppel . . .  which arises out of the same subject matter.") (citing *Hoeg*

*Corp. v. Peebles Corp.*, 60 N.Y.S.3d 259, 262, 153 A.D.3d 607 (2d Dep't 2017)).

      To prove an unjust enrichment claim, the plaintiff must establish that "the

defendants were enriched, at the plaintiff's expense, and that it is against equity

and good conscience to permit the Defendants to retain what is sought to be

recovered." *Cty. of Nassau v. Expedia, Inc.*, 120 A.D.3d 1178, 1180 (2d Dep't 2014).

Like promissory estoppel claims, however, claims for unjust enrichment "may not be

maintained where a contract exists between the parties covering the same subject

matter." *Goldstein v. CIBC World Markets Corp.*, 6 A.D.3d 295, 296 (1st Dep't

2004).

      As an initial matter, the basis of the unjust enrichment claim concerns

Citibank Colombia's alleged misrepresentations and omissions in connection with

the Currency Trades.  However, because the parties entered into contracts

governing those Currency Trades, as discussed in detail above, the unjust

enrichment claim cannot be maintained.

      In addition, the basis for the promissory estoppel claim is the purported

promise to restructure or terminate the Second Currency Trade.  However, as

Defendants have pointed out, the parties entered into contracts governing the

restructuring and termination of the Second Currency Trade.  DEX 55 (Total Early

Termination by Mutual Agreement); DEX 56 at 8287 (Confirmation of Sales Transaction restructured and update as of December 18, 2014).  Because the promissory estoppel claim is based on the same subject matter as those contracts, this claim should be dismissed.

In any event, the promissory estoppel claim also fails because there is no evidence of a clear and unambiguous promise.  In its pleadings, Mayagüez alleges that "Citigroup assured Mayagüez that cancelling the January 2015 Currency Trade was unnecessary because Citigroup would amend it, if and when the USD/COP exchange rate exceeded COP 2,600 and in any case, before the second tranche took effect."  Am. Compl. ¶ 134.  However, "[i]t is well-established that a mere willingness to execute a contract or enter into a transaction is insufficient to make out a claim for promissory estoppel."  *Exceed Holdings LLC*, 2018 WL 4757961, at *3.  Mayagüez also argues that its claims are based on promises and conduct by Citibank Colombia that occurred after the 2014 Currency Trade.  Pl. Opp. at 33 (citing Pl. 56.1 ¶¶ 383–395).  However, at best, the cited material in support of its position relates to discussions and proposals concerning restructuring the trade with Mayagüez, not promises.  *See* Pl. 56.1 ¶¶ 385–386, 392.  Indeed, Mayagüez's Treasurer Alarcon testified that Citibank Colombia did not make any promises to Mayagüez about restructuring the trade, although there were conversations about doing so.  Def. 56.1 ¶ 236; DEX 5 at 133:6–134:13.  Mayagüez insists that Citibank made representations regarding their ability and willingness to modify the product, but it does not proffer any evidence to that effect.  *See* Pl.

56.1 ¶ 236.  Without evidence of a clear and unambiguous promise, Mayagüez's

claim for promissory estoppel fails as a matter of law.

### 6.  Citibank, N.A. and Citigroup's Liability Under Agency Theory

Defendants also move for summary judgment on Mayagüez's theory that

Citigroup was an agent of Citibank Colombia and, therefore, is liable for claims

concerning Citibank Colombia's actions in the Currency Trades.  Mayagüez, on the

other hand, moves for summary judgment on its agency theory as to Citibank N.A.,

and Citigroup.

Although the parties disagree as to the governing law on the agency issue,

the parties have not identified any discernible difference between New York and

Colombian law as to agency liability.  *See* Def. Opp. at 31; Pl. Reply at 14.

According to Defendants, "[u]nder New York law, an agency relationship can be

established if: (i) a person has "actual authority" to act as an agent for another; (ii) a

person has 'apparent authority' to act as an agent for another; or (iii) an entity

'ratifies' the acts of an agent."  Def. Opp. at 31.  Mayagüez argues that "Colombian

law recognizes that a corporation is liable for the conduct of a person acting under

actual or apparent representation, or where the acts are ratified by the

corporation."  Pl. Mem. at 33.  Regardless of the applicable law, both parties argue

that the undisputed facts require that their respective summary judgment motions

be granted as to this issue.  Pl. Mem. at 33 n.8; Def. Reply at 13.  Because the law is

not materially different as to agency, and the parties contend that summary

judgment should be granted under either Colombian or New York law, it is not necessary to decide the choice of law issue at this juncture.

With respect to agency as to Citibank, Defendants have failed to argue that Citibank N.A. is not liable under an agency theory.  Nevertheless, as the Second Circuit has held, "[t]he fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996)).  Accordingly, the Court has reviewed the record and concludes that Mayagüez's summary judgment motion as to Citibank N.A. should be granted.  Citibank N.A. had extensive involvement in the Currency Trades, including that Citibank N.A. approved the July 2014 Currency Trade (Pl. 56.1 ¶ 365), signed the January 2015 Currency Trade (Ex. 143 at CITICOLOM00159313), was represented as the counterparty for the trades (DEX 106 at 611), and executed the trades (Ex. 121 at CITICOLOM00019511).  Moreover, Citibank N.A. prepared the information contained in the July 2014 presentation (as well as other presentations related to the Currency Trades) and indicated that it was presenting the transactions described therein.  *See* Ex. 98 at CITIDEFS00007712; Def. 56.1 Resp. ¶ 307; *see also* Ex. 60 (October 2013 presentation).  Taken together, the evidence establishes that Citibank N.A. either had actual or apparent authority and, as a result, is an agent of Citibank Colombia.

Unlike Citibank N.A., Citigroup did not have actual or apparent authority, nor did it ratify the Currency Trades. There is nothing in the record to suggest that Citigroup was involved in any aspect of the Currency Trades, including approving, executing, or proposing the trades. Mayagüez's argument that agency exists between Citigroup and Citibank Colombia largely rests on a somewhat tenuous connection through Institutional Client Group ("ICG"). ICG is a group description assigned to certain clients, one of which is Mayagüez. Pl. Ex. 2 at 171:22–24; Tr. at 46:6–8. Organizationally, ICG falls under Citicorp, and Citicorp is one of Citigroup's "two primary business segments." Pl. 56.1 ¶¶ 61–62. As part of ICG, Mayagüez had a relationship manager at Citibank Colombia, who serviced Mayagüez and other ICG clients, and had the benefit of certain ICG policies that applied to it. *See* Pl. 56.1 ¶¶ 68, 72–74. Revenue from ICG was incorporated into Citigroup's consolidated financial statements in 2014 and 2015. *Id.* ¶ 63. Given these facts, Mayagüez concludes that "ICG's principal role in the conduct at issue makes Citigroup liable for that conduct." Pl. Mem. at 34. However, even if ICG had a "principal role"—and even that conclusion lacks support based on the limited evidence proffered by Mayagüez—Mayagüez fails to provide evidence to establish a connection between Citigroup and the ICG group for agency purposes. Indeed, as Defendants point out (Def. Opp. at 32), Mayagüez did not demonstrate that Citibank Colombia employees were authorized or the apparent agents of Citigroup, or that Citigroup ratified their conduct. Nor is there any evidence to indicate that the Currency Trades were entered into on Citigroup's behalf or that Citigroup had

any involvement in effectuating the trades. The fact that Mayagüez falls within a category of clients described in the overall structure of Citigroup, without more, does not demonstrate agency.

Accordingly, on this agency issue, I recommend that Defendants' motion as to Citigroup be granted, and that it be dismissed as a defendant, and that Mayagüez's motion as to Citibank, N.A. be granted.

### D. Mayagüez's Summary Judgment Motion as to Its Colombian Law Claims

Finally, for the same reasons that Defendants' motion should be denied, Mayagüez's motion as to the remaining Colombian law claims (fifth and eighth causes of action) should also be denied. As discussed above, Mayagüez's arguments have raised a myriad of factual issues as to those claims and, accordingly, resolution at this stage is inappropriate.

### III.     CONCLUSION

For the reasons set forth above, I recommend that (1) Mayagüez's motion to strike be denied; (2) Defendants' motion to disregard  Mayagüez's Reply Rule 56.1 Statement be granted; (3) Defendants' motion for summary judgment be granted as to Mayagüez's first, ninth, and tenth causes of action and as to the dismissal of Citigroup, and otherwise denied; and (4) Mayagüez's motion for summary judgment be denied, except as to its agency theory against Citibank, N.A., which should be granted.

This Report and Recommendation refers to information that has been redacted in the parties' motion papers and in the accompanying exhibits, and

accordingly will be temporarily filed under seal (and provided to the parties in

unredacted form by email).[23] The Court directs the parties to advise the Court by

email to CottNYSDChambers@nysd.uscourts.gov within three business days of the

date of this Report and Recommendation with any proposed redactions for the

Court's review.  The parties should be mindful of the presumption of public access to

judicial documents in proposing any redactions. *See, e.g.*, *Brown v. Maxwell*, 929

F.3d 41, 47-48 (2d Cir. 2019); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110,

119–20 (2d Cir. 2006).  The Court will then determine how this Report and

Recommendation may be filed on the public docket.

Until further order of the Court, the Clerk is respectfully directed to file this

Report and Recommendation under seal.

## PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to

file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any

responses to such objections, shall be filed with the Clerk of Court, with courtesy

copies delivered to the chambers of the Honorable Paul G. Gardephe, United States

Courthouse, 40 Foley Square, New York, NY 10007, and to the chambers of the

undersigned, United States Courthouse, 500 Pearl Street, New York, New York,

---

[23] The Court will not disturb its earlier ruling granting the parties' request to file
redacted and/or sealed materials.

10007.  Any requests for an extension of time for filing objections must be directed to Judge Gardephe.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: April 30, 2021
      New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

68