UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAYAGÜEZ S.A.,

                              Plaintiff,

        - against -

CITIBANK, N.A. and CITIGROUP, INC.,

                              Defendants.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 6788 (PGG) (JLC)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff Mayagüez S.A. asserts claims for negligence, misrepresentation, fraud, unjust enrichment, and promissory estoppel under Colombian and New York law against Defendants Citibank, N.A. and Citigroup, Inc.  (Am. Cmplt. (Dkt. No. 15)) Magistrate Judge Cott has issued a 71-page Report and Recommendation ("R&R") recommending that Plaintiff's motion for summary judgment be granted insofar as it seeks to hold Citibank N.A. liable for the actions of Citibank Colombia, and otherwise denied.  Judge Cott recommends that Defendant's motion for summary judgment be granted as to Plaintiff's claims (1) against Citigroup; and (2) for willful misconduct under Colombian law, and unjust enrichment and promissory estoppel under New York law, and otherwise denied.  (R&R (Dkt. No. 210))  This Court will adopt Judge Cott's recommendations in large part, as set forth below.

        In this Opinion, the Court also addresses Defendants' motion to strike Plaintiff's jury demand (Mot. (Dkt. No. 196)).

## BACKGROUND

### I.   FACTS

Mayagüez is a Colombian company that produces and sells refined sugar and ethanol.  (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 1-2)[1]  Although Mayagüez sells most of its sugar products in Colombia, it has exports of about $25 million per year, generating revenue in U.S. dollars.  (Id. ¶¶ 3, 10, 18, 25)  Mayagüez's ethanol products are sold exclusively in Colombia. (Id. ¶ 18)

Because Mayagüez incurs costs primarily in Colombian pesos ("COP"), but receives revenue for its exports and certain of its domestic sales in U.S. dollars ("USD"), it faces financial risk from unexpected fluctuations in the peso-dollar exchange rate.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 23)  To protect – or "hedge" – against this risk, Mayagüez has – since 2008 – regularly entered into currency hedge transactions with commercial banks, including Citibank, N.A. ("Citibank").  (Id. ¶¶ 6, 35; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 28)

Citibank is a U.S.-based national banking association, and is a wholly-owned-subsidiary of Citicorp, which is in turn a wholly-owned subsidiary of Defendant Citigroup, Inc. ("Citigroup").  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 8)  Citigroup is a globally diversified financial services holding company that is incorporated in Delaware and maintains its principal

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where a non-movant disputes the movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-movant's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

place of business in New York.  (Id. ¶ 9)  Non-party Citibank Colombia is an affiliate of
Citibank with operations in Colombia.  (Id. ¶ 10)  In connection with the transactions at issue in
this case, Mayagüez interacted primarily with Citibank Colombia employees.  (Id.)

### A.      Mayagüez and Citibank Agreements

Between 2008 and 2015, Mayagüez entered into hedging transactions with at least
five financial institutions, including Citibank.  (Pltf. R. 56.1 Ctrstmt. (Dkt. No. 164) ¶ 35)  From
Mayagüez's perspective, the purpose of the hedging transactions was to reduce its exposure to
unanticipated fluctuations in the peso-dollar exchange rate.  (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶
28)  These hedging transactions include what the parties refer to as "plain vanilla" and "non-
plain vanilla" transactions.  (Id. ¶ 34; Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 34)  One example of a
"plain vanilla" transaction is a "plain vanilla forward," in which parties contract to buy or sell
foreign currency at a pre-specified price – or "strike price" – on a specified future date for a
specified amount of currency or "notional amount."  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 24;
Pltf. R. 56.1 Ctrstmt. (Dkt. No. 164) ¶ 24)  If the foreign currency depreciates such that the
market exchange rate – or the "spot" price – falls below the strike price, the hedging party – here,
Mayagüez – would nonetheless be entitled to the agreed-upon, higher price for the foreign
currency.  The hedging party would then receive payments reflecting the difference between the
strike price and the spot rate multiplied by the notional amount.  (Def. R. 56.1 Stmt. (Dkt. No.
160) ¶ 26; Pltf. R. 56.1 Ctrstmt. (Dkt. No. 164) ¶ 26)  Where the foreign currency appreciates
above the strike price, however, the hedging party would be required to make payments to the
counterparty – here, Citibank – amounting to the difference between the spot rate and the strike
price multiplied by the notional amount.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 26; Pltf. R. 56.1
Ctrstmt. (Dkt. No. 164) ¶ 26)

Another type of hedging transaction is a "limited compensation forward." Although similar to a "plain vanilla forward," this type of transaction differs in that, inter alia, the amount of compensation that the hedging party can receive is limited, and the transaction will terminate if the maximum compensation amount is reached.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 28; Pltf. R. 56.1 Ctrstmt. (Dkt. No. 164) ¶ 28)  "Limited compensation forward" transactions generally have no limit on the amount the hedging party may have to pay if the foreign currency appreciates above the strike price.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 29)

In August 2008, Mayagüez entered into a hedging transaction with Citibank (the "2008 Currency Trade").  (Id. ¶ 36)  The 2008 Currency Trade had a maximum compensation of 75 million pesos, meaning that Mayagüez could exercise its right to sell dollars to Citibank at the strike price until Mayagüez had received the maximum compensation amount of 75 million pesos, at which point the transaction would terminate.  (Id. ¶ 37)  There was no cap on payments that Mayagüez might have to make to Citibank.  (Id. ¶ 38)

On July 28, 2009, Mayagüez and Citibank entered into an International Swaps and Derivatives Association agreement (the "Swap Agreement") in anticipation of future hedging transactions.  (Id. ¶¶ 12-14; Swap Agmt., DX 15 (Dkt. No. 160-25))  Mayagüez entered into a similar agreement with Citibank Colombia on January 3, 2011, in anticipation of hedging transactions in Colombia (the "Colombian Swap Agreement").  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 20; Colombian Swap Agmt., DX 16 (Dkt. No. 160-43))

## B.   **First Currency Trade**

In August 2012, and in connection with discussions about potential hedging transactions, Citibank Colombia sent a presentation to Hector Alarcon, Mayagüez's treasurer, relating to a possible limited compensation collar hedging transaction.  (Def. R. 56.1 Stmt. (Dkt.

No. 160) ¶ 61; Aug. 2012 Presentation, DX 38 (Dkt. No. 160-72))  The presentation states that

the structure of the transaction "offers a better hedging rate than the market for traditional

collars, in exchange for limiting its gains."  (DX 38 (Dkt. No. 160-72) at 27)[2]  In December

2012, Citibank Colombia sent a spreadsheet to Mayagüez that compared several different types

of hedging transactions, including limited compensation forward transactions.  (Def. R. 56.1

Stmt. (Dkt. No. 160) ¶ 67; DX 67 (Dkt. No. 179-32))

       In October 2013, Citibank Colombia sent two additional presentations to

Mayagüez relating to potential limited compensation forward hedging transactions.  (Def. R.

56.1 Stmt. (Dkt. No. 160) ¶¶ 69-70; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 123, 145)  An October

21, 2013 presentation states that "[i]f the market ends up above the established strike, the client

will have to compensate the bank based on the exchange difference between the strike in the

structure and the market exchange rate."  (Oct. 21, 2013 Presentation, DX 20 (Dkt. No. 160-47)

at 18)  An October 28, 2021 presentation includes six exchange rate scenarios, including one in

which the peso-dollar rate increases above the strike price, requiring Mayagüez to make

payments to Citibank.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 70; Pltf. R. 56.1 Stmt. (Dkt. No. 159)

¶¶ 147, 162; Oct. 28, 2013 Presentation, DX 45 (Dkt. No. 160-79))

       Both presentations include disclaimers stating that Citibank Colombia is not

serving as Mayagüez's advisor and that Mayagüez must conduct its own financial analysis.

(Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 71)  The presentations contain conflicting statements about

which Citibank entity is providing the presentation, however.  The presentations state at one

point that "Citibank, N.A. ('Citibank') is pleased to present the transaction . . . described below,"

---

[2] All references to page numbers in this Opinion are as reflected in this District's Electronic Case Files ("ECF") system.

but later state that "[t]his proposal is the sole responsibility of Citibank-Colombia.  Neither Citibank N.A. nor . . . its affiliates outside of Colombia assume any liability for the content of this proposal."  (DX 45 (Dkt. No. 160-79) at 28; DX 20 (Dkt. No. 160-47) at 20)  The presentations were transmitted to Mayagüez by Citibank Colombia employees, and all communications about the presentations were between Citibank Colombia employees and Mayagüez.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 72)

On November 6, 2013, after conducting its own financial analysis, Mayagüez entered into a limited compensation forward transaction with Citibank Colombia (the "First Currency Trade").  (Id. ¶¶ 66, 88; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 204)  The First Currency Trade includes the following provisions:  (1) a 2,020 peso strike price; (2) a $2 million notional amount per month; (3) a maximum amount of compensation of 900 million pesos; and (4) a term of 22 months.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 90; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 206, 210, 212, 214; DX 50 (Dkt. No. 160-84))

The terms of the First Currency trade were amended on February 13, 2014, February 26, 2014, and April 16, 2014.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 93-96; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 237)  The First Currency Trade reached the maximum compensation to Mayagüez amount on July 31, 2014, and the transaction terminated at that time.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 97; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 251)  Citibank Colombia compensated Mayagüez pursuant to an early termination agreement executed that same day.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 97)

**C.      July 2014 Presentation and Sensitivity Analysis**

On July 10, 2014, shortly before the First Currency Trade terminated, David Polania of Citibank Colombia sent quotes to Alarcon and Ludwig Chvatal, Mayagüez's chief

financial officer, regarding a new proposed hedging transaction.  (Id. ¶ 130; Pltf. R. 56.1 Stmt.

(Dkt. No. 159) ¶ 299; DX 81 (Dkt. No. 160-115))  The next day, Polania sent a spreadsheet to

Alarcon and Chvatal that analyzes Mayagüez's ethanol revenues as compared to the peso-dollar

exchange rate (the "Sensitivity Analysis").  (DX 30 (Dkt. No. 160-57); see also Pltf. R. 56.1

Ctrstmt. (Dkt. No. 164) ¶ 133; Def. R. 56.1 Ctrstmt. (Dkt. No. 157) ¶ 308)  At that time, the

Colombian government set the price of ethanol using the highest of the prices generated by three

formulas:  (1) a sugar-based formula; (2) a gasoline-based formula; and (3) a fixed minimum

determined by the Ministry of Mines and Energy and a maximum amount not to exceed the price

of gasoline in Bogota for the previous month.   (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 275-77)

The sugar-based and gasoline-based formulas both include the peso-dollar exchange rate as one

of several variables.  (Veronesi Rpt., PX 27 (Dkt. No. 154-20) ¶ 88; Iragorri Dep. Tr., DX 3

(Dkt. No. 179-3) at 35:22-36:6; Stulz Rpt., PX 54 (Dkt. No. 154-47) ¶ 177)

              The Sensitivity Analysis isolates the impact of variations in the peso-dollar

exchange rate on the price of ethanol – and by extension, the impact on Mayagüez's ethanol

revenue – by applying only the sugar-based formula and maintaining all variables other than the

peso-dollar exchange rate as constant.  (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 279, 281; Stulz

Dep. Tr., PX 53 (Dkt. No. 154-46) at 183:19-184:5; 185:13-18)  Because only the peso-dollar

exchange rate is manipulated, the Sensitivity Analysis reflects a 1:1 correlation between the

exchange rate and the price of ethanol.  (DX 30 (Dkt. No. 160-57); Stulz Dep. Tr., PX 53 (Dkt.

No. 154-46) at 195:18-197:15)  Citibank Colombia did not disclose to Mayagüez that the

Sensitivity Analysis uses only the sugar-based formula, or that the peso-dollar exchange rate is

the only non-fixed variable in the Sensitivity Analysis.  (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 282;

DX 30 (Dkt. No. 160-57))

D.     **Second Currency Trade**

On July 31, 2014, after additional discussions, Mayagüez and Citibank Colombia entered into a limited compensation collar hedging transaction (the "Second Currency Trade"). (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 98; DX 75 (Dkt. No. 160-109); Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 328, 334-35, 337)  The Second Currency Trade contains the following provisions:  (1) a 2,090 peso strike price; (2) a notional amount per month of $3 million if the strike price is above the spot rate on the trading date, or a notional amount of $6 million if the strike price is below the spot rate on the trading date; (3) a maximum amount of 3 billion pesos that Mayagüez could receive under the contract; and (4) a term of September 2014 to July 2017.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 99; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 343)  In the Second Currency Trade, Mayagüez's sugar and ethanol revenues are both hedged.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 135; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 338)

After the Second Currency Trade was executed, the peso-dollar spot rate began to rise.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 149)  By November 2014, the spot rate had risen above the 2,090 peso strike price, and Mayagüez and Citibank Colombia began discussing a restructuring of the Second Currency Trade.  (Id. ¶¶ 158-59, 161, 163; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 385)  In December 2014, Citibank Colombia provided Mayagüez with quotes for restructuring the Second Currency Trade.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 164-68, 170-71; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 386; DX 89, 96-99 (Dkt. Nos. 160-123, 160-130, 160-131, 160-132, 160-133))

On December 18, 2014, Mayagüez and Citibank Colombia agreed to amend the Second Currency Trade, and on December 29, 2014, the Second Currency Trade was formally restructured.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 100-01)  On the day of the restructuring,

Mayagüez executed a letter in which it acknowledged that – pursuant to the original terms of the

Second Currency Trade – it then owed Citibank Colombia approximately $30.1 million.  (Id. ¶¶

174-76; DX 87 (Dkt. No. 160-21))  As explained in a Mayagüez internal memorandum, it had

> requested Citi to restructure an outstanding [foreign exchange] hedge closed in
> Jun[e] 2013 prior to [a] strong devaluation period [that] occurred during the last 4
> months. . . . Instead of terminating the outstanding hedges and paying the positive
> mark to market value to Citi, [Mayagüez] is willing to embed the current MTM
> [mark to market] into the strike price of the resulting transaction receiving a lower
> strike price than current market levels.

(DX 106 (Dkt. No. 160-45) at 2; Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 181)

On January 7, 2015, Citibank Colombia sent Mayagüez proposals for a new

hedging transaction, and Mayagüez agreed to one of the proposed transactions.  (Def. R. 56.1

Stmt. (Dkt. No. 160) ¶ 184; DX 107 (Dkt. No. 160-46))  On January 13, 2015, Mayagüez and

Citibank Colombia entered into an early termination agreement unwinding the Second Currency

Trade, in which Mayagüez acknowledged that it owed Citibank Colombia $34.9 million.  (Def.

R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 102, 189; DX 55 (Dkt. No. 160-89); DX 110 (Dkt. No. 160-

149))

### E.    Third Currency Trade

On January 20, 2015, Citibank Colombia sent Mayagüez confirmation of the

agreed upon terms for a third currency trade (the "Third Currency Trade").  (Def. R. 56.1 Stmt.

(Dkt. No. 160) ¶ 191; DX 61 (Dkt. No. 160-95))  The Third Currency Trade includes two

components:  (1) an initial eleven-month hedge with a strike price of 2,600 pesos and a notional

value of $6 million per month, followed by (2) a 23-month hedge with a strike price of 2,090

pesos and a notional value of $7.5 million per month.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 184;

DX 107 (Dkt. No. 160-46))

Before the Third Currency Trade was executed, Citibank Colombia provided Mayagüez with a "supplemental risk disclosure statement" warning of "significant risks" associated with the transaction, including that the "[p]otential losses [for Mayagüez] can be very substantial." (DX 108 (Dkt. No. 160-47) at 3-4) Mayagüez also executed a letter providing that the purpose of the Third Currency Trade was to "continue hedging the forecasted exposure generated by [Mayagüez's] sugar exports production and ethanol sales," and acknowledging that it owed Citibank Colombia $32.9 million as a result of the Second Currency Trade. (Jan. 9, 2015 Ltr., DX 83 (Dkt. No. 160-117)) Mayagüez's board of directors approved the Third Currency Trade on January 22, 2015. (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 192; DX 112-13 (Dkt. Nos. 179-36, 179-37))

The peso-dollar exchange rate began to rise after the Third Currency Trade was executed, and the parties began discussing a possible restructuring of the trade. (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 193, 197-98, 200-01; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 443) They agreed to restructure the Third Currency Trade on February 22, 2016, and to partially unwind it on March 9, 2016. (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 214-15; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 449) The parties could not reach agreement on further amendments to the Third Currency Trade, however, and on March 21, 2016, they decided to fully unwind the Third Currency Trade. (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 216) On March 23, 2016, Mayagüez paid Citibank $44.1 million in connection with the unwinding of the Third Currency Trade. (Id.; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 453)

II.     **PROCEDURAL HISTORY**

Plaintiff filed this action in New York state court on August 9, 2016.  (Dkt. No. 1-1)  Defendants removed the action to this Court pursuant to the Edge Act, 12 U.S.C. § 632, on August 29, 2016.  (Dkt. No. 1)

The Amended Complaint was filed on January 13, 2017, and asserts claims for negligence and bad faith in violation of Article 2341 of the Colombian Civil Code and Article 863 of the Colombian Commercial Code; willful misconduct in violation of Article 2341 of the Colombian Civil Code; and fraudulent inducement, fraudulent concealment, negligent misrepresentation, unjust enrichment, promissory estoppel, and unconscionability under New York law.  (Am. Cmplt. (Dkt. No. 15))

Defendants moved to dismiss (Dkt. No. 21), and in a March 28, 2018 order, this Court granted Defendants' motion as to Plaintiff's unconscionability claim.  Defendants' motion to dismiss was otherwise denied.  (Dkt. No. 36)

Following fact and expert discovery, the parties moved for summary judgment. (Dkt. Nos. 149, 152)  Plaintiff contends that Colombian law governs here, and seeks summary judgment on its claims under Article 2341 of the Colombian Civil Code and Article 863 of the Colombian Commercial Code.  (Pltf. Br. (Dkt. No. 153) at 20-28)  Defendants take no position as to whether Colombian or New York law governs (Def. Br. (Dkt. No. 150) at 19), but seek summary judgment on Plaintiff's claims under both Colombian and New York law.  (Id. at 23-24)

Plaintiff has moved to strike Defendants' Rule 56.1 Statement, and Defendants have moved to strike Mayagüez's Reply to Defendants' Rule 56.1 Counterstatement.  (Dkt. Nos. 140, 192)

The parties have also submitted motions to seal portions of their summary judgment papers.  (Dkt. Nos. 151, 173)

On September 23, 2020, this Court referred the parties' cross-motions for summary judgment, motions to strike, and motions to seal to Magistrate Judge James L. Cott for a Report and Recommendation ("R&R").  (Dkt. No. 188)  Judge Cott granted the parties' motions to seal on September 23, 2020.  (Dkt. Nos. 190-91)

On May 5, 2021, Judge Cott issued his R&R.  (Dkt. No. 210)  Judge Cott recommends that Plaintiff's motion to strike Defendants' Local 56.1 Statement be denied, and that Defendants' motion to strike Plaintiff's Reply to Defendants' Rule 56.1 Counterstatement be granted.  (Id. at 69)  Judge Cott further recommends that the parties' cross-motions for summary judgment on Plaintiff's claims for negligence and bad faith under Article 2341 of the Colombian Civil Code and Article 863 of the Colombian Commercial Code be denied, finding that there are material issues of fact that preclude summary judgment.  (Id. at 38, 69)  He also recommends that Defendants' motion for summary judgment on Plaintiff's willful misconduct claim under Article 2341 be granted, because Plaintiff has not offered evidence showing that Defendants acted with the necessary intent.  (Id. at 55, 58)  As to Plaintiff's claims under New York law, Judge Cott recommends that Defendants be granted summary judgment on Plaintiff's unjust enrichment and promissory estoppel claims, because those claims  are precluded given the existence of an enforceable contract.  (Id. at 64, 66)  As to Plaintiff's fraudulent inducement, fraudulent concealment, and negligent misrepresentation claims, Judge Cott recommends that summary judgment be denied, finding that there are material issues of fact.  (Id. at 62)

### III.    OBJECTIONS TO THE R&R

Both sides have filed objections to the R&R.  Defendants contend that Judge Cott erred in

(1) concluding that issues of fact preclude summary judgment on Plaintiff's claims under Colombian law because, inter alia, the record does not establish that Defendants made misrepresentations or omissions in connection with the Currency Trades, Plaintiff cannot show that it was "legitimately ignorant" of the risks associated with the Currency Trades, and disclaimers in the relevant agreements preclude liability as to those claims (Def. Obj. (Dkt. No. 213) at 17-18);

(2) recommending denial of summary judgment as to Plaintiff's fraudulent inducement and fraudulent concealment claims, because the record contains no evidence that Defendants acted with fraudulent intent (id. at 22-23);

(3) finding that issues of fact preclude summary judgment as to Plaintiff's negligent misrepresentation claim, because Plaintiff cannot establish reasonable reliance or the existence of a special duty (id. at 23-26);

(4) concluding that issues of fact regarding causation preclude summary judgment, because Plaintiff cannot show that the alleged misrepresentations and omissions caused Plaintiff's losses (id. at 26-29); and

(5) stating that Citibank N.A. was an agent of Citibank Colombia (id. at 29).

Plaintiff contends that Judge Cott

(1) improperly weighed in on disputed issues of fact relating to the extent to which Defendants disclosed the risks associated with the Currency Trades, as well as Plaintiff's knowledge and experience with financial transactions similar to the Currency Trades (Pltf. Obj. (Dkt. No. 214) at 8-17); and

(2) erred in finding that all claims against Citigroup should be dismissed, because the record establishes a dispute of fact as to whether Citibank Colombia was acting as an agent of Citigroup (id. at 17-20).

**DISCUSSION**

I.   **LEGAL STANDARD**

    A.   **Review of Report and Recommendation**

        A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  Where, as here, a timely objection has been made to a magistrate judge's recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  Id.  However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'"  Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (alteration in Phillips) (quoting Vega v. Artuz, No. 97-CV-3775 (LTS) (JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)).  "To the extent . . . that the party . . . simply reiterates the original arguments, [courts] will review the Report strictly for clear error."  Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., No. 07-CV-6865 (LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01-CV-2343 (WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are 'merely perfunctory responses,' . . . 'rehashing . . . the same arguments set forth in the original petition.'" (quoting Vega, 2002 WL 31174466, at *1)).

        For portions of the R&R to which no timely objection is made, a court's review is limited to a consideration of whether there is any "'clear error on the face of the record'" that

14

precludes acceptance of the recommendations.  Wingate v. Bloomberg, No. 11-CV-188 (JPO), 2011 WL 5106009, at *1 (S.D.N.Y. Oct. 27, 2011) (quoting Fed. R. Civ. P. 72(b) advisory committee note; citing Nelson v. Smith, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)) ("When no objections are filed to a[] [report and recommendation], a district court need only satisfy itself that there is no 'clear error on the face of the record' in order to accept the recommendation.").

## B. Summary Judgment Standard

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'"  Lesavoy v. Lane, No. 02-CV-10162 (RWS), 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 166 (2d

Cir. 2010) (alteration in <u>Hicks</u>) (quoting <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995)).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." <u>Eviner v. Eng</u>, No. 13-CV-6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996)).

      "The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment . . . ." <u>Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." <u>Id.</u> (citing <u>Heublein, Inc. v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993); <u>Schwabenbauer v. Bd. of Educ.</u>, 667 F.2d 305, 314 (2d Cir. 1981)).

      **C.**    **<u>Determining Foreign Law</u>**

      Under Federal Rule of Civil Procedure 44.1, courts have broad discretion to determine foreign law.  <u>See</u> <u>Abdelhamid v. Altria Grp., Inc.</u>, 515 F. Supp. 2d 384, 395 n.60 (S.D.N.Y. 2007).  Rule 44.1 provides that, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.

**II.**    **<u>ANALYSIS</u>**

      **A.**    **<u>Plaintiff's Motion to Strike</u>**

      Plaintiff has moved to strike portions of Defendants' Local Rule 56.1 Statement. Plaintiff complains that Defendants' statement does not follow the "one fact per paragraph"

requirement; that Defendants do not provide supporting citations for all of their factual

assertions; and that Defendants improperly cite to the affidavit of an expert witness.  (Pltf. Br.

(Dkt. No. 141) at 6-14)

Defendants respond that any violation of the "one fact per paragraph" requirement

is merely a "technical deficiency"; that any factual assertion lacking a citation to the record

should simply be disregarded rather than stricken; and that references to the expert's affidavit are

appropriate, because his affidavit constitutes admissible evidence.  (Def. Opp. (Dkt. No. 143) at

8-17, 21)

Under Local Rule 56.1, motions for summary judgment must be supported by "a

separate, short and concise statement, in numbered paragraphs, of the material facts as to which

the moving party contends there is no genuine issue to be tried" and, for each paragraph, a

"citation to evidence which would be admissible."  Local Rules of the United States District

Courts for the Southern and Eastern District of New York, Rule 56.1(a) & (d) ("Local Rule

56.1").  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment

motions by freeing district courts from the need to hunt through voluminous records without

guidance from the parties."  Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001).  This

Court's Individual Rules require that each numbered paragraph in a Local Rule 56.1 statement

"contain only one factual assertion[,] . . . followed by a supporting citation to the record."

Individual Rules, Rule V.A.

"A party seeking to strike a Rule 56.1 statement 'bears a heavy burden, as courts

generally disfavor motions to strike.'"  Christians of California, Inc. v. Clive Christian New

York, LLP, No. 13-CV-275 (KBF), 2014 WL 3407108, at *2 (S.D.N.Y. July 7, 2014) (quoting

Pharmacy, Inc. v. Am. Pharm. Partners, Inc., No. 05-CV-776 (DRH), 2007 WL 2728898, at *1

(E.D.N.Y. Sept. 14, 2007)).  Accordingly, "courts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and [instead] simply disregard any improper assertions." Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc., No. 09-CV-1410 (KAM) (RLM), 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012) (citing cases), report and recommendation adopted in relevant part, 2013 WL 1334271 (Mar. 28, 2013).  Courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz, 258 F.3d at 73.

Here – as to Plaintiff's complaint that Defendants have violated the "one fact per paragraph" rule – Judge Cott recommends that the motion to strike be denied.  Judge Cott finds that while **many** of the non-compliant paragraphs "appear to be within the[] spirit [of the applicable rules]," certain paragraphs contain a mix of disputed and undisputed facts, and thus "clearly violate both the Local and Individual Rules."  (R&R (Dkt. No. 210) at 18-19)  Plaintiff "responded to each fact within these paragraphs, [however,] delineating between the facts it contests and those that it does not," and Judge Cott recommends that this Court "exercise its broad discretion to overlook the violations at issue here."  (Id. at 19)  As to paragraphs that lack citations to admissible evidence, Judge Cott recommends that – instead of "expend[ing] judicial resources addressing each of the paragraphs that Mayagüez identifies in its motion to determine whether it should be stricken" – this Court "simply . . . ignore[]" "those paragraphs lacking factual support or citing to inadmissible evidence."  (Id. (citing Emanuel v. Griffin, No. 13-CV-1806 (JMF), 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015); Sauerhaft v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist., No. 05-CV-9087 (PGG), 2009 WL 1576467, at *8 (S.D.N.Y. June 2, 2009)))

More broadly, Judge Cott recommends that this Court not make "piecemeal rulings . . . as to the admissibility of Defendants' submissions, but instead . . . carefully review[] and disregard[] [inadmissible material]." (Id. at 20-21 (citing Flaherty v. Filardi, No. 03-CV-2167 (LTS) (HBP), 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("This Court will disregard those portions of Plaintiff's submission which are inappropriate, but will not expend limited judicial resources scrutinizing each line . . . ."); DeSimone v. JP Morgan/Chase Bank, No. 02-CV-7039 (RPP), 2004 WL 2978011, at *3 (S.D.N.Y. Dec. 22, 2004) ("In this opinion, any inappropriate portions of the Plaintiff's submissions have been disregarded, and this Court's analysis relies upon admissible evidence.")))

As to Defendants' citations to the affidavit of Andres Villaquiran, Plaintiff's former expert witness, Plaintiff contends that this affidavit is not admissible evidence, because it was not disclosed during discovery.  (Pltf. Br. (Dkt. No. 141) at 12)  Defendants identified Villaquiran as a source of relevant information, however, and informed Mayagüez that they might contact him during discovery.  Mayagüez did not object.  (R&R (Dkt. No. 210) at 20 (citing Def. Opp. (Dkt. No. 143) at 15; Dunogué Decl., Ex. A (Dkt. No. 145-1) at 6; Smith v. New York & Presbyterian Hosp., 440 F. Supp. 3d 303, 318 n.5 (S.D.N.Y. 2020) (rejecting plaintiff's objection to affidavit not produced in discovery where defendants identified affiant "as a witness at several points during discovery, and [plaintiff] chose not to depose her"); Blake v. City of New York, No. 05-CV-6652 (BSJ), 2007 WL 1975570, at *5 (S.D.N.Y. July 6, 2007) (denying motion to strike affidavit where moving party was on notice during discovery that affiant was a potential witness)))  Noting that Mayagüez had not responded to Defendant's disclosure argument, Judge Cott recommends that this Court reject Plaintiff's objections to the Villaquiran affidavit.

The parties have not objected to Judge Cott's recommendations concerning Plaintiff's motion to strike, and this Court finds no error in Judge Cott's analysis and recommendations.  Given the parties' voluminous submissions, the Court agrees with Judge Cott that a line by line analysis of the contested paragraphs is not feasible or necessary.  To the extent that Defendants' Local Rule 56.1 Statement cites inadmissible material, or does not provide supporting citations to the record, this Court has disregarded it in resolving the parties' motions for summary judgment.

That portion of the R&R addressing Plaintiff's motion to strike is adopted, and Plaintiff's motion to strike will be denied.

B.    **Defendants' Motion to Strike**

Defendants have moved to strike Plaintiff's Reply Rule 56.1 statement, which Plaintiff submitted in response to Defendants' Rule 56.1 Counterstatement.  (Dkt. No. 192) Defendants argue that Plaintiff's Reply Rule 56.1 statement is not permitted under Local Rule 56.1.  (Id. at 2-3)  In response, Plaintiff argues that its Reply Rule 56.1 statement is not prohibited by Local Rule 56.1, and that courts routinely consider such submissions.  (Dkt. No. 193)

Courts in this District have concluded that a reply Rule 56.1 statement constitutes "a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules."  G.S. v. Pleasantville Union Free Sch. Dist., No. 19-CV-6508 (CS), 2020 WL 4586895, at *1 (S.D.N.Y. Aug. 10, 2020) (citation and quotations omitted).  While Plaintiff contends that reply Rule 56.1 statements are not prohibited by Local Rule 56.1 (Dkt. No. 193 at 1-2), the local rule does not authorize the filing of such a reply.  See Capital Records, LLC v. Vimeo, LLC, No. 09-CV-10101 (RA), 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018)

20

("Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts.").

Judge Cott recommends that Defendants' motion to strike Plaintiff's Reply Rule 56.1 statement be granted.  He reasons that "Mayagüez not only had a chance to file its own Rule 56.1 statement but also had an opportunity to respond to Defendants' [Local Rule] 56.1 Statement."  A "reply thus gives Mayagüez a third shot at commenting on the facts in this case." (R&R (Dkt. No. 210) at 22)  Given these circumstances, Mayagüez's reply is not only unnecessary; it undermines the purpose of Local Rule 56.1, which is "to streamline the consideration of summary judgment motions."  Thompson v. Spota, No. 14-CV-2473 (JMA) (AKT), 2018 WL 6163301, at *16 (E.D.N.Y. Aug. 23, 2018) (citations and quotations omitted), report and recommendation adopted, 2018 WL 4771901 (Sept. 30, 2018).

The parties have not objected to Judge Cott's recommendation concerning Defendants' motion to strike Plaintiff's Reply Rule 56.1 statement, and this Court finds no error in his analysis and recommendation.  Accordingly, his recommendation to grant Defendants' motion to strike Plaintiff's Reply Rule 56.1 statement will be adopted.

## C.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff contends that its claims against Defendants are governed by Colombian law.[3]  (Pltf. Br. (Dkt. No. 153) at 16-17)  Defendants take no position as to whether Colombian or New York law applies, stating that, "[s]olely for purposes of [the summary judgment] motion[s] (and reserving all rights), [they] assume that either Colombian or New York law governs. . . ."  (Def. Br. (Dkt. No. 150) at 19)  Given that Plaintiff contends that Colombian law

---

[3]  In the alternative, Plaintiff pleads claims for fraudulent inducement, fraudulent concealment, and negligent misrepresentation under New York law.  (Am. Cmplt. (Dkt. No. 15) ¶¶ 1, 163, 172, 181, 204, 220)

applies, and that Defendants have consented to the application of Colombian law for purposes of the instant summary judgment motions, Judge Cott does not resolve the choice of law issue. (R&R (Dkt. No. 210) at 24-25)  This Court will adopt the same approach.[4]

### 1.    Plaintiff's Colombian Law Claims

#### a.    Negligence and Bad Faith Claims Under Articles 2341 and 863

Plaintiff asserts that Defendants acted negligently and in violation of Articles 2341 and 863 by making false and misleading representations and concealing material information regarding the First, Second, and Third Currency Trades (the "Currency Trades"). According to Plaintiff,

> Defendants knowingly falsely represented to Mayagüez that the Currency Trades were (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez[;] . . .
>
> Defendants knowingly fraudulently concealed from Mayagüez that the Currency Trades:  (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendant[; and] . . .
>
> Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that: (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

(Am. Cmplt. (Dkt. No. 15) ¶¶ 196-99)

Article 2341 of the Colombian Civil Code provides that "whoever commits a crime or negligent act that has caused damage to another, is obligated to repair it . . . ."  (PX 179,

---

[4]  Judge Cott goes on to say that "[w]hether Defendants have waived their right to argue that Colombian law does not apply is a question to be addressed in advance of trial if this Report and Recommendation is adopted."  (Id. at 25)

Ex. B (Oct. 30, 2019 Decl. of Diego Muñoz-Tamayo ("Muñoz Decl.")) (Dkt. No. 154-167) ¶ 28)[5]  This provision imposes liability based on "culpa," which translates as "fault" or "negligence."  (Dunogué Decl., Ex. 5 (Jan. 14, 2020 Decl. of Javier Tamayo Jaramillo ("Tamayo Decl.")) (Dkt. No. 167-5) ¶ 38)[6]  The parties agree that – in order to establish liability under Article 2341 – a plaintiff must prove "(i) fault or positive intent to cause damage on the part of the defendant, (ii) damages suffered by the plaintiff, and (iii) a causal nexus between the conduct and the damage."  (Id.; Pltf. Br. (Dkt. No. 153) at 20-21; Def. Br. (Dkt. No. 150) at 20-22).  "Determining whether fault has been proven is highly fact- and circumstance-specific." (Tamayo Decl. (Dkt. No. 167-5) ¶ 42)

Article 863 of the Colombian Commercial Code imposes certain duties and obligations on parties engaged in contract negotiations, including that they "'proceed with good faith free of negligence during the precontractual period.'"  (Id. ¶ 70)  Liability under Article 863 "applies exclusively in the period of negotiation of a contract."  (Muñoz Decl. (Dkt. No. 154-167) ¶ 39)  To establish a violation of Article 863, a plaintiff must show that the "defendant did not act with good faith nor without fault" and that "damage [was] caused to [plaintiff] by the acts or omissions of the defendant."  (Tamayo Decl. (Dkt. No. 167-5) ¶¶ 64, 66)

Article 863's "good faith" standard

> requires (i) acting with honesty, (ii) acting with the caution, diligence and care of the Roman law standard of a good head of the household . . . or a good and careful businessperson . . . , and (iii) providing complete and accurate information regarding the prospective contract.  Conversely, the duty to act with good faith implies abstaining from acting with (i) guile, (ii) malice, (iii) concealment, (iv) deception, and/or (v) lack of care and ponderation.  It also entails acting with certainty or conviction as to what is being represented to the counterparty and avoiding conflicts of interest.

---

[5]  Muñoz is Plaintiff's Colombian law expert.  (Id. ¶¶ 1-3)
[6]  Tamayo is Defendants' Colombian law expert.  (Id. ¶ 2)

(Muñoz Decl. (Dkt. No. 154-167) ¶ 41)

The Colombian Constitution and other Colombian civil and commercial statutes applicable to contract negotiations incorporate similar principles of good faith.  (Id. ¶ 70 (citing Colombian Const. Art. 83; Article 1603 of the Colombian Civil Code; Article 871 of the Colombian Commercial Code))  The Colombian Supreme Court of Justice has instructed "that good faith constitutes a principle and a duty . . . that must be observed in all stages of the contractual relationship." (Id. ¶ 71 (citation omitted))

From the requirement of good faith arises "a series of secondary duties . . . applicable to all stages of a contractual relation. . . ."  (Id. ¶ 72)  These secondary duties include, inter alia, a "duty of information," a "duty of fidelity," a "duty of loyalty," a "duty to respect the interests of the client," a "duty of perseverance," "a duty of advice," and a "duty of vigilance." (Id.)  The "duty of information" imposes an "obligation to provide the other party with accurate, complete and relevant information regarding the prospective contract."  (Id. ¶ 74)  The "duty of information" also "includes the duty of each party engaging in contract negotiations to inform itself."  (Tamayo Decl. (Dkt. No. 167-5) ¶ 78)

### i.    Negligence Standard under Colombian Law

The parties disagree on the standard for negligence under Articles 2341 and 863. Plaintiff asserts that there are three categories of negligence under Colombian law – gross negligence, ordinary negligence, and slight negligence – and that all three categories of negligence provide a basis for liability in the pre-contractual context.  (Pltf. Br. (Dkt. No. 153) at 20-21)  Defendants argue that the three categories of negligence cited by Plaintiff apply only in the context of contractual liability, and that there is no liability for "slight negligence" in the pre-contractual context.  (Def. Opp. (Dkt. No. 156) at 16-17)

Judge Cott concludes that Plaintiff has not shown that negligence is divided into three categories for purposes of claims arising from pre-contractual conduct.  In this regard, he notes that Plaintiff's expert, Dr. Muñoz, "opines, under the 'Extracontractual Liability' section, that '[i]n contrast to contractual liability, in extracontractual liability, negligence (<u>culpa</u>) is not divided into different categories.'"  (R&R (Dkt. No. 210) at 28 (quoting Muñoz Decl. (Dkt. No. 154-167) ¶ 29))  Judge Cott also finds Dr. Muñoz's analysis of the "slight negligence" standard unpersuasive.  Although Dr. Muñoz asserts that "'a party can be liable for even the slightest breach of the duty of care or diligence'" in the precontractual context, he cites no legal support for that view.  Dr. Muñoz also does not explain his assertion that a "'slight breach' equates to 'slight negligence.'"  (<u>Id.</u> at 28-29 (quoting Muñoz Decl. (Dkt. No. 154-167) ¶ 29; citing <u>NML Cap., Ltd. v Republic of Argentina</u>, No. 03-CV-8845 (TPG), 2013 WL 491522, at *3 (S.D.N.Y. Feb. 8, 2013); <u>Curtis v. Beatrice Foods Co.</u>, 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980), <u>aff'd</u>, 633 F.2d 203 (2d Cir. 1980)))

This Court finds no error in Judge Cott's conclusion that negligence is not divided into three categories in the context of pre-contractual liability, and that "slight negligence" is not sufficient to demonstrate liability in that context.[7]

---

[7]  Defendants argue that <u>culpa</u> is found "only where violations of law can be clearly established, . . . or for clear departures from basic standards of care and diligence. . . ."  (Def. Br. (Dkt. No. 177) at 21)  Citing testimony from Defendants' expert, Judge Cott concludes that <u>culpa</u> encompasses both "'culpa for negligence, which is equivalent to being uncareful,'" and "'culpa for violation of regulations.'"  (R&R (Dkt. No. 210) at 30 (quoting PX 178 (Feb. 19, 2020 Tamayo Dep. Tr.) (Dkt. No. 154-166) at 79:08-18))

In their objections to the R&R, Defendants state that they "do not argue that culpa is <u>only</u> established 'when the facts show violations of law or clear departures from basic standards of care'. . . . Rather, Defendants pointed out – that Mayaguez did not dispute – that Colombian courts have only found financial institutions liable for culpa where violations of the law can be clearly established or for clear departures from basic standards of care and diligence. . . ."  (Def. Obj. (Dkt. No. 213) at 13 (quoting R&R (Dkt. No. 210) at 27) (emphasis in Def. Obj.)))

ii.      **Whether Financial Institutions Are Subject to a**
**<u>Heightened Standard and a Presumption of Negligence</u>**

Plaintiff contends that, under Colombian law, financial institutions are subject to

heightened standards of conduct and a presumption of negligence.

In support of its claim that a heightened standard of care applies, Plaintiff asserts

that "Colombian statutes require that financial institutions act in 'good faith and of service to the

public interest,' . . . with diligence and transparency in the products and information provided."

(Pltf. Br. (Dkt. No. 153) at 24 (citing Muñoz Decl. (Dkt. No. 154-167) ¶¶ 126, 135-37, 143-44,

148, 151-52; Law 1328, Articles 3, 5, 9; Organic Stat. of the Financial Sys., Article 97))

"Colombian Courts have consistently considered that financial entities have to perform their

activities in accordance with a higher level of 'diligence and professionalism'" based on their

status as "'repositories of public trust'" and "the 'inherent inequalities and asymmetry' between

the consumers and financial entities. . . ."  (Muñoz Decl. (Dkt. No. 154-167) ¶¶ 116, 118 (citing,

<u>inter alia</u>, Case No. 7447, Colombia Supreme Court of Justice (Aug. 3, 2004) (holding that

because "management of savings has been considered of public interest due to its social and

economic importance[], . . . financial institutions [have a] duty to act with a special degree of

diligence . . . .")); <u>see also</u> Pltf. Br. (Dkt. No. 153) at 24)

The Colombian Supreme Court of Justice has stated that,

> "when it comes to judging the fulfillment of [banking entities'] obligations, it
> must be done with greater rigor than with respect to other common or ordinary
> businessperson[s], to the extent that the banking entity, as a specialized

---

Judge Cott found, however, that "[w]hile liability in the cases cited by Defendants was
established based on violations of law, departures from internal regulations, and failure to follow
court instructions, . . . nothing in those cases suggests that this degree of misconduct is <u>required</u>
to prove <u>culpa</u>."  (R&R (Dkt. No. 210) at 30 (emphasis in R&R))  In sum, Defendants have not
demonstrated that financial institutions are liable only where "violations of the law can be clearly
established or [where a plaintiff has shown] clear departures from basic standards of care and
diligence."  (Def. Obj. (Dkt. No. 213) at 13)

26

entrepreneurial organization, must be prepared to anticipate, avoid or control the damage deriving from its activity."

(Muñoz Decl. (Dkt. No. 154-167) ¶ 120 (quoting Case No. 08001-31-03-003-2006-00251-01, Colombia Supreme Court of Justice (Apr. 25, 2018)))

Defendants contend that the statutes Plaintiff references "do[] not suggest a different standard; rather, . . . the statutes require that financial institutions act in 'good faith' with 'diligence and transparency' concerning the products and information they provide." (Def. Opp. (Dkt. No. 156) at 16 n.58) Defendants do not address the Colombian court decisions cited by Plaintiff, however, which indicate that financial institutions are subject to a higher standard of care.

Judge Cott concludes that, "[g]iven th[e] legal authority [cited by Plaintiff], and that Defendants have failed to rebut this case law, . . . their conduct will be assessed in accordance with this more rigorous heightened standard of conduct in light of their status as financial entities." (R&R (Dkt. No. 210) at 31) The Court finds no error in Judge Cott's determination.[8]

As to whether financial institutions are subject to a "presumption of negligence," Plaintiff argues that, "because banking involves a 'risky activity,' there is a 'presumption of

---

[8] In their objections, Defendants say that, "[c]ontrary to the statement in the R&R, . . . [they] did not concede that a more 'rigorous heightened standard of conduct' applies to financial entities. Rather, as argued by Defendants, the Colombian financial statutes to which Mayaguez points do not set forth a different standard for 'culpa'. . . ." (Def. Obj. (Dkt. No. 213) at 12) But the basis for Judge Cott's finding was that Defendants had "failed to rebut th[e] case law" cited by Plaintiff. (R&R (Dkt. No. 210) at 31) In their objections, Defendants still do not address the case law indicating that financial entities are held to a higher standard of care. (See Def. Obj. (Dkt. No. 213)) Accordingly, there is no basis for this Court to find error in Judge Cott's determination.

negligence against' the banks."  (Pltf. Br. (Dkt. No. 153) at 25 (citing Muñoz Decl. (Dkt. No. 154-167) ¶ 122))

Defendants counter that a presumption of negligence applies only where a financial institution is party to a contract that imposes an "obligation of result" – meaning a contract in which the financial institution takes on an obligation to "seek a fixed and precise result for the counterparty" and to "indemnify if the promised event is not produced."  (Def. Opp. (Dkt. No. 156) at 19 (citing Tamayo Decl. (Dkt. No. 167-5) ¶ 91))  Defendants argue that the Currency Trades are "[c]ontracts involving obligations of means."  Because the Currency Trades "do not guarantee results" and do not obligate Defendants "to deliver a specific promised result," the presumption of negligence is not applicable.  (Id.; Tamayo Decl. (Dkt. No. 167-5) ¶ 93)

Judge Cott concludes that a presumption of negligence applies "only in certain circumstances, such as cases involving a party's obligation to obtain a specific result."  (R&R (Dkt. No. 210) at 33)  In reaching this result, Judge Cott cited, inter alia, a recent Colombian Supreme Court decision addressing the liability regime applicable to banks.  The court noted that "'banking activity cannot be qualified in a totalizing manner as dangerous,'" and instead must be considered in light of "'the fundamental differences that can arise between the many legal relationships that [financial institutions] engage in with their clients and with third parties.'"  (Id. at 32 (quoting Supreme Court of Justice, Civil Cassation Chamber, Case No. 5176-2020 (Dec. 18, 2020) (Dkt. No. 205-1) at 68); see also id. at 32 n.12 (citing ALBERT H. KRITZER, Limitation and exoneration of liability clauses in consideration of the degree of diligence assumed by the parties — Preliminary considerations, 2 INTERNATIONAL CONTRACT MANUAL § 52:9 (Dec. 2020 Update) ("Colombian case law states that in contractual matters, the creditor must prove the lack

of diligence that it attributes to the debtor . . . when the debtor is only oblige[d] to employ its best efforts to obtain a result that . . . is not guaranteed.  On the contrary, the negligence of the debtor is presumed when the obligation is to obtain a specific result. . . .")))

Judge Cott also points out that Plaintiff has not addressed the authorities cited by Defendants indicating that the presumption applies only when a financial institution has taken on an obligation to obtain a specific result.  Plaintiff instead "merely repeats that the presumption applies without limitation because 'banking involves risks.'"  (Id. (quoting Pltf. Reply (Dkt. No. 168) at 8 n.2))  Judge Cott goes on to find that a presumption of negligence does not apply here, because the Currency Trades do not require Defendants to obtain a specific result.  (Id. at 33)

This Court finds no error in Judge Cott's conclusions that, as financial institutions, Defendants are subject to a heightened standard of conduct, but are not subject to a presumption of negligence.

### iii.        Pre-Contractual Liability

Defendants argue that – to the extent that Plaintiff's claims under Articles 2341 and 863 are premised on pre-contractual conduct – they fail, "[b]ecause the alleged misconduct occurred in 2012 and 2013, after the execution of the framework agreements [i.e., the Swap Agreement and the Colombian Swap Agreement], and in connection with transactions that were part of such agreements. . . ."  (Def Opp. (Dkt. No. 182) at 38-39)  Plaintiff counters that no valid contract was formed until the parties entered into the Currency Trades.  According to Plaintiff, although the Swap Agreement and the Colombian Swap Agreement were executed in 2009 and 2011, respectively, these agreements do not contain certain essential terms and thus do not constitute valid contracts.  (Pltf. Br. (Dkt. No. 153) at 25-28; Pltf. Reply (Dkt. No. 168) at 8-9)

Defendants do not dispute that the Swap Agreement and the Colombian Swap
Agreement do not contain certain essential terms, and their expert concedes that the Currency
Trades constitute "new contract[s]."  (Tamayo Dep. Tr., PX 178 (Dkt. No. 154-66) at 183:23-
185:13)  But Defendants argue that because the Swap Agreement states that all "[t]ransactions
are entered into in reliance on the fact that this Master Agreement and all Confirmations form a
single agreement between the parties," Plaintiff may bring claims for pre-contractual liability
"'only in connection with conduct that occurred prior to the entry into the framework agreement
[– the Swap Agreement].'"  (Def. Opp. (Dkt. No. 156) at 38 (quoting Swap Agmt., DX 15 (Dkt.
No. 160-25) at 3; Tamayo Dep. Tr., PX 178 (Dkt. No. 154-66) at 202:4-6))

Judge Cott rejects Defendants' argument, noting that Defendants have not "cite[d]
any persuasive legal authority for their theory that the Currency Trades relate back to the
framework agreement."  (R&R (Dkt. No. 210) at 34)  Judge Cott also finds the Swap
Agreement's "language . . . weighs in favor of Mayagüez's position – that the framework
agreement <u>and</u> the trade confirmations formed a single contract is consistent with the proposition
that it was only when the parties executed the Currency Trades, which provided the essential
terms, that a contract existed."  (<u>Id.</u> at 34-35 (emphasis in R&R))  Judge Cott further concludes
that because the relevant contracts were not formed until the parties executed the Currency
Trades, Plaintiff may "rely on the alleged misconduct prior to the Currency Trades to establish
extra-contractual liability under Articles 2341 and 863."  (<u>Id.</u> at 35)

This Court agrees with Judge Cott's conclusions.  Defendants do not dispute that
no valid contract existed prior to execution of the Currency Trades.  And Defendants have not
explained why the Swap Agreement's language stating that the framework agreements and

currency trades constitute a "single agreement" has any bearing on when a valid contract was formed.  Accordingly, Judge Cott's conclusion will be adopted.[9]

### iv.        **Contractual Disclaimers**

Defendants argue that Plaintiff's express representations and disclaimers as to reliance and acceptance of risk should be considered in assessing whether Defendants acted with "culpa."  (Def. Br. (Dkt. No. 150) at 35-36 (citing Plaintiff's representations in the Swap Agreement, the Colombian Swap Agreement, and "numerous executed letters" that it "was not relying on Citibank or Citibank Colombia when entering into the transactions," and that it would "'determine . . . the economic risks and merits . . . of the Transactions and . . . assum[e] such risk.'" (quoting Feb. 2014 Ltr., DX 72 (Dkt. No. 160-106) at 2; citing Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 12-21, 101, 119-20, 186; Dec. 2014 Ltr., DX 59 (Dkt. No. 160-93) at 3; Jan. 2015 Ltr., DX 83 (Dkt. No. 160-117) at 2)))

According to Defendants' expert, while one party cannot contractually "absolve[] . . . the other from liability for the former's own positive intent to cause damage," parties may limit their liability through "contractual provisions pursuant to which one party indicates that it has accepted the contract and accepted the inherent risks of the contract."  (Tamayo Decl. (Dkt. No. 167-5) ¶ 82 (citing Colombian Civil Code Article 1604))  Defendants argue that, because Plaintiff expressly disclaimed reliance on Defendants' advice and represented that it would

---

[9]  In their objections, Defendants assert that Judge Cott "erred in finding that the [Swap] Agreement did not preclude Mayagüez's Colombian claims based on conduct from 2012 to 2014," and they complain that he "failed to consider that the [Swap] Agreement stated it and the trade confirmations 'form a single agreement between the parties.'"  (Def. Obj. (Dkt. No. 213) at 22 (quoting Swap Agmt., DX 15 (Dkt. No. 160-25) at 3))  As discussed above, however, Judge Cott explicitly considered – and rejected – Defendants' argument.  (R&R (Dkt. No. 210) at 34-35)  Accordingly, Defendants' objection is overruled.

31

independently determine and assume the risks of the transactions, Plaintiff cannot show that Defendants acted with <u>culpa</u>. (Def. Br. (Dkt. No. 150) at 36)

Plaintiff responds that "gross negligence, willful conduct, and lack of good faith all cannot be disclaimed as a matter of well-established Colombian law," and that constitutional and statutory obligations premised on the duty of good faith – including the so-called "secondary obligations," such as the "duty of information" – likewise cannot be disclaimed by contract. (Pltf. Opp. (Dkt. No. 161) at 15-16) Plaintiff further argues that, in any event, the representations and disclaimers cited by Defendants do not limit Defendants' liability, because they are "boilerplate." (<u>Id.</u> at 16)

As Judge Cott points out, however, even if Plaintiff is correct that the obligations Plaintiff cites cannot be disclaimed by contract, Plaintiff "has not provided any authority to suggest that contractual disclaimers and representations should not be part of the liability assessment." (R&R (Dkt. No. 210) at 36) Judge Cott concludes that express representations and disclaimers are relevant in assessing whether Defendants acted with <u>culpa</u>. (<u>Id.</u> at 36-37)

This Court finds no error in Judge Cott's analysis, and adopts his conclusion that contractual disclaimers are relevant to the overall <u>culpa</u> analysis.

### b.    <u>Application</u>

#### i.    <u>Alleged Misstatements and Omissions Regarding the Currency Trades</u>

Defendants contend that it is undisputed that Plaintiff "received accurate and complete documentation reflecting" the terms of the transactions at issue, including the Swap Agreement, the Colombian Swap Agreement, and letters confirming the material terms of the Currency Trades and their amendments. (Def. Br. (Dkt. No. 150) at 25) According to Defendants, Plaintiff was informed and understood that the potential payment it could receive

32

under the Currency Trades was capped, while no cap applied to the payments Plaintiff might become obligated to make to Defendants.  (Id. at 28)

The record reflects – and Plaintiff does not dispute – that it received this documentation and that it was aware of the material terms of the Currency Trades.  Plaintiff likewise concedes that it was informed of the payment cap structure.  (Pltf. Opp. (Dkt. No. 161) at 20-21; see DX 6, 38, 45, 50, 51, 56-57, 61-62, 75 (Dkt. Nos. 160-7, 160-72, 160-79, 160-84, 160-85, 160-90, 160-91, 160-95, 160-96, 160-109))

Judge Cott therefore concludes that, "to the extent that Mayagüez's claims are based on allegations that Defendants misstated, omitted, or otherwise acted negligently or in bad faith in providing the terms of the Currency Trades or explaining how the trades would function, those allegations are unsupported."  (R&R (Dkt. No. 210) at 39)

Plaintiff objects to this finding, arguing that the fact that "Citibank Colombia[] inform[ed] Mayagüez that there was a cap on payments [Citibank Colombia might become obligated to pay to Mayagüez]," but no such cap on payments Mayagüez might become obligated to pay to Citibank Colombia, does not demonstrate that Defendants adequately "explain[ed] how the trades would function."  (Pltf. Obj. (Dkt. No. 214) at 8-9 (citing R&R (Dkt. No. 210) at 39))  According to Plaintiff, "informing Mayagüez that there was a cap on payments made by Citibank Colombia to Mayagüez is [not] the same as 'explaining how the trades would function,'" because "[a] full explanation would require (inter alia) Citi to inform Mayagüez that the Currency Trades do not hedge against material changes in the [dollar-peso] exchange rate in either direction, i.e., where there is an appreciation of the [U.S. dollar] against the [Colombian peso] or a depreciation."  (Id. at 9 (emphasis in original))

33

For reasons that will be explained in detail below, to the extent the R&R could be read to find that Defendants adequately explained the extent to which the Currency Trades functioned as hedges and the risks associated with the Currency Trades, Plaintiff's objection is sustained.[10]   The Court otherwise adopts the R&R's finding that Plaintiff received the material terms of the Currency Trades.

### ii.        Sensitivity Analysis

Both sides seek summary judgment on the issue of whether Defendants' Sensitivity Analysis was negligent.

Plaintiff argues that Defendants acted with "culpa" in connection with their use of the Sensitivity Analysis because (1) Defendants did not disclose that the Sensitivity Analysis (a) relied on only one of three formulas that the Colombian government uses to set the price of ethanol, and (b) held all variables constant except for the peso-dollar exchange rate; and (2) the Sensitivity Analysis shows a 1:1 correlation between Plaintiff's ethanol sales and the peso-dollar exchange rate, when in fact there was no such correlation.  (Pltf. Br. (Dkt. No. 153) at 28-29)

Defendants offer several arguments as to why their presentation of the Sensitivity Analysis was not negligent.  Defendants first argue that Plaintiff was aware that the Colombian government uses three formulas to set the price of ethanol.  Indeed, according to Defendants, Mayagüez's treasurer directed Defendants to the three formulas.  Accordingly, it was not

---

[10]  As discussed below, given that the R&R concludes that there are material issues of fact as to whether Defendants adequately explained the extent to which the Currency Trades functioned as hedges and the risks associated with the Currency Trades (R&R (Dkt. No. 210) at 48-49), this Court does not believe that Judge Cott intended to recommend – at this point in the R&R – that this Court find as a matter of law that Defendants' disclosures regarding the risks of the Currency Trades and whether they served a hedging function were adequate.

misleading in the Sensitivity Analysis to rely on only one of the formulas used to set the price of ethanol.  (See Def. Br. (Dkt. No. 150) at 31-32)

Defendants further argue that it should have been apparent to Plaintiff that the price of sugar was held constant, because the purpose of a sensitivity analysis is to show the impact of changes to a single variable.  Here, the Sensitivity Analysis showed how variations in the peso-dollar exchange rate affected Plaintiff's ethanol revenue.  (Def. Opp. (Dkt. No. 156) at 29)

Defendants also argue that it was not improper in the Sensitivity Analysis to apply only the sugar-based formula, because – in doing so – Citibank Colombia showed one of three possible outcomes, and "Mayagüez . . . offers zero evidence suggesting that one of the other formulas . . . applied during the relevant period."  (Def. Reply (Dkt. No. 180) at 10, 10 n.16 (emphasis in original))

Finally, Defendants argue that Plaintiff misstates the significance of the alleged "1:1 correlation between [the peso-dollar exchange rate and] the price of ethanol" set forth in the Sensitivity Analysis.  According to Defendants, rather than setting forth a conclusion that there is a 1:1 correlation between the peso-dollar exchange rate and the price of ethanol, the 1:1 correlation shown in the Sensitivity Analysis simply reflects the basic operation of a sensitivity analysis, which is designed to show how changes to one input affect another input, while holding all other variables constant.  (Def. Opp. (Dkt. No. 156) at 29-30)

As to the alleged correlation between the peso-dollar exchange rate and the price of ethanol, Plaintiff argues that Defendants falsely represented that Plaintiff – as a result of its ethanol sales – faced a risk from potential fluctuations in the peso-dollar exchange rate.  (Pltf. Opp. (Dkt. No. 161) at 23)  According to Plaintiff, Defendants falsely represented "that there

<u>was</u> a correlation (not a potential correlation) [between the peso-dollar exchange rate and the price of ethanol], and that this correlation was 1:1 (not simply positive)."  (Pltf. Br. (Dkt. No. 153) at 30 (emphasis in original))

In this regard, Plaintiff cites an expert report showing that between 2008 and 2014, there was "no stable correlation . . . between ethanol prices and the exchange rate." According to Plaintiff's expert, the peso-dollar exchange rate and ethanol prices "did not fluctuate together, . . . and if anything [they] 'display a negative relation.'"  (<u>Id.</u> at 29 (citing Veronesi Rpt., PX 27 (Dkt. No. 154-20) ¶¶ 89, 93-94))  Plaintiff further asserts that it "never hedged ethanol sales before Citi presented the idea . . . , [but it] did hedge ethanol after Citi's presentation (as Mayagüez would have done only if it then believed there was a 1:1 correlation)." (Pltf. Opp. (Dkt. No. 161) at 22-23)

As discussed above, Defendants contend that the Sensitivity Analysis presents the 1:1 correlation as an illustration rather than as a conclusion, and they argue that – as a result of Plaintiff's ethanol sales – Plaintiff faced a risk from fluctuations in the peso-dollar exchange rate, because both the sugar-based formula and the gasoline-based formula incorporate the exchange rate as a variable.  (Def. Opp. (Dkt. No. 156) at 30)  Defendants also cite testimony from Plaintiff's expert in which he acknowledges that there was a correlation between ethanol prices and the peso-dollar exchange rate during the time period of the Second and Third Currency Trades.  (Def. Reply (Dkt. No. 180) at 10-11 (citing Veronesi Rpt., PX 27 (Dkt. No. 154-20) ¶ 94; Veronesi Dep. Tr., PX 182 (Dkt. No. 154-170) 201:16-202:8; Stulz Rpt., PX 54 (Dkt. No. 154-47) ¶ 164))

Judge Cott concludes that there are issues of material fact as to whether Defendants' presentation in the Sensitivity Analysis was negligent.  He rejects Defendants'

arguments relating to their use of the sugar-based formula, because they ignore Plaintiff's claim "that Defendants should have disclosed that only the sugar-based formula was applied in the Sensitivity Analysis." (R&R (Dkt. No. 210) at 42) But Judge Cott also acknowledges that – given Plaintiff's awareness that three formulas are used to set the price of ethanol – "the fact that the Sensitivity Analysis only showed one output . . . suggests that Mayagüez should have been aware that only one formula was being applied." (Id.)

With respect to the fact that all variables except for the peso-dollar exchange rate were held constant in the Sensitivity Analysis, Judge Cott notes that "[g]iven Mayagüez's extensive background in hedging transactions and financial instruments, . . . it seems likely that Mayagüez would have known that a Sensitivity Analysis ke[eps] certain variables constant to demonstrate the impact of a specific variable." (Id. at 42-43) He also finds, however, that "nothing in the record . . . establish[es]" that Plaintiff "should have understood these assumptions in the Sensitivity Analysis without Citibank Colombia needing to explain them," and that "there is evidence to suggest that [Mayagüez] did not possess the level of knowledge that Defendants assign to it." (Id. at 43 (citing Pltf. Rule 30(b)(6) Dep. Tr., DX 4 (Dkt. No. 179-4) at 112:9-11; Iragorri Dep. Tr., DX 3 (Dkt. No. 179-3) at 35:25-36:18))

Given that the peso-dollar exchange rate is an input in the ethanol formulas used by the Colombian government, Judge Cott notes that the exchange rate "potentially had an impact on the price of ethanol." Accordingly, "the parties' dispute is really [about] whether Defendants' conduct in presenting the Sensitivity Analysis was negligent and in bad faith because of the degree to which it suggested that the [peso-dollar exchange] rate affected ethanol pricing." (Id. at 44-45 (emphasis in R&R)) Judge Cott finds that the parties' "arguments raise a plethora of fact issues as to whether Defendants' presentation of the Sensitivity Analysis was

37

negligent or in bad faith as it provided an example of how the exchange rate could interact with the ethanol pricing formula," as well as "to what extent Mayagüez believed that there was a 1:1 correlation even though the exact formula used to establish ethanol prices and the multiple variables within that formula were not known at the time." (Id. at 45-46)

Finally, Judge Cott notes that – under Colombian law – Defendants have a number of duties and obligations, including the "duty to act with care and diligence," but that Defendants "generally avoided addressing their own obligations in their papers." (Id. at 43) He concludes that there are issues of fact as to whether Defendants "acted with the requisite level of diligence and care required of financial entities, or complied with their duty to provide complete information under Colombian law, as well as whether Mayagüez had the experience and knowledge to understand these assumptions on its own." (Id. at 44)

In their objections, Defendants argue that Judge Cott's factual findings compel the conclusion that there are no material issues of fact as to whether Defendants were negligent in (1) presenting the Sensitivity Analysis without stating that it only applied the sugar-based ethanol formula and held all variables constant other than the peso-dollar exchange rate; and (2) presenting examples of how the peso-dollar exchange rate could affect the price of ethanol while holding all other variables constant (i.e., through use of a 1:1 correlation). (Def. Obj. (Dkt. No. 213) at 13-17) This Court considers Defendants' arguments de novo.

According to Defendants, Judge Cott finds that the Sensitivity Analysis's underlying assumptions were "discernible from the Sensitivity Analysis." Accordingly, the R&R "appear[s] to make [the] recommendation [to deny summary judgment] on the sole basis that the record does not establish that Mayagüez actually knew the assumptions underlying the Sensitivity Analysis," which is not the correct standard for proving negligence. (Id. at 15

38

(emphasis in original))  But Defendants have mischaracterized the R&R's conclusion, which is that there are material issues of fact as to whether Defendants complied with their heightened duties – under Colombian law – to act with diligence and care and provide complete information to Mayagüez.  In their objections, Defendants do not acknowledge that Judge Cott made this finding, nor do they offer any argument demonstrating that the evidence establishes – as a matter of law – that they complied with these duties.

Defendants also argue that their failure to disclose the assumptions underlying the Sensitivity Analysis presents no material issue of fact, because (1) "there is no . . . evidence in the record to suggest that, had the gasoline-based ethanol price formula been used (or a note about the statutory cap included), the Sensitivity Analysis would have been materially different," because "the gasoline-based formula would <u>also</u> show a 1:1 correlation"; and (2) "Mayagüez's suggestion that it would not have proceeded with the Currency Trades if Citibank Colombia had only explained what a sensitivity analysis does is implausible on its face and certainly not a genuine material issue over which this case needs to be tried."   (<u>Id.</u> at 15-16 (emphasis in original))

As an initial matter, Defendants conflate the issue of whether they complied with their duties of care and disclosure obligations under Colombian law with the issue of causation. In asserting that the Sensitivity Analysis would not have been materially different if the gasoline-based formula had been incorporated, Defendants argue that Plaintiff would have entered into the Currency Trades even if Defendants had complied with their duties and obligations under Colombian law.  But whether Plaintiff would have entered into the Currency Trades absent Defendants' alleged misconduct goes to whether Defendants' misconduct caused Plaintiff's losses.  In any event, Plaintiff contends that it was negligent to present a sensitivity analysis

showing a 1:1 correlation between the price of ethanol and the peso-dollar exchange rate, regardless of the formula applied.

While Defendants argue that Plaintiff should have known how the Sensitivity Analysis functioned – because sensitivity analyses are "one of the most 'commonly used' tools in business and plainly comprehensible to the operators of a substantial company with extensive currency hedging" (id. at 16) – they do not point to any evidence demonstrating that Plaintiff did, in fact, understand (1) how a sensitivity analysis works, or (2) that the Sensitivity Analysis involved manipulating only one of several possible variables relevant to the ethanol formulas.

Plaintiff acknowledges that Defendants provided it with a sensitivity analysis in 2012 relating to its sugar revenue, but argues that the 2012 sensitivity analysis was fundamentally different, because "the only relevant variable when calculating Mayagüez's revenues from its sugar exports is the [peso-dollar] exchange rate," and "there is no formula to consider." (Pltf. Obj. (Dkt. No. 214) at 12)  Plaintiff argues – and Defendants do not dispute – that there is no evidence suggesting that – prior to receiving the July 2014 Sensitivity Analysis – Plaintiff "had experience analyzing sensitivity analyses with multiple relevant variables." (Id.)

The Court concludes that there are material issues of fact as to Plaintiff's understanding of what the Sensitivity Analysis purported to show, and that these issues of fact bear directly on whether Defendants were negligent in failing to disclose the assumptions underlying the Sensitivity Analysis.

Defendants also object to the R&R's conclusion that there are material issues of fact as to whether Defendants acted negligently in presenting a sensitivity analysis which suggested that there is a correlation between the price of ethanol and the peso-dollar exchange rate.  According to Defendants, "[n]othing in the record suggests that Mayagüez . . . would not

have entered [into] the Currency Trades had the Sensitivity Analysis expressly stated that the correlation was simply due to the inherent nature of a sensitivity analysis." (Def. Obj. (Dkt. No. 213) at 16-17)  As discussed above, however, the record is not clear as to Mayagüez's general understanding of what the Sensitivity Analysis purported to show, and there is evidence suggesting that Mayagüez did not understand the Sensitivity Analysis or the extent to which it indicated that Mayagüez's ethanol revenues were exposed to the exchange rate.  (See Iragorri Dep. Tr., DX 3 (Dkt. No. 179-3) at 102:19-22 ("If we had understood the product and if it had been explained to us what the nature was of the product, I'm sure that we wouldn't have entered into this transaction."); id. at 149:23-25 ("Had we understood the nature of this product, we would have never entered into it."))  That same evidence supports Plaintiff's argument that, if it understood the nature of the Currency Trades as they were presented in the Sensitivity Analysis, it would not have entered into them.  (See id.) [11]

      Moreover, as Plaintiff points out, the Sensitivity Analysis quantifies the exposure of Plaintiff's ethanol sales to the exchange rate based on a 1:1 correlation.  (Pltf. Resp. (Dkt. No. 217) at 11-12)  The Sensitivity Analysis states that "the monthly sales of ethanol behave as if the refinery had 6.7 MM USD in cash per month."  (PX 103 (Dkt. No. 154-98) at 11)  Defendants also "used the number calculated in the Sensitivity Analysis (USD 6.7 million) in determining the size of the Currency Trades."  (Pltf. Resp. (Dkt. No. 217) at 12 (quoting PX 103 (Dkt. No. 154-98) at 11); citing PX 122 (Dkt. No. 154-119) at 2))  Based on the evidence in the record, it is

---

[11]  Defendants also argue that "nothing in the record indicates [that] the alleged 'degree' of exposure purportedly shown in the Sensitivity Analysis was actually used in connection with Mayaguez's hedging," because "Mayaguez simply added up its projected sugar and ethanol sales and hedged a percentage of those total revenues." (Def. Obj. (Dkt. No. 213) at 17 (emphasis in original))  This argument misses the point; Judge Cott concludes that there are material issues of fact as to whether the Sensitivity Analysis was misleading in that it overstated the strength of the correlation between the price of ethanol and the peso-dollar exchange rate.

plausible that Defendants' calculations in the Sensitivity Analysis created the impression that there was, in fact, a 1:1 correlation between the peso-dollar exchange rate and the price of ethanol. This evidence further demonstrates that there are material issues of fact as to whether Defendants were negligent in failing to explain the extent to which the 1:1 correlation was theoretical and hypothetical.

In its objections, Plaintiff contends that Judge Cott gave insufficient weight to the "historical analysis presented by Mayagüez's expert" concerning the relationship between the price of ethanol and the peso-dollar exchange rate. Judge Cott concluded that the expert's analysis has "'little bearing on whether Defendants acted negligently or in bad faith at the time [they] presented [their] Sensitivity Analysis with a 1:1 correlation.'" (Pltf. Obj. (Dkt. No. 214) at 14-15 (quoting R&R (Dkt. No. 210) at 45)) Plaintiff contends that Defendants "could have (and should have) explained to Mayagüez that, up to that point, the relationship between the price of ethanol and the [peso-dollar] exchange rate had a weak, negative correlation; that in the short term, the relationship proved itself unstable at best, and that hedging ethanol sales against fluctuations in the [peso-dollar] exchange rate under such circumstances was nonsensical and ultimately increased Mayagüez's risk, rather than reducing it." (Id. at 15)

To the extent that Plaintiff contends that it is entitled to summary judgment based on the expert's analysis, its argument is not persuasive. A historical analysis of the correlation between the price of ethanol and the peso-dollar exchange rate (or lack thereof) is relevant to Plaintiff's claim to the extent that it bears on what Defendants knew or should have known about that correlation at the time they presented the Sensitivity Analysis. But the expert's historical analysis – which has the benefit of hindsight and broad access to historical data – is not sufficient to demonstrate that Defendants were negligent as a matter of law.

In its objections, Plaintiff complains that Judge Cott improperly resolved issues of material fact in making the following findings:  (1) that "'[g]iven Mayagüez's extensive background in hedging transactions and financial instruments . . . , it seems likely that Mayagüez would have known that a Sensitivity Analysis kept certain variables constant to demonstrate the impact of a specific variable'"; (2) that because "'the Sensitivity Analysis only showed one output,'" Plaintiff "should have been aware that only one formula was being applied; [because] if the Sensitivity Analysis had incorporated the entire ethanol pricing formula (which, as Mayagüez is aware, consists of three separate formulas), it would have presumably produced a total of three separate outputs (one for each formula)"; and (3) that "'because Mayagüez knew that the ethanol pricing formula included many different variables, Mayagüez likely should have been aware that the analysis of one of those variables – the USD/COP exchange rate – had to involve, in part, assumptions as to the other variables.'"  (Pltf. Obj. (Dkt. No. 214) at 12-14 (alteration in Pltf. Obj.) (quoting R&R (Dkt. No. 210) at 42-43))

Plaintiff's objection is misplaced, because Judge Cott ultimately concludes that these issues are not sufficiently clear to permit resolution as a matter of law.  Because Plaintiff has moved for summary judgment on its Colombian law claims, Judge Cott was required to address whether there are material issues of fact as to Plaintiff's understanding of the nature of and risks associated with the Currency Trades.  The R&R excerpts about which Plaintiff complains indicate that Defendants have offered sufficient evidence on these points to create material issues of fact for resolution by a finder of fact.

For the reasons stated above, this Court overrules the parties' objections and adopts Judge Cott's conclusion that there are material issues of fact as to whether Defendants acted with <u>culpa</u> in (1) failing to disclose that the Sensitivity Analysis only applies the sugar-

based ethanol formula and maintains as constant all variables other than the peso-dollar

exchange rate; and (2) presenting the Sensitivity Analysis showing a 1:1 correlation between the

price of ethanol and the peso-dollar exchange rate.

### iii.  Defendants' Presentation of the Currency Trades as Hedges

Plaintiff argues that Defendants acted with culpa in presenting the Currency

Trades as hedges, because the Currency Trades "did the opposite of what a hedge is supposed to

do – they dramatically increased, rather than decreased, the risk to Mayagüez." (Pltf. Opp. (Dkt.

No. 161) at 24) Citing its expert's analysis, Plaintiff argues that the Currency Trades did not

hedge against Plaintiff's foreign exchange risk, because "the only scenario where Mayagüez

does not suffer substantial losses is where the exchange rate is relatively stable – but this is

precisely the situation where a hedge is unnecessary." (Pltf. Br. (Dkt. No. 153) at 32-34 (citing

Veronesi Rpt., PX 27 (Dkt. No. 154-20) at 44)) Plaintiff further asserts that Defendants did not

"provide information about any exchange-rate scenarios for the July 2014 and January 2015

Currency Trades, the potential for substantial losses to Mayagüez, and the unlimited risk to

Mayagüez," and thereby violated their duty "to provide complete and accurate information,

. . . . to act diligently, . . . to act in [their] client's interests, and . . . to act in good faith." (Pltf.

Opp. (Dkt. No. 161) at 27-28)

Defendants respond that they were not negligent in describing the Currency

Trades as hedges, because the terms of the Currency Trades were fully disclosed, including that

"the Currency Trades did not cover all of Mayagüez's exchange rate exposure and capped its

compensation if the USD depreciated." (Def. Reply (Dkt. No. 180) at 9 (emphasis in original))

Defendants further argue that at the time Plaintiff entered into the Currency Trades, it "had

extensive, first-hand experience with the operation of the cap," because it had previously

44

"amended the First Currency Trade to increase the compensation cap and eventually received this increased maximum compensation, as the trade terminated when the cap was reached." (Def. Br. (Dkt. No. 150) at 28-29)  According to Defendants, Plaintiff "assessed [the cap] . . . and decided to accept that limitation to its hedging coverage in exchange for other benefits, namely a higher strike price."  Finally, Defendants argue that Plaintiff's losses were not caused by the cap, which only limits the payments Mayagüez could receive, and had no effect on the payments it might have to make in the event of appreciation in the U.S. dollar.  (Def. Opp. (Dkt. No. 156) at 27)

> Judge Cott concludes that,

> [w]hile the record comes close to establishing that Defendants were not negligent and did not act in bad faith in selling [the] Currency Trades as "hedges" given the context, there are factual issues that cannot be resolved at this juncture, including, as Mayagüez argues . . . , whether it was negligent or bad faith to sell Currency Trades that functioned as hedges only if the exchange rate moved within a narrow range and to what extent Mayagüez's affirmative decision to focus on the strike price to the detriment of other terms should weigh in assessing culpa.

(R&R (Dkt. No. 210) at 48-49)  Judge Cott also finds, however, that the "record establishes that Mayagüez understood that the Currency Trades did not cover all of its exposure and had a compensation cap," and thus any claim that Defendants misrepresented these facts is without merit.  (Id. at 47 (citing Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 90, 97, 127-28, 168))

In their objections, Defendants argue that Judge Cott errs in characterizing these disputes as factual, rather than legal, in nature.  (Def. Obj. (Dkt. No. 213) at 18)  They assert that they "cannot be liable for engaging in the Currency Trades with a cap that was fully disclosed to and chosen by Mayagüez."  (Id. (emphasis in original))  Defendants further contend that inclusion of a compensation cap is not a material fact because it only capped "payments

Mayagüez could <u>receive</u>" and thus "cannot render Defendants liable for payments [Plaintiff] <u>made</u>."  (<u>Id.</u> (emphasis in original))  The Court reviews these arguments <u>de novo</u>.

Defendants' criticism of the R&R is misplaced.  Judge Cott's finding of material issues of fact is not premised on the compensation cap, which Judge Cott concludes was fully disclosed.  (R&R (Dkt. No. 210) at 47)  Judge Cott's finding is instead premised on the structure of the Currency Trades, which reduced Plaintiff's risk only in narrow circumstances.  Judge Cott finds that Plaintiff has offered evidence sufficient to demonstrate that the effect of the Currency Trades was that Plaintiff "suffered losses with any material movement of the COP/USD exchange rate," and that "the only scenario where Mayagüez does not suffer substantial losses is where the exchange rate is relatively stable," which "is precisely the situation where a hedge is unnecessary."  (Pltf. Br. (Dkt. No. 153) at 32-33 (citing Veronesi Rpt., PX 27 (Dkt. No. 154-20) at 44 (Fig. 19)); <u>see</u> R&R (Dkt. No. 210) at 48-49)  Whether Defendants acted with <u>culpa</u> and complied with their duties under Colombian law in characterizing the Currency Trades as hedges – despite the allegedly limited protection and high risk the Currency Trades provided – presents issues of fact that must be resolved by a fact-finder.  And because <u>culpa</u> must be assessed in light of all the facts and circumstances (<u>see</u> Dunogué Decl., Ex. 8 (Muñoz Dep. Tr.) (Dkt. No. 167-8) at 52:7-53:5), Plaintiff's alleged decision to decline terms that would have provided it with more hedging protection in favor of terms that provided a higher strike price presents questions of fact that are material to the negligence determination.

### iv.      <u>Legitimate Ignorance</u>

Defendants argue that they are entitled to summary judgment on Plaintiff's Colombian law claims because Plaintiff was not "legitimately ignorant" of the risks involved in entering the Currency Trades.  According to Defendants, Plaintiff's reliance on any allegedly

false or misleading statements was not justified, because Plaintiff disclaimed reliance on

Defendants' advice and represented that it would perform its own analyses in contracts and other

documents relating to the Currency Trades.  Defendants further argue that Plaintiff did not

comply with its duty under Colombian law to self-inform.  (Def. Br. (Dkt. No. 150) at 29-30, 33-

34)

> Under Colombian law,

> the pre-contractual duty to inform implies that one of the parties has information
> unbeknownst to the other party which . . . is necessary to be provided so as to
> avoid an imbalance in the contract . . . . Notwithstanding the above, by virtue of
> the principle of responsibility derived from the social utility of the contract, the
> parties' ignorance must be legitimate so that they cannot ignore information that
> they should know or would have known if they had behaved diligently . . . . [O]ne
> has to evaluate [legitimate ignorance] based on the conditions, capacities, the
> educational and professional level of that debtor whose ignorance is being
> evaluated.

(Dunogué Decl., Ex. 8 (Muñoz Dep. Tr.) (Dkt. No. 167-8) at 93:7-18, 95:6-9)

### (a)      Representations and Disclaimers

Defendants contend that Plaintiff's "prior representations and conduct" as to its

lack of reliance on Defendants' advice "must form a part of any liability assessment" under

Colombian law.  (Def. Reply (Dkt. No. 180) at 15)  In the Swap Agreement and the Colombian

Swap Agreement, Plaintiff represented, inter alia, that it "ha[d] made its own independent

decision[] . . . as to whether th[e] Transaction is appropriate or proper for it"; that it was "not

relying on any communication (written or oral) of the other party as investment advice or as a

recommendation to enter into th[e] Transaction"; and that it was "capable of evaluating and

understanding (on its own behalf or through independent professional advice), and understands

and accepts, the terms, conditions and risks of th[e] Transaction."  (Swap Agmt., DX 15 (Dkt.

No. 160-28) at 8-9; see also Def. Br. (Dkt. No. 150) at 35 ("Mayagüez [represented that it]

'[wa]s not relying on the advice of [Defendants] . . . [and] will determine, without reliance upon [Defendants], the economic risks and merits . . . of the Transaction[] and that it will be capable of assuming such risk.'" (citing Feb. 2014 Ltr., DX 72 (Dkt. No. 160-106) at 2; Dec. 2014 Ltr., DX 59 (Dkt. No. 160-93) at 3; Jan. 2015 Ltr., DX 83 (Dkt. No. 160-117) at 2)))  Defendants argue that, given these representations, "there can be no basis to find that [Defendants] acted with 'culpa' by allegedly not providing enough information to [P]laintiff."  (Def. Br. (Dkt. No. 150) at 36)

Plaintiff responds that Defendants' duties under Colombian law "cannot be disclaimed by contract," and that in any event the disclaimers at issue provide no basis for excusing Defendants' conduct, because they are "boilerplate" and do not "identify any specific statements upon which Mayagüez could not rely."  (Pltf. Opp. (Dkt. No. 161) at 14, 16-17)

Judge Cott concludes that Plaintiff's "representations must be afforded some weight, particularly considering Mayagüez's claims that it relied on Defendants' recommendations of the Currency Trades."  Judge Cott also concludes, however, that the "disclaimers present further factual questions that should be resolved by the trier of fact, including to what extent these representations undermine Mayagüez's reliance on Defendants' alleged misconduct. . . ."  (R&R (Dkt. No. 210) at 50)

This Court finds no error in Judge Cott's finding that questions of fact remain as to the effect of Plaintiff's representations and disclaimers of reliance.

### (b)   Plaintiff's Experience and Duty to Self-Inform

Defendants argue that they are entitled to summary judgment on Plaintiff's claims under Articles 2341 and 863, because Plaintiff was equipped with sufficient experience and information to understand the nature and risks of the Currency Trades, but failed to comply with

its duty to self-inform.  (Def. Br. (Dkt. No. 150) at 30)  In this regard, Defendants note that

Plaintiff "had repeatedly entered into 'exotic'/non-'plain vanilla' currency hedges," including

"the 2008 Transaction with Citibank [which] shared many of the same features as the Currency

Trades."  (Id. at 30-31)  According to Defendants, Plaintiff knew or should have known that "(i)

the Currency Trades had a compensation cap . . . ; (ii) the larger notional amount of the Second

Currency Trade . . . could lead to larger payments; and (iii) there was no limit on the amount it

might have to pay."  (Def. Reply (Dkt. No. 180) at 16)  Defendants also assert that Plaintiff

ignored its auditor's advice that it should develop policies and procedures to evaluate proposed

currency hedging transactions, and cite testimony from Plaintiff's Rule 30(b)(6) witness that

Mayagüez "'didn't analyze'" "the terms and structure of the Currency Trades." (Def. Br. (Dkt.

No. 150) at 34 (quoting Alarcon Dep. Tr., DX 4 (Dkt. No. 179-4) at 82:15-16))

        Citing Defendants' expert's declaration, Plaintiff responds that "any supposed

failure by Mayagüez would affect Citi's liability only if Mayagüez's 'behavior is the exclusive

cause of the damage.'"  (Pltf. Opp. (Dkt. No. 161) at 18 (quoting Tamayo Decl. (Dkt. No. 167-5)

¶ 55))  Plaintiff further argues that the duty to self-inform is not applicable here, because under

Colombian law, "trust can negate [Defendants'] proposed requirement of 'legitimate

ignorance.'"  (Id. (citing Auscol S.A. v. Parcheggio S.A. (July 23, 2013), PX 183 (Dkt. No. 164-

1) at 39))  Plaintiff contends that – under Colombian law – it was entitled to trust Defendants'

representations because of the longstanding relationship between the parties and Defendants'

status as a financial institution, and because Defendants were selling their product to Plaintiff.

(Id. at 18-19)  According to Plaintiff, to the extent that the duty to self-inform is applicable, it is

"relevant only in potentially reducing the amount of damages to be awarded to the plaintiff."  (Id.

at 17 (citing Tamayo Decl. (Dkt. No. 167-5) ¶ 57))

Judge Cott concludes that, "[u]nder Colombian law, Mayagüez's failure to self-inform must be the exclusive cause of the damage in order for there to be no liability," and that "issues of fact . . . prevent the grant of summary judgment to Defendants [on this point]."  (R&R (Dkt. No. 210) at 52 (citing Tamayo Decl. (Dkt. No. 167-5) ¶¶ 55-56, 83 n.75))  He finds that although Mayagüez's experience suggests that it "had knowledge of currency forwards" and "understood how payments to Citibank Colombia would work under the Currency Trades," Mayagüez "did not even attempt to analyze the trades, but simply agreed to the terms without [conducting] its own due diligence."  (Id. at 51)  "Viewing the ambiguities in Mayagüez's favor," "there remain issues of fact as to whether Mayagüez had the requisite knowledge about the risks involved with hedging its ethanol revenues given the undisclosed assumptions in the Sensitivity Analysis."  (Id. at 53)

In their objections, Defendants argue that Judge Cott "incorrectly concluded that 'issues of fact exist' as to whether Mayagüez's failure to self-inform was the 'exclusive cause of the damage' and whether Mayagüez 'had the requisite knowledge about the risks involved with hedging its ethanol revenues given the undisclosed assumptions in the Sensitivity Analysis.'"  (Def. Obj. (Dkt. No. 213) at 20 (quoting R&R (Dkt. No. 210) at 52-53))  The Court reviews these arguments de novo.

As an initial matter, Defendants contend that "Colombian law does not require that Mayagüez's failure to self-inform be the 'exclusive' cause of its purported losses in order to be relevant to a determination of whether Defendants are liable."  (Id. at 20)  Once again, Defendants' objection to the R&R is misplaced.  Judge Cott does not say that Mayagüez's failure to self-inform is irrelevant unless it is the exclusive cause of damage.  Instead, he finds that a

defendant cannot be completely absolved of liability unless the plaintiff's failure to self-inform is the exclusive cause of damage.  (R&R (Dkt. No. 210) at 52)

Defendants also argue that the undisclosed assumptions in the Sensitivity Analysis "had nothing to do with whether Mayagüez 'had the requisite knowledge about the risks involved with hedging its ethanol revenues,'" because the risks were determined by "how the payments worked" and "what the exchange rate might end up being."  (Def. Obj. (Dkt. No. 213) at 21 (quoting R&R (Dkt. No. 210) at 53))  But this argument simply ignores Judge Cott's finding that summary judgment cannot be granted on the basis that Plaintiff failed to self-inform unless that failure is the exclusive cause of Plaintiff's damages.  Moreover, the undisclosed assumptions in the Sensitivity Analysis are relevant to Plaintiff's knowledge of the risks, because financial institutions are obligated to "provide information that . . . is complete and not partial, so that the receiver of the information may have an integral and detailed picture of the position it is in."  (Muñoz Decl. (Dkt. No. 154-167) ¶ 152; R&R (Dkt. No. 210) at 53)  As discussed above, there are issues of material fact as to whether Defendants complied with their duty to provide complete information in presenting the Sensitivity Analysis.  These fact issues preclude a finding that, as a matter of law, Plaintiff's failure to self-inform was the exclusive cause of its damages.

In its objections, Plaintiff states that, while the R&R "correctly den[ied] summary judgment as to how or whether Mayagüez's duty to self-inform affected [Defendants'] liability, Magistrate Judge Cott erroneously noted that Mayagüez had 'extensive experience' in currency hedging that undercut a claim of legitimate ignorance."  (Pltf. Obj. (Dkt. No. 214) at 16 (quoting R&R (Dkt. No. 210) at 51))  According to Plaintiff, "[t]here is no evidence that suggests that Mayagüez had extensive experience with these types of exotic hedging transactions."  (Id.)  The Court reviews Plaintiff's objection de novo.

Plaintiff's objection misstates Judge Cott's finding, which is that Plaintiff has extensive experience with "currency forwards," not extensive experience with "exotic hedging transactions."  The evidence shows that Plaintiff "had entered into numerous plain vanilla and non-plain vanilla trades with a variety of financial institutions, including a 2008 transaction with Citibank Colombia."  (R&R (Dkt. No. 210) at 51 (citing 2008 Trade Confirmation, DX 25 (Dkt. No. 160-52); Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 36-38, 40-42))  While Plaintiff asserts that "experience with plain vanilla products is [not] equivalent to experience using exotic, complex products" (Pltf. Obj. (Dkt. No. 214) at 17), Judge Cott does not equate the two.  Instead, he merely notes that Plaintiff's currency hedging experience includes both "plain vanilla and non-plain vanilla trades" (R&R (Dkt. No. 210) at 51), as Plaintiff itself admits.  (Pltf. Obj. (Dkt. No. 214) at 17; see also Pltf. R. 56.1 Cntrstmt. (Dkt. No. 166) ¶ 34 ("Mayagüez admits that from 2008 to 2012 [it] entered into plain vanilla hedging transactions . . . . [and] non-plain vanilla hedging transactions."))

The parties' objections are overruled as set forth above.  The Court adopts the R&R's conclusion that there are material issues of fact as to whether Plaintiff's failure to self-inform was the exclusive cause of its alleged damages.

### v.        Causation

Defendants contend that they are entitled to summary judgment on Plaintiff's claims under both Colombian and New York law, because the "unprecedented appreciation" of the U.S. dollar – not their alleged misconduct – was the cause of Plaintiff's losses.  (Def. Br. (Dkt. No. 150) at 40)  In support of this argument, Defendants note that, in connection with the First Currency Trade, Plaintiff "received payments, up to the maximum amount, so it had no losses," and that Plaintiff suffered losses in connection with the Second and Third Currency

Trades only "when the USD dramatically appreciated, contrary to market expectations."  (Id. at 39-40 (emphasis in original))  Defendants further argue that "if the COP had appreciated instead of depreciated, Mayagüez would have received greater payments under the Currency Trades due to the higher notional amount."  (Def. Reply (Dkt. No. 180) at 20 (emphasis in original))

Plaintiff responds that it "would not have entered into the Currency Trades" – and suffered the attendant losses – "but for [Defendants'] misconduct."  (Pltf. Opp. (Dkt. No. 161) at 30-31)

Judge Cott concludes that the issue of causation cannot be resolved as a matter of law.  (R&R (Dkt. No. 210) at 55)  He finds that although there is evidence that "Mayagüez understood that the loss was due to USD devaluation in the market, . . . . [t]here is no clear evidence in the record to establish whether Mayagüez would have entered into the Currency Trades absent the alleged misconduct."  (Id. at 54 (citing Holguin Dep. Tr., DX 130 (Dkt. No. 179-42) at 104:5-13; Pltf. Rule 30(b)(6) Dep. Tr., DX 4 (Dkt. No. 179-4) at 148:11-14; Iragorri Dep. Tr., DX 3 (Dkt. No. 179-3) at 138:13-15))  Accordingly, there are material issues of fact as to whether Defendants' alleged misconduct was one of "multiple contributing causes to [Plaintiff's] losses."  (Id. at 54)

In their objections, Defendants contend that Judge Cott "erred in (i) looking only at transaction causation, not proximate or loss causation, and (ii) even as to transaction causation, speculating about hypotheticals as to which there is no evidence in the record."  (Def. Obj. (Dkt. No. 213) at 27)  As to "transaction causation" – "whether the specific alleged omissions caused Mayagüez to enter into the Currency Trades" – Defendants argue that "[t]he record is replete with evidence that Mayagüez would have entered into the Currency Trades, or substantially similar trades, regardless of Defendants' alleged omissions."  In this regard, Defendants cite

Plaintiff's "long history . . . of hedging a significant portion of its USD exposure risk," its "singular focus on strike price," and the lack of "evidence suggesting that Mayagüez's decision to enter into the Currency Trades hinged on the specifics of the Sensitivity Analysis." (Id. at 27-28)  The Court reviews Defendants' objections de novo.

As to transaction causation, the Court acknowledges Plaintiff's history of currency hedging and its alleged focus on strike price, and Defendants will be free to argue to the factfinder that Mayagüez would have entered into the Currency Trades even absent Defendants' alleged misconduct.  For reasons already explained, however, there are issues of material fact as to Plaintiff's understanding of the nature and risks of the Currency Trades that preclude summary judgment.

As to loss causation, Defendants argue that "Mayagüez cannot show these alleged omissions were the proximate/adequate cause of its purported losses – rather than an intervening cause like a market-wide event – [which] is fatal to its claims."  (Id. at 29)

Plaintiff responds, however, that the Currency Trades were structured such that Mayagüez would "suffer[] losses with any material movement of the COP/USD exchange rate" (Pltf. Br. (Dkt. No. 153) at 32-33 (citing Veronesi Rpt., PX 27 (Dkt. No. 154-20) at 44)), and that "even if the exchange rate had moved only from approximately 2,000 to 2,477 – a shift that was far from unprecedented – Mayagüez would have suffered substantial losses of COP 60 billion." (Pltf. Reply (Dkt. No. 168) at 14 (citing Veronesi Rpt., PX 27 (Dkt. No. 154-20) ¶ 101))  Under Plaintiff's theory, Defendants' omissions and misrepresentations both induced Plaintiff to enter into the Currency Trades and caused Plaintiff's losses, because the structure of the Currency Trades meant that "there was no way in which the Currency Trades protected Mayagüez from risk," and that Mayagüez would suffer losses even absent an "unprecedented" change in the

exchange rate.  (Id.; see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 188-89 (2d Cir. 2015) ("Here, while Defendants by no means represented the CDOs to be free of risk, they represented the CDOs to be more than simply 'well built,' and far from what Plaintiffs claim the CDOs actually were:  designed to fail. . . . The requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations."))

Accordingly, this Court adopts Judge Cott's conclusion that, with respect to Plaintiff's claims under Colombian and New York law, there are issues of material fact as to whether Defendants' alleged misconduct caused Plaintiff's losses.

\*       \*       \*       \*

For the reasons stated above, this Court adopts Judge Cott's recommendation that the parties' cross-motions for summary judgment on Plaintiff's claims for negligence and bad faith under Articles 2341 and 863 be denied.

### c.     Willful Misconduct Under Article 2341 (First Cause of Action)

Defendants move for summary judgment on Plaintiff's claim for willful misconduct under Article 2341, arguing that there is no evidence that Defendants acted with the necessary intent.  (Def. Br. (Dkt. No. 150) at 25)

Under Colombian law, liability for willful misconduct under Article 2341 requires evidence of a "positive intent to cause damage [dolo in the original Spanish]," which "means engaging in an act or omission with the intent to cause damage to another party."  (Tamayo Decl. (Dkt. No. 167-5) ¶ 41 (citing Colombia Civil Code Art. 63); see also Muñoz Decl. (Dkt. No. 154-167) ¶ 53 ("Willful misconduct (dolo) requires malicious intention."))

In support of its claim for willful misconduct, Plaintiff asserts that Defendants (1) "knowingly falsely represented to Mayagüez that the Currency Trades were: (i) tailored for Mayagüez and as such, would satisfy its currency hedging needs; and (ii) the best hedging alternative for Mayagüez"; and (2) "knowingly fraudulently concealed from Mayagüez that the Currency Trades: (i) created unlimited exposure for Mayagüez; and (ii) generated potentially very significant earnings for Defendants." (Am. Cmplt. (Dkt. No. 15) ¶¶ 155-56)

Plaintiff further claims that

> Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade by knowingly fraudulently promising that (i) Defendants would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014 Currency Trade at the end of the January 2015 Trade, folding that debt into a new trade; and (ii) if the USD/COP exchange rate exceeded COP 2,600, or in any case, before the second tranche took effect, Defendants would amend the trade to increase the strike price, ensuring that Mayagüez would not have to make payments to Citibank.

(Id. ¶ 158) According to Plaintiff, "Defendants knew, recklessly disregarded and/or should have known, that their representations and omissions concerning the Currency Trades . . . [and] their promises concerning the January 2015 Currency Trade were false and/or misleading at the time they were made." (Id. ¶ 161)

Asserting that there is no evidence that any alleged misrepresentations or omissions in connection with the Currency Trades were intentional, Defendants argue that Plaintiff "received . . . all material terms of the three Currency Trades and their amendments," "was aware that its payment obligations were tied to the future USD/COP exchange rate," and that it "received substantial information about the limited compensation structure," including that its "proceeds from the Currency Trades were capped." (Def. Br. (Dkt. No. 150) at 25, 27-28 (emphasis in original))

Defendants also cite evidence that "Citibank Colombia employees believed that ethanol revenues could be exposed to the exchange rate," including a February 2014 email from David Polania – the Citibank Colombia employee who handled the Currency Trades – in which he describes Mayagüez's ethanol revenues as being exposed to the peso-dollar exchange rate. Polania's email states that Mayagüez was "just hedging with this transaction the USD exposure associated [with] the sugar sales, they are not including the Ethanol exposure.  When they add the USD exposure associated [with] the ethanol sales[,] the hedge ratio is below 50%."  (Feb. 13, 2014 Polania email, DX 73 (Dkt. No. 160-107) at 3; Def. Reply (Dkt. No. 180) at 10; see also Polania Dep. Tr., PX 2 (Dkt. No. 154-2) at 14:14-15:07 (Polania testimony that in 2014 he believed the price of ethanol would increase if the dollar appreciated and decrease "if the dollar value decreased"))

Plaintiff responds that Defendants "fail[ed] to disclose and provid[ed] misrepresentations regarding the extreme risks that the Currency Trades imposed on Mayagüez," and that they "made affirmative misrepresentations by repeatedly referring to the Currency Trades as hedges, claiming [that] they acted like plain vanilla forwards, and stating that the trades were 'favorable' to Mayagüez."  (Pltf. Opp. (Dkt. No. 161) at 27)

Judge Cott recommends that Defendants be granted summary judgment on Plaintiff's willful misconduct claim, because "Mayagüez has not identified any evidence in the record to support the intent required under Article 2341."  (R&R (Dkt. No. 210) at 58)  There is evidence that Citibank Colombia employees believed that Plaintiff's ethanol sales exposed the company to risk from fluctuations in the peso-dollar exchange rate, and there is no evidence that Defendants were "intentionally misrepresenting the exposure to induce Mayagüez into the [C]urrency [T]rades."  (Id. at 55-56)  Moreover, the record does not "support any concealment of

the terms" of the Currency Trades; indeed, it is "clear . . . that Mayagüez received trade

confirmations that provided the terms of the Currency Trades."  (Id. at 57 (citing DX 7 (Dkt. No.

160-8) ¶ 6; July 31, 2014 Second Currency Trade confirmation, DX 75 (Dkt. No. 160-109); Dec.

18, 2014 first amendment to Second Currency Trade, DX 56 (Dkt. No. 160-90); Jan. 20, 2015

Third Currency Trade confirmation, DX 61 (Dkt. No. 160-95); Mar. 21, 2016 restructured Third

Currency Trade confirmation, DX 62 (Dkt. No. 160-96)))

      As to Plaintiff's argument regarding Defendants' omissions and affirmative

misrepresentations, Judge Cott reasons that "even assuming [that] Defendants are at fault for

these alleged omissions [and misrepresentations], Mayagüez does not offer any evidence that

Defendants acted with intent."  (Id.)

      Plaintiff has not objected to Judge Cott's recommendation concerning its willful

misconduct claim.  (Pltf. Obj. (Dkt. No. 214) at 6 ("Mayagüez . . . does not object to the

dismissal of its claim based on willful misconduct under Colombian law."))

      This Court finds no clear error in Judge Cott's conclusion that Plaintiff has not

offered evidence sufficient to demonstrate that Defendants intentionally misrepresented or

concealed information relating to the Currency Trades.  See Crawford v. Franklin Credit Mgmt.

Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of

proof on an issue at trial, the moving party may satisfy its burden by 'point[ing] to an absence of

evidence to support an essential element of the nonmoving party's' case." (alteration in

Crawford) (quoting Brady v. Town of Colchester, 863 F.2d 205, 210-11 (2d. Cir. 1988))).

Accordingly, the Court adopts the R&R's recommendation that Defendants be granted summary

judgment on Plaintiff's claim for willful misconduct under Article 2341.

2.      **New York Law Claims**

Although Plaintiff asserts that its claims are governed by Colombia law (Pltf. Br. (Dkt. No. 153) at 20-28), as discussed above, the Amended Complaint pleads claims in the alternative under New York law.  Given that Defendants have chosen not to seek a choice of law determination at this time, this Court will address their motion for summary judgment on Plaintiff's New York law claims.

a.      **Fraud and Negligent Misrepresentation Claims**

Defendants have moved for summary judgment on Plaintiff's claims for fraudulent inducement, fraudulent concealment, and negligent misrepresentation under New York law.  They argue that Plaintiff has not put forth evidence demonstrating that (1) Defendants intentionally or negligently misrepresented or omitted facts concerning the Currency Trades; (2) Plaintiff justifiably relied on any alleged misstatements; or (3) that Defendants had a special duty to Plaintiff.  (Def. Br. (Dkt. No. 150) at 25-29, 34-36)

i.      **Fraudulent Inducement and Fraudulent Concealment**

To establish fraudulent inducement under New York law, a plaintiff "must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result."  Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007).  "'Fraudulent concealment claims have the additional element that the defendant had a duty to disclose the material information.'"  PetEdge, Inc. v. Garg, 234 F. Supp. 3d 477, 494 (S.D.N.Y. 2017) (quoting UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485, 497 (S.D.N.Y. 2003) (citing Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995))).

According to Defendants – and for the same reasons discussed above in connection with Plaintiff's willful misconduct claim under Article 2341 – Plaintiff has not demonstrated that Defendants knowingly or recklessly concealed a material fact.  (Def. Br. (Dkt. No. 150) at 25-29)

Although the R&R recommends that Defendants be granted summary judgment on Plaintiff's willful misconduct claim, the R&R does not address whether, for the same reasons, Defendants should be granted summary judgment on Plaintiff's fraudulent inducement and fraudulent concealment claims, which require evidence that a defendant "knowingly or recklessly misrepresented a material fact . . . ."  Merrill Lynch, 500 F.3d at 181.  Judge Cott instead recommends that summary judgment be denied on these claims, citing material issues of fact as to whether Plaintiff reasonably relied on Defendants' alleged misrepresentations.  (R&R (Dkt. No. 210) at 59-62)

In their objections, Defendants argue that Judge Cott erred in not recommending that they be granted summary judgment on Plaintiff's fraud claims.  Defendants note that the R&R concludes that "'Mayagüez has not proffered any evidence that Defendants acted with intent'" in connection with Plaintiff's willful misconduct claim, but does not acknowledge "that this lack of any fraudulent intent similarly disposes of Mayagüez's New York fraud claims."  (Def. Obj. (Dkt. No. 213) at 22-23 (quoting R&R (Dkt. No. 210) at 55))  Defendants further assert that, "[t]o the extent a recklessness standard is also applied to fraud claims, . . . that 'recklessness standard requires that Plaintiffs . . . allege facts supporting a strong inference of conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  (Id. at 23 n.45 (quoting Setzer v. Omega Healthcare Invs., Inc., 968 F.3d 204, 213 (2d Cir. 2020))  The Court reviews Defendants' objection de novo.

60

In response, Plaintiff contends that Defendants' argument is waived, because they did not raise it in their summary judgment motion.  (Pltf. Resp. (Dkt. No. 217) at 26)  Plaintiff also argues that it "need only show that [Defendants] knew or recklessly disregarded the truth of [their] statements," and that "there is evidence showing, at least, a dispute of fact as to whether [Defendants] knew or recklessly disregarded the truth of [their] statements regarding ethanol and that the Currency Trades were hedges."  (Id. (citing Merrill Lynch, 500 F.3d at 181; Veronesi Rpt., PX 27 (Dkt. No. 154-20) ¶¶ 8, 28-32, 47-48, 57-63))

As an initial matter, Defendants' objection is not waived because they did, in fact, make the same argument in their summary judgment motion.  (See Def. Br. (Dkt. No. 150) at 18-22 ("The gravamen of Mayagüez's Colombian and New York law claims is that Defendants allegedly 'knowingly misrepresented the terms and risks' of the Currency Trades. . . . Mayagüez was neither misled nor misinformed by Defendants, neither intentionally, nor in 'bad faith,' nor negligently."))  As to whether Defendants' alleged misrepresentations and omissions were knowing or intentional, the Court finds, for the reasons explained above in connection with Plaintiff's willful misconduct claim under Article 2341, that the record does not establish that Defendants acted with knowledge or intent.

While Plaintiff asserts that there are material issues of fact as to whether Defendants' alleged misrepresentations and omissions were reckless, under New York law, "reckless disregard for the truth . . . mean[s] 'conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in S. Cherry) (quoting Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000)); see also In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) ("[R]ecklessness 'must be conduct that is highly

unreasonable, representing an extreme departure from the standards of ordinary care.'" (quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000))).  As explained above, the record demonstrates that Citibank Colombia believed in 2014 that Plaintiff's ethanol revenues presented a risk to the company from fluctuations in the peso-dollar exchange rate.  Moreover, Plaintiff has not identified any evidence suggesting that Defendants were aware of, but recklessly disregarded, information suggesting that the Currency Trades would not function as hedges.

The Court concludes that Plaintiff has not demonstrated that there are material issues of fact as to whether Defendants acted with fraudulent intent or recklessness. Accordingly, Defendants' motion for summary judgment will be granted as to Plaintiff's fraudulent misrepresentation and fraudulent concealment claims.

### ii.        Negligent Misrepresentation

As to Plaintiff's negligent misrepresentation claim,

> the elements . . . are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

Hydro Invs., Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted). Moreover, "'the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition.'"  Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd., 257 F. Supp. 3d 348, 357 (S.D.N.Y. 2017) (quoting Hydro Invs., 227 F.3d at 20-21).

Judge Cott recommends that Defendants' motion for summary judgment on Plaintiff's negligent misrepresentation claim be denied, because there are material issues of fact as to whether Plaintiff's reliance was justified.  (R&R (Dkt. No. 210) at 59-62)

In their objections, Defendants contend that they are entitled to summary judgment on Plaintiff's negligent misrepresentation claim, because Plaintiff has not shown reasonable reliance or the existence of a special duty.  (Def. Obj. (Dkt. No. 213) at 23-26)  The R&R is reviewed de novo as to these points, and for clear error as to the remaining elements of negligent misrepresentation.

In their moving papers, Defendants argue that the misrepresentations alleged here are "'promises of future output'" rather than statements of existing fact.  (Def. Br (Dkt. No. 150) at 27 (quoting Hydro Invs., 227 F.3d at 21))  This argument is not persuasive, because Plaintiff alleges that Defendants misrepresented the relationship between the price of ethanol and the peso-dollar exchange rate at the time the Currency Trades were entered into.  Plaintiff further contends that Defendants likewise misrepresented how the Currency Trades worked and the extent to which they functioned as hedges.  These alleged misrepresentations relate to existing facts.  See Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010) ("As alleged in the Complaint, this is not a case of 'failure to predict' riskiness or future mortgage market downturns but an[] instance where loans were internally known to be of poor quality, inadequately reviewed, improperly described and highly risky at the time they were purchased. . . . It is not 'fraud by hindsight' when statements related to a loan's existing quality and risks were false and misleading when made." (citations omitted)).  Moreover, for the reasons explained in connection with Plaintiff's claims for negligence and bad faith under Articles 2341 and 863, there are material issues of fact as to whether Defendants were negligent in representing (1) that there was a strong and/or 1:1 correlation between the price of ethanol and the peso-dollar exchange rate; and (2) that the Currency Trades would function as hedges.

In their objections, however, Defendants argue that there is "no evidence in the record" that "Defendants had a special duty to Mayagüez as a trade counterparty."  (Def. Obj. (Dkt. No. 213) at 26)[12]

"In determining whether a special relationship exists, the New York Court of Appeals has instructed courts to weigh three factors:  (1) 'whether the person making the representation held or appeared to hold unique or special expertise;' (2) 'whether a special relationship of trust or confidence existed between the parties;' and (3) 'whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.'"  Kortright, 257 F. Supp. 3d at 357 (quoting Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (1996); citing Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001)).

"A special relationship may be brought about by 'either privity of contract between the parties or a relationship so close as to approach that of privity.'"  JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 400-01 (S.D.N.Y. 2004) (quoting I.L.G.W.U. Nat'l Retirement Fund v. Cuddlecoat, No. 01-CV-4019 (BSJ), 2004 WL 444071, at *3 (S.D.N.Y. Mar. 11, 2004)).  "Under New York law, such a duty exists in the commercial context when 'the relationship of the parties, arising out of contract or otherwise, is such that in morals and good conscience the one has the right to rely upon the other for information.'"  Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 406 (2d Cir. 2015) (quoting Kimmell, 89 N.Y.2d at 263; citing Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012)).  "[W]here the duty arises in commercial contexts in which a contract exists, the duty attendant to that

---

[12]  The R&R does not address whether Plaintiff has proffered evidence demonstrating the existence of a special duty.

special relationship 'must spring from circumstances extraneous to, and not constituting elements of the contract, although it may be connected with and dependent upon the contract.'" JP Morgan Chase Bank, 350 F. Supp. 2d at 400-01 (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987)).

Here, there is evidence that Defendants are highly sophisticated financial institutions that have "special expertise" in structuring and executing complex financial transactions such as the Currency Trades, and there is evidence that Plaintiff looked to Defendants for that expertise.  (See Iragorri Dep. Tr., DX 3 (Dkt. No. 179-3) at 70:17-18 ("[Defendants] were the bank that [Mayagüez] trusted for everything that had to do with futures."))  Moreover, the parties entered into multiple hedging contracts between 2008 and 2015, and there is evidence that Mayagüez personnel trusted Defendants in financial matters based on this relationship.  (See Pltf. Rule 30(b)(6) Dep. Tr., DX 4 (Dkt. No. 179-4) at 129:7-9 ("[W]e were always relying on [Defendants'] representations and the information that they were always giving."))  Finally, it is undisputed that Defendants presented the Sensitivity Analysis to Plaintiff in connection with the latter's determination of whether or not to participate in the Currency Trades.  Setting aside the significance of the contractual disclaimers for purposes of the "special duty" inquiry – an issue that is addressed below – Plaintiff has offered sufficient evidence to create a material issue of fact as to whether a "special relationship" existed.

Finally, Defendants argue that Plaintiff has not shown that it reasonably relied on Defendants' statements, because in the Swap Agreement, the Colombian Swap Agreement, and in related correspondence concerning the Currency Trades, Plaintiff disclaims reliance on Defendants.

"It is settled in New York that '[w]here a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud [or negligent misrepresentation], assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed.'"[13] Merrill Lynch & Co. v. Allegheny Energy, Inc., 382 F. Supp. 2d 411, 417 (S.D.N.Y. 2003) (quoting Banque Arabe, 57 F.3d at 155). "The mere existence of a non-reliance clause, however, does not automatically render a plaintiff's reliance on external representations unreasonable; rather, courts have consistently found that a disclaimer is 'enforceable only if it tracks the substance of the alleged misrepresentation.'" Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC, No. 13-CV-4650 (JFK), 2015 WL 769573, at *3-5 (S.D.N.Y. Feb. 24, 2015) (quoting Caiola v. Citibank, N.A., 295 F.3d 312, 330 (2d Cir. 2002)).

Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395 (2d Cir. 2015), is instructive on this point. In that case, plaintiff brought a claim for negligent misrepresentation against defendant. Defendant had stated – in written materials provided to plaintiff – that it "'expressly disclaim[ed] any creation of a special duty,'" and that it was not "acting as a financial advisor" or in a "fiduciary capacity." The offering memorandum also urged investors to "'rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved.'" Id. at 406-07. The Second Circuit held that these disclaimers did not preclude the finding of a special relationship between the parties, noting that plaintiff's

---

[13] Although Plaintiff pleads negligent misrepresentation rather than fraud, these two causes of action share certain common features and are often analyzed together. See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11-MD-2262 (NRB), 2016 WL 7621354, at *2 (S.D.N.Y. Dec. 19, 2016); Sheth v. New York Life Ins. Co., 273 A.D. 2d 72, 74 (1st Dept. 2000). Moreover, both Judge Cott and the parties cite fraud cases in connection with their analysis of Plaintiff's negligent misrepresentation claim. (See R&R (Dkt. No. 210) at 61; Def. Reply (Dkt. No. 180) at 17; Def. Obj. (Dkt. No. 213) at 24; Pltf. Resp. (Dkt. No. 217) at 25)

claims were not premised on defendant's status as a fiduciary or financial advisor to plaintiff, and that the disclaimers did not address the premise for plaintiff's claim, which was that defendant did "not disclose the possibility that [it] would cede control of the collateral selection process to other market participants with interests adverse to long investors [such as plaintiff]." In reversing the district court's grant of summary judgment on the negligent misrepresentation claim, the court emphasized that defendant's disclaimers "'fall well short of tracking the particular misrepresentations alleged' by [plaintiff]." Id. (quoting Caiola, 295 F.3d at 330 (holding, in context of securities fraud claim, that general disclaimers did not bar plaintiff from relying on defendant's oral statements)).

        In sum, "general disclaimer language is ineffective to preclude a fraud [or negligent misrepresentation] claim as a matter of law. . . . In order for [a] [p]laintiff['s] fraud-based claims to be barred, therefore, [d]efendant must show that the non-reliance clauses at issue are 'adequately specific' – meaning that they contain 'explicit disclaimers' of the 'particular representations' that form the basis of [plaintiff's] fraud claims." Le Metier Beauty, 2015 WL 769573, at *4 (citations and emphasis omitted). Moreover, "[t]he reasonableness of a plaintiff's reliance is a 'nettlesome' and 'fact intensive' question, and thus 'is often a question of fact for the jury rather than a question of law for the court.'" FIH, LLC v. Found. Cap. Partners LLC, 920 F.3d 134, 141-43 (2d Cir. 2019) (quoting Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 186 n.19 (2d Cir. 2015); STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011)).

        Here, the Swap Agreement contains the following representations and disclaimers as to reliance:

    (h) Relationship Between Parties. Each party will be deemed to represent to the
    other party on the date on which it enters into a Transaction that (absent a written

agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

> (1) No Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

> (2) Evaluation and Understanding.  It is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

> (3) Status of Parties.  The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(Swap Agmt., DX 15 (Dkt. No. 160-28) at 8-9)

> The Colombian Swap Agreement provides that

> [e]ach of the Parties states and represents to the other, in so far as it corresponds thereto, that . . . . [t]hey know and understand the legal nature, characteristics and risks inherent to the Transactions, are acting at their own initiative and account and have reviewed at their own behest, or through their own legal or financial advisors, the implications of signing the Documents of the Framework Agreements and of entering into and executing each and every Transaction between the Parties under the Framework Agreement.

(Colombian Swap Agmt., DX 16 (Dkt. No. 160-43) at 10-11)

> Finally, in letters executed by Mayagüez representatives between February 2014

and January 2015 relating to the Currency Trades, Mayagüez made the following

representations:

> [Mayagüez] acknowledges that it is not relying on the advice of Citi[bank Colombia] for legal, tax, accounting or investment matters, it is seeking and will

rely on the advice of its own professionals and advisors for such matters and it
will make an independent analysis and decision regarding the Transaction based
on such advice.  In addition, [Mayagüez] acknowledges that it will determine,
without reliance upon Citi[bank Colombia], the economic risks and merits, as
well as legal and accounting characterizations and consequences, of the
Transaction and that it will be capable of assuming such risk.  Nothing herein
shall give rise to any liability or responsibility on the part of Citibank [Colombia]
for the success or otherwise of the Transaction.

(Feb. 10, 2014 Ltr., DX 72 (Dkt. No. 160-106) at 2; see also Dec. 29, 2014 Ltr., DX 59 (Dkt. No.

160-93) at 3 (same); Jan. 9, 2015 Ltr., DX 83 (Dkt. No. 160-117) at 2 (same))

Plaintiff argues that these disclaimers do not preclude its negligent

misrepresentation claim, because they are "boilerplate" and not sufficiently specific to apply to

the misrepresentations at issue.  (Pltf. Opp. (Dkt. No. 161) at 36-38)  Plaintiff further contends

that the disclaimers do not apply because the Swap Agreement defines "investment advice" as

excluding "information and explanations related to the terms and conditions of a Transaction."

(Id. at 36-37; Swap Agmt., DX 15 (Dkt. No. 160-28) at 9)

Judge Cott concludes that "the disclaimer that Mayagüez would not rely on

recommendations to enter the Currency Trades tracks the allegations that Citibank Colombia

misrepresented the suitability of the Currency Trades."  He further concludes that "[t]he

disclaimers that Mayagüez did not rely on Citibank Colombia to determine the 'economic risks

or merits' similarly track[] the alleged misrepresentations that the Currency Trades were not

hedges because they increase the exchange rate exposure."  (R&R (Dkt. No. 210) at 61)  This

Court agrees with Judge Cott that Plaintiff's fraud and negligent misrepresentation claims cannot

be premised on these alleged misrepresentations, because they are specifically disclaimed.

Judge Cott goes on to find, however, that "the disclaimers do not preclude all of

[Plaintiff's] allegations," because "Mayagüez's claims largely rely on Defendants' presentation

of the Sensitivity Analysis, which can appropriately be characterized as information and

therefore do[es] not fall under the disclaimers." (Id.) And as to the "special relationship" element, Judge Cott notes that – while Defendants argue that "the agreements disclaim the special relationship and duty of care alleged by Mayagüez" – "they do not cite or otherwise refer to the exact disclaimer provisions on which they are relying." He thus concludes that "[t]o the extent [Defendants] rely on the same provisions as the other disclaimer arguments, those provisions lack the specificity required to preclude a duty of care or special relationship." (Id. at 62 n.22 (citing Fin. Guar. Ins. Co., 783 F.3d at 406))

On the basis of these findings, Judge Cott concludes that the disclaimers in the swap agreements and correspondence do not bar Plaintiff's negligent misrepresentation claim in its entirety. He therefore recommends that Defendants' motion for summary judgment on Plaintiff's negligent misrepresentation claim be denied. (Id. at 62)

Defendants make several objections to Judge Cott's findings. First, they argue that his reliance on Caiola is improper, because in that case "[t]he court concluded that [a] no-reliance clause in the original agreement did not apply to a fraud that allegedly occurred years after the agreement was signed," whereas here "the alleged omissions at issue occurred before Mayagüez entered into the Second and Third Currency Trades." (Def. Obj. (Dkt. No. 213) at 25-26 (citing Caiola, 295 F.3d at 330)) Defendants also assert that in Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A., No. 17-CV-6334 (PGG), 2020 WL 2614765 (S.D.N.Y. May 22, 2020), "this Court found that similar disclaimers and deemed representations . . . precluded claims that defendants made material misstatements and omissions about company information which allegedly increased the risk." (Id. at 25) And, as discussed above, Defendants argue that Plaintiff has not shown that Defendants owed it a "special duty."

Finally, Defendants contend that Plaintiff's reliance was not justifiable, because it did not perform its own due diligence before entering into the Currency Trades.  (Id. at 26)

As to Judge Cott's citation to Caiola, this Court finds no error.  Judge Cott cites Caiola for the well established rule that "'[a] disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation.'"  (R&R (Dkt. No. 210) at 61 (quoting Caiola, 295 F.3d at 330))  Defendants have not explained why this principle is not applicable here.

Defendants' reliance on Kirschner is likewise misplaced.  There, plaintiff – the trustee of a bankruptcy estate – brought negligent misrepresentation and other claims against defendant banks, alleging that the defendants made misrepresentations to investors about the risks associated with purchasing certain debt securities.  The disclaimer at issue in Kirschner provided that defendants "shall not have any duty or responsibility to provide . . . any credit or other information" relating to the securities.  Given that the alleged misrepresentations related to defendants' evaluation of the securities' credit risk, this Court found that the disclaimer barred plaintiff's claim for negligent misrepresentation.  Kirschner, 2020 WL 2614765 at *13-14.

Here, the Swap Agreement specifically excludes from the scope of the disclaimer "information and explanations" relating to transactions between the parties, and Plaintiff contends that Defendants misrepresented and omitted information about the correlation between the price of ethanol and the peso-dollar exchange rate in presenting the Sensitivity Analysis. Moreover, while the disclaimers state generally that each party will "act[] for its own account," Defendants have not cited any language specifically disclaiming the parties' special relationship or Defendants' duty of care.

As discussed above, in order "to preclude a fraud [or negligent misrepresentation] claim as a matter of law[,] . . . Defendant[s] must show that the non-reliance clauses . . . contain

'explicit disclaimers' of the 'particular representations' that form the basis of Plaintiffs' fraud claims." Le Metier Beauty, 2015 WL 769573, at *4 (finding that disclaimer of reliance on "'any representations, oral or written, by any person, except for those representations, warranties and covenants set forth' in the Purchase Agreements" was too general to cover alleged "misrepresentations concerning the present and projected financial condition of the Company, the availability of financial information, and the intended use of Plaintiffs' investment funds"); see also Fin. Guar. Ins. Co., 783 F.3d at 406-07 (holding that disclaimers must "track[] the particular misrepresentations alleged by [plaintiff]"); Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of New York, No. 02-CV-1312 (LMM), 2002 WL 31426310, at *6 (S.D.N.Y. Oct. 29, 2002), clarified on denial of reconsideration sub nom., 2003 WL 288988 (Feb. 7, 2003) (finding that representations in ISDA swap agreement "that neither party is relying on any advice of the other party, that [plaintiff] has the capacity to evaluate the transaction and has made its own decision to enter it, [and] that [defendant] is neither acting as a fiduciary or financial advisor for [plaintiff] nor giving any representation as to the merits of any transaction" did not preclude negligent misrepresentation claim "based on alleged representations and/or omissions made by [defendant] regarding the existence and availability of a secondary market for the swap[] [transactions]").

Defendants also argue that Plaintiff's reliance was not justifiable because it is a sophisticated party and did not perform its own due diligence before entering into the Currency Trades.  (Def. Obj. (Dkt. No. 213) at 26)  There is evidence that Plaintiff had significant experience with currency hedging transactions and that it did not perform adequate due diligence before entering into the Currency Trades.  However, there is also evidence that Mayagüez did not have prior experience hedging its ethanol revenues, and that Mayagüez personnel did not

understand the Sensitivity Analysis or have the expertise to independently evaluate Defendants'
statements regarding the alleged correlation between the price of ethanol and the peso-dollar
exchange rate.  (See DX 1 (Dkt. No. 179-1) at 6 (November 2015 email from Mayagüez CFO
stating that he believed "the price of alcohol is indexed in US dollars"); Iragorri Dep. Tr., DX 3
(Dkt. No. 179-3) at 35:24-25, 36:17-18 ("[The ethanol formula] is a complex formula.  It is
handled by the government. . . . [T]here are other variables and I don't know the formula so
well."))  Moreover, "the general rule is that '[q]uestions of the reasonableness of reliance raise
issues of fact that must be resolved at trial.'"  Le Metier, 2015 WL 769573, at *5 (quoting MTV
Networks v. Curry, 867 F. Supp. 202, 207 (S.D.N.Y. 1994)).  Viewing the record in the light
most favorable to Plaintiff, the Court finds that there are material issues of fact as to whether
Plaintiff's reliance was reasonable.

Accordingly, Defendants' objections are overruled, and this Court adopts the
R&R's recommendation that summary judgment be denied as to Plaintiff's negligent
misrepresentation claim.

### b.      **Promissory Estoppel and Unjust Enrichment**

Defendants seek summary judgment on Plaintiff's claims for promissory estoppel
and unjust enrichment under New York law.  They argue that both claims are barred as a matter
of law because the parties' relationship is governed by enforceable contracts.  And as to
promissory estoppel, Defendants contend that there is no evidence that they made any actionable
promises to Plaintiff.  (Def Br. (Dkt. No. 150) at 35-36)

"Under New York law, the elements of promissory estoppel are (1) 'a clear and
unambiguous promise,' (2) 'a reasonable and foreseeable reliance by the party to whom the
promise is made,' and (3) 'injury sustained by the party asserting the estoppel by reason of his

reliance.'"  Exceed Holdings LLC v. Chicago Bd. Options Exch. Inc., No. 17-CV-8078 (RA), 2018 WL 4757961, at *3 (S.D.N.Y. Sept. 30, 2018) (quoting Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd., 383 F. Supp. 2d 428, 448 (S.D.N.Y. 2003)).

"As a quasi-contract claim, promissory estoppel liability cannot lie where a valid contract governs the dispute."  Id. at *3 (citing Ashlock v. Slone, 10-CV-453 (PAE), 2012 WL 3055775, at *6 (S.D.N.Y. July 26, 2012)).  Accordingly, "[u]nder New York law, claims of promissory estoppel . . . are precluded whenever a valid and enforceable contract governs the same subject matter of the claims."  CUnet, LLC v. Quad Partners, LLC, No. 16-CV-6327 (CM), 2017 WL 945937, at *6 (S.D.N.Y. Mar. 7, 2017) (emphasis omitted).

To prevail on a claim for unjust enrichment, a plaintiff must establish that "the defendants were enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendants to retain what is sought to be recovered."  Cty. of Nassau v. Expedia, Inc., 120 A.D.3d 1178, 1180 (2d Dept. 2014).  As with promissory estoppel, claims for unjust enrichment "may not be maintained where a contract exists between the parties covering the same subject matter."  Goldstein v. CIBC World Mkts. Corp., 6 A.D.3d 295, 296 (1st Dept. 2004).

Here, Plaintiff's claim for unjust enrichment is premised on the same allegations underlying its negligence claims – that Defendants "mis[led] Mayagüez into purchasing the Currency Trades."  (Am. Cmplt. (Dkt. No. 15) ¶ 249)

Plaintiff's promissory estoppel claim is based on the Third Currency Trade, which the parties entered into in January 2015.  Plaintiff alleges that "Defendants convinced Mayagüez to enter into, and not to cancel, the January 2015 Currency Trade" by promising that they (1) "would defer Mayagüez's payment of the USD 34.9 million resulting from the July 2014

Currency Trade at the end of the January 2015 Trade"; and (2) "would amend the trade to increase the strike price" if the exchange rate exceeded COP 2,600, "or in any case, before the second tranche [– a 23-month hedge –] took effect."  (Id. ¶ 254)

Plaintiff acknowledges that the parties entered into enforceable contracts, but contends that its "unjust enrichment and promissory estoppel claims are not based in contract" but "on promises and conduct by Citi that occurred after the [Third] Currency Trade was entered into . . . in connection with restructuring or terminating that trade."  (Pltf. Opp. (Dkt. No. 161) at 38 (emphasis in original))

Defendants respond that the restructuring and termination of the Third Currency Trade are also governed by enforceable contracts.  (Def. Reply (Dkt. No. 180) at 18 (citing DX 55 (Total Early Termination Mutual Agmt.) (Dkt. No. 160-89); DX 56 (Dec. 18, 2014 confirmation of Transaction restructuring) (Dkt. No. 160-90)))

Judge Cott concludes that Defendants are entitled to summary judgment on Plaintiff's unjust enrichment and promissory estoppel claims, because the subject matter of these claims is governed by contract.  Plaintiff's unjust enrichment claim – as pled in the Amended Complaint – is based on alleged misrepresentations and omissions in connection with the Currency Trades, but the Currency Trades are governed by enforceable contracts.  (R&R (Dkt. No. 210) at 64)  Plaintiff's promissory estoppel claim arises from the structuring and termination of the Third Currency Trade, but these matters are also governed by enforceable contracts.  (Id. at 64-65 (citing DX 55-56 (Dkt. Nos. 160-89, 160-90)))  Finally, Judge Cott finds that the promise alleged in support of Plaintiff's promissory estoppel claim – that Defendants would amend the Third Currency Trade – cannot support such a claim, because "'[i]t is well-established that a mere willingness to execute a contract or enter into a transaction is insufficient to make out

75

a claim for promissory estoppel.'" (Id. at 65 (quoting Exceed Holdings LLC, 2018 WL 4757961, at *3))

Plaintiff has not objected to Judge Cott's recommendations concerning its unjust enrichment and promissory estoppel claims.  (Pltf. Obj. (Dkt. No. 214) at 6 ("Mayagüez does not dispute the recommendation of dismissal of [its] claims for promissory estoppel and unjust enrichment under New York law."))

Finding no clear error in Judge Cott's analysis, this Court adopts his recommendation that Defendants' motion for summary judgment be granted as to Plaintiff's unjust enrichment and promissory estoppel claims.

### c.   Liability of Citibank, N.A. and Citigroup

Plaintiff moves for summary judgment on the issue of whether Citibank Colombia was acting as an agent of Citibank N.A. and Citigroup.  Defendants cross-move for summary judgment on the issue of whether Citibank Colombia was acting as an agent of Citigroup.  (Pltf. Br. (Dkt. No. 153) at 37; Def. Br. (Dkt. No. 150) at 37)

In the R&R, Judge Cott notes that – while the parties disagree on what law governs the agency issue – they "have not identified any discernible difference between New York and Colombian law as to agency liability."  (R&R (Dkt. No. 210) at 66 (citing Def. Opp. (Dkt. No. 156) at 36; Pltf. Reply (Dkt. No. 168) at 18))

> According to Defendants, "[u]nder New York law, an agency relationship can be established if:  (i) a person has 'actual authority' to act as an agent for another; (ii) a person has 'apparent authority' to act as an agent for another; or (iii) an entity 'ratifies' the acts of an agent."  Mayagüez argues that "Colombian law recognizes that a corporation is liable for the conduct of a person acting under actual or apparent representation, or where the acts are ratified by the corporation."  Because the law is not materially different as to agency, and the parties contend that summary judgment should be granted under either Colombian or New York law, it is not necessary to decide the choice of law issue at this juncture.

(Id. at 66-67 (quoting Def. Opp. (Dkt. No. 156) at 36; Pltf. Br. (Dkt. No. 153) at 37))

This Court agrees with Judge Cott's analysis, and will apply agency principles that are common to both New York and Colombian law.

Plaintiff asserts that Citibank Colombia employees were acting under the actual authority of Citibank N.A. and Citigroup in connection with the Currency Trades, because (1) Citibank, N.A. was involved in "pric[ing] and approv[ing] the details of the trades, including the decision to add hedging of ethanol"; (2) Mayagüez was a corporate client of the Institutional Client Group ("ICG"), which "ultimately falls within Citigroup"; (3) Citigroup "includes ICG revenue in its consolidated financial statements"; (4) "[t]he relationship manager charged with ensuring that Mayagüez was provided products to meet its needs, and the banker involved in conversations with Mayagüez about the trades, was an ICG employee"; and (5) "[m]any of the policies that applied to the trades were likewise ICG's." (Pltf. Br. (Dkt. No. 153) at 38 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 63, 65-66, 68-74, 79-82, 85, 92, 228-29, 350, 365, 417))

As to apparent authority, Plaintiff argues that it had reason to "believe that the advice and the trades themselves were authorized by Citibank N.A. and Citigroup," because – in addition to the facts supporting a finding of actual authority – "the presentations for the Currency Trades . . . expressly stated that the transactions were presented by Citibank N.A."; "Citibank Colombia employees pursued Mayagüez's entry into multiple amendments to the [Swap Agreement] with Citibank N.A."; "Mayagüez had previously purchased products from Citibank Colombia employees where Citibank N.A. was actually the corporate entity that engaged in the sale"; and "under Colombian law, Citibank [N.A.] and Citigroup were required to operate through a representative office in Colombia or a Colombian subsidiary when offering financial

products in Colombia or to Colombia residents." (Id. at 39 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 52, 58-60, 75, 85, 144, 189, 307; Muñoz Decl. (Dkt. No. 154-167) ¶ 8 n.1))

Plaintiff also contends that Citibank N.A. and Citigroup ratified the trades. According to Plaintiff, "Citibank N.A. approved the trades and performed the hedges[,] . . . the Citibank N.A. trader counter-hedged the Currency Trades," and "Citigroup took on the risks and benefits by placing the ICG revenue in its consolidated financial statement." (Id.)

Defendants argue that Citibank Colombia employees were not authorized or apparent agents of Citigroup. According to Defendants, there is no evidence that (1) Citibank Colombia employees "were authorized (contractually or otherwise) to act as agents for Citigroup or that Citigroup conferred upon Citibank Colombia the authority to act on its behalf"; (2) Citigroup exercised control over Citibank Colombia in connection with the Currency Trades; or (3) "Citibank Colombia appeared authorized [to] enter into transactions on behalf of Citigroup, or that Citigroup 'ratified' the acts of Citibank Colombia employees." Defendants further argue that Plaintiff's allegations regarding Citibank Colombia's relationship with ICG are not sufficient to establish actual or apparent authority, or ratification. (Def. Opp. (Dkt. No. 156) at 37)

In his R&R, Judge Cott notes – as an initial matter – that Defendants have not "argue[d] that Citibank N.A. is not liable under an agency theory." He nonetheless analyzes this issue, because "'[t]he fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically.'" (R&R (Dkt. No. 210) at 67 (quoting Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996))) He goes on to conclude that – as to Citibank, N.A. – Plaintiff is entitled to summary judgment on the agency issue, because of Citibank N.A.'s extensive involvement in the Currency Trades. Citibank N.A.'s approval of the

Second Currency Trade, its status as a signatory to the Third Currency Trade, its execution of the trades, its preparation of the information set forth in the Sensitivity Analysis and other presentations, and references in the presentations to Citibank N.A. as the party making the presentation, all demonstrate that it had actual or apparent authority over Citibank Colombia. (R&R (Dkt. No. 210) at 67 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 365; PX 143 (Dkt. No. 154-140) at 6; PX 121 (Dkt. No. 154-118) at 6; PX 98 (Dkt. No. 154-93) at 14; Def. R. 56.1 Ctrstmt. (Dkt. No. 157) ¶ 307; PX 60 (Dkt. No. 154-155)))

As to Citigroup, Judge Cott finds that Plaintiff has not proffered evidence sufficient to demonstrate an agency relationship between Citigroup and Citibank Colombia, or that Citigroup ratified the Currency Trades.  He finds that although "ICG falls under Citicorp, and Citicorp is one of Citigroup's 'two primary business segments,'" that fact alone – even assuming that ICG played a "principal role" in the Currency Trades – is insufficient to establish an agency relationship between Citigroup and Citibank Colombia.  ICG "is a group description assigned to certain clients, one of which is Mayagüez," and the placement of Mayagüez "within a category of clients described in the overall structure of Citigroup, without more, does not demonstrate agency."  (Id. at 68-69 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 61-62; Polania Dep. Tr., PX 2 (Dkt. No. 154-2) at 171:22-24))  Judge Cott also finds that there is no evidence "that the Currency Trades were entered into on Citigroup's behalf or that Citigroup had any involvement in effectuating the trades."  (Id. at 68-69)

Because Plaintiff has not proffered evidence demonstrating that Citibank Colombia employees were authorized or apparent agents of Citigroup, or that Citigroup ratified Citibank Colombia's conduct, Judge Cott recommends that Defendants be granted summary judgment on the issue of whether Citibank Colombia was Citigroup's agent.  (Id. at 69)

This Court finds no error in Judge Cott's analysis.  Accordingly, the parties' objections to the R&R as to the agency issue (Pltf. Obj. (Dkt. No. 214) at 17-21; Def. Obj. (Dkt. No. 213) at 29) are overruled, and this Court adopts Judge Cott's recommendation that – as to the agency issue – Defendants' motion for summary judgment be granted as to Citigroup, and that Plaintiff's motion for summary judgment be granted as to Citibank, N.A.[14]

### D.   <u>Defendants' Motion to Strike Plaintiff's Jury Demand</u>

Defendants have moved to strike Plaintiff's jury demand.  (Mot. (Dkt. No. 196)) According to Defendants, in the Swap Agreement, Plaintiff waived its right to a jury in connection with any dispute relating to the Swap Agreement.

Plaintiff concedes that the jury waiver in the Swap Agreement is enforceable as to its claims against Citibank N.A.[15]

"Although the [Seventh Amendment] right [to a jury trial] is fundamental and a presumption exists against its waiver, a contractual waiver is enforceable if it is made knowingly, intentionally, and voluntarily."  <u>Merrill Lynch</u>, 500 F.3d at 188.  The Second Circuit has stated that "[w]hen asserted in federal court, the right to a jury trial is governed by federal law."  <u>Id.</u> (citing <u>McGuire v. Russell Miller, Inc. of N.Y.</u>, 1 F.3d 1306, 1313 (2d Cir. 1993)).

---

[14] Plaintiff objects to the R&R's recommendation that summary judgment be granted in favor of Defendants as to Citigroup.  (Pltf. Obj. (Dkt. No. 214) at 17-21)  However, Plaintiff's objections merely repeat the same arguments it made to Judge Cott, which is not sufficient to invoke <u>de novo</u> review.  (<u>Compare id.</u> (arguing that Citigroup had authority over Citibank Colombia and/or ratified the Currency Trades because Mayagüez was a corporate client of the ICG), <u>with</u> Pltf. Br. (Dkt. No. 153) at 38-39 (arguing that because "Mayagüez was a corporate client of [the] ICG" and "ICG [held] a principal role in the conduct at issue," Citigroup "ratified the trades"))

[15] Plaintiff argues that Citigroup – which is not a party to the Swap Agreement – cannot enforce the jury waiver.  (Pltf. Opp. (Dkt. No. 199) at 4)  This argument is moot in light of this Court's finding that Citigroup cannot be held liable on an agency theory.

"In interpreting [jury waiver] provisions, courts have reiterated the general precept that contractual provisions containing jury trial waivers should be 'narrowly construed.'" Kortright, 327 F. Supp. 3d at 686 (citing Sherrod v. Time Warner Cable, Inc., 2014 WL 6603879, at *2 (S.D.N.Y. Nov. 21, 2014); Wechsler v. Hunt Health Sys., Ltd., 2003 WL 21878815, at *6 (S.D.N.Y. Aug. 8, 2003)). "Nonetheless, the plain language of 'enforceable waiver provisions must be construed literally.'" Id. (quoting Wechsler, 2003 WL 21878815, at *6)).

The jury waiver in the Swap Agreement provides as follows:

Waiver of Right to Trial by Jury. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement.

(Swap Agmt., DX 15 (Dkt. No. 160-28) at 11)

The jury waiver is not limited to particular provisions or claims. It instead covers "any suit, action, or proceeding relating to" the Swap Agreement. There is no dispute that the Swap Agreement governs the Currency Trades. Indeed, the Amended Complaint invokes the Swap Agreement in asserting that this Court has jurisdiction over the parties "'with respect to any suit, action or proceeding relating to any dispute arising out of or in connection with [the Swap Agreement].'" (Am. Cmplt. (Dkt. No. 15) ¶ 15 (quoting Swap Agmt., DX 15 (Dkt. No. 160-27) at 2))

Accordingly, Defendants' motion to strike Plaintiff's jury demand (Dkt. No. 196) will be granted.

## CONCLUSION

The R&R (Dkt. No. 210) is adopted as set forth above. Plaintiff's motion for summary judgment (Dkt. No. 152) is (1) denied as to Plaintiff's claims under Colombian law,

and insofar as it seeks to hold Citigroup liable for the actions of Citibank Colombia; and (2) granted insofar as Plaintiff seeks to hold Citibank, N.A. liable for the actions of Citibank Colombia.  Defendants' motion for summary judgment (Dkt. No. 149) is (1) denied as to Plaintiff's claims for negligence and bad faith under Colombian law, negligent misrepresentation under New York law, and insofar as it seeks dismissal of claims against Citibank N.A.; and (2) granted as to Plaintiff's claims for willful misconduct under Colombian law, and fraudulent inducement, fraudulent concealment, promissory estoppel, and unjust enrichment under New York law, and insofar as it seeks dismissal of all claims against Citigroup.

Plaintiff's motion to strike Defendants' Rule 56.1 Statement (Dkt. No. 140) is denied.  Defendants' motion to strike Plaintiff's Reply Rule 56.1 Statement (Dkt. No. 192) is granted.

Defendants' motion to strike Plaintiff's jury demand (Dkt. No. 196) is granted.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 140, 149, 152, 192, 196).

This matter is set for trial on **August 22, 2022, at 9:30 a.m.** in Courtroom 705 of the U.S. Courthouse, 40 Foley Square, New York, New York.  The parties are directed to consult this Court's Individual Rules as to the procedures for a bench trial.  The Joint Pretrial Order and any motions in limine are due on **June 1, 2022.**  Responsive papers are due on **June 15, 2022.**

Dated: New York, New York
     March 25, 2022

SO ORDERED.

Paul G. Gardephe
United States District Judge