UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAYAGÜEZ S.A.,

                                 Plaintiff,

                - against -

CITIBANK, N.A.,

                                 Defendant.

**ORDER**

16 Civ. 6788 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

A bench trial in this matter will begin on August 22, 2022.  Plaintiff Mayagüez
has moved in limine "to exclude any argument, testimony, or other evidence concerning New
York law."  (Pltf. MIL (Dkt. No. 227))  Mayagüez argues that New York law is irrelevant,
because its claims are governed by Colombian law.  (Pltf. Br. (Dkt. No. 228) at 3)  Defendant
Citibank, N.A. ("Citi") opposes the motion, contending that New York law applies to
Mayagüez's remaining claims.  (Def. Opp. (Dkt. No. 314) at 7-19)

For the reasons stated below, this Court concludes that Colombian law governs
Plaintiff's remaining claims.  Accordingly, Plaintiff's motion in limine will be granted.

## BACKGROUND

### I.    FACTS

Plaintiff Mayagüez is a Colombian company that produces and sells refined sugar
and ethanol.  (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 1-2)[1]  Mayagüez sells all of its ethanol
products and most of its sugar products in Colombia.  (Id. ¶¶ 3, 10, 18, 25)

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence.

Defendant Citi is a U.S.-based national banking association, with its principal place of business in New York, New York.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 8)  Non-party Citibank Colombia is an affiliate of Citi with operations in Colombia.  (Id. ¶ 10)

Plaintiff's claims in this action arise out of certain hedging transactions that Plaintiff entered into with Citi and Citibank Colombia.  (Hakki Decl., Exs. C-E (Dkt. Nos. 23-4, 23-5, 23-6))  In connection with these transactions, Mayagüez interacted primarily with Citibank Colombia employees.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 10; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 84 ("Mayagüez communicated with Citibank Colombia employees regarding currency hedging products."))

The vast majority of the meetings and communications between the parties concerning the hedging transactions at issue took place in Colombia.  (Id. ¶ 92 (citing Secron Dep. (Dkt. No. 154-3) 227:14-23 ("[S]ince Mayagüez is a Colombian client and we do have an office in Colombia, the relationship is managed by the local teams.  So the communications between Citi and Mayagüez were conducted by the other people who are based in Colombia."); Polania Dep. (Dkt. No. 154-2) 7:21-8:13) (all of Polania's meetings with Mayagüez's chief financial officer – Ludwig Chvatal Franco – were in Cali, Colombia, and "between 20 and 30" calls between the two took place when Polania was in Bogota, Colombia); Bermudez Dep. (Dkt. No. 154-31) 25:11-15; 66:17-67:05; 98:09-14 (Citibank Colombia's relationship manager – who was in charge of the Mayagüez portfolio – testifying that "the meetings and calls . . . between 2012 and 2013 between Citibank and Mayagüez . . . all happened in Colombia"); Moreno Dep. (Dkt. No. 154-13) 14:16-15:14; 41:14-42:13; 193:25-194:07 (all meetings "between October/November of 2015 through March of 2016" between Citibank's "relationship manager

covering local corporates" and Mayagüez occurred in Colombia); Def. R. 56.1 Ctrstmt. (Dkt. No. 183) ¶ 92)

### A.   <u>The Swap Agreements</u>

On July 28, 2009, Mayagüez and Citi entered into an International Swaps and Derivatives Association ("ISDA") agreement in anticipation of future hedging transactions ("the Swap Agreement").  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 12-14; Swap Agmt., DX 15 (Dkt. No. 160-27))  The Swap Agreement provides that "[t]his Agreement will be governed by and construed in accordance with the law specified in the Schedule."  (<u>Id.</u> § 13(a))  The attached Schedule provides that "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York."  (Swap Agmt. Schedule (Dkt. No. 160-29) § 4(h))

Mayagüez entered into a similar agreement with Citibank Colombia on January 3, 2011, in anticipation of hedging transactions in Colombia (the "Colombian Swap Agreement"). (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 20; Colombian Swap Agmt., DX 16 (Dkt. No. 160-43))  An arbitration clause in the Colombian Swap Agreement provides that, where a dispute arises between the parties, "[t]he Arbitration Tribunal shall decide as a full matter of law, applying Colombian law."  (<u>Id.</u> § 12.2)

### B.   <u>The Currency Trades</u>

In August 2012, Maria Isabel Botero, a Citibank Colombia employee, sent a presentation to Hector Alarcon, Mayagüez's treasurer, relating to a possible limited compensation collar hedging transaction.  (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 114; DX 38 (Dkt. No. 160-72); Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 61)  In December 2012, Citibank Colombia sent a spreadsheet to Mayagüez that compared several different types of hedging transactions, including limited compensation forward transactions.  (<u>Id.</u> ¶ 67; DX 67 (Dkt. No. 179-32))  In

October 2013, Citibank Colombia sent two additional presentations to Mayagüez relating to

potential limited compensation forward hedging transactions.  (Def. R. 56.1 Stmt. (Dkt. No. 160)

¶¶ 69-70; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶¶ 123, 145)

The documents provided to Mayagüez contain conflicting statements as to their

source.  At one point the documents state that "Citibank, N.A. ('Citibank') is pleased to present

the transaction . . . described below," but later the documents state that "[t]his proposal is the

sole responsibility of Citibank-Colombia.  Neither Citibank N.A. nor . . . its affiliates outside of

Colombia assume any liability for the content of this proposal." (DX 20 (Dkt. No. 160-47) at 20;

DX 45 (Dkt. No. 160-79) at 28)  These materials were all transmitted to Mayagüez by Citibank

Colombia employees, however, and all communications about these materials were between

Citibank Colombia employees and Mayagüez personnel.  (Def. R. 56.1 Stmt. (Dkt. No. 160)

¶ 72)

On November 6, 2013, Mayagüez entered into a limited compensation forward

transaction with Citibank Colombia (the "First Currency Trade").  (Id. ¶¶ 66, 88; Pltf. R. 56.1

Stmt. (Dkt. No. 159) ¶ 204)  The First Currency Trade reached the maximum compensation to

Mayagüez amount on July 31, 2014, and Citibank Colombia compensated Mayagüez pursuant to

an early termination agreement executed that same day.  (Id. ¶ 251; Def. R. 56.1 Stmt. (Dkt. No.

160) ¶ 97)

On July 10, 2014, shortly before the First Currency Trade was terminated, David

Polania[2] of Citibank Colombia sent quotes regarding a new proposed hedging transaction to

---

[2]  Polania of Citibank Colombia was the primary point of contact between Citibank Colombia
and Mayagüez.  He provided Mayagüez with hedging presentations, numerous quotes for
potential hedging transactions, trade confirmations, and potential restructuring options.  (Def. R.
56.1 Stmt. (Dkt. No. 160) ¶¶ 123, 126, 130-32, 159, 184, 188-89, 193, 202)

Hector Fabio Alarcon, Mayagüez's treasury director, and Ludwig Chvatal, Mayagüez's chief financial officer.  (Id. ¶ 130; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 299; DX 81 (Dkt. No. 160-115))

The next day, Polania provided Alarcon and Chvatal with a spreadsheet that analyzes Mayagüez's ethanol revenues as compared to the peso-dollar exchange rate (the "Sensitivity Analysis").  (DX 30 (Dkt. No. 160-57); see also Pltf. R. 56.1 Ctrstmt. (Dkt. No. 164) ¶ 133; Def. R. 56.1 Ctrstmt. (Dkt. No. 157) ¶ 308)  In an accompanying email, Polania states, "I'm sending the Excel showing the calculations of the ethanol sales sensitivity analysis at the exchange rate that we saw at the meeting."  (DX 30 (Dkt. No. 160-57) at 13)  Citibank Colombia did not disclose to Mayagüez that the Sensitivity Analysis uses only a sugar-based formula, or that the peso-dollar exchange rate is the only non-fixed variable in the Sensitivity Analysis.  (See id.; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 282)

On July 31, 2014, after additional discussions, Mayagüez and Citibank Colombia entered into a limited compensation collar hedging transaction (the "Second Currency Trade").  (Id. ¶¶ 328, 334-35, 337; DX 75 (Dkt. No. 160-109); Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 98)  After the Second Currency Trade was executed, the peso-dollar spot rate began to rise.  (Id. ¶ 149)  By November 2014, the spot rate had risen above the 2,090 peso strike price.  As a result of the U.S. dollar's appreciation against the Colombian peso, Mayagüez would owe money to Citibank Colombia.  Mayagüez and Citibank Colombia began discussing a restructuring of the Second Currency Trade.  (Id. ¶¶ 158-59, 161, 163; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 385)  In December 2014, Citibank Colombia provided Mayagüez with quotes for restructuring the Second Currency Trade.  (Id. ¶ 386; DX 89, 96-99 (Dkt. Nos. 160-123, 160-130, 160-131, 160-132, 160-133); Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 164-68, 170-71)

On December 18, 2014, Mayagüez and Citibank Colombia agreed to amend the Second Currency Trade, and on December 29, 2014, the Second Currency Trade was formally restructured.  (Id. ¶¶ 100-01)  On January 7, 2015, Citibank Colombia sent Mayagüez proposals for a new hedging transaction, and Mayagüez agreed to one of the proposed transactions.  (Id. ¶ 184; DX 107 (Dkt. No. 160-46))  On January 13, 2015, Mayagüez and Citibank Colombia entered into an early termination agreement unwinding the Second Currency Trade, in which Mayagüez acknowledged that it owed Citibank Colombia $34.9 million.  (DX 55 (Dkt. No. 160-89); DX 110 (Dkt. No. 160-149); Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 102, 189)

On January 20, 2015, Citibank Colombia sent Mayagüez confirmation of the agreed upon terms for a third currency trade (the "Third Currency Trade").  (Id. ¶ 191; DX 61 (Dkt. No. 160-95)  Before the Third Currency Trade was executed, Citibank Colombia provided Mayagüez with a "supplemental risk disclosure statement" warning of "significant risks" associated with the transaction, including that the "[p]otential losses [for Mayagüez] can be very substantial."  (DX 108 (Dkt. No. 160-47) at 3-4)

After the Third Currency Trade was executed, the U.S. dollar continued to appreciate as against the Colombian peso, and the parties began discussing a possible restructuring of the trade.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 193, 197-98, 200-01; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 443)

In a March 4, 2016 email, Mayagüez treasury director Alarcon asked Polania for "a partial unwind" of the Third Currency Trade.  (DX 127 (Dkt. No. 160-169))  Polania told Alarcon that "the price for early termination of [the Third Currency Trade] is $44,121,000." (DX 128 (Mar. 17, 2016 email from Polania to Alarcon) (Dkt. No. 160-170) at 6)  On March 21, 2016, the parties signed confirmations to unwind the Third Currency Trade, pursuant to which

Mayagüez paid Citibank $44.1 million on March 23, 2016, with a reservation of rights.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 216)

## II.   **PROCEDURAL HISTORY**

The Complaint was filed on August 9, 2016, in Supreme Court of the State of New York, New York County, and named Citigroup, Inc. and Citibank, N.A. as defendants. (Dkt. No. 1-1)  On August 29, 2016, Defendants removed the action to this District pursuant to the Edge Act, 12 U.S.C. § 632.  (Not. of Removal (Dkt. No. 1) ¶ 3)

The Amended Complaint was filed on January 13, 2017, and asserts claims against Citigroup, Inc. and Citibank, N.A. for negligence and bad faith in violation of Article 2341 of the Colombian Civil Code and Article 863 of the Colombian Commercial Code; willful misconduct in violation of Article 2341 of the Colombian Civil Code; and fraudulent inducement, fraudulent concealment, negligent misrepresentation, unjust enrichment, promissory estoppel, and unconscionability under New York law.  (Am. Cmplt. (Dkt. No. 15))

Defendants moved to dismiss (Dkt. No. 21), and in a March 28, 2018 order, this Court granted Defendants' motion as to Plaintiff's unconscionability claim.  Defendants' motion to dismiss was otherwise denied.  (Dkt. No. 36)  As to choice of law, this Court ruled

> that the choice of law provision in the ISDA Master Agreement and Schedule do[es] not cover Plaintiff's tort and other non-contractual claims. . . . Having determined that this choice of law provision does not apply to Mayagüez's tort and other non-contractual claims, it would be premature – absent the development of an appropriate factual record and proper briefing – to determine whether New York or Colombian law applies to those claims.

(Id. at 22-23)

After fact and expert discovery, the parties cross-moved for summary judgment. (Dkt. Nos. 149, 152)  Plaintiff argued that Colombian law governs, and sought summary judgment on its claims under Article 2341 of the Colombian Civil Code and Article 863 of the

Colombian Commercial Code.  (Pltf. Br. (Dkt. No. 153) at 20-28)  Defendants took no position

as to the governing law (Def. Br. (Dkt. No. 150) at 19), arguing that they were entitled to

summary judgment whether Colombian or New York law applied.  (Id. at 23-24)  Defendants

"reserve[d] all rights" to argue choice of law at a later stage of the litigation, however.  (Id. at 19)

   In a March 25, 2022 opinion addressing the parties' cross-motions for summary

judgment, this Court did not resolve the choice of law issue, because "Plaintiff contend[ed] that

Colombian law applie[d]," and "Defendants . . . consented to the application of Colombian law

for purposes of the . . . summary judgment motions."  (Mar. 25, 2022 Mem. Opinion & Order

(Dkt. No. 220) at 21-22)

   In its opinion, this Court granted Plaintiff summary judgment "insofar as [it]

seeks to hold Citibank, N.A. liable for the actions of Citibank Colombia."[3]  (Id. at 82)  In so

holding, this Court found that

> Citibank N.A. [had] extensive involvement in the Currency Trades.  Citibank
> N.A.'s approval of the Second Currency Trade, its status as a signatory to the
> Third Currency Trade, its execution of the trades, its preparation of the
> information set forth in the Sensitivity Analysis and other presentations, and
> references in the presentations to Citibank N.A. as the party making the
> presentation, all demonstrate that it had actual or apparent authority over Citibank
> Colombia.

(Id. at 78-79 (citing R&R (Dkt. No. 210) at 67; Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 365; Def. R.

56.1 Ctrstmt. (Dkt. No. 157) ¶ 307; PX 60 (Dkt. No. 154-155); PX 98 (Dkt. No. 154-93) at 14;

PX 121 (Dkt. No. 154-118) at 6; PX 143 (Dkt. No. 154-140) at 6))

   As a result of this motion practice, the only claims remaining for trial are

Mayagüez's negligence and bad faith claims under Colombian law, and its alternative claim for

---

[3]  This Court also granted Citigroup's motion for summary judgment on all of Plaintiff's claims.
(Id. at 80, 82)

negligent misrepresentation under New York law.  (Id. at 81-82)  In connection with its

Colombian law claims, Mayagüez contends that Citibank acted negligently and in bad faith by

making false and misleading representations and concealing material information regarding the

currency trades.  (Am. Cmplt. (Dkt. No. 15) ¶¶ 196-99, 241-243, 247)

## DISCUSSION

Mayagüez has moved in limine "to exclude any argument, testimony, or other

evidence concerning New York law," arguing that Colombian law applies to its remaining claims

under New York choice-of-law principles and that, in any event, Defendant has waived any

argument that New York law controls.  (Pltf. Br. (Dkt. No. 228) at 3-8)  Citi opposes the motion,

arguing that federal common law choice-of-law rules govern this action and dictate that New

York law applies.  (Def. Opp. (Dkt. No. 314) at 7)  Citi also denies that it waived any choice of

law argument, contending that "it was careful at all relevant times to expressly preserve that

right."  (Id.)

## I.    APPLICABLE CHOICE OF LAW RULE

Mayagüez contends that New York's choice-of-law rules control which

jurisdiction's substantive law applies here.  (Pltf. Br. (Dkt. No. 228) at 3)  Mayagüez relies on

diversity cases that are inapplicable in this Edge Act case, however.  (Id. (citing Williams v.

Deutsche Bank Sec., Inc., 2005 WL 1414435, at *3 (S.D.N.Y. June 13, 2005) ("In diversity

cases, federal courts resolve conflicts of law by looking to the conflicts rules of the forum

state.");  Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (same)))

Citi contends that because this Court's jurisdiction is premised on the Edge Act,

12 U.S.C. § 632, "federal common law choice-of-law analysis applie[s] here."  (Def. Opp. (Dkt.

No. 314) at 7)

For many years, the Second Circuit applied the "federal common law choice of law approach" in Edge Act cases. Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 120-21 (2d Cir. 1984) (citing Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 791-92 (2d Cir. 1980)). In Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160 (2d Cir. 2015), however, the court expressed uncertainty about the continued viability of that doctrine:

> In decades past, panels of our Court analyzed choice of law in Edge Act cases under federal common law. See, e.g., Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 120-21 (2d Cir. 1984); Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 791-92 (2d Cir. 1980). It is not clear, however, that employing federal common law was determinative of the choice-of-law issue in either Aaron Ferer or Corporacion Venezolana. And the Supreme Court's curtailment of federal common lawmaking in the years since those cases were decided casts doubt on the durability of their approach. See, e.g., Atherton v. F.D.I.C., 519 U.S. 213, 218 (1997) (requiring "significant conflict" between federal policy and use of state law as "precondition" for federal common lawmaking); O'Melveny & Myers v. F.D.I.C., 512 U.S. 79, 87 (1994) (same); see also In re Gaston & Snow, 243 F.3d 599, 605 (2d Cir. 2001) ("[F]ederal choice of law rules are a species of federal common law . . . . [And they] are no different from any other judicially created rule of decision. . . ." (citations omitted)). In light of the Supreme Court's more recent pronouncements, at least one circuit has endorsed the opposite approach in Edge Act cases – namely, applying the forum state's choice of law. See Petra Int'l, 62 F.3d at 1463-64 ("[W]here the 'federal question' giving rise to federal jurisdiction need not appear upon the face of a well-pleaded complaint, there is no reason for the federal court to conduct any different choice-of-law inquiry than would a court of the forum state in deciding the same issue.").
>
> We need not decide the question here, however. The complaint asserts, and Defendants do not dispute, that "all Defendants transacted business within New York giving rise to Plaintiffs' causes of action," and that the conduct complained of was "orchestrated . . . in and from New York." J.A. at 105. And the result is therefore likely the same, regardless of whether we analyze choice of law under federal or New York law. Compare Corporacion Venezolana, 629 F.2d at 793 (2d Cir. 1980) (inquiring into which state has most significant contacts with litigation), and Aaron Ferer, 731 F.2d at 121 (same), with Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 197 (1985) (inquiring into which state has "greatest interest" in litigation).

Loreley Fin. (Jersey) No. 3 Ltd., 797 F.3d at 170 n.5; see also Pescatore v. Pan Am. World

Airways, Inc., 97 F.3d 1, 12 (2d Cir. 1996) ("Demonstrably, the law is unsettled when it comes

to applying either a federal common law choice of law rule or state choice of law principles in

non-diversity cases.  Even within this Circuit, the law is not fixed.").

        Given the unsettled nature of the law in this area, the Court addresses the choice

of law issue under both approaches.

## II.    FEDERAL COMMON LAW CHOICE OF LAW ANALYSIS

        Citi contends that federal choice-of-law factors "tilt . . . the analysis decidedly in

favor of applying New York law."  (Def. Opp. (Dkt. No. 314) at 11)  Mayagüez does not

explicitly address the federal common law choice of law approach, but argues that "Colombia

has the greatest interest in th[is] litigation."  (Pltf. Br. (Dkt. No. 228) at 5)

### A.    Applicable Law

        "In general, '[t]he federal common law choice-of-law rule is to apply the law of

the jurisdiction having the greatest interest in the litigation.'"  Eli Lilly Do Brasil, Ltda. v. Fed.

Express Corp., 502 F.3d 78, 81 (2d Cir. 2007) (quoting In re Koreag, Controle et Revision S.A.,

961 F.2d 341, 350 (2d Cir. 1992)).  "The goal of this analysis is to evaluate the various contacts

each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies

are implicated to the greatest extent."  In re Koreag, 961 F.2d at 350.  "[W]hen conducting a

federal common law choice-of-law analysis, absent guidance from Congress, [courts] may

consult the Restatement (Second) of Conflict of Laws."  Eli Lilly, 502 F.3d at 81 (citing

Pescatore, 97 F.3d at 12).

        As to tort claims generally, Section 145 of the Restatement provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined
by the local law of the state which, with respect to that issue, has the most significant
relationship to the occurrence and the parties under the principles stated in § 6.

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145; see also Terra Firma Invs. (GP) 2 Ltd. v. Citigroup Inc., 09-CV-10459 (JSR), 2010 WL 4455833, at *5 (S.D.N.Y. Nov. 4, 2010) ("Generally speaking, federal courts will apply the law of the jurisdiction with 'the most significant relationship to the occurrence and the parties.'" (quoting Restatement (Second) of Conflict of Laws § 145(1))), aff'd, 716 F.3d 296 (2d Cir. 2013).

> Section 6 of the Restatement
>
> instructs courts to determine which jurisdiction has the most significant relationship to the dispute based on factors such as:  (1) "the needs of the interstate and international systems," (2) "the relevant policies of the forum," (3) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," (4) "the protection of justified expectations," (5) "the basic policies underlying the particular field of law," (6) "certainty, predictability and uniformity of result," and (7) "ease in the determination and application of the law to be applied."

Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc., 14-CV-9270 (RJS), 2016 WL 7507757, at *3 (S.D.N.Y. Dec. 30, 2016) (quoting Restatement (Second) Conflicts of Laws § 6(2)), aff'd, 747 F. App'x 3 (2d Cir. 2018).

> As to claims for "fraud and misrepresentation," Section 148(2) of the Restatement provides a more specific rule:
>
> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular

case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2).

**B.    Analysis**

Because Mayagüez's remaining claims sound in tort and are premised on alleged misrepresentations (see Am. Cmplt. (Dkt. No. 15) ¶¶ 196-99, 241-43, 247), both Sections 145 and 148(2) of the Restatement apply here.

Although Citi acknowledges that Section 148 of the Restatement applies (see Def. Br. (Dkt. No. 314) at 10), it addresses only "the domicil, residence, nationality, place of incorporation and place of business of the parties," and then only as to Citi.  (Id. at 16-17)  Citi argues that "this factor militates in favor of New York law because . . . Mayagüez elected to sue not Citibank Colombia, but Citibank, whose principal place of business is New York."  (Id. at 16)  Citi ignores the fact that Mayagüez – the other party in this action – has its principal place of business in Colombia.  The Court concludes that this factor is neutral.

As to the remaining factors cited in the Restatement, the vast majority of the communications between Defendant and Mayagüez concerning the currency trades at issue took place in Colombia.  (Pltf. R. 56.1 Stmt. (Dkt. No. 159) ¶ 92; Def. R. 56.1 Ctrstmt. (Dkt. No. 183) ¶ 92)  Moreover, central to Mayagüez's claims is the allegation that "Defendant[] had a duty to

13

disclose to Mayagüez . . . that the Currency Trades . . . created unlimited exposure for Mayagüez." (Am. Cmplt. (Dkt. No. 15) ¶ 179) Mayagüez contends that Defendant deliberately withheld this information in order to facilitate the currency trades. (Id. ¶¶ 6, 179, 242) Citibank Colombia was Mayagüez's primary point of contact for this and all matters involving the currency trades, and the communications between Mayagüez and Citibank Colombia took place in Colombia.

As discussed below, "the place where the defendant made the representations" is Colombia; "the place where plaintiff received the representations" is Colombia; "the place where the injury occurred" is Colombia; "the place where the conduct causing the injury occurred" is Colombia; and "the place where the relationship . . . between the parties is centered" is Colombia. Accordingly, the Restatement factors weigh in favor of applying Colombian law. See Restatement (Second) of Conflict of Laws §§ 145(2) and 148(2).

While Citi assisted in the "preparation of the information set forth in the Sensitivity Analysis and other presentations" (Mar. 25, 2022 Sum. J. Op. (Dkt. No. 220) at 79), the primary "place where the defendant made the representations" is Colombia. See Restatement (Second) of Conflict of Laws § 148(2)(c). Citi's presentations in connection with the First Currency Trade were transmitted to Mayagüez by Citibank Colombia employees, and all communications about the presentations were between Citibank Colombia employees and Mayagüez in Colombia. (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 72) Moreover, it was Polania, a

Citibank Colombia employee, who sent the Sensitivity Analysis to Mayagüez.[4]  (DX 30 (Dkt. No. 160-57); see also Pltf. R. 56.1 Ctrstmt. (Dkt. No. 164) ¶ 133; Def. R. 56.1 Ctrstmt. (Dkt. No. 157) ¶ 308)

       Citi does not dispute that "the place of the injury" is Colombia, given that Mayagüez – a Colombian-based company – suffered financial losses as a result of Defendant's alleged misconduct.  Moreover, when Mayagüez and Citibank Colombia entered into an early termination agreement unwinding the Second Currency Trade, Mayagüez acknowledged that it owed Citibank Colombia – and not Citi – $34.9 million.  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶¶ 102, 189; DX 55 (Dkt. No. 160-89); DX 110 (Dkt. No. 160-149))

       Citi argues that "the place where the relationship . . . between the parties [was] centered" is New York.  (Def. Opp. (Dkt. No. 314) at 14-15)  Citi has conceded, however, that "Mayagüez primarily interacted with Citibank Colombia employees in connection with the matters at issue in this action."  (Def. R. 56.1 Stmt. (Dkt. No. 160) ¶ 10)  In any event, Citi points to the following evidence in arguing that the parties' relationship was centered in New York:  (1) "the Sensitivity Analysis . . . was identified as being on behalf of Citibank"; (2) "Mayagüez and Citibank entered into the ISDA master agreement"; (3) "Citibank Colombia employees needed to obtain approval from Citibank employees to approve currency hedges"; and (4) "[a]n August 2012 Presentation requir[ing] that, in order to enter into a Limited Compensation Collar, Citibank would have to be the counterparty."  (Def. Opp. (Dkt. No. 314) at 15-16)

---

[4]  At summary judgment, this Court found that "there are material issues of fact as to whether Defendants acted with culpa in (1) failing to disclose that the Sensitivity Analysis only applies the sugar-based ethanol formula and maintains as constant all variables other than the peso-dollar exchange rate; and (2) presenting the Sensitivity Analysis showing a 1:1 correlation between the price of ethanol and the peso-dollar exchange rate."  (Mar. 25, 2022 Sum. J. Op. (Dkt. No. 220) at 43-44)

While this evidence supports a finding that Citi controlled Citibank Colombia, it does not suggest that the parties' relationship was centered in New York.  As discussed above, the record demonstrates that Citibank Colombia managed Citi's relationship with Mayagüez, and that Citibank Colombia played a far more critical role than Citi in facilitating the currency trades at issue.  (See, e.g., Secron Dep. (Dkt. No. 154-3) 227:14-23 ("[S]ince Mayagüez is a Colombian client and we do have an office in Colombia, the relationship is managed by the local teams.  So the communications between Citi and Mayagüez were conducted by the other people who are based in Colombia."))  In sum, Citi's argument that the parties' relationship was centered in New York is not persuasive.

Citi also argues that "New York has a great interest in regulating the banking industry within its borders."  (Def. Br. (Dkt. No. 314) at 11-12)  But Colombia "certainly has a substantial interest in preventing torts by banks operating within its jurisdiction."  Aaron Ferer, 731 F.2d at 121.  Indeed, at summary judgment, this Court noted that Citi, as a financial institution operating in Colombia, is "subject to a heightened standard of conduct" under Colombian law.  (Mar. 25, 2022 Sum. J. Op. (Dkt. No. 220) at 29)  Given that Colombia subjects financial institutions to a higher standard of conduct, it has a great interest in a lawsuit alleging misconduct by a bank operating within its borders.  Accordingly, New York's "interest in regulating the banking industry" writ large does not outweigh Colombia's "relevant policies" and "relative interest" in the outcome of this litigation.[5]

---

[5] Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786 (2d Cir. 1980), cited by Defendant (Def. Br. (Dkt. No. 314) at 16-17), is not to the contrary.  In holding that Venezuelan law applied in that case – which involved two Venezuelan corporations – the Second Circuit noted that "the alleged fraud . . . concerned acts that were to take place in Venezuela and be of Venezuelan legal significance."  Corporacion Venezolana, 629 F.2d at 795.

Finally, Citi argues that "'the protection of justified expectations'" factor points toward New York law, because of the Swap Agreement's choice of law provision.  (Def. Opp. (Dkt. No. 314) at 13-14 (quoting Restatement (Second) of Conflict of Laws § 6(2)(d))  (Dkt. No. 36)  As discussed above, however, in addressing Defendants' motion to dismiss, this Court "conclude[d] that the choice of law provision in the [Swap] Agreement and Schedule do[es] not cover Plaintiff's tort and other non-contractual claims."  (Mar. 27, 2018 MTD Op. (Dkt. No. 36) at 22)

Citi also argues that the parties expected New York law to apply to this litigation, because "the first formal litigation step Mayagüez . . . took was to file a lawsuit in state court in New York, pleading only New York law claims."  (Def. Opp. (Dkt. No. 314) at 14 (citing Not. of Removal, Ex. A (Dkt. No. 1-1))  But Plaintiff had a right to amend its complaint to add claims under Colombian law, and it did so within months of the Defendants' removal.  (See Am. Cmplt. (Dkt. No. 15) at 64)  And given that Citibank Colombia operated with Citi's "actual or apparent authority" in connection with the hedging transactions at issue (Mar. 25, 2022 Sum. J. Op. (Dkt. No. 220) at 79), Citi "justifiabl[y] [should have] expect[ed]" that Colombian law would be applied to its agent's conduct in connection with Mayagüez in Colombia.

Having considered all the applicable factors in the Restatement, the Court concludes that Colombia has a greater interest in this litigation than New York.  Indeed, Colombia has "the most significant relationship to the occurrence and the parties."  Restatement (Second) of Conflict of Laws §§ 145(1) and 148(2); see Terra Firma, 2010 WL 4455833, at *6 ("Given that most of the conduct relating to the tortious interference claim occurred in New York, the Court finds that New York law governs the tortious interference claim."); Aaron Ferer, 731 F.2d at 121 ("All of the acts which plaintiffs complain of took place in New York, and New

York certainly has a substantial interest in preventing torts by banks operating within its jurisdiction.").

## III.   <u>NEW YORK CHOICE OF LAW ANALYSIS</u>

Mayagüez argues that New York's "interest analysis establishes that Colombian law applies to this case." According to Mayagüez, its remaining claims implicate "'conduct-regulating rule[s],'" and in such circumstances "'the law of the jurisdiction where the tort occurred will generally apply.'" (Pltf. Br. (Dkt. No. 228) at 5-6 (quoting <u>In re Thelen LLP</u>, 736 F.3d 213, 220 (2d Cir. 2013))

Citi counters that "even if it were proper to apply a New York choice-of-law analysis . . . , that analysis – like the federal analysis – points to New York law." (Def. Opp. (Dkt. No. 314) at 19)

### A.   <u>Applicable Law</u>

Under New York choice of law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." <u>GlobalNet Financial.com, Inc v. Frank Crystal & Co.</u>, 449 F.3d 377, 382 (2d Cir. 2006). If there is an actual conflict, "the relevant analytical approach to choice of law in tort actions in New York is the 'interest analysis.' The New York Court of Appeals has defined 'interest analysis' as requiring that 'the law of the jurisdiction having the greatest interest in the litigation will be applied.'" <u>Id.</u> at 384 (quoting <u>Schultz v. Boy Scouts of Am., Inc.</u>, 65 N.Y.2d 189, 197 (1985)).

Under New York's choice of law principles as applied to tort actions, if conflicting "'conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating

behavior within its borders.'"  GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d

377, 384 (2d Cir. 2006) (quoting Cooney v. Osgood Mach., 81 N.Y.2d 66, 72 (1993)).

   "A tort occurs in 'the place where the injury was inflicted,' which is generally

where the plaintiffs are located."  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of

Am. Sec., LLC, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (quoting Cromer Fin. Ltd. v. Berger,

137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001)); see also Lyman Commerce Sols., Inc. v. Lung, 12

Civ. 4398 (TPG), 2013 WL 4734898, at *4 (S.D.N.Y. Aug. 30, 2013) (same).  "For actions

sounding in fraud and deceit, the substantive law of the state in which the injury is suffered,

rather than the state where the fraudulent conduct was initiated, often governs."  Simon v. Philip

Morris Inc., 124 F. Supp. 2d 46, 57 (E.D.N.Y. 2000) (citing Sack v. Low, 478 F.2d 360, 365 (2d

Cir. 1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is

sustained, not where fraudulent representations are made.")).  Likewise, "[f]or claims sounding

in negligence, courts generally apply the law of the state where the injury is suffered, rather than

the state where the negligent conduct occurred."  HSA Residential Mortg. Servs. of Texas v.

Casuccio, 350 F. Supp. 2d 352, 364 (E.D.N.Y. 2003) (citing Schultz, 65 N.Y.2d at 195).

 **B.** **Analysis**

   Here, the parties agree that there is an actual conflict between the applicable New

York law and Colombian law.  (See Pltf. Br. (Dkt. No. 228) at 4-5; Def. Br. (Dkt. No. 314) at 17-

19)

   The tort claims that will be tried involve allegations of negligent

misrepresentation, fraud, and bad faith.  These are "conduct regulating laws."  See HSA

Residential, 350 F. Supp. 2d at 364 ("The negligent misrepresentation claim is a conduct-

regulating law.").

As discussed above, because Mayagüez is based in Colombia, "the place where the injury was inflicted" was Colombia.  See Cromer Fin. Ltd., 137 F. Supp. 2d at 492.  Because the laws underlying Plaintiff's remaining claims are conduct-regulating, the substantive law of "the state in which the injury is suffered" – here, Colombia – governs.  Simon, 124 F. Supp. 2d at 57.

Citi argues that "where the loss was suffered is not conclusive and does not trump a full interest analysis."  (Def. Opp. (Dkt. No. 314) at 18 (quoting Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 284 (S.D.N.Y. 2009)).  The Court conducted a "full interest analysis" above, however, and that analysis demonstrates that Colombia has far more contacts with this litigation than New York.

The Court concludes that – under New York choice of law rules – Colombian law applies.[6]

---

[6]  Given this conclusion, the Court does not reach Plaintiff's argument that Defendant waived its right to argue that New York law applies.  (See Pltf. Br. (Dkt. No. 228) at 6-8)

## **CONCLUSION**

For the reasons stated above, the claims proceeding to trial are governed by the law of Colombia.  Accordingly, Plaintiff's motion in limine to exclude references to New York law is granted, and Plaintiff's claim for negligent misrepresentation under New York law is dismissed.

The Clerk of Court is directed to terminate the motion (Dkt. No. 227).

Dated: New York, New York
August 21, 2022

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge